UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JABARI-JASON TYSON-PHIPPS, | |
| *Plaintiff*, | |
| vs. | Case No.: |
| ANTONY BLINKEN, | |
| SECRETARY, U.S. DEPARTMENT OF STATE, | **VERIFIED COMPLAINT** |
| *Defendant*. | |
| | JURY TRIAL DEMANDED |

**ORIGINAL COMPLAINT FOR EMPLOYMENT DISCRIMINATION, CIVIL RIGHTS VIOLATIONS, AND RETALIATION UNDER THE WHISTLEBLOWER PROTECTION ACT AND SECTION 1981**

Plaintiff, United States Diplomatic Security Special Agent Jabari-Jason Tyson-Phipps, ("JJTP," SA Tyson-Phipps" or "Plaintiff"), complains and alleges against the Antony Blinken in his position as the United States Secretary of State as the head of the United States State Department (the "Agency", "Department" or "Defendant") as follows:

# Table of Contents

**ORIGINAL COMPLAINT FOR EMPLOYMENT DISCRIMINATION, CIVIL RIGHTS VIOLATIONS, AND RETALIATION UNDER THE WHISTLEBLOWER PROTECTION ACT AND SECTION 1981** ................................................................................................................ 1

      **NATURE OF THE DISPUTE** ....................................................................... 4

      **THE PARTIES** ................................................................................................ 5

      **JURISDICTION, VENUE, TIMELINESS** ................................................ 6

      **FACTUAL BACKGROUND** ......................................................................... 8

          **A.  Brief SA Tyson-Phipps' History with the Agency and Limited Relevant Facts** .......................... 8

          i.  *Threats to Ruin Career After Standing up about False Allegations about the G20* ...................... 10

          ii.  *Making JJTP undergo SERE training the day after the Man Who raised Him Died, Refusing to Allow him to go Home, and Docking him Pay for going Home to the Funeral* ................................................................ 11

          iii.  *Forcing JJTP to Alter a Report of Investigation to Falsely Accuse a Black Dominican Mother of Fraud to have Her Deported* ................................................................................................ 14

          iv.  *2018 Attempt to Sabotage JJTP's Rating to Stop his Administrative Promotion* .......................... 17

          v.  *JJTP Attempted to Remove Himself from the Harassment but the Agency Refused to Help* .......... 18

          vi.  *Racist Remarks about JJTP's WWII Veteran family member who had recently passed* .............. 20

          vii.  *2018 Attempt to Have JJTP removed from Service through False Accusations of Mental Health Issues* ................ 22

          viii.  *Attempt to Cover Up the Suicide of a NYFO Agent who They Were Bullying* ........................... 24

          ix.  *2019 Attempt to Sabotage JJTP's Rating to Stop his Administrative Promotion* ........................ 25

          x.  *Attempt to Have JJTP punished in violation of his Second Amendment Rights* ........................... 28

          xi.  *Punishing JJTP for Standing up to them for Calling a High-Level Minister to India a "terrorist"* 31

xii.  *2019 Attempt to Have JJTP removed from Service through False Accusations of Mental Health Issues Through an unwarranted Fitness for Duty Examination* ............................................................ 33

xiii.  *Taking of JJTP's Annual Leave in Violation of OPM policy* ................................ 36

B.  **Issues Addressed in DOS-0385-19 Which Serve as a Basis For this Claim** .............................. 38

C.  **JJTP has Exhausted the Administrative Process** ........................................................ 39

D.  **Subsequent Protected Activities, Retaliation, and Actions and History of Bad Behavior and Discrimination**      40

**FIRST CLAIM FOR RELIEF** ................................................................ 43

**Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, for Employment Discrimination on the Basis of Race, Color, and National Origin** ................................ 43

**SECOND CLAIM FOR RELIEF** ........................................................ 44

**Violations of 42 U.S.C. § 1981 for Intentional Employment Discrimination on the Basis of Race** .. 44

**THIRD CLAIM FOR RELIEF** ........................................................ 45

**Violations of Title VII and Section 1981 for Retaliation** ........................................ 45

**FOURTH CLAIM FOR RELIEF** .................................................... 49

**Violation of the Whistleblower Protection Enhancement Act of 2012 ("WPEA") 5 U.S.C. § 2302(b)(8) & (9)** ................................................................ 49

**FIFTH CLAIM FOR RELIEF** ........................................................ 51

**Violations of the First Amendment to the United States Constitution** ........................ 51

**SIXTH CLAIM FOR RELIEF** ........................................................ 52

**Violations of the Second Amendment to the United States Constitution** .................... 52

**SEVENTH CLAIM FOR RELIEF** .................................................. 54

**Violations of the Fifth Amendment to the United States Constitution** ...................... 54

**EIGHTH CLAIM FOR RELIEF** .................................................... 55

**Violations of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297, for**

**Employment Discrimination on the Basis of Race, Creed, Color, and National Origin** ................................. 55

**NINTH CLAIM FOR RELIEF** ................................................................ 56

**Violations of New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131, for**

**Employment Discrimination on the Basis of Actual or Perceived Race, Creed, Color, and National Origin** ............ 56

**TENTH CLAIM FOR RELIEF** ................................................................ 57

**Violations of Section 740 of the New York Labor Law Prohibiting Retaliatory Action by**

**Employers** ................................................................................................ 57

**PRAYER FOR RELIEF** ...................................................................... 58

**DEMAND FOR JURY TRIAL** .............................................................. 59

## <u>NATURE OF THE DISPUTE</u>

1.      This action is brought based on the Defendant's persistent, repeated, egregious, willful, and knowing violations of JJTP's civil rights and their open acts of employment discrimination and violations of the US Constitution and federal law including but not limited to the Whistleblower Protection Enhancement Act of 2012 and Title VII and Section 1981.

2.      Accordingly, JJTP now brings this action against the Defendant for violations of (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, and national origin; (2) 42 U.S.C. § 1981 for intentional employment discrimination on the basis of race; (3) Title VII and Section 1981 for retaliation; (4) the Whistleblower Protection Enhancement Act of 2012 ("WPEA") 5 U.S.C. § 2302(b)(8) & (9); (5) the First Amendment to the United States Constitution; (6) the Second Amendment to the United States Constitution; (7) the Fifth Amendment to the United States Constitution; (8) the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of race, creed, color, and national origin; (9) the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101

to 131, for employment discrimination on the basis of actual or perceived race, creed, color, and national origin; and (10) Section 740 of the New York Labor Law.

3.    All allegations and paragraphs herein are based on information and belief, the truth of which will be ascertained at trial.

## THE PARTIES

4.    Plaintiff Jabari-Jason Tyson-Phipps is a Special Agent with the United States Department of State's Bureau of Diplomatic Security who at all relevant times was assigned to the New York Field Office ("NYFO") which is co-located at 201 Varick Street in the city of New York and in Ft. Lee New Jersey. JJTP is a resident of the Commonwealth of Pennsylvania but maintains a pied-à-terre and private office in the State of New York.

5.    SA Tyson-Phipps has been employed by the Agency for nearly seven years in September 2016. Through hard work, dedication and attention to detail, JJTP has enjoyed a significant amount of success including but not limited to working in the criminal investigative program as well as in the Agency's protective mission in his assignment to the protective security detail for the United States Ambassador to the United Nations Kelly Craft, including serving as the lead advance for a trip to the Syrian border which, at the time, was considered a warzone, whereby active missile strikes occurred during the visit. Among other things, SA Tyson-Phipps is a high threat trained agent and has been awarded a US Department of State's Meritorious Honor Award for dismantling a human trafficking ring and rescuing numerous victims as well as representing the United States at the 2018 Olympics in Korea serving as the US overseas security officer for anti-terrorism and representative in the Olympic village. SA Tyson-Phipps has established himself as a reliable and knowledgeable Special Agent, which the Agency has come to rely on to carry out the mission. Despite being one of the few African American agents within the Agency, which has fostered a culture that at times can be insensitive to matters impacting minorities, SA Tyson-Phipps has always attempted to accomplish his work responsibilities with the highest ethical standards.

6.    Prior to joining the Agency, SA Tyson-Phipps graduated from Brown University and the Washington University in St. Louis School of Law. He is a licensed attorney and has over fourteen-years of licensed experience practicing law. He is admitted to practice law before different court jurisdictions including this court and the U.S. Supreme Court. His academic achievements, unique skill set, and legal

background have placed SA Tyson-Phipps in an exclusive position, which has allowed him to provide specialized insight to the Agency when carrying out his duties as a Special Agent. Moreover, JJTP is uniquely familiar with the laws governing protected whistleblowing activities. As a licensed attorney, SA Tyson-Phipps firmly believes in his obligation to report through proper channels any instance of violations of law, discrimination, harassment, waste, fraud, or abuse.

7.     The Defendant, United States Department of State, or the State Department, is an executive department of the U.S. federal government responsible for the country's foreign policy and relations. Its primary duties are advising the U.S. president on international relations, administering diplomatic missions, negotiating international treaties and agreements, and representing the U.S. at the United Nations. It is headed by the US Secretary of State the position of which is currently held by Secretary Antony Blinken.

8.     The Diplomatic Security Service ("DSS" or "DS") is the principal security and law enforcement agency of the United States Department of State. As the operational division of State Department's Bureau of Diplomatic Security, its primary mission is to protect diplomatic assets, personnel, and information and to combat visa and passport fraud. DSS also undertakes counterterrorism, counterintelligence, cybersecurity, and criminal investigations, both domestically and abroad.

## JURISDICTION, VENUE, TIMELINESS

9.     This action is based on the Defendant's violations of (1) Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, and national origin; (2) 42 U.S.C. § 1981 for intentional employment discrimination on the basis of race; (3) Title VII and Section 1981 for retaliation; (4) the Whistleblower Protection Enhancement Act of 2012 ("WPEA") 5 U.S.C. § 2302(b)(8) & (9); (5) the First Amendment to the United States Constitution; (6) the Second Amendment to the United States Constitution; (7) the Fifth Amendment to the United States Constitution; (8) the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of race, creed, color, and national origin; (9) the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of actual or perceived race, creed, color, and national origin; and (10) Section 740 of the New York Labor Law.

10.    The Court has original subject matter jurisdiction over this dispute pursuant to 28 U.S.C. § 1331 because this is a civil action arising from federal law (federal question) and supplemental jurisdiction pursuant to 28 U.S.C.§ 1367(a) for all other claims asserted in this Complaint because those claims are so closely related to the federal claims asserted herein as to form part of the same case and controversy.

11.    This Court has personal jurisdiction over the Defendant pursuant to FRCP 4 (i) as it is an agency of the United States government.

12.    Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because it is the judicial district in which a substantial part of the events or omissions giving rise to the claim occurred.

13.    All applicable statutes of limitations in this action are tolled by the Continuing Wrong Doctrine or the Continuing violation doctrine as it is called by the EEOC. Under the doctrine, "where there is a series of continuing wrongs," the statute of limitations will be tolled to the last date on which a wrongful act is committed. Henry v. Bank of Am., 147 A.D.3d 599, 601 (1st Dept. 2017). For EEOC purposes, the continuing violation doctrine holds that if an employee files an EEOC charge while at least one act constituting the hostile work environment is still timely, then the whole time period of the hostile work environment can be considered for purposes of deciding liability[1].

14.    JJTP filed an action with the EEOC regarding the subject matter of this case, DOS-0385-19. That complaint was denied on the grounds JJTP did not request sufficient discovery to prove his claims and on reconsideration it was stated that JJTP failed to meet the criteria of 29 C.F.R. § 1614.405(c). As such his petition was denied on 19 December 2022 and he was given 90 days to file an action in district court from the date the notice was received. This is that civil action.

---

[1] Nat'l R.R. Passenger Corp. v. Morgan, 536 U.S. 101, 115 (2002)

## FACTUAL BACKGROUND

### A.  Brief SA Tyson-Phipps' History with the Agency and Limited Relevant Facts

15.     SA Tyson-Phipps joined DS in September of 2016 as a special agent and began his training at the Foreign Service Institute where he was the President of his foreign service class. The next level of his training was done at the Federal Law Enforcement Training Center ("FLETC") where he completed the criminal investigator training program. This is where the harassment by his class started as the only black member of his DS class.

16.     JJTP was asked to teach the very first class at FLETC, which was Constitutional law due to his background and having previously being a law professor at the East Stroudsburg University of Pennsylvania's business school while the staff legal instructor was being looked for. This resulted in JJTP being teased, mocked, and singled out by his class with names such as "Ivy league Egghead" and not being accepted.

17.     This harassment continued into the next level of training which was DS's Basic Special Agent Course ("BSAC"). As part of the final exercises JJTP was singled out several times including being made to drive a white confederate reenactor to the Belle Groove Plantation in the Shenandoah Valley of Virginia where he can trace his ancestry to as slaves. As part of this he was called racial slurs and told he could not use the restroom in the "big house." When JJTP protested the lead instructor threatened him with termination after singling him out during and exercise.

18.     SA Tyson-Phipps reported this to his class coordinator who took him to the head of training to discuss it who had JJTP continue to finish the multiday training exercise and promised the issue would be addressed. Ultimately, SA Tyson-Phipps was spoken to by then then Director, Bill Miller, and convinced to state and give the Agency another opportunity by reporting the New York Field Office ("NYFO") where he was assigned.

