# Exhibit E



**United States Department of State**

*Washington, D.C.   20520*

SENSITIVE BUT UNCLASSIFIED                    April 15, 2019

**INFORMATION MEMO FOR TJ Shelton – DS/EX/HRM**

FROM:        DS/FLD/NYFO – Peter Carlson

SUBJECT:    (SBU) Administrative Promotion Denial for SA Jason-Jabari Tyson-Phipps

BLUF:        (SBU) The Rating and Reviewing Officers for SA Jason-Jabari Tyson-Phipps do not recommend him for Administrative Promotion.  The reason for this determination is his performance has been unsatisfactory.  Moreover, he has been advised of the areas of performance which are deficient, but failed to improve.

**(SBU)** SA Jason-Jabari Tyson-Phipps has been given a reasonable opportunity to demonstrate satisfactory performance.  Not only has he failed to improve, he continues to repeat the same poor judgment and poor interpersonal skills.  This recommendation to Human Resources (HR) to withhold his administrative promotion is not made flippantly, nor is it made based purely on the employee's mistakes.  As seasoned managers, both the Rater and Reviewer expect that agents will make mistakes.  I speak from experience when I say that I have often learned more from my mistakes than my successes.  What troubles me the most is that SA Tyson-Phipps not only refuses to take responsibility for his actions but is adamant that he had not made any mistakes at all (often blaming someone else for his "incidents" or short-comings).

Among the incidents was an email SA Tyson-Phipps sent to an investigator working at US Attorney's Office for the Southern District of New York.  In the email, SA Tyson-Phipps criticized New York Field Office management for their recommendations on how to proceed with a passport fraud investigation assigned to him.  SA Tyson-Phipps was then counseled by his rater and reviewer to show better judgment when communicating with personnel outside of our office.  Because of the email he sent, SA Tyson-Phipps was given a DS-1974 Professional Development Form identifying areas for improvement, specifically in this case focusing on how his actions, deeds and words are perceived by others and sharpening his interpersonal skills.  The DS-1974 is attached which includes SA Tyson-Phipps response.  I would have wanted SA Tyson-Phipps to learn that even though his intentions were good, the way that he executed them was not appropriate.  There is a saying, "good initiative, bad judgment;" I would have hoped that SA Tyson-Phipps would have looked at this as an opportunity to improve his judgment while maintaining his good initiative.

A second incident occurred about two months later when SA Tyson-Phipps was working in Philadelphia on a protective detail for the US Ambassador to the United Nations.  During the protective detail another agent observed SA Tyson-Phipps was carrying a secondary weapon in a holster on his ankle.  This weapon was SA Tyson-Phipps' personal weapon; it was not issued or approved by the Diplomatic Security Service.  This is a violation of 12 FAH-9 H-022 (7) which

prohibits, "Carrying or using any firearm, ammunition, or related equipment not specifically issued or approved by the Department of State."   SA Tyson-Phipps was then counseled by his rater and reviewer to show better judgment and better understanding of very elementary Diplomatic Security Service regulations.  He was given a DS-1974 Professional Development Form, specifically asking him to "… focus on his judgment and interpersonal skills as we go into the United Nations General Assembly (UNGA) 73."  In response to receiving the DS-1974 SA Tyson-Phipps stated no supervisor actually saw him carrying this weapon, the agent who did see it only saw it briefly and then only a small bit of it which stuck out from underneath his pants, it was not loaded, he had no place to store it safely, he wore it for officer safety, he was licensed to carry it in Pennsylvania, other regulations contradicted the provision cited, he did not wear it as part of his law enforcement and protection responsibilities and he did not display the weapon. He wrote, the "reading of this section of the FAH would infringe my second amendment rights as well as the license I have to carry the weapon as well as be nonsensical because it would suggest that a person could never carry their own weapon whenever they had their duty weapon." The DS-1974 is attached, however, his confusing and verbose argument is not the only cause for concern.  I find this so concerning, not only of his reluctance to take responsibility for violating rules and regulations, but also that it could have been avoided.  When both his DS colleagues who he was on post with informed him that he was not authorized to carry his personal firearm, he could have just asked what their suggestions were for safeguarding his personal weapon. Instead, he became combative and argumentative with them stating that it was his right to carry it (at no time did he make any of the arguments he made in his 1974 rebuttal).  Again, this was a lost opportunity for him to have learned from a mistake.  This was brought to the attention of our management team by SA Tyson-Phipps' colleagues not to "get him in trouble" but out of real concern that SA Tyson-Phipps could potentially find himself in a situation where the ramifications of his actions could be devastating.

