# Exhibit D



**United States Department of State**
*Office of Civil Rights*
**Washington, DC 20520**

August 21, 2020

Jabari-Jason Tyson-Phipps
1119 Crestview Drive
Stroudsburg, PA 18360

**Re: EEO Case Number: DOS-0385-19**

Dear Mr. Tyson-Phipps:

Pursuant to 29 C.F.R. § 1614.108 (f), this serves as notification that the investigation of your complaint of discrimination has been completed.  The Report of Investigation (ROI) is enclosed for your review.

You may submit a rebuttal statement in response to any of the information contained in the ROI along with your request for either a Final Agency Decision (FAD) or hearing with the Equal Employment Opportunity Commission (EEOC), both options explained below.

STATEMENT OF PROCEDURAL RIGHTS

You must now decide how you wish to have a decision made on the merits of your complaint.  Here are your options:

Option 1:  Request a decision on the record from the Office of Civil Rights (S/OCR) of the U.S. Department of State

Within 30 calendar days of receipt of the ROI, you have the right to request a Final Agency Decision (FAD) from the Department of State pursuant to 29 C.F.R. § 1614.110.  If you choose this option, S/OCR will prepare a decision using the information developed in the ROI to decide if you were or were not subjected to illegal discrimination as alleged.

1

You may submit your FAD request via email to BrownAM7@state.gov, with a copy to SOCRComplaintChannel@state.gov.

S/OCR shall issue a final decision on behalf of the Department of State:

a) Within 60 days of receiving notification that a complainant has requested an immediate decision from the agency;

b) Within 60 days of the end of the 30-day period for a complainant to request a hearing or a final decision where neither a hearing nor a decision has been requested; or

c) Within 40 days of receiving the findings and conclusions of an administrative judge.

The final decision shall consist of findings on the merits of each issue in the complaint and, when discrimination is found, appropriate remedies and relief in accordance with Subpart E of 29 C.F.R. § 1614.  The final decision shall contain a notice of further procedural rights, to include the right to appeal to the Commission, the name and address of the agency official upon whom an appeal shall be served, notice of the right to file a civil action in federal district court, the name of the proper defendant in any such lawsuit, and the applicable time limits for appeals and lawsuits.  A copy of EEOC 573, Notice of Appeal/Petition, shall be attached to the decision.

Option 2:  Request a hearing with the Equal Employment Opportunity Commission (EEOC)

Within 30 calendar days of receipt of the ROI, you have the right to request a hearing before an administrative judge with the Equal Employment Opportunity Commission (EEOC).  Enclosed is a hearing request form.

You may submit your hearing request and relevant documents via EEOC's Public Portal:  https://publicportal.eeoc.gov/Portal/Login.aspx.  To begin, click on the link that says "Filing with EEOC" and answer the questions.  After you submit your request for a hearing, you can then use the Public Portal's "My Cases" feature to view your hearing matters in one convenient location. You can also identify and manage your representative contact information in the Portal.  Once identified by a complainant, registered representatives can then upload documentation on their client's behalf.

SBU -PRIVACY OR PII

You must also send S/OCR *a copy* of the hearing request via email to BrownAM7@state.gov, with a copy to SOCRComplaintChannel@state.gov.

Within 15 days of receiving the copy of the request for hearing, S/OCR must send a copy of the complaint file to the EEOC.  The Administrative Judge may on his/her own initiative, in appropriate circumstances, or by request of either party, issue findings and conclusions without a hearing.

If after the hearing you are dissatisfied with the Administrative Judge's decision, you will have the option to appeal the decision to EEOC's Office of Federal Operations or to exercise Option 3.

Option 3:  File a civil action with a United States District Court with jurisdiction over the discrimination complaint.

In accordance with 29 C.F.R. § 1614.407(b), you may elect to file a civil action in an appropriate United States District Court if an appeal has not been filed with EEOC and a final action has not been taken by the U.S. Department of State; that is, at this time you may file a civil action in U.S. District Court, or request a hearing before EEOC, but you can only exercise one of these options now.  If you choose to file a civil action, you must name Mike Pompeo Secretary of State, as the proper defendant.  Additionally, you must serve the Department of State with appropriate notice that you are initiating a case in federal district court.

A complainant who has filed an individual complaint, an agent who has filed a class complaint, or a claimant who has filed a claim for individual relief pursuant to a class complaint is authorized under Title VII, the ADEA, and the Rehabilitation Act to file a civil action in an appropriate United States District Court:

a) Within 90 days of receipt of the final decision on an individual or class complaint if no appeal has been filed;

b) After 180 days from the date of filing an individual or class complaint if an appeal has not been filed and a final decision has not been issued;

c) Within 90 days of receipt of the Commission's final decision on an appeal; or

3

d) After 180 days from the date of filing an appeal with the Commission if there has been no final decision by the Commission.

The filing of a civil action will terminate further administrative processing of the complaint.  If you file a private suit subsequent to filing an appeal, you must notify the EEOC in writing.

Instructions for ensuring proper service of the U.S. Department of State with a summons or complaint are published at 22 C.F.R. § 172.2 and are repeated here for your convenience:

Only the Executive Office of the Office of the Legal Adviser (L/EX) is authorized to receive and accept summonses or complaints sought to be served upon the Department or Department employees.  All such documents should be delivered or addressed to –

U.S. Department of State
The Executive Office (L/EX)
Office of the Legal Adviser, SA-17
600 19th Street, NW, Suite 5.600
Washington, DC  20522
Attention:  Alicia Frechette, Executive Director

**Failure to conduct proper service on the Department of State as described above may result in having your case dismissed based on procedural error.**

\* \* \* \* \*

All requests for either a FAD or EEOC hearing or must be received or postmarked no later than 30 days from the date of receipt of this letter.  If the timeframe passes and S/OCR has not received indication that you have requested a hearing before EEOC, or if L/EX has not received service of process indicating you have filed suit in U.S. District Court, then S/OCR will automatically prepare a FAD.

Please contact me at BrownAM7@state.gov with a copy to SOCRComplaintChannel@state.gov if you have questions or need additional information.

4

Sincerely,

Ardena Brown
EEO Specialist
Intake and Resolution Section

Enclosures:
1. Request for Hearing Form
2. ROI

5

SBU -PRIVACY OR PII

DATE: *05-September-2020*

Newark Area Office
Two Gateway Center
283-299 Market Street
Suite 1703
Newark, NJ 07102
EEOC's Public Portal: https://publicportal.eeoc.gov/Portal/Login.aspx

Dear Sir/Madam:

     I request the appointment of an Equal Employment Opportunity Administrative Judge pursuant to 29 C.F.R. § 1614.108(g).  I hereby certify that more than 180 days have passed from the date I filed my complaint, or that I have been notified by the agency within the past 30 (thirty) days that I may elect a hearing or a final agency decision.

        Agency Name:        U.S. Department of State
        Agency Address:       2201 C Street, NW
                                  Washington, D.C. 20520
        Agency Number:      EEO Case No:  **DOS-0385-19**

     In accordance with section 1614.108(g), I have sent a copy of this request for a hearing to the following person at the agency:

        Gregory B. Smith, Director
        Office of Civil Rights
        U.S. Department of State
        2201 C Street, NW, Room 5806
        Washington, D.C.  20520
        Attention:  Ardena Brown

        Sincerely,

        Jabari-Jason Tyson-Phipps

6

**COVER SHEET- DOS 0385-19**

| | | |
|---|---|---|
| Jabari-Jason Tyson-Phipps | ) | |
| Complainant, | ) | |
| | ) | **Case No.: DOS-0385-19** |
| v. | ) | |
| | ) | |
| Mike Pompeo | ) | **Date Formal Filed:   6/25/19** |
| Secretary, | ) | |
| U.S. Department of State | ) | |
| Agency. | ) | |

14 September 2020

**Re: DOS 0385-19- Complainant's Cover Letter/ Rebuttal to the Report of Investigation**

To the Equal Employment Opportunity Commission and Your Honor the Administrative Judge:

I would like to respectfully thank you for taking the time to consider this complex matter. I would like to keep this as short as possible, but this has been about four years in the making and there is a lot of information. I apologize for any typos due to the rushed nature of getting this submitted as they are actively interfering with my ability to reply properly promptly as described herein.

That said this memo is not intended to be exhaustive. It is meant to only serve as an introduction and clarification of a few things that stand out and I would like to request a hearing to clarify anything that is further unclear and to be heard on this matter if needed because I firmly believe the agency's behavior hear and a negative ruling will have a chilling effect on any further reporting of bad behavior as the same parties involved here have bragged and threatened junior agents that they "got rid" of me as it was described to me after I complained.

Additionally, during another EEO counseling session when asked if I was being fired, the response from the Executive Director Stephen Dietz was that I was "being put through the process" after engaging in several documented protected behaviors including several complaints that reached the Director-General of the State Department. This is chilling to anyone who would attempt to file a complaint.

This matter spans several EEO and other complaints. Not included in this file, because I was told this was closed and I needed to file a new complaint, are additional more recent acts of retaliation. They are documented in a new formal EEO complaint that was filed recently for new retaliatory acts done soon after the report of investigation ("ROI") in this matter was finalized.

These acts include but are not limited to being punished suddenly without warning or legitimate reason by having my security clearance stripped. I was then reassigned from my prestigious post and told I would need to move over a weekend to DC during the pandemic away from my elderly mother who has serious health conditions. I then had my law enforcement authority taken along with 25% of my pay in addition to the decrease due to the locality change from NY to DC. Then I was put on administrative leave and denied the ability to take sick leave. Then I was put on a fitness for duty evaluation ("FFDE") over the objections of the agency's doctors. Then they proposed suspending me for five more days without pay. Then I was made to report to DC where I was made to sit in a room which I could not leave for the whole workday. In the room, I had no access to a bathroom, food, water, no work,



nor a computer. I also was denied travel orders to make the ordered trip and made to pay out of pocket. This has all happened in the last few weeks since this matter was referred to you. It is not inclusive of what happened before and is addressed in the ROI for this matter.

Additionally, they again cut off my access to my email and the system which is what caused the inability to create travel orders and refuse to give a reason other than the obvious, to hamper litigation and frustrate me. This is not the first time they used this tactic, last year as noted in this complaint they deleted all my emails to destroy the evidence of what had occurred. It was only after a threat to take the matter to the US attorney as it was a destruction of government records that after three weeks of stonewalling and them saying the records were gone did some of the records finally reappear.

This all occurred in a matter of approximately two weeks from 30 July to mid-August apart from the trip to Washington and the proposal for suspension, 1-2 September.
It should be noted that it also all occurred around the time the ROI in this investigation was finalized and presented for comment. I am being given less than a month which I am in now, to respond to several things from my security clearance being taken, my pay being reduced, the suspension, the new retaliation complaint, and this by myself in a naked attempt to overwhelm me so that I do not present a proper case, along with the fact that they have denied me access to evidence.

Further complicating this matter, my primary doctor, as well as several other opinions, have diagnosed me with acute stress disorder as a result of what they have put me through in the last month. A such I am afraid I cannot properly reply to the ROI but hope the record speaks for itself and that I am granted a hearing to supplement any questions that may exist or things that may be unclear from the record.

Many of these above things are elaborated further in the new formal complaint that was filed on 5 September 2020 because I was told I cannot add to this record.
I will attach that Complaint as Reply Exhibit 1. ("REX-1"). In that exhibit, you will find a timeline which better and more easily explains the dates of what has occurred. It is this lawless and cavalier attitude about the EEO process, and the law is what has brought us to this place in this matter.

There are a few things that, the investigator and I did discuss that he said I should add to the record if he has not that come to mind.

### *Prior EEO Activity*

There is an allegation that there was no prior protected activity before this complaint but that is false, and I would like to highlight it so that it does not get lost in the confusion. Courts have observed, these terms are broad, unqualified, and not expressly limited to investigations conducted by the EEOC. Protected activity encompasses workers who have made internal complaints even before a discrimination charge is filed with the EEOC.

The guidance points out that employees don't have to prove their claims of workplace wrongdoing are accurate and true to win a retaliation charge. Employees' complaints or opposition activities will be protected if their actions are based on reasonable, good faith that their assertions are accurate.

There are numerous undocumented complaints I have made about treatment, as evidenced by what can be inferred in the documented record. That said there are numerous documented complaints all of which I will not speak to in the interest of brevity, but I will highlight a few.

As spoken to herein, I was made to drive a white individual named Logan Metesh whom I was made to learn spent his time as a Confederate reenactor to the Belle Grove Plantation in Middletown, VA on 30 March 2017 as well as a Confederate Museum where a large Confederate flag flew.

2



On 13 April 2017, there is an email chain starting at 0550 between my superior and class coordinator Jeffery Kraus in which I ask to speak with him privately and he agrees.
That conversation was a complaint about the treatment I had received and me stating I wanted to quit as a result of it. I was asked to not report anything formally as it would be handled and to stay and give the field office an opportunity which I did.

On 17 March 2018, I wrote an email to SA Tanya Sears who was the acting Special Agent in Charge of the New York field office where I was assigned and the office EEO counselor and reported what I believed to be retaliation and poor treatment based on my reporting my prior complaint including that my new second-line supervisor had threatened to "ruin my career" and make sure I would not receive the administrative promotion I was entitled to last April. I have not received that promotion to this day as a result of a lie by the Assistant Special Agent in Charge ("ASAC") Peter Carlson told the Director-General, Carol Perez, on 3 May 2019 in writing as described in the complaint. That served as the impetus for this complaint. The letter and description are in the ROI. Below one of these acts of retaliation is described further and serves as direct evidence and an admission from them of the retaliation.

Sears passed the case to Carlson who said he would "take care of [me]" I believe the record shows. Carlson went on a campaign to retaliate openly and come after my career from taking work from me, assigning me dead-end work, taking credit for things I have done, refusing training, and assigning others work against there will when no one volunteered except me just to make sure I did not get it including temporary duty assignments and security details.

This continued until January 2019 when after an agent they had treated similarly and which I complained about to in writing in March of 2018, shot and killed himself in front of his wife and young child. At that point, I was threatened I should not say anything and was made to travel with Secretary Pompeo to Muscat, Oman so I would not be at the funeral after about 10 months of not being allowed to do such an assignment no matter how much I asked even if no one else was willing to and were forcibly assigned.

Carlson made derogatory comments when my father passed away that, the man who raised me whom I refer to as my father was not my father, which has racial overtones.
He further stated that no one cared and that I did not even like him but was trying to use it to get out of a kidnap and torture lab where I was put through mental and physical torture as well as sleep deprivation the day after my father passed over my objections and request to go home the day he passed 13 November 2017. I was then docked pay when I did get one day to go home to do the obituary and then was made to report back to Quantico the next day and yelled at for arriving 10 minutes after 1200.

Carlson and my direct Supervisor Eric Jagels then in 2018 attempted to give me an unsatisfactory rating with no cause other than the fact that I had made a complaint.
Jagels made clear that I would "learn better" about filing such a complaint while we were at the Varick Street office together around the time Carlson and he sat me down in an interrogation room to speak to me and threaten me about the complaint before the rating being given. This rating was against regulations as I had not been warned or told I had done anything wrong. They stated they did not care about the laws and the regulations and would do it anyway.

This led to a fight, me reaching out to my Career Development Officer Kerry Osterhoust who was my connection to human resources on 3 May 2018 and her telling me to file a complaint with the Office of civil rights which I did which led to DOS-0069-19, my prior complaint which the ROI states was dismissed but does not explain why. The complaint was not dismissed because of the merits; there was a settlement offered. I found it to be inadequate as it offered nothing other than to remove what was agreed to be lies from my record, which still have not been removed. It offered no guarantees the behavior would not stop nor any compensation specifically a formal on the

3



record apology for what I had been through. This has been a running theme as the executive director has as of a few weeks ago still refused to apologize for the plantation incident because as he stated he did not see where it was proven that such a thing is wrong or unacceptable. This is the argument we are having in 2020, about plantations.

The fact is, that it was dismissed on timeliness as I had tried to minimize the conflict and given numerous extensions during the government shut down and failed to file with the EEOC or the district court because I was promised mediation and the issues being resolved in that way by the department which failed to happen as the settlement was in fact in my opinion inadequate based on what I had been through and the fact that the wrongdoers were not being held accountable and would just continue the behavior.

It was after that settlement offer was rejected in or around April 2019 that Carlson and Jagels again attempted to give me an unsatisfactory rating. They were initially told they could not as it was against the regulations still by the new Special Agent in Charge Timothy Dumas and were forced to change it to satisfactory Despite this order, and signing the satisfactory rating, Carlson told the Director-General that I had received an unsatisfactory rating which triggered my administrative promotion to be withheld just as they had threatened to do prior.

This led to the Department trying to cover for Carlson, including changing the rating back on 6 May 2019 which will be discussed below. They further tried to sabotage a multi-agency arrest operation of a trafficker and identity thief I oversaw which put the lives of children in danger as we were using high power rifles. I objected to the highest levels of HR and the department to this and after weeks of fighting they were made to change the rating back to satisfactory but alter the narrative to add derogatory comments that were not there prior.

Further, they then lied claiming I was "suicidal" and "homicidal" to have several insider threat and other investigations opened on me and which resulted in my being put in a fitness for duty examination and suspended for approximately seven months before I was cleared and given my gun and equipment back and assigned to the high profile security detail of the United States Ambassador to the United Nations Kelly Craft.

There claims, that I was suicidal strains credulity as being legitimate as they had previously noted and pointed out that I owned not one but two personal firearms at the home to which they were sending me after telling me I was suspended "indefinitely." Is this where and in the condition, you send a suicidal person who is "not fit for duty?"

Further, the peer support counselor, Mark Danzig, who is called even if a person's pet is sick to check in on them was NEVER called to check on me being "suicidal." It was never reported to him at all, which leads to only one of two conclusions: 1. They wanted me to kill myself or 2. They were lying to get me suspended. The doctors who examined me believe it was the second and the fact that I am still alive proves the same conclusion that they intentionally defamed me to retaliate after they did not get their way and I reported their wrongdoing.

It should be further noted that subsequently as will be further elaborated on in the newly filed complaint, they told the same lie recently after I told Ambassador Craft what had happened prior during a discussion she initiated with me about the Black Lives Matter protests and racism as I explained why despite being the senior-junior agent on the detail I was still made to report to the white agents who were junior to me and I was the only one not allowed to speak with her. This is the reason for my security clearance being taken now, the suspension of my law enforcement powers, my reassignment to Washington, however, counter-intuitive it is not being allowed to take sick time, a new fitness for duty examination over the objections of their supervisory psychologist Dr. Mary Tramontin, and being put through the same "process" to get rid of me currently.

It was the 2019 evaluation and suspension that triggered this current complaint, DOS-0385-19 being filed om approximately 18 May 2019 during this fight showing there was a direct connection with the prior protected activity.



There is far more than a "convincing mosaic" of circumstantial evidence that "would support the inference of retaliatory animus." That said there is more direct evidence of retaliation which they admit to and put in two official reports that should be highlighted.


### *Direct Evidence of Whistleblower Retaliation to be Highlighted*

Jagels and Carlson filed not one but two DS- 1974 Professional Development Forms against me relating to a case where management broke the law, I opposed them, spoke to the US attorney about the situation and they then wrote me up threatening me not speak to the US Attorney again without their permission. I will re-attach those as Reply Exhibit 2. ("REX-2") This is part of the retaliation spoken to above and is open and clear.

A summary of this situation, I was assigned a case in which there was a suspicion of parental kidnapping due to a discrepancy in signatures which I cleared up right away by speaking to both parents. The mistake was that the father had given his son, with whom he shared a name power of attorney to sign on his behalf which is why the signatures were different and hence there was no fraud and I requested to close the case and have the minor US citizen's passport issued as it had been delayed for some time due to the investigation in October 2017. I was ordered to build and present a case against the mother who had nothing to do with the signatures because she was a green card holder and it would ruin her immigration status to even have a case of fraud opened against her.

I objected and stated it was not right and was ordered to present the case to four different Assistant US Attorneys in 3 different jurisdictions. They all rejected the case, one even laughing. Additionally, the case was reviewed by three senior fraud prevention managers in the New York passport Office, the National Passport Center, and Philadelphia Passport Office whom all agreed with me this was not a crime. This included the referring fraud prevention manager who stated that had he known the facts I told him he would have never referred the case in the first place.

Even after all of that, management refused to let me close the case because they were determined to show me their power and prove they were right. In doing so, they withheld a US Citizen's passport for over a year after the application was processed.

It was not issued until the New York fraud prevention manager reached out to me and overrode the investigatory hold to issue the passport so the little girl could see what was described as a sick relative in I believe August 2018.

It should be noted that there is evidence of this from the case notes, emails, and even how the ROI is phrased. In every other ROI, I have written I, the RA (Reporting Agent) took the case to the US attorney if I did but in this one, I say I was instructed to.
That is because the original ROI is not what is in the system. In the original ROI, I say there was no fraud found but I was forced to alter the official government record for the vanity of management to say they were right, and I was wrong.

Further evidence includes several emails. In one I write to Jagels in the Fall of 2017 in which I call the case nonsense and say there is no fraud and ask can I close it. Months later in an email to Luis Linares the New York Fraud prevention manager, when he asks about the status so he can override the hold and issue the passport, I say that the case will be closed as fraud found or not depending on what management says. Why was there the change otherwise? Further, in the case notes I say there is no fraud found and it is my prerogative as the case agent to make that decision, not management. Additionally, I would like to note again that I am an admitted attorney in the jurisdiction.

I understand the law just as well as any AUSA. The criminal chiefs valued my opinion on cases I presented just like any of their AUSAs and never went against it. Further, I could not be forced to lie on the stand and say there was



fraud when I disagreed yet management claimed I was being biased because of my race because my father is Dominican and the Subject, in this case, was Dominican which I found insulting and racist.

This came to a head when I mentioned the case to the US Attorney's office and that came back to management. They immediately called me in and screamed and cursed at me for saying something to the SDNY. They then proceeded to write me up not once but twice because they were so angry they wanted to make sure it was on the record. You can tell the difference because my responses are different, See REX-2.

In the write-ups, I am instructed formally (although the oral dressing down was more of a threat) "You will not communicate with anyone from the Assistant U.S. Attorney's (AUSA) office without informing and getting clearance from your supervisor or your Assistant Special Agent in Charge (ASAC)." Given those circumstances, where I was reporting what I believed to be misconduct and a crime to the US Attorney's office, this reprimand is admitted direct retaliation for protected activity, reporting a crime or violation of rules or regulation or misconduct, and a threat to not report them further on its face.

The exact words of my email which they claim are improper are in my response to the write-up and they are lying. I said nothing derogatory at all. The second 1974 attempts to clean up the language to vilify me and obscure the fact they are trying to chill me from reporting the situation to the US attorney.

Again, opposition to an employer's stance need only be based on a "reasonable good faith belief," and I am pretty convinced that jurisdiction shopping a case when it was flatly rejected and then withholding a US Citizen's passport for no legitimate reason is wrong. I may not be able to point to the law or regulation, but I know one exists.


### *Bridge Between Race and Retaliation*

I believe the EEO Investigator's ROI states that I do not make a connection to how my race played a part in this discrimination but as alluded to this whole situation comes back to one of the first incidents: being forced to drive the confederate reenactor to a plantation.

I, an African American who can trace his near relatives by name, Addison Grace, to a plantation in Virginia, was being made to drive a white Confederate Reenactor to the Belle Grove Plantation in Virginia and by recollection being called boy multiple times during training including that I may not use the bathroom in the "big house" and not to get out the car I was chauffeuring. I could have been assigned to, I believe, over 20 other positions in two other shifts but I, the only African American, was assigned to be the driver for a white Confederate reenactor for his tour of a plantation.

As stated, above, I complained and was subsequently singled out in the final training exercise, failed when I took the supervisory agent to the Howard University hospital after being picked on to randomly take him to the nearest hospital without the use of a navigation device. He subsequently stated that people only go to Howard University Hospital "to die" which I took as a racial jab as it is a historically Black University. It was the closest hospital, yet he failed me anyway over my protests. It was that argument that finally pushed me to reach out to Kraus as spoken to above on 13 April 2017 after the previous incident.

I was punished for complaining while the offender was not, and it should be noted that he went on to call another Iranian agent a few classes later a "little brown boy" and telling him to "put on his suicide vest." It was this initial complaint that marked me for retaliation and "get right" learning as is done in the military to force me to bow down and fall in line.

