# Exhibit E



## Office of Inspector General
### United States Department of State

May 10, 2021

FROM:        OIG – Jeffrey D. McDermott

TO:          M – Carol Z. Perez

SUBJECT:     Report of Investigation Pursuant to Presidential Policy Directive 19
             OIG Whistleblower Case 2020 – 0097 (Jabari-Jason Tyson-Phipps)

Presidential Policy Directive 19 (PPD-19) prohibits the taking of any action affecting an employee's eligibility for access to classified information as a reprisal for a protected disclosure.[1] PPD-19 requires that every agency have a review process that permits employees to appeal actions affecting eligibility for access to classified information that they allege to be in violation of the directive. As part of the review process, the agency Inspector General shall conduct a review to determine whether an action affecting eligibility for access to classified information violated the directive, whether the agency should reconsider the action, and whether corrective action is warranted.

The Department of State (Department) amended the Foreign Affairs Manual (FAM) to implement PPD-19.[2] The FAM requires the Office of Inspector General (OIG) to conduct an independent review to determine whether an action affecting the employee's eligibility for access to classified information was taken in violation of PPD-19 and to provide a written determination of its review and any recommendations to the Under Secretary for Management.

As described below, OIG received a complaint from Mr. Jabari-Jason Tyson-Phipps, a special agent in the Bureau of Diplomatic Security (DS). Mr. Tyson-Phipps alleged that his security clearance was suspended after he made several protected whistleblower disclosures. OIG found evidence that Mr. Tyson-Phipps made protected disclosures regarding discriminatory conduct that he faced at the Department that were a contributing factor in the decision to suspend his clearance.

---

[1] PPD-19 defines a protected disclosure as "a disclosure of information by the employee to a supervisor in the employee's direct chain of command, up to and including the head of the employing agency, to the Inspector General of the employing agency or Intelligence Community Element, to the Director of National Intelligence, to the Inspector General of the Intelligence Community, or to an employee designated by any of the above officials for the purpose of receiving such disclosures, that the employee reasonably believes evidences (i) a violation of any law, rule, or regulation; or (ii) gross mismanagement, a gross waste of funds, an abuse of authority, or a substantial and specific danger to public health or safety."

[2] 12 FAM 234.2 (October 21, 2016).

Nonetheless, the Department showed by a preponderance of the evidence that it would have taken the same action absent his disclosure.

**Allegation**

On August 11, 2020, Mr. Tyson-Phipps filed a complaint with OIG alleging that his top-secret security clearance was suspended in July 2020 in retaliation for protected disclosures that he made within DS. According to Mr. Tyson-Phipps, he raised concerns about discriminatory conduct that he faced at the Department and shortly thereafter, his clearance was suspended.[3]

**Background**

Mr. Tyson-Phipps is a DS special agent and has been with the Department since 2016. According to Mr. Tyson-Phipps, he has faced numerous instances of racism and discrimination throughout his tenure at the Department. For example, he described to OIG a training assignment in which he was directed to drive a Confederate reenactor to a former plantation and was referred to as "boy." He also described another training assignment in which he was directed to drive to the nearest hospital, but was criticized when he drove to Howard University Hospital because the trainer stated that Howard University, a historically-black university, was inferior.

In 2019, Mr. Tyson-Phipps was assigned to the New York Field Office. In May 2019, he was placed on administrative leave and ordered to undergo a fitness-for-duty evaluation[4] after a colleague alleged that Mr. Tyson-Phipps made a threat against his then-supervisor. The fitness-for-duty evaluation cleared Mr. Tyson-Phipps to return to work in late 2019, and in January 2020, he was returned to duty and reassigned to the protective detail for Ambassador to the U.S. Mission to the United Nations (USUN) Kelly Knight Craft. Concurrent with the fitness-for-duty examination, the Office of Special Investigations (OSI) within DS began an investigation of the alleged threat. In January 2020, OSI concluded its investigation and substantiated the allegation that Mr. Tyson-Phipps had made the threatening comment.