19.     It should be noted that the incident went unaddressed and the same individuals involved in this incident called an Iranian American agent a few classes later a "little brown boy" and told him to "put on his suicide vest" in reference to his gear.

20.     Upon reporting to the NYFO things did not change. SA Tyson-Phipps's "Hallway reputation" followed him.

21.      In the Agency, a person's "hallway reputation" is the informal and nonofficial way to rate and separate individuals the Agency likes and those they do not like. Those with a favorable hallway reputation are given special privileges and better assignments and those with a negative hallway reputation are punished by the Agency through administrative means, lesser treatment, and worse assignments. One's hallway reputation can depend on simply who likes you or does not and how much clout they have. It is also used to compete with others by use of the "rumor mill" in a "kick down kiss up" system to use those whose hallway reputation may not be good because they crossed someone to raise in the organization by spreading rumors and attacking them thereby decreasing their hallway reputation. That is what occurred to JJTP when he arrived at NYFO.

22.      Immediately upon arrival, SA Tyson-Phipps was targeted by management. This included being the only agent in the office who was not given a take home car which they tried to justify with an unwritten rule they made up which did not apply to everyone but only SA Tyson-Phipps who just accepted it much like most of their microaggressions. It became clear that his treatment was based on his complaining about occurred during training based on conversations where it was directly told to him, he did not belong.

23.      The fact that management knew about JJTP's previous protected activity complaining about the discrimination is evidenced by email records from the members of the NYFO management specifically: Joseph Ugarte, Peter Carlson, and Elizabeth McAleer who joked about keeping records when she is called to testify in front of congress about this situation likening it to Benghazi where the same games played by DS caused the death of Ambassador John Christopher Stevens. (See Exhibit 1). Exhibit 1 also demonstrates that everyone up to the Director knew about JJTP's protected activities.

24.      There are several examples of targeting by NYFO management. The full EEOC investigator's report which is over 1400 pages goes into much greater detail about the instances which give rise to this complaint but below are highlighted are few instances which speak directly to the allegations herein. JJTP will further develop more details to support the allegations are needed as the case progresses as needed.

i.       *Threats to Ruin Career After Standing up about False Allegations about the G20*

25.     On or about 20 July 2017 NYFO Assistant Special Agent in Charge("ASAC") Joseph Ugarte ("Ugarte") punished JJTP for being late to his post on Secretary Rex Tillerson's security Detail during the G20 in Hamburg, Germany.

26.     Records show and it was confirmed up to the Special Agent in Charge ("SAC") of the NYFO Wendy Basham that JJTP was not in fact late.

27.     As such he complained about the unwarranted punishment which included taking away specialized training that he was scheduled to take which was paid for and which had been approved up to SAC Basham prior to Ugarte's interference.

28.     JJTP complained directly to Ugarte in a conversation in his office. Realizing he was wrong about the facts, Ugarte refused to back down from the punishment instead changing his rationale for removing JJTP from the training to a new rule he made up on the spot that agents who had not been in the office for 90 days prior were not allowed to go to training. This rule only applied to JJTP as other agents had gone to training prior and were scheduled to go to training.

29.     This was only one such "JJ Rule "as the office called them referring to rules that only applied to JJTP one of the few if not the only Black Agents in the office at any given time.

30.     Another example of a JJ Rule was that JJTP was not given a take home car when all the other agents in the office were. In this case, they created a rule that JJTP lived too far away from the office however other agents who lived further including those who lived outside the NYFO locality pay area for example in Philadelphia were given take home cars. JJTP however did in fact live in the New York Area locality area. This is another example of disparate treatment.

31.     The fact is this was inconsistent with the Department's own policy. JJTP was NOT given relocation money as would be required if he lived to far away so he could relocate to the area of operation of the office. The rationale given by the Agency was that JJTP still lived in the New York Locality area and therefore was not entitled to such pay yet when it came time to give him a take home car the NYFO claimed he lived outside the area, a fact that was blatantly not true by government records, and refused him the same treatment as all the other agents in the office despite his protests. As a result, he was forced to use his personal vehicle for work which resulted in thousands of dollars in unreimbursed costs.

32.     What was more problematic about Ugarte's 90-day rule was that JJTP had been in the office for MORE THAN 90 days because he was made to give up a scheduled vacation and report to the office early to cover the security detail for the visiting Chinese foreign minister. As such, even if Ugarte's rule did exist it would not apply.

33.     JJTP pointed this which was Ugarte's third attempt to justify his wrongful actions to JJTP and he pointed out that if such a rule did exist, why was the training approved in the first place.

34.     Ugarte feeling his position of power being challenged, threatened JJTP by saying that he was a FS-2 ( a high ranking foreign service officer) and JJTP was an entry level agent and if JJTP challenged him he would ruin JJTP's career. JJTP responded that he would be administratively promoted to FS-4 and he did not know if he would remain an agent much longer than that because he left his previous career as a lawyer and founder of a startup company to serve his country and would not continue to take the abuses. Ugarte replied "we will see about that" in reference to JJTP being automatically promoted.

35.     Ugarte also threatened that he would prevent JJTP from being assigned to a CFI, which is a division in DS which handling higher level investigations which he used to be the head of and which he knew JJTP was lobbing to be assigned top as his next post. JJTP was in fact rejected for the position after the conversation.

36.      Ugarte refused to correct his lie, misstatement, and wrongful punishment and JJTP was made to contact FLETC and tell them he was withdrawing from the class just days before it started causing great reputational harm and embarrassment to his career.

> ii.     *Making JJTP undergo SERE training the day after the Man Who raised Him Died, Refusing to Allow him to go Home, and Docking him Pay for going Home to the Funeral*

37.     Shortly after, JJTP was sent against his will to participate in the Agency's high threat Advanced, Tactics, Leadership, and Skills course ("ATLAS"). The reason for JJTP's unwillingness to travel from home and participate in the training was that his uncle, Alexander Henderson ("Father"), who raised him as a son was in hospice career dying and on his last days.

38.     JJTP was forced to go the training regardless but told that he could return home if his father's condition worsened. Everyone in the management of the NYFO and the training cadre were

aware of the situation and JJTP even had a specific conversation to brief the agent in charge of the training class and the head of the training cadre on the first day.

39.    On Monday 13 November 2017, JJTP's Father passed away. He immediately contacted his class leader an informed him of the passing and that he intended to go home the next day as evidence below:



40.    JJTP was denied the leave to go home and instead was forced to go through intensive Survival, Evasion, Resistance, and Escape ("SERE") training the details of which are in part classified but includes kidnapping, sleep deprivation, torture, and being held hostage for an indeterminate amount of time just a day or two after learning about the passing of his father. The Agency cited to the SERE training as the reason JJTP was denied the leave.

41.    JJTP was ultimately allowed to travel home to read the obituary at this father's funeral which was smeared with the gun grease from his hands as he had been held at the training facility to

scrub down the AR15/MK18 assault rifles and other guns before he left and had not take the time to stop due to the long trip so that he would make it home in time.

42.     JJTP was made to return to Quantico for training just the day after the funeral and was given altered time sheets which were different from the times sheets the rest of the training class had which included pay for the travel time from the Interim Training Facility ("ITF") to Quantico despite having to make the same journey. Instead JJTP was docked pay for going home for his father's funeral. The changed time sheets can be seen below:



  iii. *Forcing JJTP to Alter a Report of Investigation to Falsely Accuse a Black Dominican Mother of Fraud to have Her Deported*

43. While JJTP was in ATLAS training, the conflict with Ugarte continued. After JJTP challenged him, Ugarte began to interfere with and over scrutinize JJTP's work sabotaging his case files.

44. In one specifically egregious case he ordered JJTP to alter the report of and investigation to claim that a Black Dominican Green Card holder committed fraud when she had not. When JJTP refused to alter the report and swear to those false statements before this very court, the Southern District of New York, as an officer of this court, the NYFO management punished him.

45. The details of the case are being omitted for this filing but in summary, the green card older mother of a US Citizen child applied for a passport for that child. The application was flagged for fraud due to inconsistent signatures between the DS-3053, Statement of Consent For Absent Parents form, and the DS-2029 Consular Report of Birth Abroad ("CRBA") form for the father which could be an indication of parental kidnapping.

46. This suspicion was quickly dispelled when JJTP spoke to the father who stated that he had given power of attorney to his son who had the same name as him while he was out of the US and the passport was in fact so the child could come visit him. Ultimately the father flew back to the US several times to resign the paperwork in person in front of JJTP and swear an affidavit that there was no issue.

47. As such, JJTP requested the case be closed and called it nonsense when Ugarte refused to allow it to be closed. Instead, Ugarte demanded that JJTP seek charges against the mother who had nothing to do with the signature situation at all and accuse her of passport fraud because he state that even the accusation of fraud would be put in her Alien file ("A-File") and would/could result in her being deported or denied US Citizenship in the future.

48. JJTP protested being forced to change his filing in the case and in response NYFO management claimed that JJTP recalcitrance to seek charges against the woman was not based on the law but instead because he, like the woman was a black dark skinned Dominican-American.

49. The record will show this had nothing to do with JJTP's decision or thought process and in fact JJTP pushed for other Dominicans to be prosecuted over the objects of the same management officials including a case where JJTP was asked by the DEA to help in an arrest of a Subject who threaten to put a bullet in an informant's head allegedly resulting in them wanting to make an immediate

arrest. JJTP's skills and training as a DS agent would have been uniquely helpful in executing that arrest and the original case was JJTP's. JJTP was scheduled to be on the enforcement operation team but on the day of or thereabout Carlson contacted JJTP and told him he would not be allowed to participate for no given reason other than his prerogative. When JJTP protested that Carlson was letting his vendetta against him put an innocent person's life at risk, Carlson responded that he did not care.

50.     It should also be noted that upon information and belief, JJTP is not the only black agent that Carlson has had an issue with, and that Carlson had issues at other posts before coming to the NYFO. Rather than address those issues, the Agency instead shuffled Carlson around and did not hold him accountable for any of his actions.

51.     JJTP attempted to explain multiple times, the law as it pertains to the case of the mother and the passport and the fact she had committed no violation as the law in interpreted in this district which he knew to be true as not only the investigating agent, but a licensed attorney in this district. Ugarte replied that he did not care that JJTP was a licensed attorney in this district because he was not an attorney according to the NYFO management. JJTP further objected that he would not swear a warrant or testify falsely in this court that that Subject had violated any rule as an officer of the court so it would make no sense to force him to see charges. Ugarte stated that it was not JJTP's decision to make and ordered him to take the case to several US attorneys in several districts all of whom agreed with JJTP's assessment of the case and refused charges.

52.     Ugarte was upset by the fact that The US attorneys had agreed with JJTP and still refused to allow the case to be closed until JJTP altered the case record and report of investigation to say that fraud had been committed so that it could be uploaded into the USCIS system to flag the mother and her A-file.

53.     This resulted in a long standoff for several months in which JJTP refused to alter the report of investigation as it was an official government document and Ugarte refused to allow the case to be closed. this resulted in the family threatening legal action and further conflict in the office because it looked as if JJTP was the one responsible for holding the case open and the family would call multiple times a day disrupting the office workflow.

54.     Ultimately, JJTP went back to a representative from the US Attorney's office for the Southern District of New York for guidance on how to handle this situation. When report of this conversation and e-mail got back to the NYFO management, JJTP was called into the office cursed at and yelled at and threatened to never speak to a US Attorney's office about them again. Further JJTP

was given a DS-1974 reprimand on 11 June 2018 by Jagels for speaking to the US Attorney's office about what was going on in the case as evidence below:

> **B. General Discussion:** Describe the employee's progress in meeting the core work responsibilities and achieving the goals and specific objectives established for the rating period. Cite specific policy and programmatic outcomes and their impact on the Department's mission.
>
> Your communication to a representative of the US Attorney's Office for the Southern District of New York was highly unprofessional, it inaccurately characterized the discussions surrounding a case and you were ultimately unduly critical of New York Field Office management.  You will not communicate with anyone from the Assistant U.S. Attorney's (AUSA) office without informing and getting clearance from your supervisor or your Assistant Special Agent in Charge (ASAC).

55.     JJTP protested the written reprimand and pointed out that it was a clear violation of the Whistleblower Protection Act in that they directly stated in the DS-1974 which was dated June of 2018 that the reason for the reprimand was that he had spoken to the US Attorney's office and complain about their conduct in that case.

56.     Two months later in August of 2018, JJTP was called to the office of his supervisor Eric Jagels ("Jagels") and give a second DS 1974 reprimand for the same incident but this time the section regarding why, speaking to the US attorney about their activities In the case, was removed. Again, JJTP protested the fact that he was being written up twice for the same incident but there was nothing he could do. This DS-1974 which was signed on 13 August 2018 by Jagels is evidenced below:

> **B. General Discussion:** Describe the employee's progress in meeting the core work responsibilities and achieving the goals and specific objectives established for the rating period. Cite specific policy and programmatic outcomes and their impact on the Department's mission.
>
> You will not communicate with anyone from the Assistant U.S. Attorney's (AUSA) office without informing and getting clearance from your supervisor or your Assistant Special Agent in Charge (ASAC).