A third incident occurred two months later during the United Nations General Assembly.  SA Tyson-Phipps was assigned to work the "chutes."  The chutes are a series of police controlled roads to allow protective details to drive to the United Nations building as quickly as possible. The Diplomatic Security agents who work the chutes assist our protective details who are moving by vehicle or on foot to get through the many layers of security and get to the appropriate location to enter the United Nations. One of the key rules is to not allow any movement of people or vehicles approximately 15 minutes before, then during and then 15 minutes after a Presidential move.

On September 25 at 5:40pm there was a Presidential freeze on.  However, SA Tyson-Phipps accompanied a woman who he said stated she was a "Minister" to 45th street, which is not an appropriate intersection to cross over to the United Nations. When he attempted to escort the woman, who was not a Diplomatic Security Service protectee, across the street the Secret Service stopped him telling him this was not an appropriate area to cross and in any case there was a Presidential freeze on.  All three of these factors, escorting a non-protectee, crossing at a blocked intersection and moving anyone during a Presidential freeze are all elementary prohibitions for a special agent working at the United Nations General Assembly and were briefed at the mandatory pre-UNGA briefing for all DS Agents. These elementary prohibitions were also briefed at a separate walkthrough and briefing specifically for DS agents working the chutes.  For this action SA Tyson-Phipp's rater wrote him a DS-1974 Professional Development

Form admonishing him on his lack of good judgment and interpersonal skills.  SA Tyson-Phipps response is in the attached DS-1974.

The management team takes no pleasure in opposing the administrative promotion of SA Tyson-Phipps.  I feel comfortable stating that the DS ethos is to take raw talent, train them and then let them go out to do the jobs for which they were trained.  Along the way, there will be mistakes and an opportunity for learning.  This learning will be done from peers, supervisors and often subordinates (I learn something from my employees almost daily).  SA Tyson-Phipps has rejected all of these opportunities to learn.  During his time at NYFO, a vast number of agents (other supervisors and peers) have tried to help him or offer him advice on his conduct; he has appeared to reject each attempt at that help (one example is the incident with him carrying his personal firearm on duty).  I feel as if everyone wanted SA Tyson-Phipps to succeed except himself.

In determining tenure and promotion we turn to our core precepts.  SA Tyson-Phipps has failed to show that he can perform many of these basic competencies.  As an example, under "Decision Making and Judgment" he has not displayed good judgment nor is he able to discern what is practical, ethical and allowable in official duties.  I feel the incident in escorting an unknown person, across the street in the middle of a presidential freeze shows extremely poor judgment.  Another competency is that the employee "…Accepts supervision, provides appropriate feedback and collaborates effectively…"  He has provided feedback although usually inappropriate and he has not accepted supervision.  His insistence he did nothing wrong when carrying an unauthorized firearm is a striking example of this problem.   I feel it clearly illustrates his reluctance to be supervised at all.  As to Written Communication, he does not "write succinctly…" nor "convey analysis clearly and highlight essential points."  His responses in the attached DS-1974s provide evidence of this deficiency.  He does not demonstrate Workplace Perceptiveness, as he does not "Demonstrate the sensitivity, inside and outside the office, to status, protocol relationships and chain of command…"  For instance, he has no problem going to supervisors other than his own or their supervisors and having overly familiar conversations, or seeking an answer to a question he has "at that moment" because he wants it answered right away.

Attachment(s):

1.  DS-1974 Professional Development Form dated June 11, 2018
2.  DS-1974 Professional Development Form dated August 15, 2018
3.  DS-1974 Professional Development Form dated October 12, 2018

SENSITIVE BUT UNCLASSIFIED