When I would not the retaliation escalated until we are where we are now and I am constructively discharged for the job I worked hard to get and will be denied the benefits I would have received if I was able to complete my



career, not to mention the mental health damage which has been done. It should be noted that I was forced to drive to Rosslyn and report to work, sitting in their prison with no restroom all day, against my doctor's express orders under threat of losing my job which caused more mental health damage which the doctor fears may result in PTSD if it goes untreated.  See Response Exhibit 5 ("REX-5")

In addition to the plantation incident, there are several other incidents of racial animus sprinkled throughout including as spoken to above in the Alverez case where I was accused of going easy on the Subject because of our race and shared national origin. This is further seen when I as an African American, am ascribed violent interpretations of anything I say and I am accused of crimes and being threatening and homicidal when I am none of these things as anyone who speaks to me for 30 seconds will agree including them ironically. At the same time, they call me violent and suspend me for being threatening and homicidal they also claim that I am not aggressive or "tough" enough and on multiple times in training I was called on to use more violence and aggression when I sought, successfully, to resolve situations without violence.

I was called an "Ivy League Egghead" and told I did not belong. I was told I belonged with the foreign service officers and not with the special agents as I am not violent and militaristic like them. At the same time, when it comes time to give a reason to suspend me, they use the troupe that as an African American I am violent and assign negative connotations to everything I say even if I am quoting what white agents say.

 This would not be done if I were white. They prove daily that there are things that white agents get away with that I could never. The currently proposed suspension for example is in part for just securing a <u>licensed unloaded</u> firearm on my person <u>where no one saw</u> as I never left the secured suite area with it, rather than leaving it an unsecured room in a hotel with the USUN Ambassador. I asked Jagels about the rules regarding this. He refused to answer. Instead he screamed at me and directed me to another agent who said it was ok. I then was subsequently punished under a rule which has been subsequently changed because it was unclear. Compare this to a white agent who was wearing an <u>unlicensed</u> firearm who used it to <u>shoot and kill an unarmed minority while drinking</u> several years ago, and <u>who has been on trial for murder three times</u>, still has a job and they describe him as a "great guy" and buddy. We are treated the same and that is yet another example of unequal treatment.

In another incident, they (Carlson and Jagels) called a woman whom I believe to be the now-former Indian Ambassador to the United Kingdom a terrorist and accused me of escorting her, the terrorist as they called her, into a secured zone which is the complete opposite of the truth. That is a second grounds given for the current suspension proposal, so I cannot imagine how they can claim that is inaccurate.

### *Missing Records*

I would like to address and issue that the investigator and I went back and forward on right at the end of the investigation: missing records, specifically the 6 May 2019 EER.

This will make more sense in the context of the report but as spoken to above there was a change on my 2019 EER yearend evaluation between Friday 3 May 2019 and Monday 6 May 2019 after I reported to the Director-General, Carol Perez, that Carlson had lied to her about me receiving an unsatisfactory rating. This was also reported to the Principle Deputy Secretary of State Kenneth H. Merten who replied on Saturday 4 May 2019 he was going to investigate it. When Merten inquired, the chief human resources officer for DSS, TJ Sheldon, changed the rating on 6 May 2019 to cover for Carlson to unsatisfactory.
That record is now missing.

As stated, I was cut off Department systems and had all my emails and records deleted by the Department by the time I was reinstated in late December/ Early January 2020. I was not able to produce this record for the investigator. Much like many of the records, I did not keep a copy. The things I did keep a copy of is another ground

---

7



they are giving for suspending my security clearance while at the same time if I did not, I would not have any evidence.

As such I do not have the record and they claim they do not either however, it is clear from the emails and goings-on around the incident that the record did exist and they were the custodian of the record. As such I would like to invoke the rules regarding the Spoliation of evidence as this is an intentional, reckless, or negligent withholding, hiding, altering, fabricating, or destroying of evidence relevant to a legal proceeding as described in Black's law dictionary.

They have every reason to make sure that the documents disappear as it is evidence of a violation of the regulations and federal law. They had the only access to it as they cut me off access to it and then it disappeared. It is clear the document exists, or the 3 May 2019 EER would have stood and none of what happened leading us here would have occurred.

Several emails are speaking about its contents because it was altered several more times to where now the EER is different than when it was signed and accepted by all parties, Jagels, Carlson, and I on 3 May 2019 before I reported that he lied. That shows there is a missing record they disappeared to cover for what happened which is improper and evidence of guilt.

The fact comes down to this, but for me reporting Carlson for lying to stop my administrative promotion they had threatened to do previously, showing intent, to Director-General Perez and PDAS Merten on 3 May 2019, my EER would not have been changed on the 6 May 2019 and subsequently to where it is now where it has additional derogatory information which is not even allowable which results in my having false negative information on my record to this day which has and will continue to affect me getting further employment.

The change on 6 May is a direct act of retaliation for statements made by me on 3 May 2019 reporting illegal behavior which did break the regulations and the Department has refused to remedy it instead suspending me without justification multiple times and forcing me into these legal processes to fight for a change that is required by the law as even they marked the EER as unacceptable which is in itself unacceptable and chilling behavior that needs to be corrected immediately. If not, it will have a further chilling effect on people who do not have the means to fight them for over a year now to seek just recompense.


*Evidence That I Was Docked Pay for Going Home to My Father's Funeral*

As will be referred to in the ROI I believe and alluded to in this letter I was docked pay to go to my father's funeral. Specifically, I had my timesheets that were universal to all agents in training, taken and changed such that I was given new ones that removed pay for travel everyone else received when I went home to do the obituary for my father. Previously I did not have the evidence, but I found the timesheets. Please see attached Reply Exhibit 3. ("REX-3").


*Admission and Evidence They Altered My Timesheets to Take 24 hours of Leave in PP26B-2019*

In further actions of pure lawlessness, they further took my annual leave as part of them punishing me last year as spoken to in the ROI. This came in two forms.

The first as described in the ROI, I was put on admin leave when falsely accused of being suicidal and they attempted to separate me for mental health issues. As part of that, I was cut off the State Department systems and not able to put in requests for leave which is something they are doing to me a second time currently.



As a result, of being out sick on the medical FFDE they ordered me on against my will, I was unable to put in to take proper leave. I was subject to them recalling me at any time to Washington and given less than a day's notice in most cases to let me know that I would be put out on admin leave another 30 days.

By way of example, I would be notified on September 30 that my Admin leave will be extended until October 31 when previously I was ordered to be at work on October 1st forcing me to prepare as if I was going into work on the first only to be yoyoed back to leave. This happened for approximately seven months from May 2019 until January 2020.

I was not allowed to take leave during this time which resulted in my having 'use or lose' leave expire. I petitioned properly for the leave to be restored and that was rejected. Shelton stated I believe that I should be grateful I was punished by being suspended in place of my leave.

They claim I did not request the leave when I in fact had on multiple occasions. I had had time off scheduled before they put me out a is indicated in emails from Jagels my supervisor as well as a direct request to the special assistant to the director which went ignored as is their policy when an agent is in purgatory, to just ignore them and claim they never said anything but there are records which I have provided you in Reply Exhibit 4. ("REX-4").

Those records show the time off was requested prior which would give one grounds for restoration. Secondly, there is the issue that they should be estopped from simultaneously arguing I was so sick I needed to be removed from duty and put on a medical FFDE where I was made to undergo regular medical evaluations but then at the same time was not sick enough for leave restoration under the sick provision of the leave restoration regulation:

"The employing agency determines that the annual leave was forfeited because of a period of absence due to an employee's sickness or injury that occurred late in the leave year or was of such duration that the excess annual leave could not be rescheduled for use before the end of the leave year." (Sic)

Additionally, in REX-4 you will see that they illegally took 24 hours of leave against the OPM regulations which are also provided. Specifically, it states:

An agency cannot require an employee to use annual leave when the agency has placed the employee on extended excused absence (e.g., in cases where adverse actions are being pursued by the agency) … If an employee schedules (i.e., makes a writen (Sic)request to use) annual leave and the agency denies the request, the agency is required to restore the annual leave."

In REX-4 you will see my requests, you will find the regulations but you will also see that in PP 26 I was charged 24 hours of leave but my signed timesheet from that pay period does not request that leave. I never do. I am explicit to not take the leave and I am not requesting it. Yet they illegally take the leave anyway. When confronted about this, Shelton slipped in an email and stated that the leave was not supposed to be taken confirming they knowingly broke the regulations.

Shelton attached the timesheet showing I had not requested the leave which was what was submitted but in REX-4 you will see my pay stub where it was taken regardless. When confronted about this, as is normal, they refused to reply. They need to be forced through litigation to reply and comply with the law which again shows that they are bad actors, dishonest, not even attempting to do the right thing to rectify situations they acknowledge they are wrong about. Not everyone has the ability and resources to fight as I have and not everyone is willing to lose their job as I have which allows them to break the law with impunity which again has a chilling effect and needs to be stopped immediately and an example needs to be made so the behavior does not continue in the future.

---

9



*Missing Witnesses*

Lastly, I would like to speak to witnesses that were not interviewed. There are three I can think of off the top of my head. All three are people I have spoken to extensively about these situations who have given me advice and who were contemporaneous witnesses to what occurred.

The first is SA Tyler "TK" King who cannot speak because as I spoke to above, he killed himself after suffering similar harassment from the same management officials I am complaining about herein. That said his death should speak to the gravity of the situation and why this behavior needs to be curbed and is why I am still fighting this matter today rather than walking away.

The Second the investigator chose not to speak to is SA Rick Schiffer. Rick will confirm what I am saying as he was also in the unit with TK and I. I also spoke and still sometimes speak to him about things that were going on asking for advice.

The third is Former SA Jennifer Pyle who might be the most important of them all as she was there for the Plantation incident and we spoke/speak to regularly about the job. She and I were not friends in training, we were at each other's throats, but we soon realized about the time of the plantation incident that they were pitting us against each other. We began to talk and share our experiences daily or weekly or whenever something went wrong. She can confirm that the things I say today were said contemporaneously and are not made up now to fit a narrative like their stories as well and verify some things through time stamped text messages and emails.

She too was forced out of the agency after age and gender discrimination. Ironically, she was the president of our agent class and I was the president of our Foreign service class, so you are not talking about people who came in angry. As I know 3 people not including me have left the agency from our class within the first 3 years: 2 were women and 2 were over 40. There is a problem and it is not me. I will be the 4th and I was the only African American.

They speak of wanting diversity, but this is what they do and then as if running a playbook they accuse the person of psychological issues and defame them driving them out of the department if they complain about discrimination and mistreatment, bullying, or abuse and then worst of all to me lie about things.

 I pray that you help put an end to it. The chilling effect caused by them getting away with this behavior has stopped others from speaking out. This is not acceptable in the United States, especially in our government agencies especially the Foreign Service where we are supposed to be an example for the world.

TK, Rick, and Jen taught me to document things especially TK. I have tried and it is a lot that I have presented. I request respectfully you review it and consider the facts and circumstances and come to a fair conclusion, one in which I pray that this behavior is curbed and TK's sacrifice of his life and my sacrifice of my job were not done in vain to just be ignored and swept under the rug as they have been.

Respectfully,

DSS SA Jabari-Jason Tyson-Phipps, Esq.
543 Main St. 213
New Rochelle, NY 10801
646-934-9694
Jabari.phipps@gmail.com

10

# *Response Exhibit 1*

# *REX-1*



U.S. Department of State

Office of Civil Rights (S/OCR)

# NOTICE OF RIGHT TO FILE A DISCRIMINATION COMPLAINT

Date *(mm-dd-yyyy)* _____

To:   Aggrieved - _____

From:   EEO Counselor - _____

This is to inform you that I have concluded my inquiry into your complaint in which you alleged discrimination based on your:

**(Check all that apply and specify.)**

☐ Race _____   ☐ Color _____   ☐ Age *(mm-yyyy)* _____

☐ Genetic Information _____   ☐ National Origin _____   ☐ Religion _____

☐ Sex _____   ☐ Disability *(Check all that apply and specify)*

    ☐ Pregnancy _____   ☐ Mental _____

    ☐ Gender Identity _____   ☐ Physical _____

    ☐ Sexual Orientation _____

☐ Reprisal *(Provide date. Check all that apply, and specify)*   Date *(mm-dd-yyyy)* _____

    ☐ Engaging in prior protected activity *(Specify)* _____

    ☐ Opposing discriminatory policies or practices *(Specify)* _____

☐ Other *(e.g., Veteran's preference, marital status, etc.)* _____

During this counseling period, the following allegations were brought to my attention in my role as your EEO counselor. **A more detailed description of your allegations will be included in the EEO Counselor's Report.** You will be provided a copy of the report by the Office of Civil Rights (S/OCR) if you file a formal complaint.

Specific allegation(s) raised in EEO counseling    Date of Alleged Discrimination    *(mm-dd-yyyy)* _____

**Please sign below to acknowledge that you have received and read both pages of this form and will return it to me regardless of whether you decide to file a formal complaint.**

Aggrieved's Certification:

☑ By checking this box, I, _Jabari Jesan Zyon-Chyme_ , certify that I am the individual submitting this document.

Date *(mm-dd-yyyy)*

08 26 2020

### IMPORTANT INFORMATION FOR FILING A FORMAL COMPLAINT OF DISCRIMINATION

Because the matter has not been resolved, you may now file a formal complaint of discrimination on the bases and allegations identified in this Notice. You must immediately read, sign, and submit the Notice of Right to File to me to acknowledge receipt. Returning the signed notice does not mean you have filed your formal complaint.

If you decide to file a formal complaint, it must be submitted (to S/OCR) on the attached DS-3079 Formal Complaint of Discrimination Form **within 15 calendar days** of your receipt of this Notice. Failure to submit a timely complaint can result in the dismissal of your formal complaint in accordance with 29 C.F.R. § 1614.107. Your complaint must be submitted directly to S/OCR by email, fax or mail at the contact information provided below. Submitting your complaint by email is the recommended method to ensure prompt processing of your formal complaint.

Email: SOCRComplaintChannel@state.gov
Fax: (202) 647-4969
Telephone:  (202) 647-9295
Mailing Address:  Director, Office of Civil Rights (S/OCR)
U.S. Department of State
2201 C Street, NW, Room 7428
Washington, DC 20520-7428

**You must not submit your formal complaint to me, as I am not authorized to receive it on behalf of S/OCR.**

Your complaint must be specific and limited to the matters discussed with me. It must also state whether or not you have filed a grievance under a negotiated grievance procedure or an appeal to the Merit Systems Protection Board on the same issues.

If you retain an attorney or a representative, you must immediately notify S/OCR in writing of the name, address, and telephone number of your representative. You and/or your representative will receive a written notice of receipt of your discrimination complaint from the Office of Civil Rights. If you and/or your representative have not received an acknowledgement of receipt within 5 business days, contact S/OCR to confirm that your formal complaint was submitted properly.

In addition, you must keep the Department informed of your current contact information, to include home address, phone number, and e-mail address. Failure to do so could result in the delay or dismissal of your complaint.

For questions concerning the discrimination complaint process or completion of  the formal complaint form, please contact S/OCR using the contact information listed above.

Attachment:
DS-3079 Formal Complaint of Discrimination Form

**INFORMATION CONCERNING THE PROCESSING OF YOUR COMPLAINT**

READ INSTRUCTIONS CAREFULLY

This form should be used if you, as an employee or applicant for employment with the U.S. Department of State, believe that you have been discriminated against because of your race, color, national origin, sex (including pregnancy and gender identity), religion, age, physical or mental disability, protected genetic information, sexual orientation, or reprisal for prior EEO activity or reprisal for prior EEO activity or opposition to illegal discrimination.

Your written complaint must be filed within **15 CALENDAR DAYS** of the date you received a "Notice of Right to File a Complaint." Failure to submit a timely complaint can result in the dismissal of your formal complaint in accordance with 29 C.F.R. § 1614.107.

**Your EEO Counselor is not authorized to receive your formal complaint on behalf of the Office of Civil Rights (S/OCR).**  Your complaint must be submitted directly to S/OCR by email, fax or mail at the contact information provided below.

| | |
|---|---|
| Email: | SOCRComplaintChannel@state.gov |
| Fax: | (202) 647-4969 |
| Telephone: | (202) 647-9295 |
| Mailing Address: | U.S. Department of State |
| | 2201 C Street, NW, Room 7428 |
| | Washington, DC  20520-7428 |

**Submitting your complaint by email is the recommended method to ensure prompt processing of your formal complaint.**  If filing by mail, please allow at least 15 calendar days for receipt.

Please be specific in stating the facts concerning your complaint when completing this form.   Keep in mind that you may agree to resolve your complaint at any stage in the process.  Also, you may have a representative at all stages of the processing of your complaint.

If your complaint is dismissed, you will be advised in writing of the reason(s) and informed of your right to appeal to the Equal Employment Opportunity Commission (EEOC).

If your complaint is accepted, you will have an opportunity to talk with an investigator and to give him/her all the testimonial and documentary evidence that you believe will support your complaint. Upon completion of the investigation of your complaint, you will receive a copy of the investigative file. At that time you may request either: (1) an immediate final decision from the Department of State based on the evidence in the file, or (2) a hearing and decision from an EEOC Administrative Judge.

The Director for Civil Rights issues a Final Agency Decision based on the file or a Final Order based on a decision from the EEOC.  If you are not satisfied with the agency's decision or Final Order, you will have the right to file an appeal with the EEOC's Office of Federal Operations:

| | |
|---|---|
| Fax: | (202) 663-7022 |
| | |
| Mailing Address: | EEOC Office of Federal Operations |
| | P.O. Box 77960 |
| | Washington, DC 20013 |

To be timely, you must file your appeal within 30 calendar days of your receipt of the Final Agency Decision or Final Order.

For questions concerning the discrimination complaint process or completion of this form, contact S/OCR by using the contact information listed above.



U.S. Department of State
Office of Civil Rights (S/OCR)
# FORMAL COMPLAINT OF DISCRIMINATION

| PRIVACY ACT STATEMENT (5 U.S.C. § 552(a)) | |
|---|---|
| AUTHORITY | Public Law 92-261 |
| PRINCIPAL PURPOSE | Used for processing complaints of discrimination because of race, color, national origin, sex (including pregnancy and gender identity), religion, age, physical or mental disability, genetic information, sexual orientation, or reprisal for prior EEO activity or opposition to illegal discrimination. Complaints can be submitted by Department of State employees, former employees, applicants for employment, and some contract employees. |
| ROUTINE USES | Information will be used (a) as a data source for complaint information for production of summary descriptive statistics and analytical studies of complaints processing and resolution efforts; (b) to respond to general requests for information under the Freedom of Information Act; (c) to respond to requests from legitimate outside individuals or agencies (White House, Congress, Equal Employment Opportunity Commission) regarding the status of a complaint or appeal; or (d) to adjudicate a complaint or appeal. |
| DISCLOSURE | Voluntary, however, failure to complete all appropriate portions of this form may lead to a delay in processing and/or rejection of the complaint on the basis of inadequate data to continue processing. |

## COMPLAINANT CONTACT/PERSONAL INFORMATION

**1. Name** *(Last, First, MI.)*
Tyson-Phipps   Jabari-Jason

**2. U.S. Citizen**
[X] Yes   [ ] No

**3. Home Telephone** *(Include area code or country code if overseas)*
917 297 5945

**4. Home E-Mail Address**
Jabari.Phipps@gmail.com

**5. Mailing Address** *(Include ZIP code, if applicable)*
543 Main St Apt 213 New Rochelle, NY 10801

**6. Work Telephone** *(Include area code or country code if overseas)*
646 9349694

**7. Work E-Mail Address**   NO Access
Tyson-Phipps@stat.gov

**8. Work Address**   See Narrative
799 UN Plaza NY NY 10017

**9. Are you working for the Federal government?**
[X] Yes   [ ] No

**10. Aggrieved is a(n):** [X] Employee   [ ] LE Staff   [ ] Other *(Specify)* _____
[ ] Applicant   [ ] *Contractor - You must provide a copy of your hiring contract at the same time you file this complaint

**11. Title and Grade of Current Position**
Special Agent 2501/FS5

**12. Current Employer**
United States Department of State

## REPRESENTATIVE/ATTORNEY INFORMATION

**13. Do you have a representative?**
[ ] Yes   [X] No

**14. If yes, provide name of representative.**

**15. Is your representative an attorney?**
[ ] Yes   [X] No

**16. Address**

**17. Telephone** *(Include area code)*

**18. E-Mail**

## COMPLAINT INFORMATION

**19. Bureau/Office/Post Where Discrimination Allegedly Took Place**
US DOS / DS / DP/P – US mission to the United Nations

**20. Date(s) Alleged Discrimination Occurred**

| 07-30-2020 | 09-01-2020 | 09-02-2020 | 08-06-2020 | 08-07-2020 |
|---|---|---|---|---|
| *(mm-dd-yyyy)* | *(mm-dd-yyyy)* | *(mm-dd-yyyy)* | *(mm-dd-yyyy)* | *(mm-dd-yyyy)* |

21. Why do you believe you were discriminated against? *(Check all that apply and specify.)*

[X] Race *Black/Hispanic*    [X] Color *Black*    [ ] Age *(mm-yyyy)* _____

[ ] Genetic Information _____    [X] National Origin *Dominican*    [ ] Religion _____

[ ] Sex _____

    [ ] Pregnancy _____

    [ ] Gender Identity _____

    [ ] Sexual Orientation _____

[X] Disability *(Check all that apply and specify)*

    [X] Mental *While I do Not Believe So they continue to make this Claim as ground for their actions so they should be estopped from arguing otherwise*

    [ ] Physical _____

[X] Reprisal *(Provide date. Check all that apply, and specify)*    *See Narrative For Details*

    Date *(mm-dd-yyyy)* *07-30-2020*

    [X] Engaging in prior protected activity *(Specify)* *EEO Complaint DOS-038519 & DOS-0069*

    [X] Opposing discriminatory policies or practices *(Specify)* *21-22 July oppose treatment by Supervisor*
    *See Narrative + on 6 July I spoke with*

[ ] Other *(e.g., Veteran's preference, marital status, etc.)* *Slock Attorney Kelly Reimers see Attached*

22. Did you discuss your complaint with an EEO Counselor?

    [X] Yes    [ ] No

23. Name of EEO Counselor

*Catherine P. Griffith*

24. Date Notice of Right to File Received *(mm-dd-yyyy)*

*08-27-2020*

25. Explain specifically how you were discriminated against (treated differently from other employees or applicants) because of your race, color, national origin, sex, religion, age, physical or mental disability, protected genetic information, sexual orientation, or reprisal for prior EEO activity or opposition to illegal discrimination.
*(Space will expand to fit. Attach additional sheets if necessary. To print the additional pages (addendum), check the print addendum box in the right hand corner of the print dialog box.)*

*Please See Attached*

26. What remedies and relief are you seeking?

*(Space will expand to fit. Attach additional sheets if necessary. To print the additional pages (addendum), check the print addendum box in the right hand corner of the print dialog box.)*

*Please See Attached*

27. Have you filed a grievance on the matter(s)?

    [X] No    [ ] Yes    Grievance Date Filed *(mm-dd-yyyy)* _____

28. Have you filed an appeal with Merit Systems Protection Board (MSPB) on the matter(s)?

    [X] No    [ ] Yes    Appeal Date Filed *(mm-dd-yyyy)* _____

29. Complainant's Signature

Date *(mm-dd-yyyy)*

*09-05-2020*

DS-3079    Page 2 of 2

# Jabari-Jason Tyson-Phipps- August 30, 2020 EEO formal complaint- Addendum for questions 25 and 26

***25. Explain specifically how you were discriminated against (treated differently from other employees or applicants) because of your race, color, national origin, sex, religion, age, physical or mental disability, protected genetic information, sexual orientation, or reprisal for prior EEO activity or opposition to illegal discrimination.(Space will expand to fit. Attach additional sheets if necessary. To print the additional pages (addendum), check the print addendum box in the righthand corner of the print dialog box.)***

### Summary of complaint

This complaint is about the blatant and clear retaliation of "putting me through the process" in the words of DSS Executive Director Stephen Dietz ("Dietz") when EEO Counselor Catherine Griffith ("Griffith") asked him was I being fired after I made whistleblower disclosures and around the same time the investigator in my prior EEO action, DOS-0385-19 was released.  Despite prior complaints for the very same activity, the lack of being held accountable have embolden the same management officials to not only continue the behavior but to escalate the behavior to the point of a constructive discharge and removal from the Department as described herein.