In June 2020, Mr. Tyson-Phipps was in Kentucky serving on the protective detail for Ambassador Craft. On June 4, 2020, Mr. Tyson-Phipps spoke to several colleagues, including the Special Agent in Charge of the detail and another special agent whom he had just met, at the hotel at which they were staying about the discriminatory treatment he had experienced at the Department. According to the other special agent, Mr. Tyson-Phipps also boasted about conducting an

---

[3] OIG was initially unsure if it could investigate the suspension of Mr. Tyson-Phipps' clearance because 50 U.S.C. § 3341(j), in which PPD-19 is codified, limits the review process to suspensions lasting longer than one year. 50 U.S.C. § 3341(j)(4)(A). However, on August 21, 2020, the Inspector General for the Intelligence Community informed OIG that it interprets PPD-19 to allow for the review of any suspension that is alleged to be retaliatory, regardless of its length.

[4] A fitness-for-duty evaluation is a comprehensive examination performed by the Bureau of Medical Services to evaluate the fitness of personnel who are authorized to carry weapons and/or who are involved in law enforcement and/or security functions. *See* 12 FAM 041.2 (September 24, 2019).

SENSITIVE BUT UNCLASSIFIED

investigation into the death of a relative in the Dominican Republic and using his diplomatic passport while on personal travel. After the conversation, the other special agent sent an email to Mr. Tyson-Phipps' supervisor recounting the discussion and stating that "the language used by SA Tyson-Phipps and outright comments he made, made me uncomfortable in the topic of racist concerns." On June 5, 2020, Mr. Tyson-Phipps' supervisor forwarded this email to his management chain, and the email was eventually forwarded to the head of the Office of Personnel Security and Suitability (PSS), which oversees the security clearance process at the Department, and placed within Mr. Tyson-Phipps' security clearance file. DS officials told OIG that they forwarded the email to PSS because they knew that PSS was currently reviewing suitability concerns regarding Mr. Tyson-Phipps, and they believed that this incident, particularly the comments about use of his diplomatic passport and his actions in the Dominican Republic, was relevant to that review and raised similar concerns to the ones PSS was already reviewing.

On June 7, 2020, Ambassador Craft and Mr. Tyson-Phipps discussed racism, and Mr. Tyson-Phipps recounted to her the discriminatory treatment that he believed he had faced at the Department. Shortly thereafter, Ambassador Craft's Chief of Staff called Mr. Tyson-Phipps' supervisor and recounted the conversation. On June 12, 2020, his supervisor emailed Mr. Tyson-Phipps and reminded him that he should keep his conversations with the Ambassador to "common pleasantries and short conversation."

On June 25, 2020, Mr. Tyson-Phipps' supervisor and another DS manager conducted a counseling session with Mr. Tyson-Phipps about the two incidents in Kentucky. His supervisor documented the session, which lasted three hours, and forwarded the report up through his chain of command with a request that Mr. Tyson-Phipps undergo another fitness-for-duty evaluation. During this session, Mr. Tyson-Phipps also raised concerns about discriminatory treatment.

On July 24, 2020, a Uniformed Protection Officer (UPO) from USUN reported that Mr. Tyson-Phipps approached him and began complaining about racism within DS and raised concerns that such racism was responsible for the suicide of another DS agent. The UPO's report, which was eventually forwarded to DS management, stated that the conversation made him feel "uncomfortable and concerned." This report was also forwarded to officials within PSS and placed within Mr. Tyson-Phipps' security clearance file.

On July 29, 2020, PSS notified Mr. Tyson-Phipps that DS had suspended his security clearance. The notice stated, "DS/SI/PSS has been notified that you have exhibited erratic behavior over the past few months, which has increased over the past few weeks, and have engaged in misconduct over approximately the past year that raises doubts regarding your judgment, reliability, and trustworthiness. This raises serious security concerns and can be disqualifying under National Security Adjudicative Guidelines E (Personal Conduct) and I (Psychological Conditions)."