57.     Ultimately, after JJTP worked with the New York passport office to override Ugarte's hold and make sure the US citizen was not being wrongfully denied her passport. After or around the same time, JJTP was forced to change the report of the investigation to state that fraud had been committed even though it had not been but he noted in IMS to the apartments case management system that he was forced to make the change. This is evidenced by the words in the actual report as well as the diary entry below:



58.    This incident caused further bad blood between JJTP and the NYFO management.

iv.    *2018 Attempt to Sabotage JJTP's Rating to Stop his Administrative Promotion*

59.    ASAC Peter Carlson ("Carlson") took over for Ugarte in JJTP's chain of command due to open hostility between JJTP and Ugarte that was known throughout the office.

60.    The change occurred after JJTP wrote to the acting SAC Tanya Sears ("Sears") who was also the EEOC counselor complaining about his mistreatment in the office including what had occurred in training when she solicited his input for his Employee Evaluation Report ("EER"). This was the first time JJTP made a specific report to an EEOC official about the management officials in the NYFO, a protected activity, although he had as spoken to above made the reports about occurred in training up the chain of command. That Email was sent on 17 March 2018 and specifically addresses Ugarte, and his threats spoke to above as well as several other issues. This email can be seen as Exhibit 2.

61.    Rather, improperly addressing the issue or reporting it up the chain of command as is required by law, Sears as evidenced by Exhibit 2 sent JJTP's confidential complaint to her to the people he was complaining about in the NYFO management to give them a heads up so that they could in their words deal with JJTP when he returned from representing DS and the State Department as an overseas security officer in Korea for the 2018 Olympics.

62.    Upon returning to New York from Korea, JJTP was immediately confronted by Carlson and Jagels and made to sit down with them in the interrogation room in the Varick St. Office in New York. During that meeting, JJTP was treated like a criminal and threatened that he should stop speaking

out or that there would be consequences which later came in the form of them trying to sabotage his 2018 EER to stop his administrative promotion just as Ugarte had threatened just a year prior.

63.    A short while after filing his complaint to Sears and the confrontation with Carlson and Jagels, JJTP was given an unsatisfactory rating in his 2018 EER in violation of federal law and department policy. Carlson specifically stated that it was due to JJTP's complaints to teach him a lesson and keep him in line. JJTP protested the rating which would stop his administrative promotion just as Ugarte had threatened to do a few months prior. This is evidenced below:

| C. Rater's Summary Judgment | | |
| --- | --- | --- |
| For All Employees: Was performance satisfactory or better?    Yes ☐    No ☒ | | |
| For Untenured Employees: | ☐ | The career candidate is likely to perform effectively across a normal career span |
| | ☒ | Additional development and observation is needed |
| | ☐ | The career candidate is unlikely to perform effectively even with additional experience |
| VIII. REVIEW STATEMENT (Completed by Reviewer) | | |

64.    Ultimately after a long fight one of the new supervisors Diane Latham who sat on the review board for evaluations told the NYFO management that they were in violation of federal law and department policy by giving JJTP the unsatisfactory rating and force them to change it. this resulted in a sit down among all the parties in which the law was explained explicitly regarding the giving of unsatisfactory ratings so that all parties understood the rules. They were forced to change the rating to satisfactory. This is evidenced below:

| C. Rater's Summary Judgment | | |
| --- | --- | --- |
| For All Employees: Was performance satisfactory or better?    Yes ☒    No ☐ | | |
| For Untenured Employees: | ☐ | The career candidate is likely to perform effectively across a normal career span |
| | ☒ | Additional development and observation is needed |
| | ☐ | The career candidate is unlikely to perform effectively even with additional experience |
| VIII. REVIEW STATEMENT (Completed by Reviewer) | | |

v.    *JJTP Attempted to Remove Himself from the Harassment but the Agency Refused to Help*

65.    Prior to this, JJTP reached out to his career development officer ("CDO"), Kerry Osterhout to request assistance in dealing with these issues as well. Specifically, JJTP asked to be removed from the office end the chain of command. Specifically in one instance JJTP noted that another agent and his unit was resigning and requested that he take the position temporarily did that agent was set to rotate to as a means to get out of the office. That was denied. Examples of JJTP reaching out to Osterhout to be removed from the NYFO from 2017 and 2018 are evidenced below:



66.    In another instance JJTP, who had worked closely with consular affairs legal on passport revocations, request it to be sent temporary duty to work in that office and reduce pay just so that he can get away from the harassment in the NYFO. That was denied. In that case, Ugarte specifically denied the request because he stated that he too wanted that position but was not offered it by consular affairs. In a third instance, JJTP ask 2 be allowed to report to his next assigned position early so that he could get away from the harassment in the NYFO. In this case, it was Carlson who stated that he would keep JJTP in the NYFO as long as possible. When JJTP noted that that made no sense because he didn't want to be there, and they didn't want him there Carlson stated that he knew and indicated that he took pleasure in making JJTP suffer.

67.     Osterhout refused to help JJTP. Instead of reporting the incidents as is required by law, she is dead directed JJTP to contact the office of civil rights and ask for a new supervisor which she knew had already been done and denied and based on the records later provided by the department she knew the entirety of the story and have been working with the New York field office at that time to have JJTP removed as will be spoken to below. the e-mail evidencing that she was informed is below:



68.     This situation came to a boil after the attempt to give JJTP the unsatisfactory rating. JJTP Did in fact reach out to the office of civil rights to file a formal complaint about the harassment after the attempt to give him an unsatisfactory rating on the recommendation of another agent Tyler King ("King") who they had also been harassing who suggested to JJTP that he needed to start keeping records and documenting because the office was attempting to in his words put paper on JJTP.

*vi.     Racist Remarks about JJTP's WWII Veteran family member who had recently passed*

69.     The bad blood in the office became personal. The passing of his Father would come up again with NYFO management. The tensions came to a boil in a conversation on or about 3 May 2018 in the afternoon with Carlson in his office, after the fight about the EER and other issues of mistreatment slowly boiled to the surface.

70.     The conversation was again about the treatment JJTP was enduring as he was attempting to speak to management and settle the matter at the lowest possible level before filing a formal complaint. During that conversation the death of his Father and what he endured during the training rather than being allowed to go home came up. Carlson made racially insensitive remarks about JJTP's Father's not being his real father and commented that JJTP did not even really care and was only using his Father's death to try to leverage something from the Department.

71.     JJTP refuse to engage Carlson in conversation any further, stood up, but his jacket on and walked out of the office back to his desk where he continued his work and then went home. That night at 2347, JJTP wrote an e-mail to Carlson documenting the conversation, providing him with the obituary which shows that he was in fact listed as an adopted son, provided the text message records that shows that he did in fact request to go home and complained about the insensitivity in which he was being treated given the death of his family member as evidence below:

> I am the one who has the military flag that was over his casket. The only reason it's not in my cube is because I was told it's not good to keep personal things there. It was extremely hurtful to hear that claim and be accused in my view of lying about this among other things. This in my opinion sir is beyond acceptable and is hurtful and mean at its core.

> If I recall the original claim was no one knew but then there was the voicemail that was left. Now it's I didn't want to go home and I wasn't close to him(ignoring it shouldn't have been my decision). What will the next version be? Why is that I am constantly needing to defend my self and prove my version beyond a reasonable doubt and others can just throw whatever at the wall and see what sticks. I just want to be left in peace. Why is that so much to ask? Yet I have to fight to defend my integrity and reputation about stuff like this by digging up my father's obituary.

> Al's mother, father and sister Victoria Henderson all proceed him in death. Al leaves to mourn: his loving wife of 50 years Joyce Henderson their son Craig and two daughters Chinique and Chermir; his son Eric and two daughters Carolyn and Annette from an earlier marriage; one "adopted" son, Jabari; eight grandchildren, Ronald, Erica, Justin, Maya, Maya Rose, Aiden, Jaden, and Jared; sisters in law Jayne, Aretha and Sandra; daughter in law, Annette, son in law; Ronald and a host of great grandchildren, nieces, nephew, family and friends.

72.     Contrary to Carlson's baseless and callous claims that JJTP did not care about his father, government records will show that it was JJTP who petitioned for his father to have a burial plot in Arlington National Cemetery which he earned along with other decorations while serving this country in World War II in Japan when black soldiers were still segregated. It can also be seen that JJTP was the person who put his ashes in the grave during the ceremony and who holds the flag that was over his coffin. it was his father's service to this country which encouraged JJTP, to leave his private practice and serve this country as a DS agent.

vii.    *2018 Attempt to Have JJTP removed from Service through False Accusations of Mental Health Issues*

73.    When the EEOC case was filed, JJTP requested discovery in the form of documents from the Department specifically after the Department cut off his e-mail which contained many of the records that he needed to prosecute this case. The Department refused to turn over any records and this case was decided on the few records that JJTP had maintained before his access was cut off. as such many of the pertinent records that speak to the allegations in this case were not part of the original EEOC file.

74.    One such record is Exhibit 1 which shows that in response to JJTP's complaint to Sears which she gave them a heads up about, the NYFO management immediately attempted to accuse JJTP of having mental health issues and sent him for a Fitness For Duty Examination ("FFDE").

75.    As will be spoken to below, this is a common tactic by the Agency when one files a complaint. They attempt to discredit the person by accusing them of having mental health issues, then provoke the person by forcing them to go through invasive examinations, false accusations, gaslighting, and general harassment and then they use that person's reaction to their actions as evidence in the case against a person in a vicious circle. the department uses this exact same tactic in nearly all cases with any employee that files a complaint as will be evidenced by the records from to the Department.

76.    By way of example, SA Jennifer Pyle, who was the class president of the special agent class JJTP was a part of also, quit due to harassment based on her age and gender by the same individuals who JJTP complain about. Those individuals bullied harassed SA Pyle asking her questions such as what it was like to run before there were paved roads and choose and stating that due to her age, she would only be allowed to eat mashed peas at the holiday party among other insults. When SA Pyle, could not take anymore and walked out on DS without warning, the agency's response was to send agents to her house to harass her and threaten her not to complain but they were  confronted by her husband a former FBI agent and force them back down. Instead, Jagels came to JJTP to ask him to spy on SA Pyle and provide information so they can claim that she had mental health issues which is why she quit which JJTP refused to do which caused a further rift between NYFO management and JJTP because he would not be a "team player."

77.    Ultimately in 2018, JJTP would not be sent for a FFDE and he would not find out that there was even a discussion of it until 2023 when discovery was turned over in another case.

78.     Exhibit 1 shows it was Ugarte and Carlson specifically, who JJTP had filed an EEOC complaint about just prior who turned around and attempted to force it out on an FFDE after he filed the complaint against them for the harassment some of which is described herein.

79.     To be clear on the timeline:

a.  28 September 2017 there is a documented email in which JJTP contacts his CDO and asks to be removed from the office which is denied.

b.  17 March 2018 SA Tyson-Phipps wrote Sears, the acting SAC and EEOC coordinator to file a complaint about NYFO management officials and their treatment of him which she forwards to the same NYFO Management officials.

c.   On 27 April 2017 the Special Assistant to the Director John Cory writes to those management officials stating that he is "following up" with their request to have JJTP sent to a FFDE psychological examination which is ultimately denied that day.

d.  On 30 April 2018 NYFO Management attempts to give JJTP an unsatisfactory evaluation in violation of federal law and department regulations as evidence below:



80.     This timeline shows that immediately after JJTP complained about the management officials, he was targeted for retaliation first by attempting to send him for a psychological examination to have him removed and when that did not work, they attempted to violate federal law and department regulations by reducing his rating to unsatisfactory which would effectively do the same thing marking JJTP for termination as a probationary agent.

81.     Further, Exhibit 1 shows that Ugarte knew about JJTP's prior complaints about unfair treatment as evidenced below:

However, I do need to point out that the agent has already expressed and raised the issue of being treated differently by DS, not NYFO. Currently, he was scheduled for a TED for his onward assignment to Pathfinder in May 2018. This TED was moved back to another year. I only raise this issue because he is beginning to say that he is being treated differently by DS as it pertains to his onward assignment as he now wants to go to Pathfinder and is asking why it has been changed. I cannot offer any response to this as it is better handled by his CDO. Please don't shoot the messenger, I am just letting you know what is being said so you can be aware if this should become an issue.

viii.    *Attempt to Cover Up the Suicide of a NYFO Agent who They Were Bullying*

82.     As a result of the treatment, and on the recommendation of the CDO, JJTP did in fact reach out to the Office of Civil Rights, specifically Ms. Ardena M. Brown, as well as representatives from the American Foreign Service Association ("AFSA") who is the union who is supposed to represent foreign service employees but who shares an email domain with the Department and management. Specifically, JJTP reached out to Attorney James Yorke. In that report via email on, 11 May 2018 which came after several oral reports in the phone, JJTP specifically named SA King as being harassed as well by the same management officials as evidenced below:

> I will stop here because this is long and I am sure you have more than a tale of what I mean about bullying and harassment between Shamar and Jagels and that I have had no relief going to my chain of command. I should not we have no SAC and so Carlson this week is the top of the chain. I reached out to AFSA on the 30th when this all came to a head and received some information from Patrick Brady but not guidance. I should also not that I am not the first person Jagels has done this to. Another agent Tyler King was removed from his unit after a similar incident and then he left for Pathfinder. Jagels continues to badmouth him and spread rumors about him. I was told to file an OIG report but I was scared about reprisals in my EER. He has already said I was not satisfactory against the FAM. The thing is they know they are wrong. Suddenly Jagles on 5 day leave but he took out much of the directly defamatory things that he tried to trick me into approving what he stood by as true until I pointed out the defamation. If he was right, as a 2 he should know what is allowed, and if he believes Shamar is telling the truth since he tried to get me to approve it why did he change it and why did Carlson try to tell me we took that part out so you can't complain about it anymore. That is not how defamation works. The damage is done. My rewording some of it and still giving me an unsat against the rules of the FAM that is still not acceptable. They know they are wrong but are trying to trade me for things that are my right like not getting an unsat without warning which is not right or above board.