### Preliminary statement

In a sentence, all of the issues current and present boil down to an attitude which is best summed up by quoting Dietz when Griffith told him I, an African American who can trace his family by name in slavery in Virginia just a few generations ago, would like an apology for being made to drive a confederate reenactor to a the Belle Grove Plantation in the Shenandoah Valley of Virginia ironically near where my Great Great Grand Father Addison Grace was born in 1860.  Rather than acknowledging the situation as wrong, Dietz stated that there would be no apology because he did not feel it was appropriate because it had not been decided that it was wrong as I understand what Griffith explained to me.

It is that attitude that brings us to this formal complaint today because if we can not agree on such basic things that the Executive Director speaking for the United States Government and specifically the United States Department of State who is supposed to hold itself out as an example for the world and other nations, cannot say that making an African American drive a white Confederate reenactor to a plantation is not acceptable and should not be tolerated in the 21st C especially in the United States Department of State, then we are not even reading from the same book and we can have no mutual resolution.

Common throughout the issues being addressed herein and in prior complains is the power dynamic.  In the issue spoke to above, it was argued that I volunteered or wanted to be the driver, when the facts and reality show senior supervisory agents chose the only black agent in the training class and put him in that one position out of twenty possible positions during the one of four possible shifts where there was a visit to a plantation and a

Confederate museum.  Then when confronted with what they had done, they lied and said that I was ok with a fact that even if true ignores the power dynamic.

They, as the senior supervisory agents, put me in a role and if I were to protest I ran the risk of not graduating and losing my job or what has actually happened when I have filed a complaint, open retaliation.  I am told the NO FEAR and whistleblower acts protect me but the reality has shown that despite even a formal investigation they openly continue the behavior because they know it will take years to investigate and nothing comes of it.  They understand the "byzantine" system as it is described protects them and that nothing will be done.

This is in fact a chilling effect to most other people who have complaints because they do not want to lose their jobs. I am in fear to complain, as clearly it has only made things worse and nothing is being done to the bad actors This is why people quit or worse to just go away.  The discrimination is rampant. At least three people in my class of 24 have left within 3-4 years.  Of those three two were over 40 and two were women. I will be the 4th, and I was the only African American.

This Chilling effect is especially dangerous because these same people go around and brag and tell people they did get me fired and I was in fact suspended pending the outcome of the last investigation for example.  In that case I was out from May until January, taken out of the GAL and off all State Department systems.  To anyone who looked they had in fact gotten rid of me for filing a complaint.  Again, this is chilling and not acceptable.

They lied to the other agents telling them I was fired or suspended for misconduct when I complained last time.  I had a fellow agent Johnny Fernadez, literally tell me that he believed them I had been fired.  The reality is I was cleared of all their accusations, yet nothing happened to them.  By allowing this to happen to me, it would effectively chill the entire EEO reporting process stopping anyone from reporting misconduct out of fear they will be the next person retaliated against and forced out of the department.

 Their continuous argument that I had a choice or agency rings hollow especially given their actions after I filed a complaint, suspending me multiple times with no grounds, accusing me of being suicidal and homicidal multiple times, abruptly removing me from post and moving me states away with no travel orders, and taking away my LEAP pay thereby cutting my salary 25% to name a few things from just the last few weeks.

This power dynamic and retaliatory acts are what tie all my complaints together.  While this complaint can me a continuation of the prior complaint which acts as a protected activity for this complaint, because the report of that investigation was being finalized just as they took these actions I am now put in a position where I have to file another complaint and fight for my job.

Management is suggesting simultaneously that because they are management they are entitled to exercise power over me, often beyond the law and often in violation of the law and demanding deference because of their position, while at the same time arguing that such a power dynamic does not exist and that I am on equal footing with them in actions and decisions.  The two things are incongruitous and the law and courts have recognized that such a power dynamic implies some sort of coercion.

**Background**

The Background in this matter is quite long and is covered in part the 1200+ page report of investigation for DOS-0385-19.

To quickly highlight some of the relevant parts, I joined the department in September 2016 approximately 4 years ago as a special agent.  During training a described above I was made on 30 March 2017 to drive Logan Metesh  who was acting as a mock protectee, and who we were told research and found out was a Confederate reenactor both to a Confederate museum and the Belle Grove Plantation located in Middletown, VA.  During the training I did complain formally to my class coordinator Jeffrey Krauss as evidenced by emails.  I was asked to not file a complain and told to report to the field office in NY and give it another shot which I did.  It is important to note that the same individual who I had issues with during this training went on a few classes later to call another Iranian agent a "little brown boy" and to tell him to "put on his suicide vest" after nothing was done to him as a result of this incident.

Getting to the field office, I was in fact a bit hurt and cautious based on my previous experience.  There were several incidents that felt targeted based on my "hallway reputation" as a complainer.  On such incident involved ASAC Joseph Ugarte ("Ugarte") punishing me wrongly by taking training for something I did not do as confirmed by the SAC Wendy Bashman and my direct Supervisor Eric Jagels ("Jagels").  When confronted Ugarte, told me he was a "[FS]2 and [I] was an entry level agent.  Don't ]I] know he can ruin my career." I pointed out that I would be promoted administratively to FS4 and by that time I probably would want to leave given the treatment I have received so there was not a lot he could do.  He said, "we will see."

Ugarte began a campaign of harassment, going out of his way to over scrutinize my cases throughout 2017 to the point where he, in my opinion, violated the law by forcing me to attempt to get several different US attorneys to prosecute people who were guilty of no crime  in order to interfere with their green card status even after the AUSAs and FMPs and I the case agent stated no crime was committed.  He had me alter the government report of investigation to prove he was right, that he was superior to me, and that he was going to get his way over my objections (See the Alverez Case for details). This is a crime.

Additionally, during this time in mid to late 2017, I was dealing with the fact that my uncle, who I refer to as my father as he raised me had suffered a stroke and was in hospice care.  I did not want to go to the strenuous Advanced Tactics Leadership and Skills training during that time but was coerced into doing so using he same power dynamic spoken to above.  My father did in fact die during the training, and when I asked to go home, the same power dynamic was used an I was not allowed to go home until late Friday even though he passed on Monday the 13th of November.  The day after he passed, I was made to go through a kidnap lab which is commonly referred to as survival, evasion, resistance, and escape (SERE) training which involves physical and psychological torture.

I later protested this to NYFO management including Tanya Sears ("Sears") who was the EEO counsellor. She passed me along to Peter Carlson ("Carlson") the new ASAC who said he would take care of it I believe to quote his email.  That this was my first attempt to reach out to for him from the EEO and office of civil rights.  I also reported that SA Tyler King ("TK") was also being abused.  This was March 2018.  TK went on to shoot and kill himself in front of his wife and young child a few months later in December after they continued to bully him.

Carlson's way of taking care of it was interrogating me, threatening me, and gaslighting with inflammatory statements such as that no one cared about my father because he was not my real father and that I did not in fact

care about him and that I never asked to go home and wanted to stay and undergo the SERE training. The statements are not only outrageous and inflammatory, they have no basis in the truth. The fact is there are text messages which show I was asking to go home, and all the records show I did not want to be in the training in the first place no less going through the worst part, the torture training of SERE the day after my father died. Further, I would be in no condition to make such a decision and the supervisors on the ground should have exercised better judgment and pulled me from such training given the circumstances. Still Carlson lied about that and stoked animosity.

He also in 2018, during this time attempted to give me an unsatisfactory rating in violation of the regulations as retaliation for making the first complaint to Sears. This resulted in a fight and ultimately, he and Jagels being made aware of the rules and being forced to change the rating. Not satisfied, they took all my work and refused to allow me to do training, go on TDY assignments, or work details. I was reassigned dead in cases. This resulted in a formal EEO complaint, DOS-0069-19. DOS-0069-19 was ultimately dismissed on 3 June 2019, because I had allowed too much time to pass when I waited for mediation which did not result in a settlement and did not occur until April due to the government shutdown.

When that matter did not Settle Carlson and Jagels took another attempt at giving me an unsatisfactory EER in violation of the regulations in 2019. This resulted in a massive fight and Carlson and or Ugarte ( She states the ASAC they are the only two)  lying to Director General Perez ("Perez") about me getting an unsatisfactory rating to hold my promotion just as Ugarte had threaten. The fight went all the way to the director level, and they were forced to change it after TJ Sheldon ("Sheldon") the DS HRO attempted to cover up Carlson's lie to protect him.

 The day, they were forced to change it NYFO management suspended me "indefinitely" which was protested. Ultimately, I was put on a fitness for duty evaluation because they claimed I was suicidal and homicidal even though they were sending me home to a place where I had two personal firearms and they never contacted the DS Peer support counsellor Mark Danzig ("Danzig"). They also opened several investigations into me for insider threat and other things with no merit.

Evidence shows that Ugarte had tied to do this prior after I complained about him and reached out to the Office of the US Attorney for the Southern District of New York, more protected activity about what he tried to make me to in the Alverez case a spoken to above. In fact, they document that by writing me up twice in 1974 performance evaluations about that.

Ultimately after about seven months of putting put out on leave, I was cleared of the fitness for duty when the DS Supervisory Psychologist, DR. Mary Tramontin ("Tramontin") as well as an independent Psychiatrist Dr. Brian Crowley found no merit to their claims. I was given my equipment back and sent to work on the high-profile security detail for the United States Ambassador to the United Nations Kelly Craft ("Craft"). Also, important to note, my emails with all the evidence of things that had happened prior were deleted upon my return and I had to fight to get some of them back.

Also, important to note, is that they took 24 hours of my annual leave in direct violation of my expressed wishes an and contrary to my signed time sheets which is against the law. This is in addition to taking approximately 122 hours of AL as described in my prior complaint arguing both at the same time that I was sick and out on a FFDE, but not sick when it comes to leave restoration.

Additionally, the timing of what has happened here should be noted as at NYFO there was an issue because I never moved formally to NY and commuted from my house in PA.  Now that I purchased a condo in NY under the assumption, I would be here through my tour which ended in 2022, upon finding this out they immediately reassigned me to Washington to make my life difficult.  Further, I was not given the time and benefits afforded to all people PCSing including a house hunting trip or even travel orders as of September 5th.

**Timeline of Current Claim**

Please see the timeline below regarding the claims discussed herein.  Also, please note that dates, and times are approximations.  They and all the facts are based on the best evidence I have at this time given the short turn around period and everything else that is occurring as described herein which also results in the typos.

*May 2019*- I am put out on a Fitness for Duty Evaluation which lasts until December and involves extensive physiological and psychological tests.

*26 December 2019 through January 2020*- SSA Etienne Singleton, the special assistant to the director of DSS, calls me and informs me that the evaluation came back that there are no mental or physical issues wrong with me and that I am being assigned to the high profile security detail for the United States Ambassador to the United Nations Ambassador Kelly Craft ( "Craft") an assignment I am to start immediately and report to Washington wit only a weekend's notice to collect my gear and send the next 2-3 weeks re-onboarding i.e. qualifying with weapons and reestablishing all my accounts they had deleted and destroyed.  This included and extensive fight over the fact that my emails were all deleted because they "mistakenly" forgot to follow the retention protocols when I was out. I was told there would be no way to get them back until I pointed out that deletion of government records was a felony for the people who deleted them and those who took part.  Suddenly they reappeared.

*5 February through 11 February 2020*- First trip to Kentucky on Ambassador Craft's security detail as an advance.

*26 February through 7 March 2020*- I was lead advance in charge on the ground fort he Ambassador's trip to the Syrian boarder with Turkey.  Successful trip despite a missile striking 15 KM from the airport the Ambassador was flying into the next day.  I was praised my the RSO shop, the country team and my supervisor SSA Jeff Jacob ("Jacob") for how well I handled the trip and the very dangerous and fluid circumstance making sure there were no issues of security safety or otherwise.

*18 March 2020*- I am scheduled to fly to Kentucky to work Ambassador Craft's detail as the lead advance until 24 March but I asked to switch because my cousin Stacy Miller had passed, and her funeral was on 21 March 2020. SA Elliot Kuck ("Kuck") took my place and I was to fly out on 22 March until 30 March however New York was

locked down and the Ambassador's protective Detail ("APD") was not allowed to travel leaving Kuck and SA Jason Parker ("Parker") in Kentucky.  Parker came home via car as he was having a baby and Kuck remained for 58 days acting as agent in charge approximately through 15 May 2020.

It was later noted that but for my cousin passing and me getting the time off, I would have been in Kuck's place but I could not act as agent in charge because due to the reasons given in the prior EEO complaint: false statements by management officials, namely ASAC Peter Carlson, that I had received an unsatisfactory rating in 2019 which have been proven to be demonstrably false, have resulted in my promotion to FS-4 has being withheld to this day.  As a result, my opportunity at tenure is withheld.   The lack of tenure is the given pretext why despite having seniority on the detail aside from Jacob, I the only African American, was relegated to answering to the Caucasian agents who were junior to me and who were now being paid more to do the same work only with the title of Agent in Charge and the prestige that carried when it came time to write EERS and seek promotions.

This was later, explained to Ambassador Craft during a conversation she initiated about the subject of race asking me about the Black Lives Matter protests in Kentucky on 7 June 2020 as discussed below.

During these 58 days, Jacob initiated daily wellness checks he put me in charge of doing via text message.  There came several times where Kuck publicly to the group chastised me and others in what can only be described as bullying in violation of department policy. There came a time where the details driver Jack Do Santos ("Dos Santos") was publicly chastised for replying to a text at 2am by Kuck.

Other times Kuck stated that he "cursed" Dos Santos out for suggesting policy changes that were inconvenient to Kuck by way of example, parking our cars at the New York Field Office while not in use during the protests to prevent damage to them.  Kuck would refuse to reply to the daily welfare checks and had the other junior agents Parker, and Mark Romanowski ("Romo") do the same to "test the system" thereby making it impossible for me to do the job of getting daily affirmation of everyone's safety that was assigned to me done.

When Jacob was made aware of one such incident, he asked me to change the time I sent the messages which I had sent at 0730 during working hours to later as to not bother Kuck.  After I pointed out Kuck was still causing issues stating he would not reply until Jacob sent him a message at times, Jacob took the work away from me rather than admonishing Kuck for the bad behavior.

During this time until we had to return Jacob did not want anyone to come to the office.  On multiple times did I attempt to come to the office to conduct business but was dissuaded by Jacob.  The driver Jack Dos Santos ("Dos Santos") and he had an issue regarding this because Dos Santos needed to come to the office to file reports.  The issue was that Jacob did not feel comfortable around anyone during the pandemic.

*1 April 2020*- I notice I have symptoms of the Corona Virus.  Shortly after I contact Jacob who instructs me to contact several people to have the office disinfected and several other things.  It should be noted that Jacob appeared to be obsessive compulsive and sensitive to the virus as he would  wash his hands with sanitizers constantly and was very sensitive about issues involving the virus.  He went as far as moving his place f work from the mission with the team in New York to an isolated place at the New York field office located in New Jersey. This was part of my rationale for sitting outside of our bullpen in one of the cubicles we had available.

Jacobs demanded I be tested by there were no tests available in New York and so I quarantined with no contact to anyone from the State Department other than the daily welfare checks via text.

*4-7 May 2020*- Jacob and Branch Chief Bradley Lynn, his boss, sign and submitted a voluntary a short form (DS-7768) EER because I had been in post less than 120 days but I had done such good work that Jacob stated that I deserve tenure.  He specifically cited to my work on the trip to the Syrian border.  There were no issues with my work noted other than I should take charge more often than being quite and waiting for permission to act a learned behavior from my previous experiences.

It should be noted that EX actively discouraged this EER to be submitted in numerous emails giving all kinds of reasons.  It was only submitted basically over their objection which they had no grounds for other than to not have anything possible about me on the record before attempting to get rid of me.

*5 May 2020*- At 0731, within working ours as the detail normally start the day at around 0530 I sent the daily welfare check as I was assigned to do my Jacob.  Kuck responded in a derogatory manner to the ground regarding the text message.  No one else had an issue.  Jacob sided with Kuck and messaged me to send the messages between 0800 and 1600 and I stated I would comply.  Dos Santos even stated in reference to the message "This is not early for me!."

*6 May 2020*- I belayed sending the message and Dos Santos sent a message at 0802 assumingly responding to the previous time where Kuck admonished him for sending a text message at a time Kuck did not approve of.  Kuck refused to answer and acknowledge the welfare check until called out.  He then stated, "I'm testing the system to see what happened if I don't reply."  This was the one of many times Kuck refused to reply making the task I was given impossible I later complained to Jacob who rather than fix the problem with Kuck just took the assignment from me.

The harassing behavior and lack of support from the supervisor led me to alter my behavior in the text messages from keeping them lite to being direct and professional so there was no room from accusations.

**26 May 2020**- Approximately on that date, I had a test for Covid-19 antibodies which came back positive indicating prior infection.

**3 June 2020**- The DS-7768 EER is accepted by PE after back and forth of DS HR discouraging me to have the form submitted for some reason.

Also, on this day I drive back out to Kentucky, as the quarantine was lifted, and it was my shift to be out there as lead advance until 19 June 2020

**7 June 2020**- Ambassador Craft, asks me about racism and the Black Lives Matter Movement while I was acting as the de facto agent in charge during her evening walk which Romo did not want to do.  Being a politically sensitive topic I, avoided engaging as much as possible and only when pressed I said that I could only speak to my experience and spoke about my life including the fact after it came up that I had seniority on the detail yet was not the agent in charge what happened last year and throughout my DS career including the Belle Grove Planation incident.  I explained that the APD was a new start and it was not Jacob who was involved and ask that she not say anything, and she said she would not.

Later that night, Brian Lomax ("Lomax"), a senior agent who was TDY from the Chicago field office and  Romo asked me about the conversation because they noted the Ambassador stated that I had never spoken to her previously and she thought I did not like her or I was mean but I was quite nice during our conversation.  I conveyed to them the uncomfortableness of the topic and that what was said.

**8 June 2020**- I served as driver for the Ambassador's morning run, and Lomax road the bike with her.  After the run, Romo told me where to park the car in front of the green sign and while sitting there I was confronted by a Caucasian man in a white truck demanding I identify myself and screaming about the BLM protests nearby.  I indicated I could not roll down the windows of the armored car and pointed at Romo who came over and spoke with him.  All this happened in front of Ambassador Craft hours after our discussion on racism and how it effects things.  Never prior was any white agent confronted while driving the Ambassador's armored limo with government plates just for being in her neighborhood.

Later that afternoon, I was contacted by Jacob and asked about the conversation with Ambassador Craft.  I complained about being overly scrutinized and how in less than 24 hours he, who is in New York, has a report of a private conversation which I only shared with Romo and Lomax and only after Romo brought it up because the Ambassador stated that I never talked to her like the other agents and she thought I had a problem with her.   I told Jacob that I felt that Romo was spying on me for him because every move I made was reported back in less than 24 hours.

Further, Romo confirmed it was him who said something in a roundabout way in a conversation later.  I complained that this was another form of bullying and harassment and that I wanted it to stop.  I asked why I was not given the same respect and treatment as the other agents and why were they being used to report back on everything I did.  Jacob denied that was happening and threaten to bring me home.

Jacob told me I was not allowed to talk to the Ambassador.  At first I just confirmed I would comply as ordered but after speaking with Lomax, who said I should press the issue, I objected to being the only one who was not allowed to talk to the Ambassador especially as the only African American because she had stated that  she thought I was not friendly or that I had an issue with her which was not the case. It was thought that having a perceived issue with Ambassador Craft and being the only one not speaking to her would have an adverse effect on my career.

The rationale for me being the only one not allowed to speak with her was a pretext:  I was not the agent in charge and would not be ever and only the agent in charge speaks with her.  This was because to be agent in charge I had to be tenured and promoted to FS4 which I had not been because I was denied tenure and my administrative promotion, because of the previous lie from Carlson which resulted as retaliation for the prior EEO complaint.

So ultimately the previous retaliation was now causing issues with my new assignment and "ruining my career" as they threaten to do by ruining my relationship with the Ambassador.  I asked Jacob to please mitigate this situation by explaining to her that it was not me making the decision and it was coming from him which after and email exchange he did not and would not do.

Subsequently, I found out Jacob was removed from the detail, apparently due to a conflict with the Ambassador which had nothing to do with me but that he had initially blamed me and this conversation for his dismissal.

*12 June 2020*- Approximately on this date without the benefit of records, Parker took over for Romo as the agent in charge and a new Agent jut out of BSAC James Miller ("Miller") who had not even reported properly and onboarded in the Chicago Field office took over for Lomax.

*13 June 2020*- On or about this day Parker wants to do surveillance on the Black Lives Matter protestors using the same car that we park in from of the Ambassador's house at night sometimes. I object as it is a security risk to the Ambassador if someone follows it or writes the tags down after seeing it surveilling them and we are not there. Over my objection, he states as the agent in charge that is what we are going to do.

Additionally, we broke the Lexington Police lines to get into their station to bring them pizza, he convinced the Ambassador to buy even though I was told I was not even allowed to talk to her days before by Jacob.  This was done so Parker could try to schmooze with the detectives using the same car in full view of the protestors.

In yet another incident I objected to, the same white truck and individual who had harassed me days before came back around and circled the block a few times during the Ambassador's run.  After taking the license plate, Parker order than we first late at night go to the individuals business and then the next day conduct a knock and talk which I objected to a we had not called for support from Lexington PD, nor did we have DS support and at least in New York the protocol was that when any such field stop was done, for officer safety we would call the stop in to our duty desk so there was a record and someone there to liaison with the local police to deconflict if there was an issue or send back up.  We did not have that here and wore Miller had not even been fully onboarded as he had never gotten his final training in the field office.  Between the three of us we had 8 years of experience total and I was most senior.  Again, this was done over my objection

*16 June 2020*- At 0026 I receive a text message from Chase bank asking if I charged $50.00 at "CHICKFILA ONE."  I reply no.  They Reply they have secured my account and will be sending a new card and to check my statement for other charges which I did.  In checking I found several charges from Lyft which were not me from the previous few hours.  Subsequently, I received about 20 plus emails stating someone was trying to use my card.

*17 June 2020*- I report to Parker and the new agent that I had been up late the night before after finding out my credit card information had been stolen and reporting it to Lyft.  Parker indicated I was wrong for reporting the information to Lyft who ultimately thanked me.  I stated that it was a federal crime in progress, and I had a duty to gather the information and report it.  Further, we did not know if other people's including Ambassador Craft's information was stolen as we had all been going to the same places.  Subsequently we found out her card was also compromised I overheard.

Regardless, this was reported back to Jacob behind my back again and the story was twisted to lie and state that I had used my status as a federal law enforcement officer to bully Chase into taking charges off my card which was not the case at all.  In fact, I had no communication with Chase other than replying to the automated text with the work "no."  Subsequently Jacob confronted me about this incident and after telling me it was ok after I showed him the evidence, he still reported it to EX who ultimately used this misuse of authority as grounds to suspend my security clearance and subsequently pull me from post, take 25% of my pay and punish me in several different ways over my objection and in contradiction to the facts.

*18 June 2020*- Kuck and other agents, were taking over the next day.  That night we are all having drinks at the Marriott on the roof bar as I prepared to turn over to the detail to him.  I notice on his phone he and Parker are sharing private pictures of me and I confront him about it, and he brushes it off.  Wanting to avoid conflict I let the issue go.

**26 June 2020**- I was confronted by Jacob and Danaher with accusations including about my conversation with the Ambassador.  I report to them what I told her including issues of discrimination bullying and harassment which they in turn report up.  There were approximately 7-8 pages of accusations that Jacob had been compiling on me from the other agents.  Among others which were less serious was included the accusation of misuse of my passport in Israel, that I had said I did not care about my duties on the trip to the Turkish Syrian border, and Parker's accusation that I had abused my law enforcement status with Chase bank both of which were provably false with evidence.  I responded to these accusations and provided a status reported one what reality happened in Kentucky.

First as stated, exiting Israel I was provided with an exit pass which shows which passport I used.  Clearly it shows the picture and number from my personal passport.  Further, if there was any question, we have systems to see where passports are used.  If there was a legit question Jacob and Danaher could have looked it up but rather, they just reported the false information to EX who used it as grounds to suspend me.

Second, regarding my duties as lead advance in Turkey, what was unexplained was yet again they in trying to belittle me allowed a junior agent working under me to question my authority and try to supersede me multiple times in country team meetings and at other times.  I got sick of it and told him I had given him an assignment and asked if he could do it stating I did not care how.  If he could not, I asked that he let me know so I could do it myself as it was a hectic situation and I had no time to argue further.  Jacob accused me of not working, and I gave him the name of the FSO in charge of the Country team, Homeyra Mokhtarzada, who I worked with who can confirm that it was only her and I working while others were gone.  Further the text chat show that I am asked my team, specifically David Ortiz and Kevin Burns, to come back and do work that was assigned to them that was doing disproving their accusation.