SENSITIVE BUT UNCLASSIFIED

**Legal Standard**

As noted above, PPD-19 prohibits the taking of any action with respect to any employee's security clearance or access determination in retaliation for having made a protected whistleblower disclosure. In 2020, the Inspector General for the Intelligence Community (ICIG) issued procedures for the review of allegations of retaliation under PPD-19.[5] These procedures specify that a complainant must demonstrate that: (a) he or she made a protected disclosure; (b) the agency took or failed to take, or threatened to take or fail to take, any action with respect to the complainant's security clearance or access determination; and (c) the protected disclosure a was contributing factor in the agency's decision to take or fail to take, or threaten to take or fail to take, the security clearance action.[6]

Although PPD-19 and these procedures do not specify how to determine whether a protected disclosure was a "contributing factor" in the adverse security clearance determination, similar language is used in the Whistleblower Protection Act, which prohibits agencies from taking adverse personnel actions in retaliation for protected disclosures.[7] Under the Whistleblower Protection Act, a complainant can establish that his or her protected disclosure was a contributing factor in the alleged retaliatory personnel action through either direct evidence or through circumstantial evidence that the official taking the adverse action knew of the disclosure and the action occurred within a period of time such that a reasonable person could conclude that the disclosure was a contributing factor in the adverse action.[8]

If a complainant can demonstrate that he or she made a protected disclosure that was a contributing factor in the adverse determination, the burden shifts to the agency, which must "prove by a preponderance of the evidence that it would have taken the same action in the absence of such disclosure, giving the utmost deference to the agency's assessment of the particular threat to the national security interests of the United States in the instant matter."[9] Federal courts have looked to three factors when determining whether an agency has met its burden: the strength of the agency's evidence in support of its decision; the existence and strength of any motive to retaliate on the part of the agency officials who were involved in the decision; and any evidence that the agency takes similar actions against employees who are not

---

[5] Inspector General of the Intelligence Community Instruction 2020.001, *External Review Panel Procedures Pursuant to 50 U.S.C. § 3236 and Presidential Policy Directive/PPD-19* (Dec. 17, 2020).

[6] Instruction 2020.001 § 9(C)(2).

[7] 5 U.S.C. §§ 1221, 2302(b)(8). The ICIG procedures also note that "to the fullest extent possible," complaints should be reviewed "consistent with the policies and procedures used to adjudicate or review alleged violations of section 2302(b)(8) of Title 5, United States Code…" ICIG Instruction 2020.001, § 9(c). Therefore, OIG has relied upon decisions of the federal courts and the Merit Systems Protection Board in weighing the evidence in this case. The Merit Systems Protection Board interprets the Whistleblower Protection Act in cases of alleged retaliation against Federal employees. 5 U.S.C. § 1221(a).

[8] 5 U.S.C. § 1221(e)(1)(A),(B).

[9] ICIG Instruction 2020.001 § 9(C)(2)(d).

SENSITIVE BUT UNCLASSIFIED

whistleblowers but who are otherwise similarly situated.[10] The courts weigh these three factors together to determine whether, as a whole, the agency has met its burden, and a strong showing on one factor may be sufficient.[11]

**Complainant Burden**

Based on its investigation, OIG determined that Mr. Tyson-Phipps made protected disclosures by raising concerns about racism and discriminatory treatment at the Department. These concerns constitute protected disclosures because OIG found that Mr. Tyson-Phipps reasonably believed that they related to a violation of any law, rule, or regulation.[12] Reasonable belief means that the whistleblower actually believes in the unlawfulness or impropriety of the conduct at issue and that belief is objectively reasonable, meaning a person similarly situated would also find the actions to be unlawful or improper.[13] The conduct about which Mr. Tyson-Phipps complained would likely violate the Department's discriminatory harassment policy, which prohibits harassment based on race.[14] Mr. Tyson-Phipps had previously filed an equal employment opportunity complaint about the conduct, demonstrating his actual belief in the impropriety of the conduct. These concerns were raised to individuals in Mr. Tyson-Phipps' chain of command, such as the Special Agent in Charge, his supervisor, and Ambassador Craft.