83.     This resulted in the first EEOC complaint against the department in 2018 the notice of rights and responsibilities was signed on 9 May 2018 and for which the Notice Of Right To File A Discrimination Complaint was filed 2 July 2018. This case was based on race and for the 2018 EER, the training that was taken, and harassment. Upon information and belief that case was DOS-0069-19.

84.     After that case was filed, the NYFO Management took all JJTP's work from him including most of his substantive casework and refuse to give him any opportunities for temporary duty assignments or protective details for several months.

85.     This changed after JJTP's friend and former unit mate SA King committed suicide in front of his wife and young child on 16 December 2018 after the same management officials continue to make fun of him and bully him even after JJTP reported the behavior to the office of civil rights as pointed out above when nothing was done about it.

86.     It was at that point that JJTP was called into the office by NYFO Management and threatened not to say anything and then ordered to go to Oman with secretary Mike Pompeo so that he would not be at the funeral in January of 2019.

87.     Upon his return from Oman, NYFO Management asked JJTP again was he going to speak out about what happened with SA King and when he indicated he would days later they again attempted to give him an unsatisfactory rating in 2019 in violation of federal law and Department regulations which we discussed in greater detail below.

88.     The only intervening event between the unsatisfactory rating and his return from Oman was an attempt to mediate the previous EEOC complaint with ADR. That mediation resulted in the NYFO Management officials admitting to the previous discrimination and offering to amend the 2018 EER to properly reflect the truth of what JJTP had done. JJTP was also offered training to make up for what was taken from him and in exchange he would have to drop all his complaints against the department and all department personnel.

89.     JJTP would not accept the deal without an apology for being forced to drive the Confederate reenactor to the plantation and the use of racial slurs/insensitive language which DSS Executive Director Steven B. Dietz refused stating that he saw nothing wrong with having black agents drive white Confederate reenactors to a plantation and the use of the specific racial slur. Without the apology JJTP refuse to deal initially and soon after when NYFO Management learned that they would be subject to a formal EEOC complaint they immediately gave him the unsatisfactory rating.

90.     Ultimately that case was dismissed due to statute of limitations because JJTP had attempted to resolve the matter through ADR and the Department ran the clock out and they used that opportunity to retaliate again being me an unsatisfactory rating for filing the previous case, DOS-0069-19, against them.  This case DOS 0385-19 was filed soon after because of that immediate retaliation which is the basis of this case.

ix.     *2019 Attempt to Sabotage JJTP's Rating to Stop his Administrative Promotion*

91.     Around the time that the EER season opened, JJTP as one of the two agents in the office who had Farsi language skills was a sign to the protective detail for the Iranian foreign minister during his trip to New York. Despite being one of the only two agents who had some language skills in Farsi NYFO Management intentionally put him in a position where those skills would not be of use making the entire detail more difficult.

92.     In addition, around that time, JJTP was scheduled to attend a sustainment skills course which is required of agents every so often to make sure that they are retaining the basic skills needed as a criminal investigator and federal agent.

93.     Jagels contacted JJTP and informed him that he would not like his EER and ask if JJTP still want it to work the Iranian foreign ministers detail because he was indicating the opening salvo in the fight about the 2019 EER. JJTP was in fact pulled from the detail and in addition pulled from the sustainment skills course which resulted in him never completing the course needed to sustain his skills as a federal agent.

94.     The NYFO Management officials, including Jagels, Carlson, and Ugarte knew the laws and regulations regarding the giving of unsatisfactory performance ratings because they tried to do the same thing in 2018 a year prior. In 2019 went up against an EEOC complaint they were open and blatant about their attempt to retaliate.

95.     This was specifically true of Carlson who when JJTP confronted him and pointed out that he knew that he could not give JJTP that rating, told JJTP to "Do something about it" using explicit language and pointed out that he was going to retire soon anyway which he has subsequently done upon information and belief.

96.     The fight over the 2019 EER moved beyond the field office to Washington and the Agency's human resources department Global Talent Management ("GTM") up to the Director General when Carlson lied and told her that JJTP had received an unsatisfactory rating knowing that he had not, and that Carlson had signed JJTP's rating which was satisfactory because he had been ordered to change the rating to comply with the law by the SAC.

97.     Rather than comply with the law and allow JJTP to move on with his career, NYFO management attempted to implement Ugarte's threat from 2017 and stop JJTP's administrative promotion which they successfully did to this day in 2023 with that lie to Director General ("DG") Carol Perez ("Perez").

98.     The record will show on 3 May 2019, JJTP, Jagels as JJTP's first line supervisor, and Carlson as JJTP's second line supervisor all signed the EER stating that JJTP had a satisfactory rating. Later that afternoon around 1500 JJTP received an email stating that he was being denied his administrative promotion because NYFO Management reported that he had an unsatisfactory EER. JJTP immediately attempted to contact DG Perez and provided her the record showing the satisfactory EER

but she had the request forward to Principle Deputy Assistant Secretary Kenneth Merten who stated on 4 May 2019 via email he would get to the bottom of it on Monday the 6th.

99.    On Monday the 6th JJTP received an email from DS Human resources Officer TJ Shelton ("Shelton") stating that he changed JJTP's rating back to unsatisfactory to cover for the Giglio violation of lying on the record from the NYFO management officials and demanded JJTP sign the unsatisfactory EER. This dispute went on until approximately 15 May 2019 when the EERs were due.

100.    On that day JJTP was leading a multiagency team in a high threaten enforcement operation to arrest a drug trafficker which included the use of assault weapons while the Agency through Shelton intentionally distracted him by threatening him that he needed to sign the wrongly amened EER by the end of the day or face termination the next day.  Essentially the Agency was attempting to use JJTP leading the high threat enforcement action to stress and distract him so he could be leveraged into the signing the  altered EER. .

101.    JJTP stood firm and the EER was forced to be changed back but only after NYFO Management made up more false allegations about JJTP to have him removed from duty the day after the successful arrest operation for seven months for a FFDE.

102.    It should be noted that GTM in its internal emails has subsequently acknowledged that NYFO Management lied and violated federal law and Department policy in giving JJTP the unsatisfactory rating he had to fight to have changed as evidenced below:

**From:** Juliao, Jeanne M <████████████████████>
**Sent:** Thursday, February 6, 2020 10:40 AM
**To:** Scandola, Joni <████████████████████>
**Subject:** RE: Tyson-Phipps

Hi Joni,
I actually have been in contact with DS quite a bit about this, including late last week. I meant to mention it yesterday as well since it directly pertains to our discussion on deferral of an Admin promotion.

As you may recall, DS' original draft EER given to Mr. Tyson-Phipps (JJTP) was satisfactory, but the final version was changed to unsatisfactory (before it was put into OPF). They attached that draft on their Action Memo requesting curtailment of the NY assignment. However, as JJTP is untenured, DS was required to follow a specific process with the DG to rate him as unsat and they did not. As a result, his final rating (as reflected in his OPF) is satisfactory. The DG deferred on the curtailment request based upon the fact that they were pursuing a fitness for duty review. That review was recently completed and JJTP was returned to work in the position in NY they originally wanted to curtail him from.

Since he was rated satisfactory, the DG's hold on Admin promotion would have to have been based on the pending discipline matter which is still pending with CSD. I don't recall if that is how the memo read (i.e., identifying this as a hold under 3 FAH-1 H-2327.2(3)). Can you please send me the signed copy of it? That will help determine next steps.
Thanks,
Jeanne

103.     As stated, to be clear, they were informed in 2018 they would be in violation of Department policy for issuing an unsatisfactory EER in this manner but deliberately did it anyway after an EEOC case was filed against them.

104.     Carlson gives his reason for the unsatisfactory EER in a memo dated 15 April 2019 to Shelton the subject of which is Administrative Promotion Denial for SA Jabari-Jason Tyson-Phipps. In that memo the first thing Carlson states as grounds for the denial of JJTP's administrative promotion is his whistleblowing in the case spoken to above to the US Attorney's office for the Southern District of New York as evidenced below:

> Among the incidents was an email SA Tyson-Phipps sent to an investigator working at US Attorney's Office for the Southern District of New York. In the email, SA Tyson-Phipps criticized New York Field Office management for their recommendations on how to proceed with a passport fraud investigation assigned to him. SA Tyson-Phipps was then counseled by his rater and reviewer to show better judgment when communicating with personnel outside of our office. Because of the email he sent, SA Tyson-Phipps was given a DS-1974 Professional Development Form identifying areas for improvement, specifically in this case focusing on how his actions, deeds and words are perceived by others and sharpening his interpersonal skills. The DS-1974 is attached which includes SA Tyson-Phipps response. I would have wanted SA Tyson-Phipps to learn that even though his intentions were good, the way that he executed them was not appropriate. There is a saying, "good initiative, bad judgment;" I would have hoped that SA Tyson-Phipps would have looked at this as an opportunity to improve his judgment while maintaining his good initiative.

x.     *Attempt to Have JJTP punished in violation of his Second Amendment Rights*

105.     The second reason Carlson gives for giving JJTP the unsatisfactory rating which resulted in the denial of his administrative promotion was JJTP's carrying of his licensed personal handgun in the state of Pennsylvania. This is an incident which Carlson and NYFO Management have long attempted to have JJTP suspended, arrested, fired, and in this case denied his due administrative promotion for.

106.     In summary, JJTP was instructed by NYFO supervisors that he needed to be armed at all times he carried his badge. Not wanted to carry his larger Glock 19M duty weapon at all times he followed the proper procedure to apply for an receive a private Pennsylvania concealed carry permit as a resident of the Commonwealth of Pennsylvania. He then purchased a smaller pistol to carry concealed while off duty in compliances with all state, federal, and local laws.

107.     JJTP was assigned to the protective detail for Ambassador Nikki Haley while she was in Philadelphia and as such he left his house in Northeast Pennsylvania to Philadelphia while off duty never leaving the Commonwealth of Pennsylvania. While on duty he was assigned to work the

command post in the hotel where she was staying and never left the hotel while on duty. Rather than leave his personal firearm unsecured in his hotel room, he took the unloaded weapon to the command post with him where he remained with it until another agent saw him and reported him to the same NYFO officials who were looking for anything they could get on him.

108.    This lead to JJTP being written up in another DS 1974 for violating a rule that did not exist at the time of the incident and which they subsequently changed as a result of the incident. JJTP protested this reprimand as well but Carlson, Ugarte, and Jagels insisted on putting it on his record.

109.    They charged that he violated 12 FAH- 9 H -022(7) which is the policy for implementing the Department regulation, which is given its authority from 22 USC 2709 the statute that gives the Department the authority to make the regulation. As such, the policy has no effect in law without authority from the statute.

110.    It should be noted that both Carlson and Ugarte are lawyers and should know how the law works about authorizing statutes and therefore any action by them or mistake should be seen as intentional specially when this was explained to them by JJTP and presumably in their combined nearly 40 years with the Agency. As such one would presume they would understand the laws and regulations and yet Carlson writes in his 15 April 2019 to Shelton the following as his second reason for giving JJTP an unsatisfactory rating:

> A second incident occurred about two months later when SA Tyson-Phipps was working in Philadelphia on a protective detail for the US Ambassador to the United Nations. During the protective detail another agent observed SA Tyson-Phipps was carrying a secondary weapon in a holster on his ankle. This weapon was SA Tyson-Phipps' personal weapon; it was not issued or approved by the Diplomatic Security Service. This is a violation of 12 FAH-9 H-022 (7) which

prohibits, "Carrying or using any firearm, ammunition, or related equipment not specifically issued or approved by the Department of State." SA Tyson-Phipps was then counseled by his rater and reviewer to show better judgment and better understanding of very elementary Diplomatic Security Service regulations. He was given a DS-1974 Professional Development Form, specifically asking him to "… focus on his judgment and interpersonal skills as we go into the United Nations General Assembly (UNGA) 73." In response to receiving the DS-1974 SA Tyson-Phipps stated no supervisor actually saw him carrying this weapon, the agent who did see it only saw it briefly and then only a small bit of it which stuck out from underneath his pants, it was not loaded, he had no place to store it safely, he wore it for officer safety, he was licensed to carry it in Pennsylvania, other regulations contradicted the provision cited, he did not wear it as part of his law enforcement and protection responsibilities and he did not display the weapon. He wrote, the "reading of this section of the FAH would infringe my second amendment rights as well as the license I have to carry the weapon as well as be nonsensical because it would suggest that a person could never carry their own weapon whenever they had their duty weapon." The DS-1974 is attached, however, his confusing and verbose argument is not the only cause for concern. I find this so concerning, not only of his reluctance to take responsibility for violating rules and regulations, but also that it could have been avoided. When both his DS colleagues who he was on post with informed him that he was not authorized to carry his personal firearm, he could have just asked what their suggestions were for safeguarding his personal weapon. Instead, he became combative and argumentative with them stating that it was his right to carry it (at no time did he make any of the arguments he made in his 1974 rebuttal). Again, this was a lost opportunity for him to have learned from a mistake. This was brought to the attention of our management team by SA Tyson-Phipps' colleagues not to "get him in trouble" but out of real concern that SA Tyson-Phipps could potentially find himself in a situation where the ramifications of his actions could be devastating.