Third Parker's accusation is discussed above so I will not go into detail any further.   Overall, these accusations were all ridiculous and disproven, yet Jacob and Danaher chose to report them to DC as if they were true evidenced later by them being brought up during my security clearance investigation as discussed herein.

**6 July 2020**- I am contacted by Kelly Reimers the attorney from the office of civil rights for an interview about previously reported acts of discrimination.   We speak that day about 1130 and I report everything that has happened to me as well a the fact that the same agent I complained about in training subsequently allegedly as was told to me called SA  Pejman Saadatzadeh ("PJ") a little Brown boy and told him to put on his suicide vest.  I pointed out that was classes after when I complained about the treatment I was targeted and punished, and the bad actor was left to continue and went to offend again, and it was not right.

**19 July 2020**- I was working as lead advance in New York with Kuck as the AIC, Cliff Kitto ("Kitto") who was new to the detail acting as my secondary advance, and Luke Fisher("Fisher") who was TDY from NYFO and the driver.

Kitto was going to do the run in the Park with the Ambassador and I oversaw getting her in and out of the residence for the morning.

The issue came up on return to the residence.  We have what is called a PACE plan for communication: primary, alternative, contingency, and emergency. The idea is that we reach out first on the primary means of communication, then the secondary, and if those are not working, we have the contingency means and the emergency last. Our primary was our radios and the secondary is a text group which was used more frequently as it reached further. Our SOP also requires that we give a warning and count down before arrives so that the advance can know to clear the site and or report any dangerous or unusual activity.

The Ambassador's run usually takes about an hour and it had been an hour and a half, and I had heard nothing.  I was told not to be in the hallway of the residence and to "scatter" by Danaher when not working just a few days prior.  I complied but when I did not hear from the detail, I did a welfare check first over the radio with no response and then via text asking if they were walking back.  Kuck refused to answer and Fisher who was driving was in fact the person who responded yes.   At that time, I prepped myself to head over and waited for the signal they were near.  It never came.  Instead I received a nasty text back from Kuck at that point asking am I "working today bro" publicly to the whole group.  I replied I was, and he replied that I was not at the residence but "do you bro" embarrassing me to the whole team.  Not wanted to get into a public spat with the agent in charge I did not reply.

It turns out Kuck did not have his radio set in a way that he could be heard.  Later that night I was doing the evening walk with the Ambassador and we were having the same issues.  I text Kuck to inform him that I would here the rest of the transmissions about departures but not him.  He responded that he knew his radio was still set the same way again making it difficult to do my job.

The next few days, Jacob called to check in and asked me how things were and I did not report Kuck's behavior as again I did not want to cause any issues and I was cautious about being punished again for reporting bad behavior.

*21 July 2020*- I am again called and interrogated by Jacob and Danaher this time about what had happened on the 19th .  Kuck rather than say nothing and letting his mistake go, instead went to Jacob, and made the false accusation, in that it is an incomplete accounting of the facts that I had "missed a move."

Again, I had to defend myself against false accusations and see the record straight and prove and show the text messages showing that Kuck was the one who violated procedure and that I had gone above and beyond by reaching out to him  and he had still not answered.

During this discussion I pointed out that Kuck was not only abusive to me but also to Dos Santos, who is Portuguese in origin, among and that Jacob was playing favorites by not correcting him which he denied. It should be noted that I asked him again on the 30th if he had taken actions to correct Kuck and he refused to state that he did or would.

There was also a false accusation of carrying additional weapons at work which I was specifically sensitive to as I was being investigated and it has ultimately been proposed I receive a 5-day suspension for the very same thing.

All of this made me angry that everything I said was continuously turned around and reported falsely up to Washington in a bid to get me in trouble. Jacob stated that it ended there, and he understood, and the issue was done.

*22 July 2020*- I came into work to find Danaher's notes about the private conversation open on the table for everyone to read. His notes misrepresented the conversation and made it seem as if I was mad at Kuck for no reason and nothing I explained here happened. I immediately emailed Jacob and Danaher and clarified what had been spoken about.

*25 July 2020*- This was the last day I worked the detail. We went to the Ambassador's favorite restaurant that night and contrary to the accusation that I was isolating myself and acting anti-social, against practice and covid restrictions, I sat inside with Romo and talked and ate with him while the Ambassador was having dinner rather than sit in the car and wait for the departure.

I was scheduled to work on the 29th through the 2nd I believe and then fly to Jackson Hole, Wy as the lead advance the next week as I had been preparing for but Jacob pulled me from the schedule on the 29th citing that I had too many work days in in a row even though I was routinely scheduled to work days and hours I was not paid for due to the cap.

*29 July 2020*- I was contacted by NYFO SSA Time Grady who is also black but was never my superior. He was "assigned" to talk to me for no reason other than race. His email made me suspicious something was going on.

Tramontin also reached out which told me something was wrong. When I spoke with Dr. Tramontin, she stated they requested a psych exam for my security clearance but there was no need for a full psychologic examination or Fitness for Duty Examination ("FFDE") because one had been completed in December and I was cleared of any issues so long as I was willing to allow the examination file to be turned over which I did. I also set an appointment with Dr. Yung Leong for the next week for my security clearance to clear any questions.

**30 July 2020**- I am scheduled to work and Jacob requests I come upstairs and speak with him before I report to the part to meet the Ambassador for her run.  I am ambushed by Jacob and SSA Ari Kaufman ("Kaufman") and David McClintic ("McClintic") who take away my equipment and inform me I am being put on suspension.  I am handed two letters, one undated from Director Erin E. Smart("Smart"), stating that my security clearance has been suspended because of alleged "erratic behavior over the "past few months" and engaged in misconduct over the last year something provably false by their own facts i.e. the performance evaluation.  The second was dated 29 July 2020 from DSS Director Carlos F. Matus ("Matus") stating that that my law enforcement authority is being suspended due to my clearance being suspended.

I directly as Jacob on multiple times including on the 11th floor in front of Kaufman and McClintic has he, my supervisor who I interact with daily, witnessed any erratic behavior.  Jacob states "No sir I have not."  I turn to Kaufman and McClintic and say I want to make sure everyone heard that for the record. They demand to take me home over my objections, and during the car ride where I am transported like a criminal, I again ask Jacob about any erratic behavior and he confirms there has not been any he observed.  They arrive at my home and come into my home to take why equipment that was here conducting what I would have been taught to do as an informal and unlawful/unconstitutional search of the home.

Later that day I contact, contact Dr. Leong who was shocked by the development and moved up our scheduled appointment to clear this situation sooner.  I also contacted Dr. Tramontin who suggested that I speak with Mark Danzig ("Danzig") to communicate with management.  I spoke with Danzig several times during this time period (the dates and times are lost due to them again cutting off my access to that information as discussed below).  Danzig confirmed based on his "30 years of experience" he saw nothing wrong with me.

I also reached out to Singleton and ask for the rationale and what behavior are they referring to and point to the fact that I just received, and he refuses to say.  He only says I am going to be reassigned to DC due to the time it would take to clear the psych exams.  I informed him that I had already scheduled the examination for early the next week and he let out an audible gasp and stated it did not matter it was going to happen regardless and that I would be contacted by my New CDO Marlon Grullon ("Grullon").

**31 July 2020**- Dr Leong moves the date of the Psych exam up to Tuesday the 4th of August to speed things up.

I believe Danzig also arranges so that I will get 30 days of admin time and not have to report to DC by Monday.

**3 August 2020**- I reach out to S/ OCR.

**4 August 2020**- I get official notice from Shelton that I am getting 30 days admin leave.

I receive an email from S/OCR regarding counseling.

I also have my security clearance psych evaluation with Dr. Leong.

*5 August 2020*- I was contacted by Singleton and now told that he reason I would need to report to DC now that the previous psychological examination were being done sooner than expected, they were now putting me on the FFDE that Tramontin ha stated less than a week prior was not necessary.  Singleton drafted the letter and it was signed by Matus.  This represents blatant retaliation and abuse of power and process to achieve a preplanned goal.  They have used this all to attempt to elicit a response from me.

*6 August 2020*- I was contacted by Grullon, who referred to me as "Mr. Tyson-Phipps" rather than the customary "SA Tyson-Phipps" ordering me to fill out a TMtwo sending a TMone stating I requested curtailment which is not true.  I respond by requesting he call me so I can understand better my options and he refuses stating it's there and I would just need to do what is there and refused to answer any questions even on how I would go about completing the requested information.  As of 5 September, I have not received that call.

I comply to reach out to Dr. Tramontin, and she emails me back about talking at noon on the 7th.

*7 August 2020*- Email from Scott Bozworth ("Bozworth"), LEAP Management Analyst, stating that Dietz will be suspending my Leap pay.  The reason given was again all pretext.  They suspended my security clearance based on dubious accusations, which they used to suspend my law enforcement powers, which they used as grounds to suspend my Leap pay.

I was informed I was being reassigned to DC to work in Countermeasures under SSA Joseph Anthony ("Anthony").  I reached out to him that day and asked for a call.  During that call I requested leave, unused comp time, sick for family and self-care issues as well as and annual and he stated he would get back to me.

Also, on this day, I am contacted by Catherine Griffith, the EEO Counselor for my informal complaint and we set a time to speak on 10 August 2020 via video conference.

*10 August 2020*- Anthony sent me an email stating that I would not be allowed to take any leave and "**must**" (no emphasis added as it was bold in the email) report to DC not later than the 1st.  The excuse used was that I needed to meet with Tramontin however Tramontin and I had already discussed the matter and she had no intention of seeing me until no sooner than mid-September and further, had no issue with my seeing doctors in

New York where my elderly mother was and where I had just purchased a home which I intended to stay in at least until January 2022 which was the end of my tour before it was "requested to be curtailed 17 months."

There was much back and forward about the denial of leave and Tramontin confirmed in an email at 2112 that she did not need me "prior to the week of 9/14/2020" Still they persisted in denying me the right to take leave and stating that I would need too be in DC on 1 September 2020.

I also meet Ms. Griffith who takes my EEO complaint on this day.

**11 August 2020**- My attorneys Peter Noone ( "Noone") and Ngai Otieno ("Otieno") filed an appeal for a review of the suspension of my security clearance with the Office of Inspector General of the Department of State in accordance with Section B of the Presidential Policy Directive ("PPD-19"), "Protecting Whistleblowers with Access to Classified Information" which provides protections to individuals who hold security clearances by prohibiting retaliatory acts intended to affect an individual's ability to obtain or retain access to classified information. PPD-19 permits each agency's inspector general to investigate and remediate suspected acts of retaliation and the letter suspending my clearance stated this would be the proper way to address that matter.

**12 August 2020**- Approximately on this day I was contacted by SA Brian Palmero of TIA/PII and informed that he was conducting another investigation on me and would like me to cooperate for an interview the next week or so.

Also on this day, SA  Jeffrey McDermott ( "McDermott") the Assistant Inspector General, Evaluations & Special Projects, replied to the letter requesting review of the security clearance suspension by stating that they would not review the suspension as it has not been over a year.  My lawyers subsequently asked for clarification as the letter from Smart clearly stated this was the process and McDermott said he would get back to them and has as of 5 September 2020 he has not.

Also on this day I received an email from William Terrini ("Terrini") Deputy Executive Director of Diplomatic Security stating that after I reported on 1 September I would be able to take leave still denying me the ability to take leave on that day.

Also, on this day Investigator Robert Maddern, who was assigned to investigate my prior EEO complaint forwarded that complaint to me for review and rebuttal.

**14 August 2020**- Follow up with appointment with Dr. Leong to answers questions she had going through the file. She acknowledges that everything that they claim is blown out of proportion or is false when you look at the facts

but followed up with me about the Israel exit and other accusations they made such as wearing boutonnière in 2020 despite the impossibility since we wear protection pins and I have not worn one since 2016 on a detail in training.

*16 August 2020*- I provide the rebuttal to Madden, including several emails which show clear false statements backed up by emails I did not have when I sent the original complaint as they had cut off my access and deleted my State Department email prior by failing to properly put a preservation order in place and then cutting off my access and threaten me under penalty of law from accessing any of them. It was only after I fought and argued and pointed out their actions violated federal law for them to delete the email that after three weeks of them stating the emails were gone forever that they suddenly reappeared.

*17 August 2020*- My State Department accounts and emails are cut off again cutting me off from the ability to put in leave properly as required by the FAM/FAH, do my time sheets, complete my TMtwo, and access my email to say the least.

When I complained they insisted I use my personal Gmail account instead which I objected to as I should not be conducting Department business be in my time and attendance which can be SBU, or my travel orders which contain PII, or my leave forms over personal email. I stated that I believed it to be a violation of the FAM/FAH and yet they refused to remedy the situation and continued to use my personal email to conduct Department business.

*18 August 2020*- I saw my primary care physician who stated I should not return to work for the time being due to medical reasons. This was communicated to DS EX who told me they did not care I was have to report on 1 September 2020 over my and my doctor's objections and they were denying my ability to take sick leave as I would need to be there that day under penalty of losing my job. Specifically, my primary physician provided an opinion that I should not return to work until further notice based on her medical findings regarding the stress they were putting me under and the "toxic work environment" from which I should remove myself at least temporarily.

I receive an email from Elizabeth Twedahl from DS/EX dated August 17th from Aaron B. Utley (DS/IS/APD). The letter clearly says that I am to be removed from CLASSNET while my security clearance is being investigated. It literally says "DS imposes no other restrictions on information, information systems, or facilities in regard to assignment which in this security clearance suspension status." Even that and pointed that out I was even restricted from Opennet and had my email taken. I protested this and pointed out first that it was not what it says in plain English and second that they are intentionally trying to sabotage me and my ability to get anything done including respond to the EEO complaint. Again this is an example of abuse of power and then they will say, opps they made a mistake and there will be no consequences except to me in a clear act of retaliation they are trying to give plausible deniability for but is obvious given the timing.

**19 August 2020**- I received a formal request for an interview from Palmero via my personal email.

Also, I requested on this day the information and regulations regarding my why LEAP was taken as I had no access to them to be able to reply.

I also reached out regarding an explanation and rationale for my security clearance suspension so I can properly reply.  I requested a call back which I never received a of 5 September 2020.

I also on this day reached out to Alan Beni ("Beni") and TJ Sheldon ("Sheldon") stating that previously in 2019 they took approximately 122 hours of annual leave from me stating that I had not scheduled it in time.  I showed that I had in fact scheduled it properly prior based on recovered emails and complained that they were doing the same thing this year by again denying me the ability to put leave in.  In an series of emails, Shelton acknowledged that they had taken 24 hours of my leave over my objections in direct violation of the law and OPM regulations will address his believe that a he stated I should not complain because I was "given" over 1000 hours of leave when they suspended me last year.  I do not believe being suspended and put under stress is the same as annual leave that is earned.  It is a taking in violation of the constitution.

Additionally, on this day, I addressed an issue that was brought up during my examination with Dr. Leong with Jacob via email. Dr. Leong asked me about a previously accusation Jacob made about me that I illegally used my Diplomatic passport to exit Israel on 22 October 2019, a act he could and should have easily verified before making the accusation  and spreading misinformation to Washington which in part resulted in my current suspension.  Instead he willfully spread the misinformation.  I sent him an email with my passports and exit card showing the passport used was my personal passport and what he reported was in fact a lie.  There was no reply.

Additionally, on this day, I had a follow up with Griffith in which she told me the answers from Dietz.  She conveyed to me two things that alarmed me most.  First, when asked if I was being fired, he responded according to her I was "being put through the process."  Second, when asked for an apology from the Department for making me drive a white Confederate Reenactor to the Belle Grove Plantation as part of a training exercise, he stated that that was not adjudicated to be wrong or improper so he saw no reason to offer such an apology.

**21 August 2020**- I sought treatment for the stress for the first time.

Also, on this day the final EEO report of Investigation for the previous case was sent.

**24 August 2020**- I sought further treatment for the stress.

*25 August 2020*- I sought further treatment for the stress.

*26 August 2020*- I sought further treatment for the stress.

*27 August 2020*- I sought further treatment for the stress

Also, this was the day I was interviewed by Palmero and SA Travis Blanton regarding the investigation Management opened on me.  Again, in this interview there were accusations that I was suicidal based on the fact that I chose not to continue to be subjected to the harassment of sitting in the same room as people who took my words and twisted them resulting in all the other accusations.

*28 August 2020*- I sought treatment and a second opinion, from another doctor in New York.  This doctor concurred that I should not return to work for at least a month.

I south several further treatments for stress after this which I will not continue to mention for the sake of brevity.

*30 August 2020*- I was sent an email to my personal email address over my objections regarding conducting department business over personal email an accusation they made of me, from Claudia Osinaga with a ".pages" document telling me to file it out on to complete my travel orders on the Sunday before I was to me made to report to DC.  I was not given a house hunting trip more the ability to pack out as all other employees are.  I stated I could not open the document as I do not have a Mac computer as required for it.

*31 August 2020*- Osinaga emails me back at 0531 with a word file but I am already in transit to Rosslyn, VA to be at work 28 hours later.

*1 September 2020*- I complied with the order of DS EX over the objections of both my primary and treating physician putting my health at risk and reported to work in DC under duress, coercion, and threat.

Arriving in Rosslyn after the four-hour drive starting 430 am, I meet Deputy Executive director William Terrini ("Terrini").  Terrini directs me to my new cubicle in SA 15 but informs me the card office is closed and so I will not be able to get a new badge to access the door.  As such I cannot leave the room to use the rest room or take lunch without propping the door open which would trigger a security alarm and be a security violation.  Additionally, I was given no access to a computer to use and as such I was to sit in the room alone for the workday with no access to a rest room, food, water, or a computer.

No one came to check on me and the person who was supposed to also be there was not there most of the day and so that was the condition I was left in. At about 1800 I left to drive back to my house in Pennsylvania as I had no place to stay in Virginia.  I took my doctors advice and took sick leave and used my comp time as this was too much to bear.  I arrived home late that night

*2 September 2020*- After arriving home I received an email this day from Director Calli Fuller stating that it was being proposed I be suspended for 5 days and that I had 15 days to reply.  The reasons given were the same reason in the 2019 FFDE that I was cleared of.

**Retaliation (*reprisal for prior EEO activity*)**

As described herein, there were several prior protected activities including prior complaints the last of which was conducting its investigation just as this all happened to start.  Prior they tried an insider threat accusation, an OSI investigation, and an FFDE to get rid of my and retaliate and they all failed because they had no basis in the truth.  The question is how many bites of the apple to they get.  Now this new tactic is to lie and misreport everything that I say and do to create smoke which  triggers my clearance being suspended and the dominos as described here in resulting in my being made to move away from my elderly mother who is alone and sick during the pandemic, to DC to do a job where I sit in a room with no computer access which can be done remotely as confirmed when I arrived just to make me miserable.  It means cutting my salary and finding ways to abuse their power to make life difficult and unbearable until I quit or worse.

Dr. Tramontin stated on the 29th of July there was no need for a full psychological examination and fitness for duty examination ("FFDE") as one had just been completed in December.  She requested I allow that file be turned over to another Psychologist, Dr. Yung Leong ("Leong"),  to review and have a short examination which was scheduled for the next week which I complied with no questions asked.  When this was reported to the special assistant to the director SSA Etienne Singleton, rather than praise the fact that I had sped up the process, he audibly gasped as if something was wrong and immediately blurted out it does not matter you will be reassigned to Washington regardless. This shows that this was only being used as a pretext to move me.

I have my equipment taken and I am put on suspension.  I am handed two letters, one undated stating that my security clearance has been suspended because of alleged "erratic behavior over the "pat few months" and engaged in misconduct over the last year.  The prior "few months" are detailed above: mostly quarantine and a few trips I was praised for. I have had little to no contact with DS people to demonstrate such behavior and my supervisor denied seeing any and gave me a positive voluntary evaluation.  I make a whistleblower statement to the Ambassador about what happened to me prior and literally over night I am interrogated twice and then put out with my clearance revoked days later.

They accuse me of being suicidal but after suspending me "indefinitely" as was the attempt, which would be traumatic for anyone one, they left me with two guns, never checked on me, did not call Danzig or a counselor. That makes no sense unless they were hoping I did hurt myself which is darker.  The examining psychologist, Dr. Leong,  said that I was not suicidal and one examination and a follow up which after reading the file and claims they made stated that even she could see where they twisted fact and their narrative did not comport with the

evidence and reality.  I reached out to Danzig who said based on his 30 years of experience I was not suicidal, or he would call 911.  He has not.

They attempt to solicit a response from me so they can claim I am crazy.  They open insider threat cases for which they only need to make an anonymous accusation. I am neve allowed to confront the witnesses against me and by the time I spend seven months fighting it they get the chilling effect they want, and they can rinse and repeat it again.

They put me in a catch 22 and make accusations that are unfounded.  If I react, I am crazy or shirking responsibility and called a liar but if I do not, I am guilty of the lies.  If I respond to every lie, I am a complainer but if I wait and compile one response, I am writing a long email which makes me crazy.  It is Kafka-trapping. Then if I get upset by anything at all they tone-police and focus on my emotion resulting from what is happening rather than what is happening.

They live in a world of logical fallacies. They make ad hominem attacks on me to poison the well of anyone I may reach out to and attempt to discredit me before I can say anything.  They appeal to the fear that I am some monster and they are the good guys having to deal with it rather than the clear abusers they are. It is Alice in Wonderland level gaslighting where up is down and down is up.

Specifically, they repeat the I am crazy troupe and its all happening in my head yet when it comes time to present evidence of claims I am the only one with evidence.  Then after making the wild claims about me they make an argument to moderation that we should split the difference and say I am only half as bad as they describe when no one of it is true.  It is mental abuse and gaslighting.

They use this to create the Ipse dixit situation where I am wrong and guilty because I am JJ.  Not need for investigation, everyone knows who JJ is.  There is so much smoke there must be fire.  If I try to defend myself then they insert the Bulverism fallacy.  Again, it is an abusive situation and despite my best efforts there is no attempt to stop it.

This whole situation is circulus in demonstrando in that that they start with the premise that my security clearance is revoked and therefor none of this is in their control, but their false statements are the reason it is revoked. They suppress and cherry pick evidence that does not fit their narrative and anyone who objectively looks at things can see it.  Instead they use this argumentum ad verecundiam, ethos argument that because of their rank they are right which is wrong.

This again is another recurring troupe. They attempt to induce stress and elicit a reaction.  Then when they get the reaction, they use it as evidence that the things they claim is true, that I have mental issues is in fact true all while ignoring their actions that caused my reaction.  They cannot at same time induce stress and antagonize me to have a reaction, then use any reaction as justification to punish.  It is the same as shooting someone then fining them for littering because their blood is on the ground or suing for the medical bills for their treatment.

Their most used tactic is the argumentum ad populum the idea that if they get enough people to repeat a lie it becomes true.  I have given examples of this throughout, but I will pick two which are the same: the Israeli exit card and the issue with Chase bank.  They claimed everyone heard and knew that I had illegally used my passport and therefore it was true.  Everyone knew that I had called Chase it was true.  That said in both instances the evidence showed that the thing everyone knew was true was in fact false and I am being punished for no reason.

In bonus examples, we can look to the claim about what happened when my father died which they denied and about the plantation which they dined until I found direct evidence of both. You would thing law enforcement officials would be held accountable for lying during an official investigation as it is a federal crime but instead, they brush it off and claim they are allowed to and it's a legitimate tactic.

All this boils down to these facts: This started when I complained about going to the Belle Grove Plantation. I was flagged as a complainer and troublemaker. It escalated when Ugarte wrongfully punished me. I complained about what he did all the way up my chain of command and then accounting to them to the US Attorney. He retaliated by attempting to put me out on an FFDE and saying I am crazy, see the logical fallacies above. At first they did not accept it but after he enlisted Carlson and Jagels they kept chipping away at me from when my father passed making unacceptable comments to trying to ruin my EERs to getting me suspended and my promotion withheld to opening several cases on me and when I filed complaints and let it go all the way to the investigation stage DS took my security clearance within days of the investigation coming out, suspended me moved me from my duty station abruptly without travel orders, took 25% of my pay, opened another investigation into me, locked me in a room with no bathroom or food or computer for a day, and then proposed suspending me for 5 days. That is all jus a start. The same official who I refused to back down from in the complaint process executive director Dietz signed all this paperwork.