OIG found direct evidence that these protected disclosures were a contributing factor in the suspension of his clearance. As noted above, the reports of his June 4, 2020, and July 25, 2020, conversations were forwarded to PSS and placed in his security file. In forwarding these reports, DS managers discussed the possibility of using the reports to curtail his assignment. For example, the report of his June 4 conversation was forwarded to PSS by a DS manager who added the note that DS was speaking to the Bureau of Global Talent Management (GTM) about the issue on the following day and that "if he [Mr. Tyson-Phipps] causes more problems than [sic] we can look at curtailing him." Similarly, the report of his July 24 conversation was forwarded to a number of DS senior officials by a Deputy Assistant Secretary (DAS) in DS with the note: "This most recent interaction may result in GTM supporting the course of action that we requested months ago." The DAS told OIG that the course of action was curtailing Mr. Tyson-Phipps' assignment with USUN.

The letter from PSS suspending Mr. Tyson-Phipps' clearance stated that the suspension was based in part on his "erratic behavior." DS officials told OIG that this phrase referred to interactions with his colleagues that made them uncomfortable, some of which included his

---

[10] *Carr v. Social Security Administration,* 185 F.3d 1318, 1323 (Fed. Cir. 1999) (citing *Geyer v. Dep't of Justice*, 7 M.S.P.R. 682, 688, aff'd, 116 F.3d 1497 (Fed. Cir. 1997)).

[11] *Lucchetti v. Dep't of Interior*, 2017 MSPB LEXIS 743, *11 (M.S.P.B. Feb 15, 2017) (*citing Phillips v. Dep't of Transportation*, 113 M.S.P.R. 73, 77 (2010)).

[12] 12 FAM 231.1(5)(a) (October 21, 2016).

[13] *Craine v. NSF*, 687 Fed. Appx. 682, 691 (10th Cir. Apr. 26, 2017).

[14] 3 FAM 1526 (November 6, 2020).

conversations about discriminatory treatment, the subject of his protected disclosures.[15] Thus, Mr. Tyson-Phipps has met his burden by demonstrating that he made a protected disclosure that was a contributing factor in the suspension of his clearance.

**Agency Burden**

Because Mr. Tyson-Phipps met his burden, the Department must demonstrate by a preponderance of the evidence that it would have suspended his clearance even absent his protected disclosures.

The first factor that the courts use to weigh whether an employer/agency has met its burden is the strength of the employer's evidence in support of its personnel action. In examining this factor, the Merit Systems Protection Board examines the evidence supporting the personnel action and whether there were "legitimate reasons" for the personnel action.[16]

The Department provided evidence that it made the decision to suspend Mr. Tyson-Phipps' security clearance independently of his disclosure. OIG found numerous credible allegations of misconduct that the Department investigated or is in the process of investigating that implicate the adjudicative guidelines. For example, in January 2020, OSI substantiated that Mr. Tyson-Phipps made a threat of violence against his then-supervisor by stating, "If murder was legal, [his supervisor] would be dead." This conduct touches upon Guideline E (Personal Conduct), which lists "any disruptive, violent, or other inappropriate behavior" as disqualifying.

Similarly, in November 2018, OSI substantiated that Mr. Tyson-Phipps carried a firearm while on duty that was not a DS issued or approved weapon, in violation of Department policy.[17] This conduct also relates to Guideline E in that it involves "questionable judgment" and "unwillingness to comply with rules and regulations."