111.    No only does this show a fundamental lack of understanding of the law, it shows an arrogance that he refuses to learn and a willingness to violate a person's constitutional rights. More troubling is that it shows the Department's willingness to defend the violation of Constitutional rights.

112.    To be clear, the FAH cited to be Carlson is not a regulation but a policy and his citation in this section is incomplete as it leaves out the key point that it pertains to firearms used for the performance of an agents duties and to the authorization given by 22 U.S. Code § 2709[2].

113.    Further to be clear, while he mocks JJTP's citation to the Second Amendment he also in doing so mocks Supreme Court Justice Clarence Thomas whose ruling in <u>New York State Rifle & Pistol</u>

---

[2] 22 U.S. Code § 2709 (a)(4) authorizes DS Special agents "if designated by the Secretary and qualified, under regulations approved by the Attorney General, for the use of firearms, carry firearms for the purpose of performing the duties authorized by this section" and (b)(3) states "The Secretary of State shall prescribe regulations, which shall be approved by the Attorney General, with respect to the carrying and use of firearms by special agents under this section."

Association Inc. v. Bruen, 597 U.S. ___ (June 23, 2022) which echoes exactly what JJTP said as will be discussed below.

114.    Using one of the Agency's other favorite tactics, lying by omission of key and relevant facts, they have on numerous occasions tried to prosecute both criminally and admiratively JJTP for this. By way of example on or about 23 October 2018 JJTP was pulled off a detail and into a compelled interview with Office of Special Investigations ("OSI") agent Andraea Boutiette who interrogated JJTP about the incident. At that time JJTP presented the Agency with his personal firearm license which they made a copy of so they knew it existed.

115.    In another instance directly after the incident, Jagels questioned JJTP about  the incident and was given a copy of the license as well as held the license in his own hands to inspect. Carlson later had the same interaction. On 19 March 2020 agents from upon information and believe is the Department's Office of Personnel Security and Suitability investigating JJTP's security clearance Robert T. Flaherty and Billivan H Johnson were provided in an email with the licenses. A year later when the Agency attempted to slow walk JJTP's clearance investigation another investigator Charles "Dave" Muggleworth asked for the license. Again, he was provided it. The Department's system can pull records of firearms licenses so there is no doubt they know JJTP was licensed at all times to carry that gun and yet they have continued to openly violate the US Constitution and try to punish JJTP for exercising his Second Amendment right while violating the Tenth Amendment taking a power reserved to the States to do things which they have no statutory authority to do all in an attempt to retaliate.

116.    It should be further noted that SA Ari Kaufman who they represented as the deputy supervisor of JJTP's unit not only encouraged him to carry a personal weapon on his ankle, but Kaufman also carried his personal weapon on his ankle a fact known to NYFO management which they did nothing about instead only targeting JJTP. This is a violation of JJTP's 5th Amendment right to equal protection.

xi.    *Punishing JJTP for Standing up to them for Calling a High-Level Minister to India a "terrorist"*

117.    The third incident Carlson cites to is JJTP complying with an order to escort an Indian High Minster across the street to her speech at the United Nations.

118.    There are several things to note about this incident the first of which is that the Department reviewed the incident and said it was unfounded. That is not only because of a lack of evidence or witnesses, it is because NYFO management again lied and tried to pay the game of hide evidence and then claim that a person is guilty because they do not have the evidence the Department hid.

119.    The truth is this incident occurred in front of hundreds of people, the media, and cameras in front of the US Mission to the United Nations where the Department controls hundreds of cameras so the whole thing was caught on film. Rather than review the film or speak to any of the witnesses NYFO Management opted for confirmation bias and to take the opportunity to try to make another false allegation which again became a moving target.

120.    First rather than acknowledging the woman as a diplomat from an allied nation, these same officials initially called her a "terrorist" and accused JJTP of escorting a "terrorist" into a secured zone. It was only after it became apparent who she was that they began to change their story. The next story they claimed JJTP jumped a fence with the woman, then they claimed JJTP cut a barricade. None of this is close to the truth.

121.    The witness who were there will say if asked and videos will show that when the minster approached JJTP's checkpoint with her aid he first went to the senior agent and asked for instructions who directed him to even more senior agent who was standing in front of the US Mission to the UN who instructed him and a loud voice that could be heard all the way down a New York City street by the NYPD police officers who were standing in file blocking the street to let her through and that JJTP should escort her and only her across the street to the UN.

122.    After the NYPD let her through their barrier to meet JJTP in front of the US Mission to the UN and the senior DS agent who was standing their and observed the whole thing, JJTP attempted to do as instructed  and go to the agents manning the barricade he was directed to who opened it to let him escort the Minister across the street  as directed as they heard the same orders.   It was at that point that a Secret Service agent from across First Ave., who did not hear the commands ran over and redirected JJTP to another crossing which he complied with immediately.

123.    None of the agents who were there were questioned nor was the video reviewed because NYFO Management had the narrative they were looking for but when JJTP was brought up on charges for this this case was immediately dismissed when the evidence was reviewed and yet Carlson uses that

as his rationale for giving JJTP an unsatisfactory rating something that he had no evidence of, spoke to no witnesses about, and reviewed none of the tape which would confirm what actually happened.

xii.    *2019 Attempt to Have JJTP removed from Service through False Accusations of Mental Health Issues Through an unwarranted Fitness for Duty Examination*

124.    The fight's over JJTP's 2019 EER led to more false allegations which resulted in first NYFO Management stripping him of his government vehicle, gun, badge, and credentials when he arrived to work the day after the arrest operation and then escorting him out of the building like a criminal embarrassing him in front of his colleagues to make an example of him for those who would also complain.

125.    It should be further noted that JJTP paid for his old badge to be made into a commemorative plaque when the old DS badges were retired, and new ones issued. The Department took JJTP's money but has refused to give him the plaque and badge he paid for as retaliation to this day. This is similar to when JJTP received the meritorious honor award with DS management withheld and did not even tell hm about until he saw it on his OPM employment record inquired and then was made to hunt down the wall plaque and award on the DS executive floor as it was being held in a random office and they had no intention of giving it to him or giving him the credit he deserved for his work.

126.    Not only did the NYFO Management lies result in JJTP's administrative promotion being withheld for about now four years, but he was also subjected to and invasive fitness for duty evaluation ("FFDE") for the first of two times in his career.

127.    Without any credentials or training NYFO management, specifically upon information and believe Ugarte publicly accused JJTP of having mental health issues formally and pushed for him to be removed from the office and subjected to the FFDE.

128.    Initially, JJTP was given an indefinite suspension which he protested to GTM which informed the NYFO that they would only be allowed to keep him out for 16 hours or two workdays. After that, the then SAC Timothy Dumas ("Dumas") forced JJTP to work out of a windowless room in 26 Federal plaza under armed guard by two agents who followed him everywhere including to the bathroom.

129.    As a result of being forced to move to 26 Federal Plaza  and not being given a government car and EZ Pass JJTP was subjected to having to pay out of pocket the toll to cross the George Washington Bridge daily which he had not had to do before their actions and which no other agent had to do. This was in addition to a significantly longer commute and cost for gas and parking. When JJTP protested this to SAC Dumas, he flippantly replied that JJTP better keep receipts indicating that he knew that it was an additional hardship on JJTP but was doing it anyway as part of NYFO's plan to constructively discharge JJTP by forcing him to quit or to act out in a way that would be later used as evidence against him by claiming that he had psychological issues or as evidence of bad behavior as is the Department's way to get rid of individuals they find undesirable or who make complaints or raise concerns.

130.    During this time, Ugarte continued to try to defame JJTP's name accusing him of not properly completing work in office wide emails which was false. JJTP received an e-mail from Jagels in which he was accused of not properly filing a document for a case by way of example. The facts and records showed that not only had JJTP filed the document but both Jagels and Ugarte were CCed on the filing. When JJTP noted to Jagels that they both were in fact CCed on the e-mail, Jagels initially called JJTP a liar until JJTP forwarded the e-mail to him showing they both were on the e-mail JJTP had originally sent. Rather than correcting the record by replying to the email sent to the entire office undoing the further reputational damage he had done to JJTP's name, he simply replied "thank you" to JJTP alone leaving the office to believe still the JJTP had done something wrong.

131.    Ultimately after a few days of being held prisoner essentially at 26 Federal in isolation, JJTP was put out on the FFDE which was overseen by Dr. Mary Tramontin the department's chief psychologist.

132.    The reason given for the FFDE was that they accused JJTP of being suicidal and homicidal but just months after SA King's suicide they sent JJTP to his home where they knew he had 3 personal guns and never even had the peer support counselor contact him to check on his well-being even though  the same counselor calls if an Agent's pet passes away.

133.    Further, knowing that he wore his personal weapon on his ankle they never checked him for any weapons when he came to the office. This suggests one of two things: 1. there was not a good faith belief that JJTP was suicidal or homicidal or 2. They intended for JJTP to take his own life after they put him in a stressful situation were his career was on the line and sent him home to a place where

he had three firearms, ammunition they supplied, and was in according to them a suicidal mindset. The reality is the first option is true and this is an act of retaliation.

134.    JJTP was cooperative with the FFDE and was not only seen by Dr. Tramontin, but another independent doctor hired by the Department who called the case "bullshit." In relevant part Dr. Tramontin's medical assessment of JJTP stated:

> major and minor. There is reason to believe that Mr. Tyson-Phipps, with his high intelligence, individual skill set and style, might do well should he return to private solo law practice in NYC. There are no indications, however, that the current severely dysfunctional pattern of behavior would likely improve should Mr. Tyson-Phipps return to full duty as a Special Agent of the Diplomatic Security Service. That, in my view, would be like 'trying to put a square peg in a round hole.'"
>
> Finally, given the concern expressed in the referral documentation that SA Tyson-Phipps had made "threatening observations," Dr. Tramontin conducted a violence risk assessment using a systematic, structured professional judgment approach. She found SA Tyson-Phipps to be at a low risk for future violence at this time.
>
> Upon careful review and in appreciation of all of the findings and within a reasonable degree of medical and psychological certainty, it is MED's opinion that SA Tyson-Phipps does not presently suffer from a medical condition that would render him unable to perform the duties of a Special Agent of the Diplomatic Security Service of the United States Department of State as pertains to the possession and use of SPE. We do not currently have any clearly defined medical condition (psychiatric) by which MED could opine that he is unfit for full duty.
>
> SA Tyson-Phipps is fit for full duty at this time.

135.    As such, the assessment by two medical professionals hired by the Department showed the FFDE was without good cause and there was never a risk of violence or any psychological issues.

136.    Another thing that should be noted to show this FFDE was retaliatory is that agents had a 30-day windows plus or minus of their time of estimated departure ("TED") from a post to leave. When JJTP's request to be removed from the NYFO was denied he had pushed his TED up to the first possible day he could leave and then taken leave from the day after the arrest operation when he would do his after-action report with his team until the day of departure. As such he would have never come back to the office or been a threat to anyone. This is a fact known by everyone in management as evidenced below:

| | |
|---|---|
| **From:** | Carlson, Peter  M |
| **Sent:** | Friday, May 17, 2019 12:24 PM |
| **To:** | Twerdahl, Elizabeth H; McAleer, Elizabeth G; Dumas, Timothy W; Ugarte, Joseph S; Jagels, Eric M |
| **Cc:** | Sweeney, Julia P; Boushell, Clint C; Cory, John R |
| **Subject:** | RE: Clarification on AL and what happened today |
| **Attachments:** | image2019-05-17-122138.pdf |

Leave is through May 29.  See attached.

**Official - SBU**
UNCLASSIFIED

137.    Knowing that JJTP had no intention of coming back to the office to continue to put up with their harassment, the FFDE was a parting shot ruin his career in retaliation just as they had threatened to do.

*xiii.    Taking of JJTP's Annual Leave in Violation of OPM policy*

138.    As a result of being put on the FFDE, and having his Department OpenNet access taken, JJTP was not able to put in leave slips in the normal way through the forms and GEMS system in OpenNet. As such he had to send his request in manually via an e-mail to his then acting point of contact Etienne Singleton who was then the special assistant to the director.

139.    JJTP did in fact send a leave request to preserve his expiring annual leave to Singleton on or around 15 November 2019 as seen below:



Friday, November 15, 2019

**Via Email**

▇▇▇▇▇@state.gov

<u>**In Re: Leave Request December 2019**</u>

Page | 1

Dear SSA Singleton:

Thanks for taking the time to speak with me yesterday.

As we spoke about, I am scheduled to return to duty on 2 December 2019 however I have approximately 122.5 hours of use or lose AL. I would obviously like to use that time or find how to be paid for it as it is approximately $6300 worth of time or more than 15% of my annual salary.

By my calculation that is 15 days and 2.5 hours and as you are my point of contact and I don't have access to HR portal or my email ( I understand I have been removed from the GAL completely) I would like to make the request to schedule it.

Can I schedule 8 hours for each day (Standard time 0700-1700 with a lunch) from 9 December 2019 to 13 December 2019, 16 December 2019 to 20 December 2019, and on the 23, 24, 26, 27, and 31st.