**The Law**

To establish a prima facie retaliation claim under Title VII or § 1981, the plaintiff must show: (1) protected activity; (2) "materially" adverse employment action; and (3) a causal connection between the protected activity and materially adverse action. Cepada v. Board of Educ. of Baltimore County, 814 F. Supp. 2d 500, 514 (Dist. Court, D. Maryland 2011) (Citing Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53(2006)) Title VII's anti-retaliation provision as interpreted by the courts state that an "adverse employment action," is a "materially adverse change in the terms and conditions" of employment. Burlington N. & Sfr Co,547 US 53 A "materially" adverse action is one that "well might have dissuaded a reasonable worker from making or supporting a charge of discrimination." Cepada at 514

The EEOC website, lists work-related threats, warnings, or reprimands, negative or lowered evaluations; transfers to less prestigious or desirable work or work locations; making false reports to government authorities; threatening reassignment; and scrutinizing work or attendance more closely than that of other employees, without justification as examples of "materially adverse" actions. (https://www.eeoc.gov/laws/guidance/questions-and-answers-enforcement-guidance-retaliation-and-related-issues) These have all happened in this matter.

I did:

1. Engage in protected activity;
2. There have been numerous adverse actions taken against me;
3. And the reason for these actions is clear retaliation as the excuse that I have been acting erratic for "a few months" rings hollow in light if the facts as demonstrated above which they voluntarily documented in a short for EER praising me just the prior month before I was put out.

My protected activity includes but is not limited to:

1. complaining or threatening to complain about alleged discrimination against myself or others;
2. providing information in an employer's internal investigation of an EEO matter as described herein;
3. refusing to obey an order reasonably believed to be discriminatory as described herein; and
4. advised my supervisor on EEO compliance as described herein.

In response to my actions I was subjected to:

1. work-related threats, warnings, or reprimands;
2. negative or lowered evaluations;
3. transfers to less prestigious or desirable work or work locations;
4. making false reports to government authorities;
5. threatening reassignment; scrutinizing work or attendance more closely than that of other employees, without justification;
6. removing supervisory responsibilities;
7. being subjected to in abusive verbal behavior that is reasonably likely to deter protected activity;
8. being put on leave;
9. having my pay cut;
10. and most recently being suspended among other things.

A retaliation claim only requires a causal connection between the protected activity and adverse action. Here there is much more as described. The new guidance states position that retaliation can be established by creating "a 'convincing mosaic' of circumstantial evidence" that would support the inference of retaliation. Again, there is a lot more here than that. The EEOC even said to create a convincing mosaic it could go back years into a person's employment history to find evidence of either a protected activity or an adverse action. Here you do not need to go back that far.

**Whistle blower (*opposition to illegal discrimination*)**

As stated, here in I opposed being bullied and harassed in violation of the Department policies, and reported violations of policies, regulations and the law and was subsequently immediately removed multiple times including this time which is more severe than the previous.

Even if they did not carry out the act of retaliation, the threat alone is in fact a violation of law. The Whistleblower Protection Act (WPA) and PRESIDENTIAL POLICY DIRECTIVE/PPD-19 regarding the protecting of whistleblowers with access to classified information which was transmitted directly to the Secretary of State and the Department state that a violation occurs when "the acting official has the authority to take, recommend, or approve any personnel action;" and "the acting official used his authority to take, or refuse to take, a personnel

action against the aggrieved employee." LaChance v. White, 174 F.3d 1378, 1380 (Fed. Cir. 1999)). This is exactly what occurred here as described herein.

Protected activity including participation in the EEOC process and reporting discriminatory behavior such as abuse of power and bullying as described herein.  If the employer takes the action "shortly after" learning about the protected activity, courts may infer a causal connection between the two. Price v. Thompson, 380 F.3d 209, 213 (4th Cir.2004)  Literally within days of the report of the prior complaint being released and days after I complained to Jacob and the Ambassador there were letters putting me on administrative leave, taking my security clearance,  and stating I have been acting erratic for months despite the fact that I had just received a voluntary short for EER stating the opposite in the prior month.

In Cepada the Court found that putting the Plaintiff on administrative leave shortly after a complaint was filed did constitute a materially adverse action even when a pretext was given, and the plaintiff knew the pretext to be untrue. See Cepada at 515-16 This is exactly what happened in this case.

Even "a threat would be a form of anticipatory retaliation, actionable as retaliation under Title VII." Johnson v. ITT Aerospace/Communications Division, 272 F.3d 498, 500-01 (7th Cir.2001); Sauers v. Salt Lake County, 1 F.3d 1122, 1128 (10th Cir.1993)  In Romero v. Allstate, the Court held:  "It is illegal to either retaliate, or threaten to retaliate, against an employee to prevent him from exercising rights under the EEOC, Title VII, ADEA, ADA, etc. (See https://www.eeoc.gov/newsroom/court-rules-allstates-threats-retaliation-are-illegal-0)

All these things happened here with no actual dispute only a blanket denial by them which would be expected of someone who has done wrong who is under investigation.  The fact is I did engage in protected activity in multiple instances from prior EEOC complaints to reporting of bad behavior by these management officials. Several adverse actions were taken and were threatened against me both of which are prohibited.  These adverse actions are still affecting me to this day including the creation of a hostile work environment and my administrative promotion due in April of 2019 being held now over a year later because of false statements by the accused shortly after protected activity.

Ultimately after additional protected activity making a claim, I was put out accused of crimes and mental health issues wrongfully a second time because no action was taken the first time against the bad actors.  Last year I spent approximately seven months going through psychological and other examinations to clear my name only for them to do it again to me recently just days after the EEO investigator's report into the prior allegations was released.  That is by law a textbook example of retaliation.

**_26. What remedies and relief are you seeking? (Space will expand to fit. Attach additional sheets if necessary. To print the additional pages (addendum), check the print addendum box in the right hand corner of the print dialog box.)_**

**Constructive Discharge**

The following has been given as an example of constructive discharge of a federal employee:

A federal employee, rather than facing daily acts of retaliation at work for having filed an Equal Employment Opportunity (EEO) complaint against their supervisor later resigns because his manager, still angry about the earlier EEO complaint, continues to retaliate against the employee severely. The federal employee, despite her attempt to notify upper management of these acts of retaliation, begins to suffer anxiety and depression. The employee resigns based on these intolerable working conditions to protect her health.

The key issue in a constructive discharge or removal case is whether the agency, through discrimination, retaliation, harassment, etc., made the employee's conditions at work so horrible that any reasonable person in the same situation would have felt compelled to resign or retire.

I have continuously made management up to the director general aware of what has happened to me not only in this situation but also previously through, filing formal complaints and in writing in emails which they have deleted all the way up my chain of command to the Director.  In return I have been the one suspended, had my rank taken, been removed from post, had my leap pay taken, been reassigned to a post which inconveniences me and my family during a pandemic, been denied right to seek medical care even after my doctor stated that the stress this has put me under is grounds to take time off.  This was confirmed independently by a second doctor in another diagnosis who has been treating me for physical ailments associated with the stress they have diagnosed and who also suggested time off.  A third doctor, I have seen as a mental health check up described what I am going through as "toxic" and "unhealthy" to stay in if nothing changes.

Management has been made aware of these things and instead of doing something to remedy them, instead they have piled onto the stress by doing things like taking my leap pay, cutting my email and Department accounts off so that I cannot do my job, refusing to reply to reasonable requests such a ensuring I have travel orders to comply with their demands that I move to DC, and making statements to Ms. Griffith when asked about if I am being fired, that I am "being put through the process" as Dietz, the executive director and top management official in the bureau did, adding additional stress.

The EEOC, in 2017, in Latarsha A. v. Cochran, 2017 EEOPUB LEXIS 319, EEOC (IHS) 0120150488 (E.E.O.C. Jan. 31, 2017) offered their reasoning:

The central question in a constructive discharge case is whether the employer, through its unlawful discriminatory behavior, made the employee's working conditions so difficult that any reasonable person in the employee's position would feel compelled to resign. Carmon-Coleman v. Dep't of Def., EEOC Appeal No. 07A00003, 2002 EEOPUB LEXIS 2344 (Apr. 17, 2002). The Commission has established three elements which a complainant must prove to substantiate a claim of constructive discharge: (1) a reasonable person in the complainant's position would have found the working conditions intolerable; (2) conduct that constituted discrimination against the complainant created the intolerable working conditions; and (3) the complainant's involuntary resignation resulted from the intolerable working conditions. See Walch v. Dep't of Justice, EEOC Request No. 05940688, 1995 EEOPUB LEXIS 1014 (Apr. 13, 1995).

While, I have not resigned, there is no way for me to reasonably continue to comply with these orders. On Sunday 30 August 2020, I finally get an email from someone telling me to file out a ".pages" document to get travel orders to be in Washington to report to work on Tuesday 1 September 2020 at 0900.  How?  How do I pack out move my life in less than a day? Where do I go? How do I take care of family issues?  All this during a pandemic.  It is not reasonable.

Continuing this thought from when I stopped writing previously, I have since then been made to sit alone in a windowless room with no access to a restroom , food or water that I did not know I had to bring, or a computer for a full work day.  I was told this would be my life, with a 25% pay reduction until further notice with some people languishing in this gulag purgatory for 7 years.

Subsequent to this I was then told it was proposed I was to be suspended for a incident that happened two years ago and that I was cleared of by another group of internal investigators.  This shows that this will continue to go on forever.

Subsequently on the 3rd of September by treating doctor stated that his initial diagnosis was that it seemed I was suffering from an acute stress reaction which he fears if was not addressed could result in PTSD. This forced me to take the advice and remove myself and use my sick days.  I could no longer sustain the barrage of retaliation and I am not sure if I will ever be able to and it is clear nothing is being done to stop it and it is only escalating which suggest that my only choice will be to leave for my health.

**Prayer for relief**

As such I am requesting the following:

1. My record be cleared of all derogatory material as it is put there in retaliation.
2. $300,000 representing lost wages, overtime I worked that I was not compensated for, the loss of pay for moving to a new duty station, the loss of leap, the loss of my administrative promotion; moneys owed for travel expenses; plus other moneys owed.
3. Interest on all moneys owed.
4. Matching amounts to my TSP
5. Full retirement based on the department's own statements that I am sick including medical insurance so that I can seek treatment again since I am sick now and was not so when I started this position and it was their actions that was the direct cause of my sickness.
6. Attorney's fees.
7.  Full student loan repayment as that is what I would have if I were not forced out of this job through these wrongful acts.
8. Time to recuperate from the stress induced.
9. A return of my taken 24 hours of leave during pp26 for 2019 as well as all other leave taken.
10. All other damages the court sees fit.

# *Response Exhibit 2*

# *REX-2*

U. S. Department of State

# PROFESSIONAL DEVELOPMENT FORM
## For All Foreign Service Employees

| **Name of Employee** *(Last, First, MI.)* | **Post or Office/Position Title** |
|---|---|
| TYSON-PHIPPS, JABARI-JASON | 172684 - DS/FLD/NYFO<br>SPECIAL AGENT |

**Name of Rating Official**

JAGELS, ERIC M

| **Date** *(mm-dd-yyyy)*<br>06-11-2018 | **Period Covered**<br>**From** *(mm-dd-yyyy)* 01-23-2018  **To** *(mm-dd-yyyy)* 04-15-2019 |
|---|---|

This form is a mandatory part of the performance management process. Use it to record interim discussions of the rated employee's performance. At least one interim discussion session must be documented. Each discussion should identify areas of strength in the employee's performance and opportunities for improved effectiveness; review goals achieved and update work responsibilities; and provide a mechanism for the rating official and rated employee to have a compatible view of the outcomes of their discussion. Notations should highlight major points.

A copy of the completed form must be provided to the employee. The rater should keep the original for his or her own records. Use a separate form for each discussion.

**A. Discussion of Overall Performance:**  The rater should briefly characterize the employee's overall performance and cite supporting examples.   The following items should be components in each discussion:

1. In considering performance to date, assess the performance areas where the employee was strongest:

SA Tyson-Phipps has been working tirelessly on closing cases and criminal investigations.

2. Describe the performance areas on which the employee should focus over the coming months, including any areas of specific weakness or deficiency:

SA Tyson-Phipps should focus on how his actions, deeds and words are perceived by others.

3. Discuss the employee's demonstrated potential to take on greater responsibilities and which core competencies need the most additional development to succeed in higher level positions:

SA Tyson-Phipps needs to work on his Interpersonal Skills.

4. Identify any needed changes to the employee's core work responsibilities or specific objectives:

N/A

**B. General Discussion:**  Describe the employee's progress in meeting the core work responsibilities and achieving the goals and specific objectives established for the rating period. Cite specific policy and programmatic outcomes and their impact on the Department's mission.

You will not communicate with anyone from the Assistant U.S. Attorney's (AUSA) office without informing and getting clearance from your supervisor or your Assistant Special Agent in Charge (ASAC).

| | |
|---|---|
| /s/ ERIC JAGELS | 08-13-2018 |
| Rating Official | Date *(mm-dd-yyyy)* |

**C. Optional Employee Comments:** The employee is encouraged but is not required to comment. The employee's signature acknowledges receipt of this form, not agreement with the conclusions recorded by the rating official.

This Professional Development Form directly stems from an email correspondence between the AUSA's office and I on 8 June 2018.  I would like to put what happened in its full context including the actual email which is reproduced below.  It is my contention that nothing I said is inaccurate and that it is all backed up directly by the documented case record and evidence.  I do understand that it can be interpreted in a way that might not cast NYFO and DS in the best light and should not have been written as it was.  The email I sent was in response to an email from a person from the AUSA's office offering to answer questions. In response to the email correspondence with this person which I did not start, I took him up on the offer and asked him to help me understand what his office is looking during case presentations so I could better give them what they are seeking.   As an example, I cited to the circumstances in a case which multiple AUSAs declined prosecution, the FPM said there was no fraud, and which I believed there to be no fraud.  I did not give any PII or details of the case only the generic set of facts. Specifically I said "For example I have a case where there was an allegation of two-parent consent fraud because the non-custodial parent, who agreed the child should get a passport so they child could, in fact, come to visit him, signed a power of attorney to his child so he could sign on the father's behalf because the father was not in the country. "  After this, I stated my opinion of how such a case should be handled, a finding of no fraud and my rationale.  I then stated that "management" felt different and had me present the case which I did as instructed.  What I did not say was the passport application was done 28 June 2017 almost a year prior, I had been assigned to the case 9 August 2018 and that I had presented the case to be closed 29 December 2017 with a finding of no fraud but was instructed by the two NYFO ASACs, "NYFO Management," to present the case against the mother who by no evidence even knew the father did not sign. I further did not say that two AUSAs including the chief intake AUSA for the Eastern District of New York actually laughed about the case and declined when I did present

*(continued on page 3)*

| | |
|---|---|
| /s/ JABARI-JASON TYSON-PHIPPS | 10-11-2018 |
| Rated Employee | Date *(mm-dd-yyyy)* |

**DS-1974**                                                                                                    **Page 2 of  4**

**C. Continued**

it on 2 January 2018 which was embarrassing to me.  I did not say that on that same day I informed ASAC Ugarte the case was declined and rather than allowing the case to be closed he first instructed me to jurisdiction shop the case to operation Checkmate and when I told him it was not eligible he told me to take it to RAC Michael Davies in Pennsylvania which to me seemed to be wrong in that we were shopping cases where there was no crime to find a friendly jurisdiction to force a non-criminal into the legal system to improve stats.  I further did not say that after expressing my opinion that this was not a crime and being threaten to do what I was told by management I did in fact do what I was told and complied.  The result was that the US Attorney's office in the EDPA also declined the case and that I was told they were also confused why anyone would present this case.  I did not put in the email that the fraud prevention manager from the passport office said this was not fraud.  In fact, my email in no way states the result of the presentation of the facts only generic facts of a case that I had.  What should be noted is regardless of the if there is a cognizable criminal offense against any of the adults in the actual case, the minor child is a US citizen and entitled to a passport which she has been denied for more than a year.  It was not until August of 2018 when what was going on in this case became more public that there was finally some movement to get the child the passport after the family missed several trips and called me nearly daily. The minor child, her parents, and two passport agencies called and reached out to me continuously to try to resolve this situation which was put in limbo because of this ASAC.  The Applicant lost money on several trips as well as family time together.  The minor child called me the week this happened and stated her father had taken ill in the Dominican Republic and she needs her passport to go see him.  It was because of calls like that the case was on my mind when I replied to the email.  Throughout all of that, even though the FPM, AUSAs and I the case agent all agreed no action was taken by NYFO management to ensure that a minor US citizen who is entitled to a passport received for which she paid.  The fact is I was attempting to do my job the right and legal way and this reprimand is being demanded by the same "NYFO Management" responsible for creating the problem because I dared almost shed light on what they were doing.  The reproduced email below will show that I NEVER refer to any of these things and none of it would be documented but for this write up because now I am forced for explain and defend my behavior. It is not noted that it comes after and EEO complaint.  The "embarrassing" thing would only be embarrassing to someone who knows the details I did not state and who is looking at the situation with those details.  "NYFO Management" during their counseling session stated that I did not or should have followed the SOP but the fact is I did.  In my orientation binder which they demanded I bring, they pulled out a page that refers to the "Prosecution Guildlines-January 2016" During this sit down ASAC Ugarte specifically put these in my face and said this is what I should be following but the fact is I did and it was them who were not.  Specifically they state:"DSS Agents of New York Field Office will seek prosecution of passport and visa fraud suspects, when investigation reveals probable cause in affiliation with the following:Suspect(s): who:•Investigation reveals probable cause of passport fraud, while revealing that the:•Suspect has prior felony convictions,•Suspect has prior crimes of violence with handguns,•Ongoing criminal nexus to mail fraud, social security fraud, financial and/or other "white collar" crimes.•Immigration offender, moral turpitude crimes and re-entry after deportations.•Suspect(s) passport or visa fraud activity involves nexus to transportation and possible endangerment of children.•Suspect(s) passport or visa fraud activity involves nexus to smuggling of humans for purposes of indentured servitude or sexual slavery.•Passport fraud investigation reveals "identity theft" from death identity or stolen identity of a living U.S. citizen.•Passport fraud investigation reveals lower level rung to false "breeder" document vendors.•Preponderance of false documents investigation "public integrity" abuse in state, federal or local government agencies.•Passport and visa fraud offenses as a conveyance to terrorism activity (funding, conspiracy, surveillance, or endangering the lives of U.S. citizens).•Passport and visa offenses that involve the International Parental Child Abduction (IPCA) cases.This case did not meet one of these circumstances and I as the investigating agent, the FPM who referred the case and ultimately the AUSA all agreed there was no probable cause. The argument given to me was that it is not for me and I assume any of these people to decide it is for "NYFO Management."  So Yet again I am being reprimanded for following the policy and ultimately I am sure will be further punished for putting this in writing which I don't feel is fair and which violates the whistleblower laws and protections.   Further, I think it is important to put the conclusion of this matter into context.  This case was referred by the Philadelphia FPM, Ray DeVoe.  After I spoke with DeVoe and sent him the power of attorney he stated that had he known that the case would have never been referred. He conferred with NY FPM Luis Linares who also agreed the case should not have ever been referred. Ultimately, "NYFO Management" had me refer a case to 3 jurisdictions, and had 3 AUSAs decline a case which I did not want to refer and which the referring person stated they would not have referred had they had

**C. Continued**

d the facts.  The Applicant as of August 13, 2018 is still waiting to get her passport which the FPMs agreed to work with her to get so I am actually being written up here for doing the right thing which they are trying to spin as being wrong when they ae the ones who had me shop a case that was not cognizable under the law.  In addition, when I spoke with Jim Murphy, the FPM from the National Passport Center, after his presentation to the office he also agreed a case like this should not have been presented nor should it have had it from the FPM's desk.  As a result of me speaking out about these circumstances of this case which I feel are not right, fair, or proper procedure in the treatment of a minor US citizen I have been punished multiple times including having opportunities taken from me, being reprimanded including this, a poor EER for the rating period, and suffering different treatment in the office.  I understand completely that sending an email to an AUSA that can be perceived as critical of NYFO management is not right but a fair reading of the email will show that was not my intent and if anything my email speaking out about I perceived to be a wrong being committed that is still being committed a clear violation of the whistleblower laws.  That is the context of why I am receiving this Professional Development Form.   Below is the verbatim copy and paste of the email I wrote which gives rise to this write up.   ** As an update this case was closed August 8, 2018, 1 year 1 month and a day after it was opened.  The child did receive the passport only because the Minor child, and both parents sat all day in the NY Passport office and the FPM over road things to make sure it happened.  That being said I was still against my judgment, the advice of  several FPMs, the the opinion of the AUSAs made to close this case as fraud found when I and all of those people all felt otherwise because I felt threatened with further retaliation if I did not.**____From the AUSA's office Hey guys.  My apologies, but I do not think I will be able to make it Wednesday.  Please feel free to give me a shout if any questions come up.  Thanks, [AUSA investigator] My response:Hi [AUSA investigator]:I'm not sure if we have met or if you can help me with this but it's something I that I've been trying to figure out and work on since I joined DS. My ask upfront is if you had a bit of time to discuss what you all are looking for and/or do you have a copy of the prosecutorial guidelines you could share.A bit of background I am a lawyer as well and I take a little backlash for it around the office even though I think it is helpful in understand some of the more nuance legal aspects of our case work which many people do not seem to understand.  For example I have a case where there was an allegation of two parent consent fraud because the non-custodial parent, who agreed the child should get a passport so they child could in fact come visit him, signed a power of attorney to his child so he could sign on the father's behalf because the father was not in the country.  My gut said no fraud, especially after the non-custodial parent appeared and replaced the form with one he signed in front of me and provided a sworn statement to me. Management said its fraud and to take it to you all because it should be prosecuted.  I still see no way that is meets any fraud statute when there is clearly no scienter and at best it is administratively not allowed by a rule you would have to dig deep for and which is still questionable. These are the kinds of back and forward discussions that happen and why I get the backlash because my response is often I am admitted in NY, the SDNY, and EDNY and I would not take that case. It is my humble opinion that pressing things like this makes us look bad and wastes time. This is where my question comes from; I am hoping I can get a better understanding of what you all need and/or are looking for so I can be able to package my things better and or know what to spend more time on. For example in another case, it came to us as passport fraud but I have enough evidence to add on bank fraud, wire fraud, mail fraud charges as well. Would that be better to lead with those or does it not matter which charge and it is dependent on the Subject or some other factors. Thanks in advance,J



U. S. Department of State

# PROFESSIONAL DEVELOPMENT FORM
## For All Foreign Service Employees

| **Name of Employee** *(Last, First, MI.)* | **Post or Office/Position Title** |
|---|---|
| TYSON-PHIPPS, JABARI-JASON | 172684 - DS/FLD/NYFO SPECIAL AGENT |

**Name of Rating Official**

JAGELS, ERIC M

| **Date** *(mm-dd-yyyy)* 06-11-2018 | **Period Covered** **From** *(mm-dd-yyyy)* 04-16-2018    **To** *(mm-dd-yyyy)* 04-15-2019 |
|---|---|

This form is a mandatory part of the performance management process. Use it to record interim discussions of the rated employee's performance. At least one interim discussion session must be documented. Each discussion should identify areas of strength in the employee's performance and opportunities for improved effectiveness; review goals achieved and update work responsibilities; and provide a mechanism for the rating official and rated employee to have a compatible view of the outcomes of their discussion. Notations should highlight major points.

A copy of the completed form must be provided to the employee. The rater should keep the original for his or her own records. Use a separate form for each discussion.

**A. Discussion of Overall Performance:** The rater should briefly characterize the employee's overall performance and cite supporting examples. The following items should be components in each discussion:

1. In considering performance to date, assess the performance areas where the employee was strongest:

SA Tyson-Phipps has been working tirelessly on attempting to close cases and working on criminal investigations.

2. Describe the performance areas on which the employee should focus over the coming months, including any areas of specific weakness or deficiency:

SA Tyson-Phipps should focus on how his actions, deeds and words are perceived by others.

3. Discuss the employee's demonstrated potential to take on greater responsibilities and which core competencies need the most additional development to succeed in higher level positions:

If SA Tyson-Phipps works on the issues identified here along with sharpening his interpersonal skills I feel he as the capacity for more responsibility.

4. Identify any needed changes to the employee's core work responsibilities or specific objectives:

N/A

**B. General Discussion:** Describe the employee's progress in meeting the core work responsibilities and achieving the goals and specific objectives established for the rating period. Cite specific policy and programmatic outcomes and their impact on the Department's mission.