It is unclear why DS did not immediately suspend Mr. Tyson-Phipps' security clearance after both of these instances of misconduct were substantiated, although Mr. Tyson-Phipps' security clearance file has some indication that the COVID-19 pandemic delayed action by PSS. In any case, OIG did find that the additional allegations regarding Mr. Tyson Phipps that came to light in the summer of 2020 precipitated the suspension of his clearance. These included the allegation that Mr. Tyson-Phipps misused his diplomatic passport, into which OSI opened an investigation in June 2020. If substantiated, such misuse would constitute a violation of Department policy and federal law and also implicates Guideline E.[18] Contemporaneously, PSS had received reports of "odd" and "disruptive" behavior and comments to colleagues including that he "was close to the

---

[15] DS officials stated that the phrase also referred to his unwillingness to engage with his colleagues and other odd comments.

[16] *Baker v. Dep't of Defense*, 2016 MSPB LEXIS 4567 (M.S.P.B August 4, 2016).

[17] 12 FAM 092 (February 22, 2021).

[18] 8 FAM 503.2-1 (June 27, 2018); 18 U.S.C. § 1544.

6

<u>SENSITIVE BUT UNCLASSIFIED</u>

line," and "being driven over the edge." Such conduct raises concerns under Guideline I (Psychological Conditions) in that they relate to "irresponsible, violent, self-harm, suicidal, paranoid, manipulative, impulsive, chronic lying, deceitful, exploitative, or bizarre behaviors." PSS officials told OIG that when these additional allegations and concerns came to their attention in June and July, they became concerned by the "sheer number" of complaints of misconduct by Mr. Tyson-Phipps and immediately began consideration of whether a suspension was justified.

OIG recognizes that Mr. Tyson-Phipps' protected disclosures also occurred in this time period, and it is at times difficult to distinguish between action taken because of his disclosures and action taken because of legitimate suitability concerns, particularly when both were raised in the same conversation, as was the case in the June 4, 2020 conversation that occurred in the Lexington hotel. Nonetheless, OIG finds that there are legitimate reasons for the Department's actions, given the two cases of substantiated misconduct and its concern about a potentially unstable employee who was authorized to carry a firearm. This is particularly true given the "utmost deference" that ICIG grants to an agency in assessing the particular threat to security interests.[19]

With respect to the second factor examined by the courts—the existence and strength of any motive to retaliate on the part of the individuals who were involved in the decision—OIG found only minimal evidence of such a motive. Mr. Tyson-Phipps' complaints related to discrimination he faced in DS. DS officials in OSI investigated the misconduct allegations against Mr. Tyson-Phipps that were used to justify his suspension, and DS officials in PSS made the decision to suspend his clearance. However, none of the officials who raised complaints to OSI or PSS, who investigated those complaints, or who were involved in the suspension decision were the individuals about whom Mr. Tyson-Phipps complained as engaging in the discriminatory conduct.

OIG's analysis of the third factor examined by the courts—evidence that the agency takes similar actions against employees who are not whistleblowers but who are otherwise similarly situated—does not support that the suspension of Mr. Tyson Phipps' clearance was retaliatory. PSS officials told OIG that either of the two substantiated misconduct allegations against Mr. Tyson-Phipps—threats against a supervisor and carrying an unauthorized weapon—would have been the basis standing alone for suspending a clearance. In fact, PSS identified two instances of individuals whose security clearances were revoked for threatening their supervisor.

Conclusion

Mr. Tyson-Phipps made protected disclosures on several occasions when he raised concerns about discriminatory treatment he faced at the Department that were forwarded to his chain of command. OIG found that these disclosures were a contributing factor in the suspension of his clearance. However, the Department showed by a preponderance of the evidence that it would

---

[19] ICIG Instruction 2020.001 § 9(C)(2)(d).

SENSITIVE BUT UNCLASSIFIED

have suspended his security clearance even absent his disclosure, because it provided a substantial amount of evidence justifying the suspension and demonstrated that it has taken similar action against the security clearance of employees who engaged in similar conduct but were not whistleblowers. Therefore, Mr. Tyson-Phipps is unable to establish that an action affecting his eligibility for access to classified information was taken as reprisal for his protected disclosures.

8