Additionally, can I schedule the last 2.5 on 6 December 2019 at the end of the day.

Speaking with Dr. Tramontin, I may not be restored to duty status before the end of the year but in case I am not I do not want to lose the time. I will reach out to TJ Sheldon as you told me to should this situation arise.

Thank you in advance.

Please feel free to contact me at ▇▇▇▇▇ should you have any questions.

Mahalo,

Jabari Jason Tyson-Phipps

140.    The leave was never granted and as such under OPM rules JJTP is entitled to the leave being restored which the Department has refused to do in another act of retaliation.

141.    When pressed on the issue Shelton made a remark that JJTP should feel lucky because he was given Seven months off for free and that he was not entitled to leave being restored despite the regulations. in essence Sheldon stated that the department would not comply with federal regulations to restore the leave that they had taken from JJTP.

142.    It should be noted that OPM policy states:

## Annual Leave While on Extended Excused Absence

An agency cannot require an employee to use annual leave when the agency has placed the employee on extended excused absence (e.g., in cases where adverse actions are being pursued by the agency). However, being placed on extended excused absence does not relieve an employee of the responsibility to schedule annual leave that would otherwise be forfeited. If the employee fails to schedule (i.e., request in writing) the use of annual leave that would otherwise be forfeited, the agency cannot restore it to the employee. If an employee schedules (i.e., makes a writen request to use) annual leave, and the agency denies the request, the agency is required to restore the annual leave.

143.    It is clear in this case that the agency was pursuing adverse actions against JJTP in the form of the FFDE. Therefore, it cannot require him to have used his leave as they did. As seen above he did in fact make a written request to use the leave and that request was not honored and therefore under the policy he would be entitled to the leave being restored which Shelton and the Agency refused to do in retaliation for the EEOC complaint against them.

### B.  Issues Addressed in DOS-0385-19 Which Serve as a Basis For this Claim

144.    The scope of this action is limited to those issues covered under DOS-0385-19. The allegations that were addressed in that complaint were discrimination on the bases of race (Black-American), national origin (Dominican-American), color (Dark Skinned), and in reprisal for prior EEO-protected activities including:

a. On May 6, 2019, receiving an unfair performance evaluation;

b. On May 13, 2019, being denied the opportunity to participate in a sustainment skills class;

c. On May 16, 2019, having his law enforcement credentials, badge, and weapon taken;

d. On May 30, 2019, being placed on administrative leave;

e. On May 30, 2019, being compelled to submit to a Fitness for Duty Evaluation ("FFDE");

f. At the end of calendar year 2019, taking 118.5 hours of annual leave denying a request to have it restored;

g. Having his administrative promotion withheld since April of 2019; and

h. Being subjected to a hostile work environment, disparaging comments, derogatory remarks, inflammatory remarks, false accusations, heightened scrutiny of his work, and changes to his duty station up to May 3, 2019.

Each one of these has been addressed above

## C.  JJTP has Exhausted the Administrative Process

145.    As stated JJTP filed multiple EEOC complaints regarding the treatment he was receiving from the Agency including but not limited to DOS-0069-19 and the complaint this lawsuit is based on DOS-0385-19. JJTP exhausted all of his appeals in the EEOC and was given the right to file in federal court within 90 days on 19 December 2022 to the issues addressed in that EEOC complaint.

146.    On August 11, 2020, JJTP filed a complaint for retaliation with the OIG. In his report to DG Perez dated 10 May 2021, OIG SA Jeffrey D. McDermott stated on page 5-6:

> OIG found direct evidence that these protected disclosures were a contributing factor in the suspension of his clearance. As noted above, the reports of his June 4, 2020, and July 25, 2020, conversations were forwarded to PSS and placed in his security file. In forwarding these reports, DS managers discussed the possibility of using the reports to curtail his assignment. For example, the report of his June 4 conversation was forwarded to PSS by a DS manager who added the note that DS was speaking to the Bureau of Global Talent Management (GTM) about the issue on the following day and that "if he [Mr. Tyson-Phipps] causes more problems than [sic] we can look at curtailing him." Similarly, the report of his July 24 conversation was forwarded to a number of DS senior officials by a Deputy Assistant Secretary (DAS) in DS with the note: "This most recent interaction may result in GTM supporting the course of action that we requested months ago." The DAS told OIG that the course of action was curtailing Mr. Tyson-Phipps' assignment with USUN.

> The letter from PSS suspending Mr. Tyson-Phipps' clearance stated that the suspension was based in part on his "erratic behavior." DS officials told OIG that this phrase referred to interactions with his colleagues that made them uncomfortable, some of which included his conversations about discriminatory treatment, the subject of his protected disclosures.[15] Thus, Mr. Tyson-Phipps has met his burden by demonstrating that he made a protected disclosure that was a contributing factor in the suspension of his clearance.

147.    Further still SA Tyson-Phipps attempted to file internal grievances for the behavior complained about but was told that due to filing an EEOC complaint the filing of a grievance is barred.

148.    As such JJTP has exhausted all of his administrative remedies and his only recourse is to file this matter in district court and seek recompense here.

## D.    Subsequent Protected Activities, Retaliation, and Actions and History of Bad Behavior and Discrimination

149.    Subsequent to DOS-0385-19, the Agency has continued on its campaign of retaliation, escalating their acts as JJTP's filed cases made their way through the legal system in an attempt to extort JJTP to drop his actions against the Department with the Department's lawyer Mr. Stanley Todman openly stating as much.

150.    This has included among other thing (1) stripping JJTP of his security clearance in violation of 50 U.S.C. § 3341(j) and PPD-19; (2) stripping JJTP of pay; (3) relocating JJTP to a less desirable work environment; (4) placing JJTP on administrative leave a second time; (5) forcing JJTP to undergo a second FFDE; (6) attempting to bring multiple sets of federal charges against JJTP based on false allegations; (7) opening specious international investigations into JJTP wasting taxpayer money; (8) spreading false rumors and defaming of JJTP's character; and (9) continuing to violate JJTP's civil and Constitutional rights as well as federal law. These issues will not be and cannot be addressed in this case as they have not run their administrative course but due to the statute of limitation, the issues addressed in this complaint must be addressed at this time.

151.    It is DS's continued recalcitrance to abide by federal law and to continue to operate in a manner that brings shame to the nation and law enforcement and Agency's refusal to reign in the behavior absent a judicial ruling which gives rise to this action.

152.    This is not the only case pending against this agency. To name a few other cases involving some of the same individuals the Agency continues to protect and defend include to name a few:

    a.    HILL v. BLINKEN, 18-cv -2518 (DLF) pending in the US District Court for the District of Columbia pertaining to the team led by an African American  DS Agent

being symbolized by a baboon and which he objected and was then suspended and forced out of the Department.

b.  CHIEN v. SULLIVAN, 313 F.Supp.3d 1 (2018) pertaining to a Taiwanese American DS agent who was called a Chinese spy, discriminated against, and subjected to a hostile work environment.

c.  GARCIA V. BLIKEN, 7:21-CV-00270 Pending in the Southern District of Texas also for civil rights employment discrimination by DS.

153.  Rather than address these issues as federal law requires, the Agency chooses to punish those who complain in attempt to silence any dissent and dismiss directly or constructively anyone who files a complaint.

154.  When such complaints are filed the Agency uses the same playbook to never address the underlying facts of the complaint but rather have the cases dismissed on technicalities. This playbook includes:

a.  Discredit the person through false allegations and spreading of rumor through the Agency's system of "hallway reputation." This promulgates the high school like environment to begin a campaign of harassment and bullying against the individual in an attempt to make them lash out thereby giving a reason to take action against that person.

b.  Regardless of how the individual response, the next step is to accuse them of psychological issues to create the grounds to take their security clearance. This also gives the Department legal cover for their actions.

c.  Gaslight and accuse the victim of being the problem and the aggressor often by bringing up "warehoused" allegation meaning things that are stale and happened often times years prior which were never addressed or an issue until the person filed a complaint.

d.  Attack the complaining victim by bringing charges against them in an attempt to scare anyone else from making a complaint and get the victim to drop their charges against the Agency quietly.

e.  If necessary, take the individual's security clearance through specious charges or claims about their psychological state based on their responses to the previous things.

   f. Use code words such as the person is not a "team player", "interpersonal skills", "good judgement", or questioning their communication skills in their evaluations to mark them for dismissal because they are not a "good fit" for the Department.

155. These same things can be seen used time and time again by the Department. They are used to silence any dissent and make sure that any allegation never makes it to a jury.

156. Another way this is done is by secreting, hiding, and in some cases destroying evidence. Mr. Todman and the Department attorneys have further openly engaged in discovery violations which is why this case is being brought in this court and was not settled in the EEOC or at a lower level.

157. By way of example, there is an email in which SSA Bradly Lyn, who is the director of dignity protection comments that "Tyson-Phipps" was back at it by refused to stop complaining about SA King's suicide and what occurred. He indicated that they could use that to get rid of JJTP. Upon information and belief that email went to Deputy Assistant Secretary Ricardo Colon who used it to write a memo to Director Carlos Matus which resulted in JJTP being removed from duty, stripped of pay and his security clearance.

158. JJTP knew the email existed based on the EEOC and OIG report where it was referred to and based on a tip. As a result, he filed a FIOA request which the Agency fought. Eventually he was given a redacted version of the email but when he asked for the unredacted version in a discovery request in another pending EEOC case, Mr. Todman responded no such email existed.

159. This attitude mirrors why this case is being filed because rather than turn the documents and evidence over in this case the Department lawyers refused, and he proceeded without them which led to the finding in the Agency's favor based on lack of evidence presented.

160. The problem for Mr. Todman is that another Department lawyer in another case used the email in question in her motion to dismiss without informing Mr. Todman who she got the unredacted email from as his name was on the top of it even though he claimed he never saw it. That is an example of the games the Agency plays and what brings us to this Court today.

161. JJTP has taken every step to try to settle these matters admiratively, but the Department refuses to abide by the law until the are forced to by the Court which is what he is now requesting.

## FIRST CLAIM FOR RELIEF

## Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, for Employment Discrimination on the Basis of Race, Color, and National Origin

162.    JJTP hereby incorporates by reference and realleges each and every allegation above.

163.    Based on the facts and allegations asserted in this complaint and those which will be developed more fully as the case continues, the Defendant's acts and the conduct complained of herein constitute violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17, for employment discrimination on the basis of race, color, and national origin.

164.    The Department has discriminated against JJTP with respect to his compensation, terms, conditions, or privileges of employment, because of his race, color, and national origin[3].

165.    The Department has limited, segregated, or classified JJTP in a way which would deprive or tend to deprive him of employment opportunities or otherwise adversely affect his status as an employee because of his race, color, and national origin[4].

166.    The Department has discriminated against JJTP because of his race, color, and national origin, and classified him on the basis of his race, color, and national origin[5].

167.    The Department has discriminated against JJTP in regard to training because of his race, color, and national origin[6].

168.    The Department has discriminated against JJTP because he has opposed any practice made an unlawful employment practice by the subchapter named above, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under the same subchapter[7].

169.    The Department's conduct described herein, and which will be further enumerated at trial as violated other sections of Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17 which as caused injury to JJTP and as a result, he has suffered and will continue to suffer irreparable harm from the Defendant's actions.

---

[3] 42 U.S. Code § 2000e–2 (a)(1)
[4] 42 U.S. Code § 2000e–2 (a)(2)
[5] 42 U.S. Code § 2000e–2 (b)
[6] 42 U.S. Code § 2000e–2 (d)
[7] 42 U.S. Code § 2000e–2 (a)

170.     As a direct and proximate result of the Defendant's unlawful acts, JJTP has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

171.     By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of discrimination, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant.

## SECOND CLAIM FOR RELIEF
### Violations of 42 U.S.C. § 1981 for Intentional Employment Discrimination on the Basis of Race

172.     JJTP hereby incorporates by reference and realleges each and every allegation above.

173.     The Defendant's acts and the conduct complained of herein constitute a violation of 42 U.S.C. § 1981 for intentional employment discrimination on the basis of race.

174.     42 U.S. Code § 1981 provides for equal rights and protection under the law. It provides for "equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other." The Department's conduct as described herein violates JJTP's rights to such equal protection under that law as in many instances the Department has treated him blatantly different and lesser as a Black American of Hispanic origin and first generation American.

175.     As a result of the Department's intentional action and hypocrisy as the United States is supposed beacon on a hill sowing other nations how to proper treat their citizens with equality and free of discrimination, JJTP has suffered and will continue to suffer irreparable harm.

176.     As a direct and proximate result of the Defendant's unlawful acts, JJTP has suffered and will continue to suffer damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

177.     By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of discrimination, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have

been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant.

### THIRD CLAIM FOR RELIEF
### Violations of Title VII and Section 1981 for Retaliation

178.    JJTP hereby incorporates by reference and realleges each and every allegation above.

179.    The Defendant's acts and the conduct complained of herein constitute retaliation under Title VII and Section 1981.

180.    Title VII of the Civil Rights Act of 1964 (the "Act") prohibits an employer from retaliating against an employee who has "made a charge, testified, assisted or participated in" any charge of unlawful discrimination under the Act.