Your communication to a representative of the US Attorney's Office for the Southern District of New York was highly unprofessional, it inaccurately characterized the discussions surrounding a case and you were ultimately unduly critical of New York Field Office management. You will not communicate with anyone from the Assistant U.S. Attorney's (AUSA) office without informing and getting clearance from your supervisor or your Assistant Special Agent in Charge (ASAC).

| | |
|---|---|
| /s/ ERIC JAGELS | 06-11-2018 |
| Rating Official | Date *(mm-dd-yyyy)* |

**C. Optional Employee Comments:** The employee is encouraged but is not required to comment. The employee's signature acknowledges receipt of this form, not agreement with the conclusions recorded by the rating official.

This Professional Development Form directly stems from an email correspondence between the office of the US Attorney and I on 8 June 2018. I would like to put what happened in its full context including the actual emails, which are below. I do not believe anything I said to be inaccurate and I believe it is all backed up by the documented case record, which is why I want what was said and why I am receiving this to be on the record with this form so the situation can be put in its full context. I do understand that my email, if read by someone with more information about what I was talking about than I provided, can be interpreted in a way that might not cast NYFO and DS in the best light and that I could have chosen other words.  The email I sent was in response to an email from the US Attorney's office offering to answer questions. In my email, I specifically asked if the sender had time to help me understand what the office is looking for during my case presentations so I could better give them what they are seeking.  Putting things in the full context, I sent the email the morning of 8 June 2018.  On 7 June 2018, at the end of the day, I was asked by my supervisor to reach out to a contact I have in the consular affairs legal office to ask for a sample letter and or guidance about the best way to present a passport revocation case to them. At the time it was my thinking that I was doing the same thing with this request so that I could more completely do my job.  In doing so, I cited the circumstances in a case which multiple AUSAs declined prosecution, the FPM said there was no fraud, and which I believed there to be no fraud. I did not give any specific details of the case only the generic set of facts. Specifically I said "[f]or example I have a case where there was an allegation of two-parent consent fraud because the non-custodial parent, who agreed the child should get a passport so they should could, in fact, come to visit him, signed a power of attorney to his child so he could sign on the father's behalf because the father was not in the country. " After this, I stated my opinion regarding how I wanted to handle the case with my rationale, which was a finding of no fraud and closing the case.  I then stated that "management"

*(continued on page 3)*

| | |
|---|---|
| /s/ JABARI-JASON TYSON-PHIPPS | 06-15-2018 |
| Rated Employee | Date *(mm-dd-yyyy)* |

**DS-1974**                                                                                     **Page 2 of 4**

**C. Continued**

felt different and had me present the case, which I did as instructed.  That was the only time I said anything about "management" and I did not specify anyone specifically. This is what is being deemed as highly critical of "management" from the perspective of people with the information I did not include in the email.  These people were not party to the email; they only received it because it was forwarded to them.  There was nothing secret about the email at all.  In fact, on multiple occasions, I discussed having such a conversation with the US Attorney's office with management.    I had not had an opportunity to do so and when this individual offered; I took him up on the offer. What I did not say was the passport application was submitted 28 June 2017 almost a year prior; that I had been assigned to the case 9 August 2018; and that I had presented the case to be closed to management 29 December 2017 with a finding of no fraud but was instructed by management to present the case against the mother who by no evidence knew the father did not sign.  I further did not say that two AUSAs including the chief intake AUSA actually laughed about the case and declined it when I did present it on 2 January 2018, which was embarrassing to me.  I did not say that on that same day I informed the ASAC the case was declined and rather than allowing the case to be closed he instructed me to jurisdiction shop the case to Pennsylvania. I further did not say that the USA office in the EDPA also declined the case and that I was told they were confused why anyone would present this case.  I did not put in the email that the fraud prevention manager from the passport office with years of experience said this was not fraud. In fact, my email in no way states the result of the presentation of the facts, only the generic facts of a case that I had.  What should be noted is regardless of whether there is a cognizable criminal offense against any of the adults in this case, the minor child is a US citizen and entitled to a passport which she has been denied for going on a year.The minor child, her parents, two passport agencies, and the command center have continuously called and reached out to me to try to resolve this situation, which still as on 15 June 2018 has not been resolved because the case has not been signed off on.  This is despite me submitting the closing report in April which went against my opinion and that of 2 US Attorneys' offices and the Fraud Prevention Manager that there was fraud after the draft sat for months.  This is even after the email so cannot say they are not aware of the situation.The Applicant has lost money on several trips as well as family time together.  The minor child called me around the same time and stated her father has taken ill in the Dominican Republic and she needs her passport to go see him.  Calls like that were on my mind when I mentioned the circumstances in the email.   As a result of me speaking out about these circumstances which I feel are not right, fair, or proper procedure in the treatment of a minor US citizen who has done no wrong but yet is suffering consequences, I have been punished multiple times.  This includes having opportunities taken from me, being reprimanded including this, a poor EER for the rating period, and suffering different treatment in the office.  I was pulled into a meeting with the ASACs and reprimanded.   They pointed to the prosecutorial guidelines for the office in NYFO orientation book.  The problem is that I did in fact follow those guidelines.  Specifically they say:"DSS Agents of New York Field Office will seek prosecution of passport and visa fraud suspects, when investigation reveals probable cause in affiliation with th following:Suspect(s): who:•   Investigation reveals probable cause of passport fraud, while revealing that the:•   Suspect has prior felony convictions,•   Suspect has prior crimes of violence with handguns,• Ongoing criminal nexus to mail fraud, social security fraud, financial and/or other "white collar" crimes.• Immigration offender, moral turpitude crimes and re-entry after deportations.•   Suspect(s) passport or visa fraud activity involves nexus to transportation and possible endangerment of children.•   Suspect(s) passport or visa fraud activity involves nexus to smuggling of humans for purposes of indentured servitude or sexual slavery.•   Passport fraud investigation reveals "identity theft" from death identity or stolen identity of a living U.S. citizen.•   Passport fraud investigation reveals lower level rung to false "breeder" document vendors.•   Preponderance of false documents investigation "public integrity" abuse in state, federal or local government agencies.•   Passport and visa fraud offenses as a conveyance to terrorism activity (funding, conspiracy, surveillance, or endangering the lives of U.S. citizens).•   Passport and visa offenses that involve the International Parental Child Abduction (IPCA) cases."This case does not meet any of these guidelines.  Yet I was told to present the case and I did as instructed.  To that end, the case was declined in multiple jurisdictions, and yet has not as of 15, June 2018 been closed which has resulted in the wrongful denial of a minor US Citizen being given a passport to which she is entitled. I sought out guidance from the US Attorney's office on how best to handle cases, something I had been asked to do the day before in similar circumstances.  This is why I am getting this Professional Development Form, because I indirectly generically mentioned circumstances that are embarrassing to the office, which they have still failed to remedy a week later, and because I attempted to find a way to resolve it so I can do my job in the proper way.I understand completely that the email can be perceived as critical of NYFO management if one adds the context, which I

**C. Continued**

left out; however, a fair reading, in my opinion, clearly shows that was not my intent.  Not only do I leave out names, and the details, which are embarrassing, I actually state my intent, seeking information how to best present cases, in the opening paragraph and end with the same.  If anything, if one were to read my email in the other light, I am speaking out about a wrong being committed that is still being committed after going through all of my chain of command and that is why I am receiving this Professional Development Form.
____From the AUSAHey guys.  My apologies, but I do not think I will be able to make it Wednesday.  Please feel free to give me a shout if any questions come up.  Thanks, [AUSA]My response:Hi [AUSA]:I'm not sure if we have met or if you can help me with this but it's something I that I've been trying to figure out and work on since I joined DS. My ask upfront is if you had a bit of time to discuss what you all are looking for and/or do you have a copy of the prosecutorial guidelines you could share.A bit of background I am a lawyer as well and I take a little backlash for it around the office even though I think it is helpful in understand some of the more nuance legal aspects of our case work which many people do not seem to understand.  For example I have a case where there was an allegation of two parent consent fraud because the non-custodial parent, who agreed the child should get a passport so they child could in fact come visit him, signed a power of attorney to his child so he could sign on the father's behalf because the father was not in the country.  My gut said no fraud, especially after the non-custodial parent appeared and replaced the form with one he signed in front of me and provided a sworn statement to me. Management said its fraud and to take it to you all because it should be prosecuted.  I still see no way that is meets any fraud statute when there is clearly no scienter and at best it is administratively not allowed by a rule you would have to dig deep for and which is still questionable. These are the kinds of back and forward discussions that happen and why I get the backlash because my response is often I am admitted in NY, the SDNY, and EDNY and I would not take that case. It is my humble opinion that pressing things like this makes us look bad and wastes time. This is where my question comes from; I am hoping I can get a better understanding of what you all need and/or are looking for so I can be able to package my things better and or know what to spend more time on. For example in another case, it came to us as passport fraud but I have enough evidence to add on bank fraud, wire fraud, mail fraud charges as well. Would that be better to lead with those or does it not matter which charge and it is dependent on the Subject or some other factors. Thanks in advance,J

# *Response Exhibit 3*

# *REX-3*



# SPECIAL AGENT TIME AND ATTENDANCE REPORT

| Name (Last, First, MI.) | | Office Symbol/Post | Pay Period | Week | Dates Covered (mm-dd-yyyy) |
|---|---|---|---|---|---|
| Tyson-Phipps  Jabari-Jason | | OS/FLD/NYFO | 23 | 2 | 11/19-25/2018 |

| | SUN | MON | TUE | WED | THU | FRI | SAT | |
|---|---|---|---|---|---|---|---|---|
| HOURS SCHEDULED | 1200-2100 | 0815-2000 | 0815-1700 | 0715-1800 | XA | 0715-1700 | | |
| HOURS WORKED | 1200-2100 | 0815-2000 | 0815-1700 | 0715-1800 | | Admin | | |
| HOURS SCHEDULED | | | | | | | | |
| HOURS WORKED | | | | | | | | Task Totals |

| PROTECTION | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |

| INVESTIGATIONS | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |

| OTHER/MISCELLANEOUS | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training - ATLAS  class 18-01 | | | 6.00 | 8.00 | 2.00 | | 8.00 | | | 8.00 | 2.00 | | | | | 8.00 | | | | | | 32.00 | 4.00 | 6.00 |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| Day Totals: | | | 6.00 | 8.00 | 2.00 | | 8.00 | | | 8.00 | 2.00 | | | | | 8.00 | | | | | | | | |

Grand Totals: 32.00 | 4.00 | 6.00

DS-3009
05-2017

Case 1:23-cv-02316-LAK-GWG   Document 19-4   Filed 08/31/23   Page 60 of 98

Case 1:23-cv-02316-LAK-GWG    Document 19-4    Filed 08/31/23    Page 61 of 98

| Name (Last, First, MI.) | | | | Office Symbol/Post | | Pay Period | Week | Dates Covered (mm-dd-yyyy) |
|---|---|---|---|---|---|---|---|---|
| Tyson-Phipps    Jabari-Jason | | | | DS/FLD/NYFO | · | 23 | 2 | 11/19-25/2018 |

| LEAVE | SUN | MON | TUE | WED | THU | FRI | SAT | Category Totals |
|---|---|---|---|---|---|---|---|---|
| ANNUAL (AL) | | | | | | | | |
| SICK LEAVE (SL) | | | | | | | | |
| HOLIDAY (XA) | | | | | 8.00 | | | 8.00 |
| MILITARY LEAVE (ML) | | | | | | | | |
| COMPTIME (CU) | | | | | | | | 0.00 |
| Day Totals: | | | | | 8.00 | 0.00 | | |
| | | | | | | | Week Total: | 8.00 |

| PREMIUM HOURS | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NIGHT (ND) | | 3.00 | | | 1.00 | | | | | | | | | | | | | | | | | | | 4.00 |
| SUNDAY (SD) | | | | | | | | | | | | | | | | | | | | | | | | 0.00 |
| HOLIDAY (HP) | | | | | | | | | | | | | | | | | | | | | | | | |
| COMPTIME (CW) | | | | | | | | | | | | | | | | | | | | | | | | |
| Day Totals: | 0.00 | | 9.00 | 8.00 | | 1.00 | 8.00 | | | 8.00 | | | | | | 8.00 | | | | | | | | |
| | | | | | | | | | | | | | | | | | | Week Total: | 32.00 | | | | 10.00 |

**CERTIFICATIONS**

| Employee | By checking this box, I, _Jabari-Jason Tyson-Phipps_, certify that the reported hours comply with Department regulations and that I am the individual submitting this document. | Date (mm-dd-yyyy) 11-16-2017 | Detail Name and Number |
|---|---|---|---|
| [X] | | | |

| Supervisor | By checking this box, I, _____ Lee Rowland _____, certify that the reported hours comply with Department regulations and that I am the individual submitting this document.    Program Manager | Date (mm-dd-yyyy) 11-13-2017 |
|---|---|---|
| [X] | | |

| AIC | By checking this box, I, _____, certify that the reported hours comply with Department regulations and that I am the individual submitting this document. | Date (mm-dd-yyyy) |
|---|---|---|
| [ ] | | |

PRIVACY ACT NOTICE: Section 2316 of the Foreign Affairs Reform and Restructuring Act of 1998 (P.L. 105-277, 10/21/98) authorizes collection of this information. The primary use of this information is by the Bureau of Diplomatic Security for time and attendance purposes. Additional disclosures of the information may be made to the Office of Personnel Management and other federal agencies in connection with their responsibilities regarding law enforcement availability pay. Furnishing the above information is voluntary, but failure to do so may result in nonpayment.

DS-3009

Case 1:23-cv-02316-LAK-GWG    Document 19-4    Filed 08/31/23    Page 62 of 98



# SPECIAL AGENT TIME AND ATTENDANCE REPORT

| Office Symbol/Post | Pay Period | Week | Dates Covered (mm-dd-yyyy) |
|---|---|---|---|
| DS/FLD/NYFO | 23 | 2 | 11/19-25/2018 |

**Name (Last, First, MI.)** Tyson-Phipps Jabari-Jason

| | SUN | MON | TUE | WED | THU | FRI | SAT |
|---|---|---|---|---|---|---|---|
| | | | | | XA | 0715-1700 | |
| HOURS SCHEDULED | 0715-2100 | 0815-2000 | 0815-1700 | 0715-1800 | | Admin | |
| HOURS WORKED | 0715-2100 | 0815-2000 | 0815-1700 | 0715-1800 | | | |
| HOURS SCHEDULED | | | | | | | |
| HOURS WORKED | | | | | | | |

**Task Totals**

| PROTECTION | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |

| INVESTIGATIONS | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |

| OTHER/MISCELLANEOUS | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Training - ATLAS class 18-01 | | | 10.00 | 8.00 | | 2.00 | 8.00 | | | 8.00 | 2.00 | | | | | 8.00 | | | | | | 32.00 | 4.00 | 10.00 |
| | | | | | | | | | | | | | | | | 8.00 | | | | | | | | |

| Day Totals: | | | 10.00 | 8.00 | | 2.00 | 8.00 | | | 8.00 | 2.00 | | | | | 8.00 | | | Grand Totals: | | | 32.00 | 4.00 | 10.00 |

Page 1 of 2

DS-3009
05-2017

Case 1:23-cv-02316-LAK-GWG    Document 19-4    Filed 08/31/23    Page 63 of 98

| Name (Last, First, MI.) | | | | | | | Office Symbol/Post | | Pay Period | Week | Dates Covered (mm-dd-yyyy) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Tyson -Phipps Jabari -Jason | | | | | | | OS/ _FLO/NYFO | | 23 | 2 | 11/19-25/2018 |

| LEAVE | SUN | MON | TUE | WED | THU | FRI | SAT | Category Totals |
|---|---|---|---|---|---|---|---|---|
| ANNUAL (AL) | | | | | | | | |
| SICK LEAVE (SL) | | | | | | | | |
| HOLIDAY (XA) | | | | | 8.00 | | | 8.00 |
| MILITARY LEAVE (ML) | | | | | | | | |
| COMPTIME (CU) | | | | | | | | 0.00 |
| Day Totals: | | | | | 8.00 | 0.00 | | |
| | | | | | | | Week Total: | 8.00 |

| PREMIUM HOURS | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| NIGHT (ND) | | | 3.00 | | | 1.00 | | | | | | | | | | | | | | | | | | 4.00 |
| SUNDAY (SD) | | | | | | | | | | | | | | | | | | | | | | | | |
| HOLIDAY (HP) | | | | | | | | | | | | | | | | | | | | | | | | 0.00 |
| COMPTIME (CW) | | 14 | | | | | | | | | | | | | | | | | | | | | | |
| Day Totals: | 0.00 | | 13.00 | 8.00 | | 1.00 | 8.00 | | | 8.00 | | | | | | 8.00 | | | | | | | | 15.00 |
| | | | | | | | | | | | | | | | | | | Week Total: | 32.00 | | | | 14.00 |

## CERTIFICATIONS

| Employee | By checking this box, I, _Jabari-Jason Tyson-Phipps_, certify that the reported hours comply with Department regulations and that I am the individual submitting this document. | Date (mm-dd-yyyy) 11 16 2017 | Detail Name and Number |
|---|---|---|---|

| Supervisor | X | By checking this box, I, _____ Lee Rowland _____, certify that the reported hours comply with Department regulations and that I am the individual submitting this document.  _signature_ Program Manager | Date (mm-dd-yyyy) 11-13-2017 |
|---|---|---|---|

| AIC | By checking this box, I, _____, certify that the reported hours comply with Department regulations and that I am the individual submitting this document. | Date (mm-dd-yyyy) |
|---|---|---|

PRIVACY ACT NOTICE: Section 2316 of the Foreign Affairs Reform and Restructuring Act of 1998 (P.L. 105-277, 10/21/98) authorizes collection of this information. The primary use of this information is by the Bureau of Diplomatic Security for time and attendance purposes. Additional disclosures of the information may be made to the Office of Personnel Management and other federal agencies in connection with their responsibilities regarding law enforcement availability pay. Furnishing the above information is voluntary, but failure to do so may result in nonpayment.

DS-3009

Page 2 of 2

# *Response Exhibit 4*

# *REX-4*

## Annual Leave While on Extended Excused Absence

An agency cannot require an employee to use annual leave when the agency has placed the employee on extended excused absence (e.g., in cases where adverse actions are being pursued by the agency). However, being placed on extended excused absence does not relieve an employee of the responsibility to schedule annual leave that would otherwise be forfeited. If the employee fails to schedule (i.e., request in writing) the use of annual leave that would otherwise be forfeited, the agency cannot restore it to the employee. If an employee schedules (i.e., makes a writen request to use) annual leave, and the agency denies the request, the agency is required to restore the annual leave.

**IN THIS SECTION**

Assessment & Selection
Classification & Qualifications
Data, Analysis & Documentation
Disability Employment
Diversity & Inclusion
Coronavirus Disease 2019
Employee Relations
Hiring Information
Human Capital Management
Human Capital Framework
Labor-Management Relations
Oversight Activities
Pandemic Information
Pay & Leave
  Pay Systems
  Salaries & Wages
  Pay Administration
  Back Pay Calculator
  Recruitment, Relocation & Retention Incentives
  Student Loan Repayment
  **Leave Administration**
  Work Schedules
  Federal Holidays
  Claim Decisions
  Furlough Guidance
  Reference Materials
Performance Management
Senior Executive Service
Settlement Guidelines
Snow & Dismissal Procedures
Training & Development
Veterans Services
Work-Life
Workforce Restructuring
Policy FAQs
Contact Policymakers

**RESOURCES FOR**

New / Prospective Employees
Federal Employees
HR Professionals
Managers

# Pay & Leave
## LEAVE ADMINISTRATION

### Fact Sheet: Annual Leave (General Information)

#### Annual Leave Entitlement

An employee may use annual leave for vacations, rest and relaxation, and personal business or emergencies. An employee has a right to take annual leave, subject to the right of the supervisor to schedule the time at which annual leave may be taken. An employee will receive a lump-sum payment for accumulated and accrued annual leave when he or she separates from Federal service or enters on active duty in the Armed Forces and elects to receive a lump-sum payment.

#### Accrual Rates

| Employee Type | Less than 3 years of service * | 3 years but less than 15 years of service * | 15 or more years of service * |
|---|---|---|---|
| Full-time employees | ½ day (4 hours) for each pay period | ¾ day (6 hours) for each pay period, except 1¼ day (10 hours) in last pay period | 1 day (8 hours) for each pay period |
| Part-time employees | 1 hour for each 20 hours in a pay period | 1 hour for each 13 hours in a pay period | 1 hour for each 10 hours in a pay period |
| Uncommon tours of duty | (4 hours) times (average # of hours per biweekly pay period) divided by 80 ÷ biweekly accrual rate. | (6 hours) times (average # of hours per biweekly pay period) divided by 80 ÷ biweekly accrual rate. | (8 hours) times (average # of hours per biweekly pay period) divided by 80 ÷ biweekly accrual rate. |
| SES, Senior Level (SL), and Scientific or Professional (ST) positions, and employees in equivalent pay systems, as determined by OPM | 8 hours for each pay period, regardless of years of service. See Extension of Higher Annual Leave Accrual Rate to SES and SL/ST Equivalent Pay Systems fact sheet | | |

**Note 1**: A temporary employee with an appointment of less than 90 days is entitled to accrue annual leave only after being currently employed for a continuous period of 90 days under successive appointments without a break in service. (This restriction only applies to the accrual of annual leave. If an employee on such an appointment already has annual leave to his or her credit from a previous appointment, he or she is allowed to use this annual leave during the temporary appointment.) After completing the 90-day period of continuous employment, the employee is entitled to be credited with the leave that would have accrued to him or her during that period.

**Note 2**: An intermittent employee (i.e., a part-time employee who does not have an established regular tour of duty during the administrative workweek) is not entitled to accrue annual leave.

> \* See the Creditable Service for Leave Accrual section of this fact sheet. A change in annual rate takes effect at the beginning of the pay period after the pay period an employee completes the required period of service.
>
> \*\* In computing leave accrual for uncommon tours of duty, the accrual rate for the last full pay period in a calendar year must be adjusted to ensure the correct amount of leave is accrued.

#### Scheduling of Annual Leave

Employees and their supervisors are mutually responsible for planning and scheduling the use of employees' annual leave throughout the leave year. Employees should request annual leave in a timely manner, and supervisors should provide timely responses to employees' requests.

#### Supervisor and Employee Responsibilities

Ultimately, supervisors are responsible for the overall planning, coordination, and approving of their employees' annual leave throughout the leave year so that the agency's mission and employees' needs are met, and so that employees do not approach the end of the leave year with a significant amount of annual leave that must be used or forfeited. While the final date to schedule leave applies only to situations involving the possible forfeiture and restoration of annual leave, employees should be sure to schedule and use annual leave throughout the leave year and not wait until the end of the leave year to schedule annual leave. When an employee makes a timely request for leave, the supervisor must either approve the request and schedule the leave at the time requested by the employee or, if that is not possible because of project-related deadlines or the agency's workload, must schedule it at a later time. If the employee forfeits annual leave because the supervisor did not schedule the leave or request a determination that a public exigency exists that would prevent the employee from using the leave, the supervisor's negligence constitutes administrative error and the employee's leave must be restored.

#### Supervisors' Request for Additional Information to Grant Annual Leave

Since supervisors must balance the work of the agency against the interest of the employee in using annual leave, supervisors may find it necessary from time to time ask employees how they will use the requested annual leave so that the supervisors may make informed decisions about scheduling the leave. In such cases, employees are not required to provide the supervisor with this information, but should understand that in the absence of such information, their request for annual leave may be denied based on project-related deadlines or the workload of the agency. However, supervisors should not make it a standard practice to require that employees inform them how the annual leave will be used.

#### Annual Leave Ceilings

Maximum Annual Leave That May Be Carried Over into the New Leave Year:

| Description | Days |
|---|---|
| Federal Employees Stationed in the United States | 30 days |
| Federal Employees Stationed Overseas* | 45 days |
| Members of the Senior Executive Service, Senior-Level and Scientific and Professional Employees** | 90 days |

> \* Employees stationed overseas must meet the requirements at 5 U.S.C. 6304(b) in order to receive the 45-day annual leave ceiling.
>
> \*\* Employees in SES/SL/ST equivalent systems, as determined by OPM, do not receive a 90-day annual leave ceiling by virtue of their being deemed by OPM to be SES/SL/ST equivalent employees.

#### "Use or Lose" Annual Leave

"Use or lose" annual leave is the amount of annual leave that is in excess of the employee's applicable annual leave ceiling. Any accrued annual leave in excess of the ceiling will be forfeited if not used by the final day of the leave year. Forfeited annual leave may be restored under 5 U.S.C. 6304(d). (See Restoration of Annual Leave fact sheet.)