181.    The records show JJTP has engaged in any number of protected activities including but not limited to prior EEOC complaints such as DOS-0069-19 and that which is shown in Exhibit 2. In addition, he opposed the unlawful employment practice as described herein. By way of example JJTP's complaint about his 2018 and 2019 EER rating in which NYFO management sought to give him unsatisfactory rating in violation of federal law and Department policy which as the email from Deputy Assistant Secretary for GTM Jeanne M. Juliao states clearly was in fact a violation and had to be changed which JJTP had to fight for. Directly, the day after they were forced to make the change, they took JJTP's, badge, weapons, and credentials and put him on indefinite leave.

182.    The Department subjected JJTP to multiple adverse employment actions including but not limited to unfair performance evaluations; being denied training opportunities and work; taking his law enforcement credentials, badge, and weapons; being placed on administrative leave; being compelled to submit to multiple FFDEs; taking 118.5 hours of annual leave from him and denying the request to have it restored; withholding his administrative promotion since April of 2019; and subjecting him to a hostile work environment, disparaging comments, derogatory remarks, inflammatory remarks, false accusations, heightened scrutiny of his work, and changes to his duty station.

183.    Further the evidence stated herein and that which will be developed at trial clearly indicate that the reason JJTP was subjected to these, and other adverse employment actions was due to his participation in protected activities. By way of example, Carlson's 15 April 2019 memo to Shelton described and copied above directly states his primary and first reason for having JJTP's administrative

promotion withheld was because JJTP had reached out to the US Attorney's Office for the Southern District of New York and reported what he believed to be an unlawful practice and that he was being forced to participate in it. Another example is that of his performance evaluations which Carlson and Jagels clearly state are a result of his participating in protected activities.

184.    Unlawful retaliation is established when a causal connection is established between a materially adverse action and the individual's protected activity. Under the Cat's Paw theory of liability adopted by the Second Circuit[8], the retaliatory animus need not necessarily be held by the employer's official who took the materially adverse action; an employer still may be vicariously liable if one of its agents, motivated by discriminatory or retaliatory animus, intentionally and proximately caused the official to take the action[9].

185.    For Title VII and ADEA retaliation claims against federal government employers, due to different statutory wording, the EEOC has held that the "motivating factor" causation standard applies based the ruling in Univ. of Tex. Sw. Med. Ctr. v. Nassar, 133 S. Ct. 2517, 2534 (2013) [10,] . The "motivating factor" standard can be met even if the employer would have taken the same action absent a retaliatory motive.[11,12]

186.    "The federal sector provisions contain a "broad prohibition of 'discrimination' rather than a list of specific prohibited practices," requiring that employment "be made free from any

---

[8] In Vasquez v. Empress Ambulance Service, Inc., No. 15-3239-cv (August 29, 2016), the Second Circuit Court of Appeals set new precedent when it held that an employer may be held liable for the retaliatory intent of a nonsupervisory employee under Title VII of the Civil Rights Act of 1964.

[9] Staub v. Proctor Hosp., 562 U.S. 411, 418-22 (2011) (applying "cat's paw" theory to a retaliation claim under the Uniformed Services Employment and Reemployment Rights Act, which is "very similar to Title VII"; holding that "if a supervisor performs an act motivated by antimilitary animus that is intended by the supervisor to cause an adverse employment action, and if that act is a proximate cause of the ultimate employment action, then the employer is liable"); Zamora v. City of Hous., 798 F.3d 326, 333-34 (5th Cir. 2015) (applying Staub, the court held there was sufficient evidence to support a jury verdict finding retaliatory suspension; Bennett v. Riceland Foods, Inc., 721 F.3d 546, 552 (8th Cir. 2013) (applying Staub, the court upheld a jury verdict in favor of white workers who were laid off by management after complaining about their direct supervisors' use of racial epithets to disparage minority coworkers, where the supervisors recommended them for layoff shortly after workers' original complaints were found to have merit).

[10] See, e.g., Nita H. v. Dep't of Interior, EEOC Petition No. 0320110050, 2014 WL 3788011, at *10 n.6 (EEOC July 16, 2014) (holding that the "but-for" standard does not apply in federal sector Title VII case)

[11] Questions and Answers: Enforcement Guidance on Retaliation and Related Issues | U.S. Equal Employment Opportunity Commission (eeoc.gov)

[12] Enforcement Guidance on Retaliation and Related Issues | U.S. Equal Employment Opportunity Commission (eeoc.gov)

discrimination," including retaliation. Therefore, in Title VII and ADEA cases against a federal employer, retaliation is prohibited if it was a motivating factor.[13]"

187.    In order for the employee to prevail in demonstrating a violation, the evidence must show that it is more likely than not that retaliation has occurred. Examples of facts that may support finding of retaliation include:

> a.  Suspicious timing i.e., evidence that the adverse action occurred shortly after the plaintiff engaged in protected activity[14]. Temporal proximity is not necessary to establish a causal link[15]. Even when the time between the protected activity and the adverse action is lengthy, other evidence of retaliatory motive may establish the causal link[16]. Moreover, like in this case, an opportunity to engage in a retaliatory act may not arise right away. In these circumstances, a materially adverse action might occur long after the original protected activity occurs, and retaliatory motive is nevertheless proven[17].

---

[13] See Gomez-Perez v. Potter, 553 U.S. 474, 487-88 (2008) (holding that the broad prohibition in 29 U.S.C. § 633a(a) that personnel actions affecting federal employees who are at least 40 years of age "shall be made free from any discrimination based on age" prohibits retaliation by federal agencies); see also 42 U.S.C. § 2000e-16(a)(providing that personnel actions affecting federal employees "shall be made free from any discrimination" based on race, color, religion, sex, or national origin).

[14] See, e.g., Quiles-Quiles v. Henderson, 439 F.3d 1, 8-9 (1st Cir. 2006) (concluding that jury could infer causation from evidence that harassment by supervisors intensified shortly after plaintiff filed an internal complaint); Hossaini v. W. Mo. Med. Ctr., 97 F.3d 1085, 1089 (8th Cir. 1996) (holding that a reasonable factfinder could infer that defendant's explanation for plaintiff's discharge was pretextual where defendant launched investigation into allegedly improper conduct by plaintiff shortly after she engaged in protected activity).

[15] Abbott v. Crown Motor Co., 348 F.3d 537 (6th Cir. 2003) (ruling that causation shown notwithstanding 11-month interim because supervisor stated his intention to "get back at" those who had supported the discrimination allegations); Kachmar v. SunGard Data Sys., 109 F.3d 173, 178 (3d Cir. 1997) (ruling that district court erroneously dismissed plaintiff's retaliation claim because termination occurred nearly one year after her protected activity; when there may be reasons why adverse action was not taken immediately, absence of immediacy does not disprove causation); Shirley v. Chrysler First, Inc., 970 F.2d 39, 44 (5th Cir. 1992).

[16] See, e.g., Muñoz v. Sociedad Española de Auxilio Mutuo y Beneficiencia de P.R., 671 F.3d at 56-57 (concluding that evidence supported jury's finding that plaintiff, a doctor, was discharged in retaliation for ADEA lawsuit filed 5 years earlier, where the evidence showed plaintiff was fired for common conduct for which others were not disciplined, he was not given an opportunity to defend himself, and had been threatened years earlier by one of the decisionmakers that if he filed the suit he would never work at the hospital or in Puerto Rico again); Rao v. Tex. Parks & Wildlife Dep't, No. 4:13-cv-0726, 2014 WL 1846102, at *3 (S.D. Tex. May 8, 2014) (holding that denial of promotion could be shown to be in retaliation for complaint filed three years earlier, where decisionmaker said to plaintiff "you didn't do anything wrong, but you filed that complaint").

[17] Davis v. Team Elec. Co., 520 F.3d 1080, 1094 (9th Cir. 2008); Goldsmith v. Bagby Elevator Co., 513 F.3d 1261, 1278 (11th Cir. 2008); Hamilton v. Gen. Elec. Co., 556 F.3d 428, 436 (6th Cir. 2009).

b.  Oral or written statements made to the employee or others by the individuals recommending or approving the challenged adverse action may reveal retaliatory intent by expressing retaliatory animus or by revealing inconsistencies, pre-determined decisions, or other indications that the reasons given for the adverse action are false[18].

c.  An inference that the adverse action was motivated by retaliation could also be supported by evidence that the employer treated more favorably a similarly situated employee who had not engaged in protected activity. For example, where a disciplinary action was taken for alleged retaliatory reasons, evidence of selective enforcement (i.e., that infraction regularly goes undisciplined in that workplace, or that another employee who committed the same infraction was not disciplined or was not disciplined as severely) could be sufficient to infer retaliatory motive[19]. Similarly, absent evidence of new performance problems, a retaliatory motive might be inferred where an employee had higher performance appraisals prior to engaging in protected activity.

d.  If the employer changes its stated reason for the challenged adverse action over time or in different settings (e.g., reasons stated to employee in termination meeting differ from reasons employer cites in position statement filed with the EEOC), pretext may be inferred[20].

e.  Other evidence that employer's explanation was pretextual.

---

[18] See, e.g., Burnell v. Gates Rubber Co., 647 F.3d 704, 709-10 (7th Cir. 2011) (concluding that evidence of plant manager's statement to African-American employee that he was "playing the race card" was sufficient to deny employer's motion for summary judgment on claim of retaliatory termination for race discrimination complaints); Abbott v. Crown Motor Co., 348 F.3d 537, 544 (ruling that summary judgment for employer on retaliation claim was improper where evidence showed supervisor stated he would "get back at those who had supported the charge of discrimination," told plaintiff he was being discharged for bringing "the morale of the shop down," and told the managing partner he fired plaintiff because he had put his nose in other people's business by testifying in support of coworker's discrimination allegations).
[19] Spengler v. Worthington Cylinders, 615 F.3d 481, 494-95 (6th Cir. 2010) (concluding that evidence showed that plaintiff, who was discharged after raising an age discrimination allegation, was a valuable employee and that the rule pursuant to which he was terminated had been selectively enforced).
[20] Pantoja v. Am. NTN Bearing Mfg. Corp., 495 F.3d 840, 851 (7th Cir. 2007) (ruling that inconsistent explanations by employer presented issue for jury); Loudermilk v. Best Pallet Co., 636 F.3d 312, 315 (7th Cir. 2011) (ruling that pretext could be shown because between the EEOC investigation and the litigation, the employer shifted its explanation for plaintiff's termination from reduction in force to mutual decision and then to violation of a company policy).

188.    All of these facts that form a basis to infer retaliation are found in this case and have been described herein. As a direct and proximate result of these unlawful and willful actions of the Agency and its employees, JJTP has suffered and will continue to suffer irreparable harm as well as damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

189.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant.

## FOURTH CLAIM FOR RELIEF

## Violation of the Whistleblower Protection Enhancement Act of 2012 ("WPEA") 5 U.S.C. § 2302(b)(8) & (9)

190.    JJTP hereby incorporates by reference and realleges each and every allegation above.

191.    The Defendant's acts and the conduct complained of herein constitute violations of the Whistleblower Protection Enhancement Act of 2012 (WPEA) specifically 5 U.S.C. § 2302(b)(8) & (9).

192.    5 U.S.C. § 2302(b)(8) provides "[a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority…take or fail to take, or threaten to take or fail to take, a personnel action with respect to any employee or applicant for employment because of any disclosure of information by an employee or applicant which the employee or applicant reasonably believes evidences any violation of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority…any disclosure to the Special Counsel, or to the Inspector General of an agency or another employee designated by the head of the agency to receive such disclosures, of information which the employee or applicant reasonably believes evidences any violation (other than a violation of this section) of any law, rule, or regulation, or gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety…any disclosure to Congress (including any committee of Congress) by any employee of an agency or applicant for employment at an agency of information described in subparagraph (B) that is not classified or if classified has been classified by the head of an agency that is

not an element of the intelligence community (as defined by section 3 of the National Security Act of 1947 (50 U.S.C. 3003)); and does not reveal intelligence sources and method"

193.    5 U.S.C. § 2302(b)(9) "[a]ny employee who has authority to take, direct others to take, recommend, or approve any personnel action, shall not, with respect to such authority…take or fail to take, or threaten to take or fail to take, any personnel action against any employee or applicant for employment because of the exercise of any appeal, complaint, or grievance right granted by any law, rule, or regulation with regard to remedying a violation of paragraph (8); or other than with regard to remedying a violation of paragraph (8); testifying for or otherwise lawfully assisting any individual in the exercise of any right referred to in subparagraph (A)(i) or (ii); cooperating with or disclosing information to the Inspector General (or any other component responsible for internal investigation or review) of an agency, or the Special Counsel, in accordance with applicable provisions of law; or refusing to obey an order that would require the individual to violate a law, rule, or regulation."

194.    "Disclosure" is defined as "a formal or informal communication or transmission, but does not include a communication concerning policy decisions that lawfully exercise discretionary authority unless the employee or applicant providing the disclosure reasonably believes that the disclosure evidences (i)any violation of any law, rule, or regulation; or (ii)gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."

195.    The Department is a covered agency yet has shirked its duty to enforce the WPEA 5 U.S.C. § 2302(b)(8) & (9). The facts provided herein show that JJTP engaged in any number of protected disclosures and has suffered and continues to suffer any number of adverse prohibited personnel actions as a result of those disclosures which the Agency has refused to remedy and in fact has protected those responsible for those actions from the consequences for their actions in violation of the law. The only person the Agency has gone after for those disclosures is JJTP.