#### Leave Year Beginning and Ending Dates

A leave year begins on the first day of the first full biweekly pay period in a calendar year and ends on the day immediately before the first day of the first full biweekly pay period in the following calendar year. (See Leave Year Beginning and Ending Dates for more information.)

#### Importance of Scheduling "Use or Lose" Leave in Advance

The maximum amount of leave that employees may carry over to the next leave year is shown in the annual leave ceiling table above. An agency may restore annual leave that was forfeited due to an exigency of the public business or sickness of the employee only if the annual leave was scheduled in writing before the start of the third biweekly pay period prior to the end of the leave year. (See fact sheet on Leave Year Beginning and Ending Dates for dates for scheduling "use or lose" leave.) Any annual leave scheduled after that date will be forfeited if not used by the final day of the leave year. Annual leave that was not scheduled in advance may be restored only under very limited conditions such as the use of annual leave that was approved by the Defense Base Closure and Realignment Act (5 U.S.C. 6304(d)(3)), administrative error, or prolonged sickness of the employee.

#### Effect of Government Closures and Special Holidays on "Use or Lose" Annual Leave

Dismissal or closure due to weather conditions or other emergencies, end-of-year holidays granted by Executive order, and other unexpected paid time off without charge to leave may disrupt plans to use scheduled annual leave. Workdays on which a Federal activity is closed are nonworkdays for pay purposes, and employees will not be charged annual leave on such nonworkdays. If such circumstances result in an employee being unable to reschedule and use "use or lose" leave before the end of the leave year, the leave will be forfeited. When "use or lose" leave is forfeited under such conditions, it cannot be restored.

#### Annual Leave for Sick Leave Purposes

Employees may request annual leave instead of using sick leave (see Sick Leave (General Information) fact sheet). Although an employee may request annual leave for sick leave purposes, annual leave is subject to supervisory approval and may be denied. If an employee chooses to use annual leave for sick leave purposes, he or she may want to share the reason for the request with the supervisor so that the request receives proper consideration.

#### Annual Leave While on Extended Excused Absence

An agency cannot require an employee to use annual leave when the agency has placed the employee on extended excused absence (e.g., in cases where adverse actions are being pursued by the agency). However, being placed on extended excused absence does not relieve an employee of the responsibility to schedule annual leave that would otherwise be forfeited. If the employee fails to schedule (i.e., request in writing) the use of annual leave that would otherwise be forfeited, the agency cannot restore it to the employee. If an employee schedules (i.e., makes a written request) use annual leave, and the agency denies the request, the agency is required to restore the annual leave.

#### Annual Leave While on Active Military Duty

Employees entering on active military duty have the following options regarding their annual leave:

- **Use** — Employees may elect to use annual leave while on active duty in order to receive both their full civilian and military pay. During the period of annual leave, employees are in pay status; therefore they will continue to accrue annual and sick leave. For example, if a full-time employee with an 80-hour biweekly tour of duty uses 80 hours of annual leave during a pay period, he or she will accrue annual and sick leave for that pay period since he or she is in pay status.
- **Lump-Sum Payment** — Employees may elect to receive a lump-sum payment for any unused annual leave when they enter on active duty in the Armed Forces. Generally, a lump-sum payment will equal the pay the employee would have received had he or she remained employed until expiration of the period covered by the annual leave. This could begin with the employee's financial obligations when going into active duty service. (See Lump-Sum Payments for Annual Leave fact sheet.)
- **Remain to their Credit** — Employees may elect to have their annual leave remain to their credit for use upon their return to civilian duty. While the employee is on active military duty, unused annual leave is not subject to the employee's "use or lose" ceiling and any annual leave above the employee's annual leave ceiling is not forfeited at the end of the leave year. Employees who choose this option will have annual leave available for their use upon return to Federal service.

#### Creditable Service for Leave Accrual

**Civilian Service**

All civilian service (including previous civilian service of a reemployed annuitant) that is potentially creditable for Civil Service Retirement Service (CSRS) purposes, including service covered by the Federal Employee Retirement Service (FERS) is creditable for purposes of annual leave accrual. Potentially creditable service includes service that could be credited if the employee made deposits to the retirement fund. Such deposits are not required before the employee receives credit for annual leave accrual purposes. See OPM's Guide to Processing Personnel Actions, Chapter 6 - Creditable Service for Leave Accrual [✎].)

**Uniformed Service**

- For non-retired members of a uniformed service, full credit for active military service*** performed under honorable conditions is given for annual leave accrual purposes.
- For retired members of a uniformed service***, annual leave accrual credit is given only for:
  - Actual service during a war declared by Congress (includes World War II covering the period December 7, 1941, to April 28, 1952) or while participating in a campaign or expedition for which a campaign badge is authorized. (See Vets Guide – War Service Creditable for Veterans Preference [✎].)
  - All active duty when retirement was based on a disability received as a direct result of armed conflict or caused by an instrumentality of war and incurred in the line of duty during a period of war as defined in 38 U.S.C. 101 and 1101. "Period of war" includes World War I, the Korean conflict, Vietnam era, the Persian Gulf War, or the period beginning on the date of any future declaration of war by the Congress and ending on the date prescribed by Presidential proclamation or concurrent resolution of the Congress.

> *Per 5 U.S.C. 2101(3), the uniformed services consist of the Armed Forces (Army, Navy, Air Force, Marine Corps, and Coast Guard), the commissioned corps of the Public Health Service, and the commissioned corps of the National Oceanic and Atmospheric Administration.
>
> **Includes service as a cadet at the United States Military Academy, United States Air Force Academy, or United States Coast Guard Academy or as a midshipman at the United States Naval Academy. See full definitions at 5 U.S.C. 2102(3) and 5 U.S.C. 6303(a).
>
> ***Per 5 U.S.C. 3501(a)(2), a retired member of a uniformed service is a member or former member of a uniformed service who is entitled, under statute, to retired, retirement, or retainer pay on account of his service as such a member. Per 5 U.S.C. 5534, employees appointed on or after October 17, 2006 while on terminal leave pending retirement from the uniformed service are treated as retired members of a uniformed service for the purposes of annual leave accrual.

#### Non-Federal Service or Uniformed Service

A newly-appointed or reappointed employee may receive service credit for prior non-Federal or active duty uniformed service that otherwise would not be creditable for the purpose of determining his or her annual leave accrual under the conditions prescribed in 5 CFR 630.205. See Creditable Service for Annual Leave Accrual for Non-Federal Work Experience and Experience in the Uniformed Service.

#### Non-Federal Service or Uniformed Service

A newly-appointed or reappointed employee may receive service credit for prior non-Federal or active duty uniformed service that otherwise would not be creditable for the purpose of determining his or her annual leave accrual under the conditions prescribed in 5 CFR 630.205. See Creditable Service for Annual Leave Accrual for Non-Federal Work Experience and Experience in the Uniformed Service.

#### Annual Leave to Establish Retirement Eligibility

An employee may use annual leave to establish initial eligibility for retirement in reduction-in-force (RIF) and other restructuring situations. An employee who has received a specific notice of termination in a RIF situation may use annual leave past the date the employee would otherwise have been separated in order to establish initial eligibility for immediate retirement, including discontinued service or voluntary early retirement.

#### Other Available Leave Options and Work Schedule Flexibilities

The Federal Government offers a wide range of leave options and workplace flexibilities to assist an employee who needs to be away from the workplace. These flexibilities include sick leave, advanced annual leave or advanced sick leave, leave under the Family and Medical Leave Act (FMLA), donated leave under the voluntary leave transfer program, leave under the voluntary leave bank program, alternative work schedules, credit hours under flexible work schedules, compensatory time off and telework [✎]. Agencies may also have a voluntary leave bank program.

#### References

- 5 U.S.C. 2101(3)
- 5 U.S.C. 5534a
- 5 U.S.C. 5552
- 5 U.S.C. chapter 63, subchapter I
- 5 CFR 351.606
- 5 CFR 353.208
- 5 CFR 550.1201
- 5 CFR part 630, subparts B and C
- Comptroller General opinions:
  - 15 Comp. Gen. 441 (1936), 39 Comp. Gen. 611 (1960) – absolute right
  - B-189065 (04/03/78), 57 Comp. Gen. 325 (1978).
  - 58 Comp. Gen. 684 (1979) – forfeiture
  - B-213380 (08/20/84), B-256975 (10/11/94) – restoration
  - B-188993 (12/12/77),56 Comp. Gen. 470 (1977),
  - 60 Comp. Gen. 598 (1981), B-221265 (06/02/86) – general information.

BACK TO TOP ↑

**ABOUT**
Our Agency
Our Director
Our Inspector General
Our Mission, Role & History
Our Structure
Careers at OPM
Doing Business with OPM
Budget & Performance
Open Government
Get Help
Contact Us

**POLICY**
Assessment & Selection
Classification &
Qualifications
Data, Analysis &
Documentation
Disability Employment
Diversity & Inclusion
Coronavirus Disease 2019
Employee Relations
Hiring Information
Human Capital
Management
Human Capital Framework
Labor-Management
Relations
Oversight Activities
Pandemic Information
Pay & Leave
Performance Management
Senior Executive Service
Settlement Guidelines
Snow & Dismissal
Procedures
Training & Development
Veterans Services
Work-Life
Workforce Restructuring
Policy FAQs
Contact Policymakers

**INSURANCE**
Life Events
Changes in Health
Coverage
Healthcare
FEHB Plan Comparison
Tool
FEDVIP Plan Comparison
Tool
Dental & Vision
Flexible Spending Accounts
Long Term Care
Life Insurance
Multi-State Plan Program
Tribal Employers
Agencies and Initiatives
Insurance Glossary
Insurance FAQs
Insurance Healthcare &
Insurance
The Affordable Care Act

**RETIREMENT**
My Annuity and Benefits
CSRS Information
FERS Information
Federal Ball Benefits
Calculators
Publications & Forms
Benefits Officers Center
Retirement Leadership
Retirement FAQs
Retirement Data
Contact Retirement
Services

**SUITABILITY**
Suitability Executive Agent
Position Designation Tool
Suitability Adjudications
Suitability Training
Oversight
Contact SuitEA

**AGENCY SERVICES**
Agencies & Oversight
Workforce Restructuring
Workforce & Succession
Planning
Recruiting & Staffing
Solutions
Assessment & Evaluation
Federal Leadership
Programs
Center for Leadership
Development
Performance Management
Federal Staffing Center
Human Resources Line of
Business
Federal Executive Boards
Contact Agency Services

**NEWS**
Our Agency
Upcoming Events
Latest News
Speeches & Remarks
Memos to Agencies
Testimony
Legislative Proposals
Social Media Presence
Feeds, Blogs & Lists
Website Archive

U.S. Department of State
Bureau of Diplomatic Security

## SPECIAL AGENT TIME AND ATTENDANCE REPORT

| Name (Last, First, MI) | Office Symbol/post | Pay Period (1-26) | Week | | Dates Covered (mm-dd-yyyy) |
|---|---|---|---|---|---|
| **Tyson-Phipps, Jabari-Jason** | **DS/FLD/NYFO** | **26B** | ☐ 1  [X] 2 | | **12/29/2019   1/4/2020** |

| | SUN | MON | TUE | WED | THU | FRI | SAT | |
|---|---|---|---|---|---|---|---|---|
| HRS SCHEDULED | RDO | 0830-1830 | 0830-1830 | 0830-1830 | 0830-1830 | 0830-1830 | RDO | |
| HRS WORKED | OFF | 0830-1830 | 0830-1830 | 0830-1830 | 0830-1830 | 0830-1830 | OFF | |
| HRS SCHEDULED | | | | | | | | |
| HRS WORKED | | | | | | | | |

**PROTECTION**

| | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT | RD | LEAP | S/OT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |
| | | | | | | | | | | | | | | | | | | | | | | | | |

**INVESTIGATIONS** (Select Type Investigation)

| | | | | | | | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | | | | | | | | | | | | | | | | | |

**OTHER/MISCELLANEOUS** (Select Type Other or Miscellaneous Type)    RD= 32    LEAP=    S/OT=

| | SUN | MON | TUE | WED | THU | FRI | SAT | Total |
|---|---|---|---|---|---|---|---|---|
| Administrative Duties | | 8 | 8 | | | | | 16 |
| Special Projects and Reporting | | | | | 8 | 8 | | 16 |
| | | | | | | | | |

WEEKLY GRAND TOTAL: 32

**LEAVE** (If other, indicate type: XA, XB, ML, LW, CU, XR)    AL=    SL=    XA= 8

| | SUN | MON | TUE | WED | THU | FRI | SAT | Total |
|---|---|---|---|---|---|---|---|---|
| ANNUAL (AL) | | | | | | | | |
| SICK LEAVE (SL) | | | | | | | | |
| HOLIDAY (XA) | | | | 8 | | | | 8 |
| MILITARY LEAVE (ML) | | | | | | | | |
| COMP TIME (CU) | | | | | | | | |

WEEKLY GRAND TOTAL: 8

**PREMIUM HOURS**    ND=    SD=    HP=    TOT PREMIUM HRS

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| NIGHT (ND) | | | | | | | | |
| SUNDAY (SD) | | | | | | | | |
| HOLIDAY (HP) | | | | | | | | |
| COMP TIME (CW) | | | | | | | | |

*I certify that the above reported hours comply with Department regulations.*

| Employee's Signature | 01-21-2020 Date (mm-dd-yyyy) | Detail Name and Number |
|---|---|---|

| Supervisor's Signature | Date (mm-dd-yyyy) | AIC's Signature | Date (mm-dd-yyyy) |
|---|---|---|---|

**PRIVACY ACT NOTICE:** Section 2316 of the Foreign Affairs Reform and Restructuring Act of 1988 (P.L. 105-277, 10/21/98) authorizes collection of this information.  The primary use of this information is by the Bureau of Diplomatic Security for time and attendance purposes.  Additional disclosures of the information may be made to the Office of Personnel Management and other federal agencies in connection with their responsibilities regarding law enforcement availability pay.  Furnishing the above information is voluntary, but failure to do so may result in nonpayment.

DS-3009
03-2019

## Department of State

## Earnings and Leave Statement

| | | |
|---|---|---|
| **For Pay Period Ending** 01/04/2020 | | **Net Pay** $ 2,245.91 |
| **Pay Period #** 26 | | **Pay Date** 01/16/2020 |

| | | | |
|---|---|---|---|
| **Name** TYSON-PHIPPS, JABARI-JASON | **Pay Plan/Grade/Step** FP   05   13 | **Annual Salary** $ 108,973.00 | **Hourly Rate** $ 52.22 |

| **Home Address/W2 Address** 1119 Crestview Drive Stroudsburg, PA 18360 | **TSP Address** |
|---|---|

### Basic Information

| | | |
|---|---|---|
| ABA/Bank Routing Number   021000089 | Service Comp Date   05/19/2016 | Agency   ST00 |
| Organization Code   172684 | Hire Date   160918 | FLSA Class   E |
| Organization Name   DS/FLD/NYFO | FEGLI Code   C0 | FEHBA Code   401 |
| Retirement Code   PF | | |

| Your Pay Consists of | Current | YTD | Tax Information | Mrtl Status | Exmps | Multi Jobs | Addtl Wthhld | Current Wages | YTD Wages |
|---|---|---|---|---|---|---|---|---|---|
| Gross Pay | 4,177.60 | 8,355.20 | | | | | | | |
| Total Deductions | 1,931.69 | 3,863.38 | Federal | S | 0 | | 0.00 | | |
| Net Pay | 2,245.91 | 4,491.82 | State ( PA ) | S | 0 | | 0.00 | | |

### EARNINGS

| Type | Rate | Adjusted | ADJ Hours | Hours | Current | YTD |
|---|---|---|---|---|---|---|
| Regular | | | | 80.00 | 4,177.60 | 8,355.20 |

### DEDUCTIONS

| Type | Misc | Adjusted | Current | YTD | Type | Misc | Adjusted | Current | YTD |
|---|---|---|---|---|---|---|---|---|---|
| FSPS Retirement | | | 206.79 | 413.58 | Federal Tax | | | 643.39 | 1,286.78 |
| State Tax 1 ( PA ) | | | 126.19 | 252.38 | OASDI or Social Security | | | 254.85 | 509.70 |
| Medicare | | | 59.60 | 119.20 | Basic Life Insurance | | | 16.65 | 33.30 |
| Thrift Savings Plan (TSP) | | | 350.00 | 700.00 | Union Dues | | | 7.18 | 14.36 |
| Savings Allotment | | | 60.00 | 120.00 | Savings Allotment | | | 140.00 | 280.00 |
| Health Benefits - Pretax | | | 67.04 | 134.08 | | | | | |

### BENEFITS PAID BY GOVT.

| Type | Current | YTD | Type | Current | YTD |
|---|---|---|---|---|---|
| FEGLI | 8.33 | 16.66 | FEHB | 201.14 | 402.28 |
| Medicare | 59.60 | 119.20 | OASDI | 254.85 | 509.70 |
| TSP Basic | 41.78 | 83.56 | TSP Matching | 167.10 | 334.20 |
| FSPS Retirement | 748.63 | 1,497.26 | | | |

### LEAVE

| Type | Begin Bal Lv Yr | Earned Current | Earned YTD | Used Current | Used YTD | Ending Bal |
|---|---|---|---|---|---|---|
| Annual Leave | 240.00 | 6.00 | 140.00 | 24.00 | 41.50 | 338.50 |
| Sick Leave | 240.00 | 4.00 | 104.00 | | 48.25 | 295.75 |

### ANNUAL LEAVE

| **Category:** 6 | **Maximum Carry Over:** 240.00 | **Use Or Lose Balance:** 98.50 |
|---|---|---|

### REMARKS

QUESTIONS YOU HAVE REGARDING YOUR PAY SHOULD BE DIRECTED TO THE PAYROLL CUSTOMER SUPPORT CENTER. THE PCSC MAY BE REACHED VIA E-MAIL AT PAYHELP@STATE.GOV, OR BY PHONE AT 1-877-865-0760.

THIS REPORT CONTAINS INFORMATION SUBJECT TO THE PRIVACY ACT OF 1974 AS AMENDED



**Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>**

---

## Fwd: Leave Restoration
1 message

---

**Jabari-Jason Tyson-Phipps** <jabari.phipps@gmail.com>                Tue, Sep 1, 2020 at 11:31 AM
To: "Terrini, William R" <TerriniWR@state.gov>

---

---------- Forwarded message ---------
From: **Shelton, TJ** <SheltonTJ@state.gov>
Date: Wed, Aug 19, 2020, 1:42 PM
Subject: RE: Leave Restoration
To: Beni, Alan J <BeniAJ@state.gov>, Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>


Are the hours in question from PP26 of last year – see attachment.

---

**From:** Beni, Alan J <BeniAJ@state.gov>
**Sent:** Wednesday, August 19, 2020 1:31 PM
**To:** 'Jabari-Jason Tyson-Phipps' <jabari.phipps@gmail.com>; Shelton, TJ <SheltonTJ@state.gov>
**Subject:** RE: Leave Restoration


I don't remember the circumstances regarding the 24 hours but if your timekeeper put you in a leave status you did not request, they should go back and correct it based on your wishes.  This other issue was brought up with Employee Relations and they would not entertain the request.  As I understand it, the Department placed you on admin leave, the fact you could not take leave is not an exigency of the public business.   If you like, you can forward your request to Pay Intake and let them make a final determination since they are now responsible for handling leave restoration.


**From:** Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>
**Sent:** Wednesday, August 19, 2020 10:20 AM
**To:** Beni, Alan J <BeniAJ@state.gov>; Shelton, TJ <SheltonTJ@state.gov>
**Subject:** Re: Leave Restoration


Hello Alan:


I would like to bring this matter back up.  As I stated to you prior I HAD requested the leave and then it was denied when I came under this attack.  I had the records before my email was deleted and not I have more evidence even though my email was deleted again.  Please find attached the email chain and not my supervisor's statement that I HAD leave scheduled and requested.  It had been requested in writing as was the policy in the office and then never given. That aside from the fact that I was clearly on long term medical with the FFDE AND the fact like now I am being  and was denied the ability to put the leave into the state systems because I was denied access and did write a letter to who was my POC requesting the leave. As I previously shared.

Gmail Fwd. Leave Restoration

Further I had 24 hours taken from my last year against my written and expressed will which is a violation of OPM regulations and the law.  I always would like that restored.  Thank you in advance.


JJTP


On Thu, Dec 19, 2019 at 10:44 AM Beni, Alan J <BeniAJ@state.gov> wrote:

> Mr. Tyson-Phipps, regarding your leave restoration inquiry, you have not met any of the requirements stated in the Department regulations to be eligible.  Specifically,  the leave would have had to have been requested and denied prior to November 22, 2019.  You do not meet the criteria for exigency of the public business (i.e. urgent need for the employee to be at work) and per my discussion with Employee Relations there are no exceptions to individuals on admin leave.  If you have any additional questions or concerns, please let me know.  Thanks.
>
>
> Alan J. Beni
>
> Supervisory Human Resources Specialist
>
> DS/EX/HRM-SA-20, 9J28
>
> Bureau of Diplomatic Security
>
> U.S. Department of State
>
> 1801 N. Lynn Street
>
> Arlington, VA  22209
>
> (571) 345-3769; fax (571) 345-3782
>
>
> DS/EX/HRM is committed to customer service.  Let us know how we are doing.


--

_____
Jabari-Jason Tyson-Phipps
(917) 297-5945 mobile
Jabari.Phipps@gmail.com
_____


---------- Forwarded message ----------
From: "Tyson-Phipps, Jabari-Jason" <Tyson-PhippsJ@state.gov>
To: "Twerdahl, Elizabeth H" <TwerdahlEH@state.gov>
Cc: "Drew, Harold D" <DrewHD@state.gov>, "Shelton, TJ" <SheltonTJ@state.gov>, "Singleton, Etienne O" <SingletonE@state.gov>
Bcc:
Date: Tue, 21 Jan 2020 16:13:21 +0000
Subject: RE: PP26

Done

Thanks

---

**From:** Twerdahl, Elizabeth H <TwerdahlEH@state.gov>
**Sent:** Tuesday, January 21, 2020 10:51 AM
**To:** Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>
**Cc:** Drew, Harold D <DrewHD@state.gov>; Shelton, TJ <SheltonTJ@state.gov>; Singleton, Etienne O <SingletonE@state.gov>
**Subject:** PP26

JJ –

Please update your PP26 timesheet to reflect:

12/30: Admin Leave

12/31: Admin Leave

1/1: Holiday

1/2: Regular Duty (no LEAP)

1/3: Regular Duty (no LEAP)

Once done, please send to Dan and he can update the system appropriately.  After this, your T&A should be shifted over to Lori Ryan in DP (which you can coordinate later this week).

Let me know if you have any questions or concerns.

Thank you,

Liz

---------- Forwarded message ----------
From: "Tyson-Phipps, Jabari-Jason" <Tyson-PhippsJ@state.gov>
To: "Twerdahl, Elizabeth H" <TwerdahlEH@state.gov>
Cc: "Drew, Harold D" <DrewHD@state.gov>, "Shelton, TJ" <SheltonTJ@state.gov>, "Singleton, Etienne O" <SingletonE@state.gov>
Bcc:
Date: Tue, 21 Jan 2020 16:13:21 +0000
Subject: RE: PP26

Done

Thanks

**From:** Twerdahl, Elizabeth H <TwerdahlEH@state.gov>
**Sent:** Tuesday, January 21, 2020 10:51 AM
**To:** Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>
**Cc:** Drew, Harold D <DrewHD@state.gov>; Shelton, TJ <SheltonTJ@state.gov>; Singleton, Etienne O <SingletonE@state.gov>
**Subject:** PP26


JJ –


Please update your PP26 timesheet to reflect:


12/30: Admin Leave

12/31: Admin Leave

1/1: Holiday

1/2: Regular Duty (no LEAP)

1/3: Regular Duty (no LEAP)


Once done, please send to Dan and he can update the system appropriately. After this, your T&A should be shifted over to Lori Ryan in DP (which you can coordinate later this week).


Let me know if you have any questions or concerns.


Thank you,

Liz


**3 attachments**

 **JJTP 2019 LEAP Tracker and Timesheets 2020.pdf**
277K

**RE: PP26.eml**
389K

**JJTP 2019 LEAP Tracker and Timesheets 2020.pdf**
277K

 **Gmail**

Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>

## RE: 24 hrs of AL taken without permission CAS000001056339

1 message

**Payroll Customer Support** <PayHelp@state.gov>        Fri, Feb 14, 2020 at 2:22 PM
To: Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>
Cc: GFS PayHelp Ticketing System <payhelpticketingsystem@state.gov>

Good Afternoon Mr. Tyson-Phipps,

Greetings from Payroll Customer Support.