196.    As a direct and proximate result of the Agency's continuing violation of the WPEA, JJTP has suffered and will continue to suffer, irreparable harm as well as damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

197.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the

willful, intentional, and/or grossly negligent activities of the Defendant. Further, JJTP requests the Court to compel the Agency to comply with the WPEA and 5 U.S.C. § 2302 and name all of the individuals who have violated the statute and apply the appropriate corrective actions under the statute to each one.

## FIFTH CLAIM FOR RELIEF

### Violations of the First Amendment to the United States Constitution

198.    JJTP hereby incorporates by reference and realleges each and every allegation above.

199.    By the acts described above, the Defendant has violated JJTP's rights guaranteed by the First Amendment to the United States Constitution.

200.    The First Amendment provides that Congress make no law respecting an establishment of religion or prohibiting its free exercise. It protects freedom of speech, the press, assembly, and the right to petition the Government for a redress of grievances[21].

201.    According to the Agency's own rationale, JJTP was placed on administrative leave due to his exercising of his free speech right to complain about the treatment he was receiving from NYFO Management specifically Carlson in that Carlson had lied to the DG Perez and was attempting to force him to accept an unsatisfactory rating in violation of federal law in Department policy. After he was solicited from his supervisory agent to answer what was wrong JJTP disclosed what Carlson and Shelton were doing in extorting him and that disclosure was given as a grounds to not only put JJTP on an FFDE, but unsuccessfully attempt to get multiple US Attorneys to bring criminal charges against him, withhold his administrative promotion for not nearing 4 years, propose him for suspension multiple times, remove him from duty multiple times, take his security clearance, law enforcement authority, weapons, badges, and credentials, as well as reassign him multiple times to less desirable positions among other things described herein and which will be developed more at trial. All of these things constitute adverse employment actions and prohibited personnel practices that rise to the level of civil rights violations which the Department has shielded the individuals responsible from being accountable for.

---

[21] First Amendment – "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the government for a redress of grievances."

202.    As a direct and proximate result of the Agency's actions JJTP has suffered and will continue to suffer, irreparable harm and damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

203.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant. Further, JJTP requests the Court to compel the Agency to comply with the First Amendment and name all of the individuals who have violated the Constitution in this case and apply the appropriate corrective action to each.

## SIXTH CLAIM FOR RELIEF

## Violations of the Second Amendment to the United States Constitution

204.    JJTP hereby incorporates by reference and realleges each and every allegation above.

205.    By the acts described above, the Defendant has violated JJTP's rights guaranteed by the Second Amendment to the United States Constitution.

206.    The Second Amendment gives citizens the right to bear arms. It states: "A well-regulated militia, being necessary to the security of a free state, the right of the people to keep and bear arms, shall not be infringed."

207.    Justice Clarence Thomas in his opinion for the United States Supreme Court in New York State Rifle & Pistol Association Inc. v. Bruen, 597 U.S. ___ (June 23, 2022), stated: "In keeping with Heller, we hold that when the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. To justify its regulation, the government may not simply posit that the regulation promotes an important interest. Rather, the government must demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation. Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's "unqualified command." Quoting Konigsberg v. State Bar of Cal., 366 U. S. 36, 50, n. 10 (1961)."

208.    The Law Enforcement Officers Safety Act ("LEOSA") is currently and was at all relevant times a United States federal law, enacted in 2004, that allows two classes of persons - the

"qualified Law Enforcement officer" and the "qualified retired or separated Law Enforcement officer" - to carry a concealed firearm in any jurisdiction in the United States or United States Territories, regardless of state or local laws. At all times relevant, JJTP was a qualified Law Enforcement officer.

209.    In the Commonwealth of Pennsylvania, any person who is at least 18 years old and legally entitled to possess a firearm can open carry. Concealed carry is legal for residents with a proper license.

210.    The statute that authorizes DS special agents to carry firearms is 22 U.S. Code § 2709. It states in relevant part: DS Agents may "if designated by the Secretary and qualified, under regulations approved by the Attorney General, for the use of firearms, carry firearms for the purpose of performing the duties authorized by this section;… (3)Firearms regulations- The Secretary of State shall prescribe regulations, which shall be approved by the Attorney General, with respect to the carrying and use of firearms by special agents under this section"[22].

211.    At all times relevant, JJTP had a legally issued Pennsylvania concealed carry permit.

212.    In regard to the period in question, at no time did JJTP cross state lines with his personal firearms which were purchased and compliant with Pennsylvania state law.

213.    Notwithstanding these facts, all of which are known to the Agency, it has inexplicitly openly chosen to defy the US Supreme Court, federal law, and its own regulations to try to punish JJTP for an offense that did not exist at the time, and they have no authority to create as it is Congress not the State Department who writes federal laws. It is a law/rule that they knows still does not exist to this day yet they have attempted to abuse their authority and the power of the US Government to force a punishment in an attempt to extort a settlement for their offenses against JJTP.

214.    As stated above, Carlson explicitly stated that JJTP's carrying of his legal licensed weapon which violated no federal, state, or local laws nor did it violate the Department regulation was the grounds he used to lie to DG Perez about JJTP receiving an unsatisfactory rating in 2019 which has led to the withholding of his Administrative promotion since April of 2019.

215.    To this day it is the grounds the Department uses to justify withholding JJTP's administrative promotion that was due in April 2019 as well as proposing him for suspension among other adverse employment actions.

---

[22] 22 U.S. Code § 2709(a)(4) and (b)(3)

216.    As such, the Department is violating JJTP's 2nd Amendment civil right to own and carry a firearm within the scope and laws of the Commonwealth of Pennsylvania as well as the 10th Amendment is that it is without any statutory or other authority usurping a power reserved to the Commonwealth of Pennsylvania.

217.    The Department' actions constitute a blatant violation of the 2nd and 10th Amendments to the US Constitution and a violation of JJTP's civil rights for which he has suffered and will continue to suffer irreparable harm as well as damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

218.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant. Further, JJTP requests the Court to compel the Agency to comply with the Second Amendment and name all of the individuals who have violated the Constitution in this case and apply the appropriate corrective action to each.

## SEVENTH CLAIM FOR RELIEF
### Violations of the Fifth Amendment to the United States Constitution

219.    JJTP hereby incorporates by reference and realleges each and every allegation above.

220.    By the acts described above, the Defendant has violated JJTP's rights guaranteed by the Fifth Amendment to the United States Constitution.

221.    The Fifth Amendment's Due Process Clause requires the United States government to practice equal protection. As described herein, JJTP has suffered discriminate and unequal treatment as well as unequal protection and application of the laws of the United States as well as Department policy. As a direct and proximate result of the Department's blatant discrimination and unequal treatment, JJTP has suffered and will continue to suffer, irreparable harm as well as damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

222.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore

JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant. Further, JJTP requests the Court to compel the Agency to comply with the Fifth Amendment and provide equal protection and treatment under the law for JJTP as well as compel the Department to name all of the individuals who have violated the Constitution in this case and apply the appropriate corrective action to each.

## EIGHTH CLAIM FOR RELIEF

### Violations of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297, for Employment Discrimination on the Basis of Race, Creed, Color, and National Origin

223.    JJTP hereby incorporates by reference and realleges each and every allegation above.

224.    New York State Human Rights Law protects employees who work in the state of New York from discrimination because of age, race, creed, color, national origin, sexual orientation, military status, sex, marital status, or disability.

225.    For the reasons stated herein, the Defendants' acts and the conduct complained of herein constitute violations of the New York State Human Rights Law, N.Y. Exec. Law §§ 290 to 297, for employment discrimination on the basis of race, creed, color, and national origin and as a direct and proximate result JJTP has suffered and will continue to suffer irreparable harm as well as damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

226.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant. Further, JJTP requests the Court to compel the Agency to comply with the New York State Human Rights Law and name all of the individuals who have violated the statute and apply the appropriate corrective action under the statute to each one.

## NINTH CLAIM FOR RELIEF

## Violations of New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131, for Employment Discrimination on the Basis of Actual or Perceived Race, Creed, Color, and National Origin

227.    JJTP hereby incorporates by reference and realleges each and every allegation above.

228.    New York City Human Rights Law protects employees who work in the city of New York from prejudice, bias, and discrimination as a result of their actual or perceived differences, including those based on race, color, creed, age, national origin, immigration or citizenship status, gender, sexual orientation, disability, marital status, partnership status, caregiver status, sexual and reproductive health decisions, uniformed service, any lawful source of income, status as a victim of domestic violence or status as a victim of sex offenses or stalking, whether children are, may be or would be residing with a person or conviction or arrest record. because of age, race, creed, color, national origin, sexual orientation, military status, sex, marital status, or disability.

229.    For the reasons stated herein, the Defendants' acts and the conduct complained of herein constitute violations of the New York City Human Rights Law, N.Y. City Admin. Code §§ 8-101 to 131, for employment discrimination on the basis of race, creed, color, and national origin and as a direct and proximate result JJTP has suffered and will continue to suffer irreparable harm as well as damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

230.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant. Further, JJTP requests the Court to compel the Agency to comply with the New York City Human Rights Law and name all of the individuals who have violated the statute and apply the appropriate corrective action under the statute to each one.

## TENTH CLAIM FOR RELIEF

### Violations of Section 740 of the New York Labor Law Prohibiting Retaliatory Action by Employers

231.    JJTP hereby incorporates by reference and realleges each and every allegation above.

232.    Section 740 of the New York Labor Law prohibits retaliatory action or threats of retaliatory actions by employers for disclosures they reasonably believes is in violation of law, rule or regulation; if they provide information to, or testifies before, any public body conducting an investigation, hearing or inquiry into any such activity, policy or practice by such employer; or object to, or refuses to participate in any such activity, policy or practice. [23]

233.    For the reasons stated herein the Departments actions and the conduct complained of herein constitute violations of Section 740 of the New York Labor Law Prohibiting Retaliatory Actions by Employers. As a direct and proximate result of their actions JJTP has suffered and will continue to suffer, irreparable harm as well as damages in an amount that is not presently ascertainable, but will be established at trial, and, at minimum, exceeds $75,000, exclusive of interest and costs.

234.    By reason of the foregoing, JJTP is entitled to injunctive relief against the Defendant, and anyone associated therewith, to restrain further acts of retaliation, to compel the Defendant to restore JJTP to the place he would be in but for their actions, and to recover any damages proven to have been caused by reason of the Defendant's aforesaid acts and to recover enhanced damages based upon the willful, intentional, and/or grossly negligent activities of the Defendant. Further, JJTP requests the Court to compel the Agency to comply with Section 740 of the New York Labor Law and name all of the individuals who have violated the statute and apply the appropriate corrective action under the statute to each one.

---

[23] Section 740 of the New York Labor Law

## PRAYER FOR RELIEF

**WHEREFORE**, based on the foregoing, JJTP prays for a judgment against the Defendant to restore him to where he would have been but for the Agencies unlawful actions including but not limited to as follows:

a. An injunction against the Department violating JJTP's civil rights as described herein and compelling them to comply with all applicable federal, state, and local laws;

b. An immediate restoration of JJTP to duty including his security clearance, law enforcement availability pay, and law enforcement powers including any and all equipment necessary to perform his duties;

c. An immediate order to grant JJTP the administrative promotion to FS-4 he was due in April 2019 with all backpay, interest, as well as maximum contributions to his TSP as he had been doing as well as moneys representing the rate of return which would have been earned since April 2019;

d. A further order to promote JJTP to where those in his class are currently as that is where he would have been but for the Department's actions as well as an immediate turning over of the commemorative badge plaque that JJTP paid for;

e. The clearing of JJTP's OPM and other personnel records of any derogatory material information that was added with bias or as a result of retaliation including all backpay, interest, as well as capped contributions to his TSP and their rate of return which would have been earned;

f. All moneys owed for moneys expended by JJTP in preforming his duties including the moneys representing the use of his car and tolls during his time at the NYFO and the moneys not paid for his permanent changes of station;

g. All backpay and interest owned from the taking of his law enforcement availability pay;

h. All contributions to his retirement account which were due;

i. If the Department continues to assert that JJTP is no longer fit for duty, full medical retirement effective to the day he was put out;

j. Repayment of JJTP's student loans as he would have received but for the Department's actions;

k. Repayment of moneys owned to the taken leave as well as for overtime he was compensated for;

l. Any all costs incurred to bring this suit and enforce the laws against the Department including but not limited to court costs, attorneys fees, and incidental expenses;

m. Paid time off to recuperate from the stress induced by the Department;

n. A return of JJTP's taken 24 hours of leave during pay period 26 of 2019 as well as all other leave taken;

o. All other damages the court sees fit.


## DEMAND FOR JURY TRIAL

Pursuant to Rules 38(b) and 38(c) of the Federal Rules of Civil Procedure, JJTP requests a trial by jury for all issues so triable.

Dated: This 18th day of March 2023
New Rochelle, New York

Respectfully submitted,

SA Jabari-Jason Tyson-Phipps, Esq.

Pro Se

NY# 4689451 | SDNY #JT9451

EDNY # JT8685 | SCOTUS # 4689451

255 North Ave #1096

New Rochelle, NY 10802-1096

646-934-9694

JJTP@jjtpgroup.com