In order to submit Time & Attendance corrections, you must work with your timekeeper.

If you have any additional questions, please contact PayHelp@state.gov.

Best Regards,

**Wanda Simmons**

Payroll Customer Support Analyst

CGFS Customer Support Desk

CGFS/CST- Charleston

Haynes, Inc. -Contractor

payhelp@state.gov

800-521-2553

IVG 60538

*According to regulation 4 FAH-3 H-512, it is the responsibility of employees to verify the accuracy and correctness of their Earnings and Leave Statement. Each employee should perform a regular review of their Earnings and Leave Statement through Employee Express, especially after pay modifications have been made. Employee Express is available 24 hours a day, seven days a week at www.EmployeeExpress.gov*

SBU -PRIVACY OR PII

---

**From:** Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>
**Sent:** Thursday, February 13, 2020 5:45 PM
**To:** Payroll Customer Support <PayHelp@state.gov>
**Subject:** Fwd: 24 hrs of AL taken without permission


Hello:


I am noting that 24 hours of my al were taken last year without my permission and I would like this rectified as soon as possible. Please see below.


My employee is number is 53-0200682 and my user name is Tyson-phippsj@state.gov. It is the email cced below.


Thank you,


Jabari


---------- Forwarded message ---------
From: **Jabari-Jason Tyson-Phipps** <jabari.phipps@gmail.com>
Date: Thu, Feb 13, 2020 at 5:42 PM
Subject: 24 hrs of AL taken without permission
To: Shelton, TJ <sheltontj@state.gov>
CC: Beni, Alan J <BeniAJ@state.gov>, Drew, Harold D <DrewHD@state.gov>, Maddern, Robert E - Ocala, FL - Contractor <Robert.E.Maddern@usps.gov>, Ngai Otieno <notieno@averydooley.com>, Peter Noone <pnoone@averydooley.com>, Singleton, Etienne O <SingletonE@state.gov>, Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>


TJ:


It has come to my attention that my 24 hours or 3 days of my annual leave was taken in pay period 26 of last year without my permission in direct violation of OPM regulations and federal law. That is a taking of a significant amount of money out of my pocket.


I really don't know what kind of game is being played here but I must demand that this be remedied immediately.


If you require a refresher on the law place see the website below where this issue is specifically addressed.


https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/annual-leave/


"

# Annual Leave While on Extended Excused Absence

An agency cannot require an employee to use annual leave when the agency has placed the employee on extended excused absence (e.g., in cases where adverse actions are being pursued by the agency)."


Thank you


JJTP




--


_____
Jabari-Jason Tyson-Phipps
(917) 297-5945 mobile
Jabari.Phipps@gmail.com
_____


--


_____
Jabari-Jason Tyson-Phipps
(917) 297-5945 mobile
Jabari.Phipps@gmail.com
_____

# Subject: RE: PP26



**Tyson-Phipps, Jabari-Jason** <Tyson-PhippsJ@state.gov>

to Twerdahl, Elizabeth H, Drew, Harold D, Shelton, TJ, Singleton, Etienne O

You are viewing an attached message. Gmail can't verify the authenticity of attached message

Done

Thanks

**From:** Twerdahl, Elizabeth H <TwerdahlEH@state.gov>
**Sent:** Tuesday, January 21, 2020 10:51 AM
**To:** Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>
**Cc:** Drew, Harold D <DrewHD@state.gov>; Shelton, TJ <SheltonTJ@state.gov>; Singleton, Etienne O <Singletor
**Subject:** PP26

JJ –

Please update your PP26 timesheet to reflect:

12/30: Admin Leave
12/31: Admin Leave
1/1: Holiday
1/2: Regular Duty (no LEAP)
1/3: Regular Duty (no LEAP)

Once done, please send to Dan and he can update the system appropriately. After this, your T&A should be shifte

Let me know if you have any questions or concerns.

Thank you,
Liz



JJTP 2019 LEAP ...

 **Gmail**

Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>

## Fwd: 24 hrs of AL taken without permission

1 message

---

**Jabari-Jason Tyson-Phipps** <jabari.phipps@gmail.com>       Tue, Sep 1, 2020 at 11:33 AM
To: "Terrini, William R" <TerriniWR@state.gov>

---------- Forwarded message ---------
From: **Shelton, TJ** <SheltonTJ@state.gov>
Date: Fri, Feb 14, 2020, 8:21 AM
Subject: Re: 24 hrs of AL taken without permission
To: Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>
Cc: Beni, Alan J <BeniAJ@state.gov>, Drew, Harold D <DrewHD@state.gov>, Maddern, Robert E - Ocala, FL - Contractor <Robert.E.Maddern@usps.gov>, Ngai Otieno <notieno@averydooley.com>, Peter Noone <pnoone@averydooley.com>, Singleton, Etienne O <SingletonE@state.gov>, Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>

Good morning,
We will reach out to the Department's POC to get further guidance. The Agency did not require you to use annual leave while on excused (administrative) leave. This discussion is about restoring unused annual leave while you were being compensated for 6 months while on paid administrative leave.

---
Sent from Workspace ONE Boxer

On February 13, 2020 at 5:43:30 PM EST, Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com> wrote:

> TJ:
>
> It has come to my attention that my 24 hours or 3 days of my annual leave was taken in pay period 26 of last year without my permission in direct violation of OPM regulations and federal law. That is a taking of a significant amount of money out of my pocket.
>
> I really don't know what kind of game is being played here but I must demand that this be remedied immediately.
>
> If you require a refresher on the law place see the website below where this issue is specifically addressed.
> https://www.opm.gov/policy-data-oversight/pay-leave/leave-administration/fact-sheets/annual-leave/
>
> "
>
> # Annual Leave While on Extended Excused Absence
>
> An agency cannot require an employee to use annual leave when the agency has placed the employee on extended excused absence (e.g., in cases where adverse actions are being pursued by the agency)."
>
> Thank you
>
> JJTP

--

_____

Jabari-Jason Tyson-Phipps

(917) 297-5945 mobile

Jabari.Phipps@gmail.com

_____



Friday, November 15, 2019

**Via Email**
SingletonE@state.gov

**In Re: Leave Request December 2019**

Page | 1

Dear SSA Singleton:

Thanks for taking the time to speak with me yesterday.

As we spoke about, I am scheduled to return to duty on 2 December 2019 however I have approximately 122.5 hours of use or lose AL.  I would obviously like to use that time or find how to be paid for it as it is approximately $6300 worth of time or more than 15% of my annual salary.

By my calculation that is 15 days and 2.5 hours and as you are my point of contact and I don't have access to HR portal or my email ( I understand I have been removed from the GAL completely) I would like to make the request to schedule it.

Can I schedule 8 hours for each day (Standard time 0700-1700 with a lunch) from 9 December 2019 to 13 December 2019, 16 December 2019 to 20 December 2019, and on the 23, 24, 26, 27, and 31st.

Additionally, can I schedule the last 2.5 on 6 December 2019 at the end of the day.

Speaking with Dr. Tramontin, I may not be restored to duty status before the end of the year but in case I am not I do not want to lose the time.  I will reach out to TJ Sheldon as you told me to should this situation arise.

Thank you in advance.

Please feel free to contact me at +1.917.297.5945 should you have any questions.

Mahalo,

Jabari Jason Tyson-Phipps

J. Jason Tyson-Phipps, Esq. | The JJTP® Group | Licensed in New York | www.jjtpgroup.com
1119 Crestview Drive | Stroudsburg, Pa 18360|Direct Dial: +1.917.297.5945| Email: Jabari.phipps@gmail.com

 **Gmail**

Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>

## Fwd: Your Restored Annual Leave Request has been Rejected

1 message

**Jabari-Jason Tyson-Phipps** <jabari.phipps@gmail.com>                    Wed, Feb 19, 2020 at 11:07 AM
To: Bob Maddern <bobsupra@aol.com>, "Maddern, Robert E - Ocala, FL - Contractor" <Robert.E.Maddern@usps.gov>

Bob:

Just to close the circle on the annual leave issue. I put a formal request into have the leave taken from me as result of being out out as a result of the retaliation restored and it was officially rejected.

Please see below.

JJTP

---------- Forwarded message ---------
From: **Tyson-Phipps, Jabari-Jason** <Tyson-PhippsJ@state.gov>
Date: Wed, Feb 19, 2020 at 11:04 AM
Subject: Fwd: Your Restored Annual Leave Request has been Rejected
To: Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>


Jabari-Jason Tyson-Phipps
Special Agent |U.S. Department of State
U.S. MISSION TO THE UNITED NATIONS | AMBASSADOR'S PROTECTIVE DETAIL
M: +1.646.512.2776 | O: +1.212.415.4428

**From:** MyApps <myapps@midatl.service-now.com>
**Sent:** Wednesday, February 19, 2020 10:22:25 AM
**To:** Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>
**Subject:** Your Restored Annual Leave Request has been Rejected



Your restored annual leave request has been rejected. Click here to view the request.

Reason for rejection: He is not eligible for restoration. This individual has been on admin leave for several months, which does not meet the Department's eligibility requirements.

**Request Details**

Number: RES0007200

Employee: Jabari-Jason Tyson-Phipps

Supervisor: Jeff Jacob

Grade: FS-05

Executive Office: DS

Leave Start Date: 2019-12-09

Leave End Date: 2019-12-31

Leave Cancelled Date: 2019-12-01

Date Approved Date: 2019-11-15

Number of Hours Requested: 122.5

Reason: I was put on involuntary medical leave in May which did not end until January which made it impossible to take this annual leave. I requested the leave When I thought I was scheduled to return on 2 December but was put out for an additional 30 days causing me to lose the AL. The dates here are mostly place holders because the form requires them.

This is an automated message from the myApps Restored Annual Leave application.

Have questions? Visit the Community.

Ref:MSG2340884

--

_____

Jabari-Jason Tyson-Phipps
(917) 297-5945 mobile
Jabari.Phipps@gmail.com

_____

 **Gmail**

**Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>**

## FW: myData | Cancelled: DS-7100: Request for Leave or Approved Absence, Closed Incomplete, RITM1406697

1 message

**Tyson-Phipps, Jabari-Jason** <Tyson-PhippsJ@state.gov>   Sun, Aug 16, 2020 at 11:34 PM
To: "jabari.phipps@gmail.com" <jabari.phipps@gmail.com>

Leave rejected

**From:** myData <mydata@midatl.service-now.com>
**Sent:** Friday, May 17, 2019 3:13 PM
**To:** Tyson-PhippsJ@state.gov
**Cc:** ValleTA@state.gov; JagelsEM@state.gov
**Subject:** myData | Cancelled: DS-7100: Request for Leave or Approved Absence, Closed Incomplete, RITM1406697



RITM1406697 has been Cancelled by Server, Mid and is now: Closed Incomplete.

Please see a summary of the submitted request below or click RITM1406697 for additional detail.

Comments: None

Requested By: Tyson-Phipps, Jabari-Jason

Requested For: Tyson-Phipps, Jabari-Jason

Form Name: DS-7100: Request for Leave or Approved Absence

Stage: Completed

Submitted Date and Time: 04-17-2019 17:47:18 EDT

Location: 2 Executive Dr.

*Please do not reply to this automated email.* Need Help? For questions or support related to this request contact our myData Service Desk

**Official - Transitory UNCLASSIFIED**

Case 1:23-cv-02316-LAK-GWG   Document 19-4   Filed 08/31/23   Page 84 of 98

 **Gmail**

**Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>**

## FW: myData | Cancelled: DS-7100: Request for Leave or Approved Absence, Closed Incomplete, RITM1406697

1 message

**Tyson-Phipps, Jabari-Jason** <Tyson-PhippsJ@state.gov>　　　　　Sun, Aug 16, 2020 at 11:34 PM
To: "jabari.phipps@gmail.com" <jabari.phipps@gmail.com>

Leave rejected

**From:** myData <mydata@midatl.service-now.com>
**Sent:** Friday, May 17, 2019 2:50 PM
**To:** Tyson-PhippsJ@state.gov
**Cc:** ValleTA@state.gov; JagelsEM@state.gov
**Subject:** myData | Cancelled: DS-7100: Request for Leave or Approved Absence, Closed Incomplete, RITM1406697



RITM1406697 has been Cancelled by Server User (AEXOAP024), MID and is now: Closed Incomplete.

Please see a summary of the submitted request below or click RITM1406697 for additional detail.

Comments: None

Requested By: Tyson-Phipps, Jabari-Jason

Requested For: Tyson-Phipps, Jabari-Jason

Form Name: DS-7100: Request for Leave or Approved Absence

Stage: Completed

Submitted Date and Time: 04-17-2019 17:47:18 EDT

Location: 2 Executive Dr.

*Please do not reply to this automated email.* Need Help? For questions or support related to this request contact our myData Service Desk

**Official - Transitory UNCLASSIFIED**

Case 1:23-cv-02316-LAK-GWG Document 19-4 Filed 08/31/23 Page 86 of 98

 Gmail

**Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>**

## FW: EER/Sustainment Training/Departure From NYFO
1 message

**Tyson-Phipps, Jabari-Jason** <Tyson-PhippsJ@state.gov>           Sun, Aug 16, 2020 at 8:11 PM
To: "jabari.phipps@gmail.com" <jabari.phipps@gmail.com>

[Sustainment skills](#)

---

**From:** Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>
**Sent:** Wednesday, May 1, 2019 11:23 PM
**To:** Jagels, Eric M <jagelsem@state.gov>
**Subject:** Re: EER/Sustainment Training/Departure From NYFO

For the record I tested it on the PDF form and it fits as it is excluding the section b which would need to go in its own box in its section.

Jabari-Jason Tyson-Phipps

Special Agent | New York Field Office

U.S. Department of State | Diplomatic Security Service

Office: +1.201.346.8100

Mobile: +1.201.290.2922

---

**From:** Tyson-Phipps, Jabari-Jason
**Sent:** Wednesday, May 1, 2019 11:21:06 PM
**To:** Jagels, Eric M
**Subject:** Re: EER/Sustainment Training/Departure From NYFO

Sir

Please find attached my proposed revisions as requested.

JJTP

Jabari-Jason Tyson-Phipps

Special Agent | New York Field Office

U.S. Department of State | Diplomatic Security Service

Office: +1.201.346.8100

Mobile: +1.201.290.2922

---

**From:** Jagels, Eric M <jagelsem@state.gov>
**Sent:** Wednesday, May 1, 2019 2:41 PM
**To:** Tyson-Phipps, Jabari-Jason
**Cc:** Carlson, Peter M
**Subject:** EER/Sustainment Training/Departure From NYFO


Greetings JJ,

We need to move your EER along.  Do you envision having your revisions back to me tomorrow?  Once it's back with me we can quickly move it along.


I approved your sustainment skills training, but we still need to discuss.  The last email from Brad Lynn indicated that most likely you're looking at a June arrival to Pathfinder.  If that's the case, there is still a lot that needs to happen.  We need to clean up your cases, execute the Garo arrest and you have leave submitted for almost 2 weeks in May.  We need to look at a calendar to make sure that you're able to get done everything you need to before you PCS.  Does that all make sense?  As much as you want to, I don't know if you attending this sustainment skills training is the best use of your short time here at NYFO.  Does that make sense?


V/R,

Eric


Eric Jagels

Supervisory Special Agent  | New York Field Office

U.S. Department of State | Diplomatic Security Service

Office:  (201) 346-8100

Cell:  (201) 675-1703


**Official - Transitory**

**UNCLASSIFIED**

 Gmail

Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>

---

**FW: AL 5/18-5/29**
1 message

**Tyson-Phipps, Jabari-Jason** <Tyson-PhippsJ@state.gov>
To: "jabari.phipps@gmail.com" <jabari.phipps@gmail.com>

Wed, Aug 12, 2020 at (

Leave that  was not granted

---

**From:** Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>
**Sent:** Wednesday, May 1, 2019 9:56 AM
**To:** Jagels, Eric M <jagelsem@state.gov>
**Subject:** Re: AL 5/18-5/29

## LEAVE

| Type | Begin Bal Lv Yr | Earned Current | Earned YTD | Used Current | Used YTD | Endi E |
|---|---|---|---|---|---|---|
| Annual Leave | 240.00 | 4.00 | 28.00 | | 13.50 | 254 |
| Sick Leave | 240.00 | 4.00 | 28.00 | | 8.00 | 260 |

### ANNUAL LEAVE

| Category: 4 | Maximum Carry Over: 240.00 | Use Or Lose Balance: 90.50 |
|---|---|---|

### REMARKS

QUESTIONS YOU HAVE REGARDING YOUR PAY SHOULD BE DIRECTED TO THE PAYROLL CUSTOMER SUPPORT CENTER. THE
PCSC MAY BE REACHED VIA E-MAIL AT PAYHELP@STATE.GOV, OR BY PHONE AT 1-877-865-0760.

THIS REPORT CONTAINS INFORMATION SUBJECT TO THE PRIVACY ACT OF 1974 AS AMENDED

[ Print ] [ View PDF ] [ Text Version ]

Yes in fact I still have use or lose. I should have zero comp on NYFO's books as I burned that all with the Australia vacation. This is as of last PP not the one that was put this week.

Jabari-Jason Tyson-Phipps

Special Agent | New York Field Office

U.S. Department of State | Diplomatic Security Service

Office: +1.201.346.8100

Mobile: +1.201.290.2922

---

**From:** Jagels, Eric M
**Sent:** Tuesday, April 30, 2019 5:43:22 PM
**To:** Tyson-Phipps, Jabari-Jason
**Subject:** AL 5/18-5/29

Greetings JJ,

Apologies, I just saw your leave request for those dates.  Do you have enough annual leave to take the 56 hours?  Thanks.

V/R,

Eric

Eric Jagels

Supervisory Special Agent  | New York Field Office

U.S. Department of State | Diplomatic Security Service

Office:  (201) 346-8100

Cell:  (201) 675-1703



**Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>**

## FW: AL 5/18-5/29
1 message

**Tyson-Phipps, Jabari-Jason** <Tyson-PhippsJ@state.gov>                    Wed, Aug 12, 2020 at 6:38 PM
To: "jabari.phipps@gmail.com" <jabari.phipps@gmail.com>

Requested leave that was not granted

**From:** Jagels, Eric M <jagelsem@state.gov>
**Sent:** Tuesday, April 30, 2019 5:43 PM
**To:** Tyson-Phipps, Jabari-Jason <Tyson-PhippsJ@state.gov>
**Subject:** AL 5/18-5/29

Greetings JJ,

Apologies, I just saw your leave request for those dates.  Do you have enough annual leave to take the 56 hours?
Thanks.

V/R,

Eric

Eric Jagels

Supervisory Special Agent  | New York Field Office

U.S. Department of State | Diplomatic Security Service

Office:  (201) 346-8100

Cell:  (201) 675-1703

# *Response Exhibit 5*

# *REX-5*

# MAIN CHIROPRACTIC & REHABILITATION CENTER

634 Main Street
New Rochelle, NY 10801
Tele #: (914) 654-1100

## DISABILITY CERTIFICATE

Date: _8_ / _28_ / _2020_

To Whom It May Concern:

This is to certify that

_Saban Jason Tyson Phipps._

Has been under my professional care,

from _8/28/20_ to _Precent_

Return to Work _10/1/2020 Pending_

Comments _The above named patient_
_is Experiencing Spinal neck/LB pain_
_and will continue Under my Care._

Dr. _____



# St Luke's
## PHYSICIAN GROUP

ST LUKES MONROE FAMILY PRACTICE 1581 N 9TH ST STROUDSBURG
1581 NORTH 9TH ST
STROUDSBURG PA 18360-7576
Phone#  272-212-4490
Fax#  866-230-6676

August 18, 2020

Patient:      **Jabari Jason Tysonphipps**
Date of Birth: **4/20/1983**
Date of Visit: **8/18/2020**

To Whom it May Concern:

Jabari Jason Tysonphipps is under my professional care. He was seen in my office on 8/18/2020. He is to remain out of work until further notice.

If you have any questions or concerns, please don't hesitate to call.

Sincerely,

Erin E Hetu, CRNP

CC: No Recipients

 Gmail

**Jabari-Jason Tyson-Phipps <jabari.phipps@gmail.com>**

## I can not upload the requested file [Incident: 200914-000005]

1 message

**EEOC Digital Support** <digitalsupport@eeoc.gov>                Wed, Sep 16, 2020 at 9:55 AM
Reply-To: EEOC Digital Support <digitalsupport@eeoc.gov>
To: jabari.phipps@gmail.com

 Recently you requested personal assistance from our on-line support center. Below is a summary of your request and our response. We hope we have answered your questions or referred you to the appropriate place to have your questions answered.
*To access your question from our support site, click here*

**Subject**

   **I can not upload the requested file**

Response By Email (Donald Sylvain) (09/16/2020 08:55 AM)

Jabari,

The developers are aware of this issue and are working diligently to resolve this matter. Unfortunately, I do not have and ETA on when this will be resolve.

Thank you for your understanding.

EEOC Digital Support

Customer By CSS Email (Jabari-Jason Tyson-Phipps) (09/15/2020 11:09 AM)

Hello no I have not. I am unable to upload the required documents to request a hearing in your system nor could not technical or other staff when they tried.

On Tue, Sep 15, 2020 at 11:24 AM EEOC Digital Support < digitalsupport@eeoc.gov> wrote:

> [image: Image]
>
> Recently you requested personal assistance from our on-line support
> center. Below is a summary of your request and our response. We hope we
> have answered your questions or referred you to the appropriate place to
> have your questions answered.
> To access your question from our support site, click here
>
> Subject
>

> I can not upload the requested file
>
> Response By Email (Donald Sylvain) (09/15/2020 10:24 AM)
> Hello,
>
> Thank you for contacting us. We apologize for the delay in responding to
> your email.
>
> Recently you requested personal assistance from our online support center.
>
> Have you been able to access our Public Portal normally since you reported
> this incident? Has the issue been resolved since then?
>
> Please be advised this email address is only for technical issues with the
> EEOC websites.
>
> If you are still having issues accessing our Public Portal normally or are
> still encountering this issue we will gladly help resolve it.
>
> We will assume your issue has been resolved if we do not hear from you
> within 48 hours.
>
> Thank you for allowing us to be of service to you.
>
> Sincerely,
>
> U.S. EEOC Digital Support
> Customer By CSS Email (Jabari-Jason Tyson-Phipps) (09/14/2020 03:23 AM)
> I have tried on three browsers and nothing works on your site. It brings
> me back the following. I need this file uploaded what can I do?
>
> [image: image.png]
>
> --
> _____
> Jabari-Jason Tyson-Phipps
> (917) 297-5945 mobile
> Jabari.Phipps@gmail.com
> _____
>
> ==================== image File Attachment ====================
> image.png, 110319 bytes, Added to incident
> Question Reference # 200914-000005
>
> - Date Created: 09/14/2020 03:23 AM

> - Date Last Updated: 09/15/2020 10:24 AM
> - Status: Closed
>
>
>

--
_____
Jabari-Jason Tyson-Phipps
(917) 297-5945 mobile
Jabari.Phipps@gmail.com
_____

**Response By Email (Donald Sylvain)** (09/15/2020 10:24 AM)

Hello,

Thank you for contacting us. We apologize for the delay in responding to your email.

Recently you requested personal assistance from our online support center.

Have you been able to access our Public Portal normally since you reported this incident? Has the issue been resolved since then?

Please be advised this email address is only for technical issues with the EEOC websites.

If you are still having issues accessing our Public Portal normally or are still encountering this issue we will gladly help resolve it.

We will assume your issue has been resolved if we do not hear from you within 48 hours.

Thank you for allowing us to be of service to you.

Sincerely,

U.S. EEOC Digital Support

**Customer By CSS Email (Jabari-Jason Tyson-Phipps)** (09/14/2020 03:23 AM)

I have tried on three browsers and nothing works on your site. It brings
me back the following. I need this file uploaded what can I do?

[image: image.png]

--
_____
Jabari-Jason Tyson-Phipps
(917) 297-5945 mobile
Jabari.Phipps@gmail.com
_____

==================== image File Attachment

```
====================
```
image.png, 110319 bytes, Added to incident

**Question Reference # 200914-000005**

Date Created: 09/14/2020 03:23 AM
Date Last Updated: 09/16/2020 08:55 AM
Status: Closed