# Exhibit H

Michael Alimenti
June 06, 2023

Pages: 1-71
Exhibits: 4

FOREIGN SERVICE GRIEVANCE BOARD

FSGB 2022-041 TYSON-PHIPPS

---------------------------------------------------

Deposition of Michael Alimenti
Taken June 6, 2023
At 9:03 a.m.
Via Teleconference

-------------Marcy J. Rogala-Looney-------------

U.S Legal Support
Market Street, Suite 240
Philadelphia, PA 19103
877.249.5484

Michael Alimenti
June 06, 2023

APPEARANCES:

For the Grievant:
AVERY DOOLEY & NOONE, LLP
3 Brighton Street
Belmont, Massachusetts 02478
BY: LAURIS NGAI OTIENO, ESQUIRE
PHONE: 617.489.5300
FAX: 617.489.0085
notieno@averydooley.com

For the U.S. Department of State:
U.S. DEPARTMENT OF STATE
Grievance Staff
GTM/G, SA-1, H-523
2401 E Street, NW
Washington, DC 20037
BY: STANLEY I. TODMAN, ESQUIRE
PHONE: 202.261.8116
FAX: 202.261.8121
todmansi@state.gov

Also Present: Jabari-Jason Tyson-Phipps,
Grievant, via telephone

Michael Alimenti
June 06, 2023

INDEX:


WITNESS: MICHAEL ALIMENTI                    PAGE

Examination by Mr. Otieno                          4






EXHIBITS:                                    PAGE

1        Proposed 5-Day Suspension

2        Written Reply

9        Alimenti MOI 5-29-19

22       Updated 12 FAM 092 Department

          Firearm Policy

(Exhibits marked and attached to transcript)

(MICHAEL ALIMENTI, sworn)

EXAMINATION BY MR. OTIENO:

Q.     Good morning, Mr. Alimenti.  My name is Attorney Ngai Otieno.  I represent Special Agent Jason Tyson-Phipps relative to his grievance to the Grievance Board concerning a four-day suspension.  I've asked to take your deposition today with respect to that action.

You are represented by, Agency counsel, Mr. Stanley Todman.  Have you ever been deposed before?

A.     No.

Q.     All right.  Let me give you a few limited instructions just to ensure that this process goes as smoothly as possible.

First, this is a telephonic deposition, the court reporter will be taking down everything we're saying and she'll produce a transcript.

For that reason, I ask that you allow me to finish my question before you answer and, in the same manner, I'll try to allow you to finish your answer before I ask a second or

Michael Alimenti
June 06, 2023

follow-up question.  That makes it easier for the court reporter so the two of us aren't talking over each other or talking at the same time?

Do you understand?

A.    Yep.

Q.    All right.  So as I indicated, you're represented by Attorney Todman from the Agency.  From time to time he may object to a question that I ask.  If that's the case, I would ask that you wait for Attorney Todman and I to resolve the objection and then he can instruct you on how to proceed going forward.

If you need to take a break at any time or for any reason, let me know and I'll try my best to accommodate you.

If you don't understand a question, please let me know; otherwise I'll have no way of knowing of whether you understood or did not understand a question.

Lastly, if you can refrain from answering any questions using gestures.  Again, it's a telephonic deposition; I don't see you, I won't see you, and I need you to answer yes, no,

Michael Alimenti
June 06, 2023

or however appropriate depending on the nature of the question.

A.    Okay.

MR. OTIENO:  Attorney Todman, can we stipulate that except as to the form of the question, all objections are reserved until the time of hearing?

MR. TODMAN:  Yes, that's fine.

MR. OTIENO:  Okay.

Q.    (By Mr. Otieno) Please state your full name and spell your last name.

A.    It's Michael Alimenti; A-L-I-M-E-N-T-I.

Q.    Okay.  How old are you, Mr. Alimenti?

A.    46.

Q.    Where are you currently employed?

A.    I'm currently employed in the U.S. Department of State, Bureau of Diplomatic Security.  And I'm currently serving in Yaoundé, Cameroon, at our U.S. Embassy, here.

Q.    How long have you worked for the Department of State?

A.    I'm in my fourteenth year now.

Q. Can you briefly take me through your career with the Department of State, beginning with the first position you held until your most current position?

A. Sure. So I came from private sector -- not private sector but state law enforcement. Started with the Department in 2010. After my initial training, I went to our Office of Protective Intelligent Investigations, which investigates threats against our personnel at facilities overseas and around the world.

I went from there to some additional training in language and then onto Mauritania, our embassy in Nouakchott, Mauritania, where I served for two years. I then went onto our embassy as security officer in Muscat, Oman for two and a half years.

From Muscat I returned to the Philadelphia resident office. I was there for three years followings another third year of language training. I was technically still assigned there.

And then I started in Yaoundé, Cameroon in August 2021, and I've been here ever

Michael Alimenti
June 06, 2023

since.

Q. Can you -- without disclosing any sensitive law enforcement or information that can be deemed classified, could you take me through your day-to-day duties being stationed in Cameroon as a Department of State Law Enforcement Official?

A. Sure. So the State Department -- the Bureau of Defense is the security and law enforcement arm of the State Department. We basically have three main hats that we wear.

The first is protective operations, which is protection of dignitaries that fall under the responsibility of the Secretary of State, visiting dignitaries and foreign ministers.

The second is criminal investigations where we do visa/passport fraud investigations, drug trafficking and person investigations. These are primarily domestic positions, but we do carry the protection and the investigations overseas.

And then overseas we're responsible for securing programs at our U.S. Embassies

Michael Alimenti
June 06, 2023

overseas to include all the criminal

investigations that may come along with them.

But all the guards, the Marines, the bodyguards,

all the armored vehicles, we're the subject

matter experts in all things security, and we

advise our ambassador and our country team on

any security-related issues.

Q.    Mr. Alimenti, I want to focus now

on your preparation for today's deposition.

And, just as a warning, I'm not inquiring as to

any conversations you may have had or

communications you may have had with Agency's

counsel or any Agency attorney.

So with the exception of any

correspondence or communication you may have had

with counsel, can you tell me how you prepared

for today's deposition.

A.    I reviewed the Memorandum of

Interview that the Office of Special

Investigations conducted.  And then I reviewed

the documents you sent me -- or that counsel

sent that you sent him that will be identified

during this deposition.

Q.    Did you speak with anyone from

Michael Alimenti
June 06, 2023

human resources or any other Department of State non-attorney?

A.   No.  Well, Rob Castro.  I was speaking with him on another incident.  He mentioned, I think, he was also contacted about this incident during this thing going on, but we didn't really discuss anything of substance.

Q.   Okay.  Just so I understand, other than you speaking with Robert Castro about being noticed for a deposition, did you have any other discussions with Mr. Castro regarding today's deposition?

A.   No.  The phone call was basically for bidding and promotions and stuff on those lines.  That's what we were talking about.  But we both recognized that we probably got contacted about the same thing.

Q.   Did you have conversations with Special Agent Terrence Wallace regarding today's deposition?

A.   No.

Q.   Did you have any conversations with Amanda Rivera regarding today's deposition?

A.   No.

Michael Alimenti
June 06, 2023

Q.    Okay.  Do you know Special Agent Tyson-Phipps?

A.    Just the limited interactions I had with him while I was assigned to Philadelphia.

Q.    When did you first meet Mr. Phipps?

A.    I think I first met him when he was assigned to Nikki Haley's detail, when she came to Philadelphia.  I think he was assigned to the command post, and I was the limo driver for her.

He came down from New York -- the visit was centered around Philadelphia, so New York sent a contingent of agents down to staff the detail and he was one of them.

Q.    What time period are we talking here; do you recall the year?

A.    No.  It was the same visit when he had the issue with the weapon, his personal weapon.  Whatever date that was.  I don't have it off the top of my head.  It was the same TDY.

Q.    Have you ever supervised Special Agent Tyson?

A.    No.

Q.    Fair to say that you worked alongside Special Agent Tyson in a limited

capacity in Philadelphia?

A.     Yes.  I mean, during the protective detail we were assigned to the same detail, in different positions, and then later on he came down to the Philadelphia Area of Responsibility -- our AOR -- for an investigation, and I was basically his liaison because we were more familiar with the area.

Q.     Okay.  But, just to be clear, that wasn't in any type of supervisory-subordinate role?

A.     No.

Q.     When you were serving in that detail in Philadelphia, what was your official position?

A.     I was the limousine driver.

Q.     Is that considered or was that role considered a senior special agent position?

A.     No. No.

Q.     Do you recall what role Special Agent Tyson held with respect to the detail in Philadelphia?

A.     I think he was assigned to the command post.  Other than that, I'm not really

Michael Alimenti
June 06, 2023

sure.

Q.   Again, I know you indicated that you had limited interactions with Mr. Tyson, but how would you describe your work relationship with Mr. Tyson, overall?

A.   I mean, during the detail I didn't really have any interaction with him, aside from the initial briefing which we were both recipients of.  We didn't give anything, so I didn't really have a relationship with him during that detail.  I think it only lasted two days, maybe.

Then when he came to the Philadelphia -- it was an agent coming down TDY to work a case.  It's pretty consistent.  We do it all the time.

Q.   During your limited interactions with Special Agent Tyson regarding the detail in Philadelphia, did you observe him in the field?

A.   During the protection?  The first one?

Q.   Yes.

A.   No, I did not.

Q.   To the best of your knowledge, have

Michael Alimenti
June 06, 2023

you ever been named in any complaint filed by

Special Agent Tyson?

        A.      Not that I'm aware of.

        Q.      But it is your understanding that

you've never been named in a complaint filed by

Special Agent Tyson, whether that be an EEOC

complaint or a grievance or discrimination

lawsuit, anything like that?

        A.      I mean, I'm assuming I'm listed --

                MR. TODMAN:  Hold on.

                Objection.  Asked and answered.

                You can go ahead and answer the

question.

        A.      No, I was never made aware that I

was the subject of anything.

        Q.      Are you familiar at all with

Special Agent Tyson's grievance to the grievance

board?

        A.      Just the material that you

provided.  I read it for the first time, you

know, maybe an hour ago.

        Q.      Okay.  Just to be clear, the

materials you reviewed included your May 29,

2019 memorandum; is that correct?

Michael Alimenti
June 06, 2023

A.     Yes.

Q.     Did you also review Agency's proposed five-day suspension of Mr. Tyson?

A.     I'll tell you exactly what I reviewed.

Q.     Thank you.

A.     As you listed it:  Exhibit 1, proposed five-day suspension; Exhibit 2, Written Reply; and Exhibit 9, the MOI.

I didn't do Exhibit 22 because I didn't really feel like reading the FAM today.

Q.     Okay.  Did you assist in any factfinding concerning the Agency's September 2, 2020 proposed five-day suspension of Special Agent Tyson?

A.     Aside from the interview that was conducted with OSI and PII, no.

Q.     Okay.  So excluding your role in participating in an interview marked as or referred to as Exhibit 9, you had no role in assisting in factfinding --

THE COURT REPORTER:  I didn't hear the whole question.

MR. OTIENO:  Sure.  I'll repeat

that.

Q.    (By Mr. Otieno) Just for the record, so the court reporter can hear, Mr. Alimenti, other than participating in an interview on or about May 29, 2019, did you assist in any factfinding or investigation relative to Mr. Tyson-Phipps' September 2, 2020 proposed five-day suspension?

A.    No.

Q.    Mr. Alimenti, if you could, could you please look at what's been marked as Grievance Exhibit 22.

A.    Exhibit 22?

Q.    Correct.

A.    Okay.  Copy of the FAM.  Yeah.

Q.    Could you take a moment and look at Exhibit 22, if you have a moment.

(Brief pause in proceedings)

A.    Okay.

Q.    Are you familiar with what's been marked as Grievance Exhibit 22?

A.    Yes.

Q.    Okay.  How are you familiar with what's been marked as Grievance Exhibit 22?

Michael Alimenti
June 06, 2023

A.      It's the Foreign Affairs Manual Policy for the Department's use of deadly force and firearms.

Q.      Is that a -- can you repeat that?

A.      Which all agents need to be familiar with in order to operate within the rules and regulations of the Department.

Q.      So based on that statement, is it fair to say that prior to today's deposition you have read 12 FAM 092?

A.      Yes.

Q.      Are you familiar with the content, guidelines, and so forth, established in 12 FAM 092?

A.      Yes.

Q.      Do you have any knowledge as to whether 12 FAM 092 prohibits Department of State Law Enforcement Officials from carrying personally owned licensed firearms while on duty?

A.      Yes, it does.

Q.      And what is your understanding as to that prohibition concerning carrying licensed firearms on duty -- personal firearms?

A.     That if you're going to -- the only weapons you're allowed to carry on duty are weapons that are approved from a list of DSS approved handguns.  And the only DS approved handguns are the ones that are issued to us.

Q.     Your understanding of the rules, is that located in 12 FAM 092?

A.     Yes, it is.

Q.     Could you point to or read for me where you're getting this information?

A.     Under the section of Off-duty and secondary firearms, paragraph two, states: "While on duty in the United States, a DSS special agent may be authorized to carry one secondary handgun in addition to his or her service weapon.  The secondary handgun must come from a list of DSS-approved handguns."

Q.     So based on your understanding of off-duty and secondary weapons, personally owned firearms are prohibited with the exception of whether or not the Agency has pre-approved the use or carrying of a privately-owned firearm?

A.     Basically, you're not allowed to carry a personal weapon on duty is my

Michael Alimenti
June 06, 2023

understanding of it.

Q.     In total, how many years of service have you or do you have with the Department of State as a law enforcement officer?

A.     I have -- I'm in my fourteenth with the State Department and in my twenty-third as a law enforcement officer.

Q.     Were you provided training concerning the use of firearms as a law enforcement officer with the Department of State?

A.     Yes, I was.

Q.     And can you describe for me the type of training you undergo as a law enforcement officer with the Department of State.

A.     It's a continuous training.  It starts from the moment you go into the academy. We have, I would guess, eighty hours minimal at the federal law enforcement training center to become familiar with weapons.

        Then the second half of our training, when we go to the State Department, Diplomatic Security Specific Training, we again

Michael Alimenti
June 06, 2023

focus highly on weapons handling, weapons

manipulation.  I can't even tell you how many

hours that takes.

And then we have annual

qualifications that we have to do three times a

year which also consists of training and

qualifications for scores.

We also have follow-on trainings

throughout our careers; such as basic firearms

instructor course, which is additional training.

Our advanced tactical leadership course also has

a month of training involved in it.

So the training for firearms

doesn't really stop.  It's just continual.

Q.    In your extensive career with the

Department of State as a law enforcement

officer, excludeing 12 FAM 092, were you ever

provided any specific training concerning the

issue of carrying licensed personal firearms

while on duty?

A.    When I was initially hired, we had

a list -- we carried a different weapon.  We

carried a SIG.  There was a list of weapons.

There might have been -- I don't know -- five or

six weapons.  Then when they switched to the GLOCK, around 2018 or 2019, that policy was reduced to just two weapons that you're authorized to carry off duty.

Q.    You said "off duty"?

A.    Yes.  You could carry either your primary or your secondary off duty.  Yes.

Q.    Again, I'm focusing primarily just on duty.

So, in your extensive career with the Department of State, were you ever provided specific training concerning the issue of carrying a personally owned firearm while on duty?

A.    Yes.  You were not permitted to. You had to use one of your issued weapons while performing on-duty actions.

Q.    You're saying you were provided training that identified or prohibited such conduct?

A.    Yep, absolutely.  Yep.

Q.    If you could, could you please look at what's been marked Grievance Exhibit 1.

A.    Sure.  Hang on.  Okay.

Michael Alimenti
June 06, 2023

Q.     What's your understanding as to what Grievance Exhibit 1 is?

A.     Let me see here.  This -- I'm not familiar with the document.  Just by reading it, it's the Department's proposed disciplinary action taken against Mr. Tyson for the allegations that they made against him.

Q.     If you could, could you please look at page 2, paragraph two, of Grievance Exhibit 1.

A.     The one that begins "On May 15, 2019"?

Q.     That's correct.

If you can take a moment and read that paragraph, and let me know when you're done.

(Brief pause in proceedings)

A.     Okay.

Q.     Do you have any knowledge to whether Special Agent Tyson participated in a multi-agency operation on or about May 15, 2019?

A.     It wasn't multiagency.  It was just the Diplomatic Security Service.  There was no other agencies, unless there was maybe local law

enforcement that was there to help on the scene, but it was a State Department investigation.

Q.    And what do you recall with respect to this May 15, 2019 operation?

A.    Tyson was -- Special Agent Tyson was directed to come down.  He had a case that fell into our AOR -- our area of responsibility -- in Southern New Jersey.  And because that's where we operate at, we were tasked to assist in the operation to arrest a subject they identified.

Q.    Okay.  Did you have any role in participating in this May 15, 2019 operation?

A.    Yes, I was his liaison representative from the office.  I was kind of walking him through everything.  He didn't have a whole lot of experience in doing any of this, so I was trying to help guide him.

Q.    Okay.  And when you said you were Special Agent Tyson-Phipps' liaison, who designated you in that role?

A.    The resident agent in charge, Rob Castro.

Q.    So Robert Castro assigned you to be

Michael Alimenti
June 06, 2023

the liaison for Special Agent Tyson?

A.    Yes.

Q.    Okay.  And I know you briefly mentioned this was a Department of State operation; is that correct?

A.    That's correct.

Q.    Do you have any knowledge as to whether any other federal agencies participated in this operation?

A.    No, not that I can recall.  It was all DS agents.

Like I said, the only other law enforcement agency that was represented there, at the scene, was a local police department. They were there just to help on the scene but the investigation -- there was no other federal agents there.  It was all State Department.

Q.    Mr. Alimenti, do you have any knowledge as to whether HSI agents participated in the May 15, 2019 operations?

A.    Yeah, like I said, it was four years ago.  If there were HSI agents there, it wouldn't surprise me.  I don't recall them being there.  I just recall all DS agents.  I remember

we got a bunch of TDY agents from the near field office to come down and assist.

If there was an HSI agent that I don't know about or don't recall, it wouldn't surprise me though.

Q.    With respect to this May 15, 2019 operation, what was the primary goal of this operation?

A.    There was a subject who had taken the identity of an American citizen.  He was not an American citizen -- I want to say maybe -- I don't recall -- but he was not an American citizen.  He had taken the identity, he had been living under that identity for a number of years, as I recall.

At some point, he had applied for a U.S. Passport or renewal of passport and that's how it came to Diplomatic Security Service.

Q.    Okay.  Was this individual part of the Department of State's operation to apprehend or arrest this individual?

A.    Yes.

Q.    Do you have any knowledge whether this individual was ultimately taken into

custody?

A.    Yes, he was.  I was there.

Q.    Could you just explain to me what role, if any, you, as well as Special Agent Tyson, played in terms of the apprehension of this individual?

A.    So Jabari came down and swore out a warrant for arrest and a warrant for a search warrant, prior to that.  He presented it to the judge.

Once we had the warrant and arrest in hand, we set up some surveillance on the house just to see who was coming and going and where would be the best place to arrest the person.

Ideally, we wanted to get him outside of the residence because -- for officer safety issues, if you're outside of residence you don't have access to weapons.

So we did some surveillance on the house.  We saw when children were coming and going.  And then we realized -- we followed him to where he went to work, and we were trying to formulate a plan to arrest him at his job.

We had some agents come down from our New York field office, and those agents were able to assist us in arrest planning, which we intended to arrest him in the early morning hours at his place of employment, which was a farm of some type, I don't recall.

But we went to arrest him at the farm.  He wasn't there.  I think he took the day off.  So our other agents at the residence, we waited until the kids in the house went off to school, and then we knocked on the door and we took the person out of the residence.

We took him into custody, and we put him in the back of my vehicle to be transported up to our field office in Philadelphia for processing.

Q.    What was the general location of this operation with respect to the target's place of residence?

A.    So the target's place of residence was in Vineland, New Jersey.  Our field office is in Philadelphia.

Q.    Okay.  Would you characterize the operation as being successful?

Michael Alimenti
June 06, 2023

A.     Yes.

Q.     Why is that?

A.     We arrested the subject without incident.  We transported him without incident. We interviewed him and obtained a confession, and he was remanded into custody and nobody got hurt.

Q.     To the best of your knowledge, did Special Agent Tyson participate in the apprehension of the target with respect to the May 15, 2019 operation?

A.     I mean, he was there.  I do recall he was a little bit withdrawn from the operation, by his own actions.  But he was definitely there and definitely participated in some capacity.

But, like I said, it was a while ago, so I'm not sure exactly what he did.

He did follow me to the field office -- after the person was taken into custody in my vehicle, he followed behind us to help us with the processing at the field office, because he was the one to go to court because he signed out the warrants.

Michael Alimenti
June 06, 2023

Q.      Did Special Agent Tyson have any role in securing the confession from the target concerning the May 15, 2019 operation?

A.      Yes, we both interviewed the subject, myself and --

Q.      So you were physically present with Special Agent Tyson when the confession was secured?

A.      Yes, I was.

Q.      So is it fair to say that you observed Special Agent Tyson in the field as part of the May 15, 2019 operation, which you characterized as a successful operation?

A.      I mean, I wasn't specifically observing him.  No.  He was there.  I saw him, like I saw every other agent.

But, as far as conducting an assessment of his actions, no, I can't say I did that.

Q.      But you were physically with Special Agent Tyson when I think you said the two of you secured a confession from the target; is that accurate?

A.      Yes.  Yes.  Back at the field

Michael Alimenti
June 06, 2023

office.

Q.     Did you congratulate or commend Special Agent Tyson with respect to his work or his role participating in the May 15, 2019 operation?

A.     I don't recall.

Q.     I want to focus now on the time line of events that occurred immediately after the May 15, 2019 operation was completed and after the target's confession was secured.

Take me through what you did after the target's confession was taken.

A.     After we took the statement from him, we processed him, which included taking DNA samples, fingerprinting, photographing, whatnot.

And then we had to transport him back into New Jersey, which is across the river from Philadelphia, in Camden, which is where the U.S. Attorney's Office is located and the Southern -- District of Southern New Jersey's Federal Court is located.

Q.     Who transported the target of the May 15, 2019 operation from New Jersey -- excuse me -- from Philadelphia back over to New Jersey?

Michael Alimenti
June 06, 2023

A.      Myself and Jabari.

Q.      And what kind of vehicle were you using to transport the target on May 15, 2019?

A.      It was a Chevy Tahoe.

Q.      So it was you and Special Agent Tyson and the target; just the three of you?

A.      Yes, as far as I can recall.

Q.      I think you said that you were transporting the target to the U.S. District Court, District of New Jersey, in Camden?

A.      Yes.

Q.      How long of a car ride was it from Philadelphia to the U.S. District Court of New Jersey in Camden?

A.      Five -- no more than ten minutes.

Q.      Were you driving the vehicle?

A.      Yes.

Q.      And where was Special Agent Tyson-Phipps located?

A.      I don't recall if he was in the backseat or the front seat.  Maybe he was in the backseat with the subject.  I really don't recall.

Q.      And do you recall where the target

Michael Alimenti
June 06, 2023

or the prisoner was located in the transport

vehicle?

    A.    He was in the back passenger's side

of the vehicle.

    Q.    Okay.  When you were transporting

the target from Philadelphia to New Jersey in

Camden, were you armed?

    A.    Yes.

    Q.    Was Special Agent Tyson armed?

    A.    I assume so.  Yes.  I'm pretty sure

he was.

    Q.    Upon arriving at the U.S. District

Court, District of New Jersey, in Camden, take

me through the process as to how a prisoner is

removed from the vehicle and processed at the

District Court.

    A.    We hadn't done a whole lot of them.

I think that was only my second one.  I think

you -- you pull into an underground garage.  We

were met by the Marshals.  You take off all your

weapons and you can either secure them in a

locker there or you can secure them in your

vehicle, if you have a safe, which I did.

    We took Jabari -- we're still

Michael Alimenti
June 06, 2023

liable, until the subject is arraigned, he's our prisoner, so we have to maintain control of him, even though we're in somebody else's facility.

So I dropped off Jabari and the subject at the Marshals. Then I had to take the vehicle out the sally port and go park it, which is what I did. I parked the vehicle. I secured my weapons and gear, and then I met them inside the courthouse in an agent holding room where the U.S. Marshals sit.

Q.    You said that you secured your firearms in the transport vehicle; is that accurate?

A.    I don't recall if I stored it in there. Normally, I think I would have just put knives and stuff inside my vehicle. I wouldn't store it in there unless I had to. But there's lockers provided at the U.S. Marshals' facility, that's why, if anything, I probably brought it inside.

Q.    Do you recall how Special Agent Tyson stored or secured his firearm upon entering the courthouse?

A.    Same thing; you're given like a

Michael Alimenti
June 06, 2023

little post office box locker and a key and you put your stuff inside and lock it.

I don't think he locked it in my vehicle because I have a safe in my vehicle which we can store stuff in, but I don't recall giving him the combination for it or anything so . . .

Q.    You indicated that the prisoner is basically your responsibility until the arraignment; is that accurate?

A.    That's correct.

Q.    So did both you and Special Agent Tyson remain present with the prisoner until he was arraigned?

A.    No.  He can be put in a holding cell but, in case something happens with him, if he gets sick and somebody has to take him to the hospital, that's our responsibility.  So we have to remain.  We can't just drop him off and leave.

We have -- per the Marshals' policies, the arresting agency has to stay there until he's actually remanded into the custody of Bureau of Prisons.

Michael Alimenti
June 06, 2023

Q.    So, at some point, was the target taken into a holding cell at the Camden District Courthouse?

A.    Yeah, that was done while I was parking the vehicle.  That's what they were doing.  They search him again for weapons and contraband, and then they put him into a holding cell until the judge is ready.

Q.    After target was taken into a holding cell, did you and Special Agent Tyson remain at the Camden Courthouse?

A.    Yes, we did.

Q.    And where were you situated?

A.    There's like a -- they call it like a bullpen but, basically, it's maybe a twenty by twenty room with individual offices around the perimeter of it but just desks in the middle.

It's not sectioned off; like if you're sitting at a desk, you can see the top -- you can see everyone's face from the shoulders up.

So there's not a whole lot of privacy.  It's basically an open-air place.  In one corner there was a small conference table

with I think maybe six chairs around it.  That's where we were sitting.

Q.    Was it just you and Special Agent Tyson sitting in the bullpen while you were waiting for the prisoner to be processed?

A.    No.  There was some other agencies there, as well, that were in the same scenario. I don't recall if they were Bureau of Prisons or if they were Camden City Police or another federal agency.  I think one of them was in uniform, as I recall.

But there was about, I would say, during the time, there was at least two to four people that came through there and sat down. Some people got their guy and left and other people came in afterwards.

Q.    How long were you in this bullpen at the Camden Courthouse with Special Agent Tyson?

A.    I don't recall but, by looking at the report, I mean, I think I said five hours. That's probably about accurate.

Q.    So, as you're sitting in the bullpen, you said you were sitting in or at the

Michael Alimenti
June 06, 2023

same table as Special Agent Tyson; is that correct?

A.    That's correct.

Q.    At some point did Special Agent Tyson take a phone call and depart the bullpen waiting area?

A.    Yes.

Q.    Okay.  At some point did Special Agent Tyson return to the bullpen after taking a phone call?

A.    Yes.

Q.    Do you have any knowledge as to who Special Agent Tyson was speaking with when he briefly departed the bullpen?

A.    He was talking to someone in our HR, Global Talent Management, throughout the day.

During the arrest and while we were sitting at the table, he had been exchanging -- I don't know if it was text messages or e-mails, I can't recall, but he was pretty upset and he was telling me he has a call with the director general.  I don't know if that was accurate or not.

Michael Alimenti
June 06, 2023

He was pretty upset while we were sitting there, and then he went and made a phone call to someone in HR -- I doubt it was the director general -- and then he came back.

Q. Did Special Agent Tyson ever disclose to you why he was upset on May 15, 2019, while you were waiting in the bullpen of the Camden District Courthouse?

A. Well, I mean, this is going on over two days with Jabari, as far as he had some issues with his employee evaluation report.

The night before I had an interview -- we had our briefing for the arrest and he had some issues going on. We stayed back to work out the arrest plan, but he was dealing with this EER issue.

He was pretty upset with his supervisors the night before, and then he was completely withdrawn after. I think I even called him that night to make sure he was going to be okay for the arrest the next day.

While we were sitting there, I think he was -- while we were sitting the day of, in the Camden Courthouse, he was going back

and forth, via e-mail or something, and he was still pretty upset, talking about how the guys were trying to screw him.  How the supervisors were trying to screw him.

How they were trying to hang the carrying of his personal firearm on his person during the detail, they were trying to use that to give him a bad EER.  Something about maybe his EER was changed or it was sent in and then the draft came back and it wasn't what he expected it to be.  So he was pretty upset.

Leading up to the phone call he was pretty vocal, and then after the phone call he was even more vocal.

Q.    When you said "the guys," do you recall who Special Agent Tyson-Phipps was having issues with, in terms of management, or claiming to have issues with?

A.    Yeah, he was particularly, at that time, he took focus with his rater and reviewer on his evaluation, which was, I think, Eric Jagels and Pete Carlson.

Q.    Mr. Alimenti, in May of 2019, who was your first-line supervisor?

Michael Alimenti
June 06, 2023

A.     Robert Castro.

Q.     And who was your second-line supervisor?

A.     It would've been Joe Ugarte who was a New York Field Office, Assistant Special Agent in Charge.

Q.     And, do you know, is Ugarte spelled U-G-A-R-T-E?

A.     That's correct.

Q.     Is it accurate that you were not in any supervisory chain with respect to Eric Jagels or ASAC Carlson?

A.     That's correct.

Q.     And I know you just said Robert Castro was your first-line supervisor.  Was Robert Castro responsible for completing or filling out any performance evaluations for you?

A.     Yes, he was my rater on my employee report and Joe Ugarte was my reviewer.

Q.     So, Mr. Alimenti, you're describing conversations that you had with Special Agent Tyson on May 15, 2019, in the bullpen, when Special Agent Tyson appeared to be upset based on his allegation that Jagels and Carlson, you

Michael Alimenti
June 06, 2023

said, were allegedly screwing with him.

Did Special Agent Tyson ever disclose to you that he believed that Mr. Jagels and Mr. Carlson had violated any policy regarding his EER?

A.    I mean, that was his issue.  That he alleged that they had changed something in his EER.  It was superficial.  I didn't ask too many questions.  I was just trying to get him to calm down and be a little bit quieter.

So the allegation was that his EER was written one way and something came back and it was changed; and that they were trying to use stuff that had already been done with the firearm as a way to justify changing his EER is the gist that I got.

Q.    Okay.  And, again, did Special Agent Tyson characterize that allegation as a violation of Agency policy?

A.    I mean, he said basically something like -- and, again, I'm just trying to recall -- essentially, something to the effect of, you know, they're not allowed to do that.

Q.    Special Agent Tyson -- sorry.  Go

ahead.

A.     They're not allowed to do it and they're just doing it to try to screw him over.

Q.     Okay.  Did Special Agent Tyson ever disclose to you on or about May 15, 2019, that he felt that he was being discriminated against by management?

A.     He never used the word "discrimination."  He said that they "had it out for him."

And then he was making a lot of threats about ongoing litigation that he had against -- I don't know if it was them or the Department or the field office, but he was saying, like, They're going to get theirs.  They'll see.  That's what I got all this stuff that I've filed all this stuff about.

You know, eluding to some other legal process that he had going on.

Again, I was trying to keep him focused on what we were doing and keep him calm.

Q.     Did Special Agent Tyson disclose to you on or about May 15, 2019, that he felt he was being harassed by management?

Michael Alimenti
June 06, 2023

A.    No.  He never mentioned the word "harassment," but he said they were picking on him, essentially.

Q.    And, lastly, did Special Agent Tyson ever disclose to you on May 15, 2019, that he's being retaliated against by management?

A.    Yeah, I think he did mention that he felt they were targeting him.  Again, based on whatever he was eluding to, as far as a legal case or EEO case or something along those lines. I think he felt that that's why they were targeting him.

Q.    All right.  If you could look at Exhibit 1, on page 2, paragraph two, Charge 3, states that:  "On May 15, 2019, at a courthouse, within earshot of agents of the U.S. Marshal's Service, you spoke loudly and negatively about the Department and DS, using profane language. Your colleague found it embarrassing to be around you in the courthouse because you would not stop talking and asked the office to have someone pick you up."

Do you see that?

A.    Yes.

Michael Alimenti
June 06, 2023

Q.    It goes on to state that SA Tyson loudly referring to -- and I quote -- "motherfucking DS and DOS."

Do you see that?

A.    Yes.

Q.    Did you hear Special Agent Tyson make a comment or refer to DS or DOS using profanity?

A.    Yes, multiple times.

Q.    Was this on May 15, 2019?

A.    Yes.  Same incident.  Same place.

Q.    Was this at the Camden Courthouse?

A.    Yes.

Q.    In the bullpen of the courthouse that you previously described?

A.    Yes.

Q.    The allegation states ". . . within earshot of agents of the U.S. Marshal's Service . . ."

Do you recall whether U.S. Marshals were present when Mr. Tyson is alleged to have made a comment referring to the Department of State using profanity?

A.    Yes.  There was multiple -- I mean,

Michael Alimenti
June 06, 2023

this is five hours.  He was making a bunch of comments beforehand.  There was like administrative staff was there and sworn U.S. Marshals.  There was other people around.  There was visiting law enforcement people who were actually sitting at the table with us.

After he got the phone call, it got even more loud and more egregious to where he was making the same disparaging comments about the Department.

Q.    And did any other non-state department, law enforcement, or administrative personnel approach you or speak to you with respect to Mr. Tyson's alleged comments?

A.    Yeah.  After -- so I asked that he get picked up and be removed from the area. While he was going back and getting his vehicle, one or two of the employees in the section said, Boy, he's really fired up, isn't he?  Or something to that effect.

I remember one person -- I don't know if he was a Marshal or administrative staff asked me, Is any of that stuff actually true what they're trying to do to him?  I just

Michael Alimenti
June 06, 2023

basically said I don't know.

So, yeah, people did -- after he left the area, people did come up to me and draw attention to it.

Q.    When you claim that you heard Mr. Tyson or Special Agent Tyson make a comment referring to the Department of State using profanity, was that in any way part or in connection with his disclosures to you complaining about management and the way he was treated?

A.    So first it was about -- so before the phone call, it was about his supervisors and people in NYFO, the New York Field Office, how they were treating him and what they were trying to do to him.

And then, after the phone call, it was more pervasive and it was geared towards the Department, in large, now trying to screw him as well.

I'm paraphrasing, but that's essentially how it worked out.

Q.    When you're having this conversation or when Mr. Tyson is speaking with

Michael Alimenti
June 06, 2023

you, was it a private conversation?

A.    No.  There was no way for it to be a private conversation.

I mean, we weren't sitting at a table, whispering to each other.  He was standing up, moving around, waving his arms a lot.  Sometimes he would sit down and then stand up.  He was -- it was very loud.  There was volume to it.  People could hear, other than just myself.

And from the table that we were sitting at, we were less than five foot away from the next desk where someone was sitting, so it doesn't take much.

Q.    I know you described your extensive career with the Department of State as a law enforcement officer.  In your experience having probably interacted with countless law enforcement officials from the Department of State and other agencies, in your opinion is it uncommon for law enforcement officials to use profanity?

A.    I would say in this scenario, yes.

It's common that law enforcement

Michael Alimenti
June 06, 2023

will complain about, you know, their supervisor,

complain about their department, you know,

complain about their wives.

But one thing we don't do is what we call "talk out of school." I mean, you don't bring that to some other agency and air out all grievances you have with your department in front of other agents or other agencies in other organizations. Especially not in the profanity-laced manner he was doing.

While it's common that that language is used, it's not common or accepted to use that language outside of your agency or outside of privacy, especially not talking about your supervisors or your agency.

Q. Who's decision was it to drive Special Agent Tyson from the Camden Courthouse back to the Philadelphia office?

A. I called the resident agent in charge, Rob Castro, and told him that his demeanor and behavior was really embarrassing and unacceptable for the venue that we were in, and that he was pretty irate and he was distracted and that he needed to be removed from

the area, give him some time to cool down.

I think we were gauging it that the judge was supposed to hear the person and arraign him within like an hour.

So I figured by the time they came over and picked him up -- because his vehicle was still at our Philadelphia field office, he had ridden over with me -- I figured by the time another agent came over and picked him up and brought him back to his vehicle, and then he came back to the courthouse, he would, number 1, hopefully be calmed down a little bit and, number 2, the defendant would've been ready to go in front of the judge and he would be out of there shortly thereafter.

Q.    So did Special Agent Tyson depart the Camden Courthouse before the arraignment of the target?

A.    Yes.  Yes.

Q.    Did you stay for the arraignment or did you leave prior to the target being --

A.    I stayed until he came back.  And then I think Rob Castro called me and said he was still pretty upset and there was some other

Michael Alimenti
June 06, 2023

stuff going on.

I didn't know at the time about the comments he had made in the vehicle to Agent Wallace, but he asked me to stay in the area until the guy was actually handed off and you guys walked out.

So he came back and I stayed, but it was only -- it wasn't any time that's memorable in my mind. It might have been only ten or fifteen minutes by the time he got back to when we actually had to walk him to the courtroom.

Q. So is it your testimony that Special Agent Tyson departed the courthouse before the target was arraigned but then ultimately returned?

A. That is correct.

Q. After the arraignment?

A. No. If I recall correctly, he was in the room when we brought him in front of the judge.

Again, this was four years ago but I'm pretty sure that's how it went down.

Q. So, to the best of your memory,

both you and Special Agent Tyson were both physically present in the courthouse when the target was arraigned?

A.    I believe so.  I remember him coming back and I remember going into the -- yeah, I remember going into the courtroom.

Yeah, to the best of my recollection -- and I'm not a thousand percent sure of this, but I was there when the guy was arraigned and so was J.J.

Q.    Is it possible that you departed prior to the arraignment of this target?

A.    I mean, the plan was for me to leave when J.J. got back.  I stayed -- maybe I stayed until they actually moved him into the courtroom, and I left before he was physically arraigned.  Again, I don't recall.

Q.    You described Special Agent Tyson as being irate or worked up after having spoken with Resident Agent in Charge Castro.

Who was scheduled to pick up Special Agent Tyson from the Camden Courthouse and drive him to the Philadelphia office?

A.    I think Agent Castro asked Agent

Michael Alimenti
June 06, 2023

Wallace to come pick him up.

Q.    Okay.  And did you walk with Special Agent Tyson out of the courthouse to the transport vehicle where he was transported or where he got a ride from the Camden Courthouse to the Philadelphia office?

A.    No.

Q.    Do you have any knowledge whether Special Agent Tyson secured his firearms when he departed the Camden Courthouse to get a ride to the Philadelphia office?

A.    No.

Q.    Did Special Agent Tyson collect any of his work or personal effects from your vehicle upon departing the Camden Courthouse on May 15, 2019, to the Philadelphia office?

A.    Yeah, I think he had like a backpack and his case files that were left in my vehicle.

Q.    And how did you know whether he removed those or gathered those items from your vehicle upon departing the Camden Courthouse; did you walk with him?

A.    No.  I gave him -- one of us had to

Michael Alimenti
June 06, 2023

stay there with the person, we couldn't leave.

So I gave him my keys, he went out and got his

stuff, and then came back and gave me my keys

back.

Q.    When Special Agent Tyson departed

the Camden Courthouse to go to the Philadelphia

office, did you have any concerns about Special

Agent Tyson?

A.    You mean concerns about what?  Him

hurting himself?  Or what concerns are you

talking about?

Q.    Anything.  I mean, you had

described his demeanor as being agitated and

upset, and you alleged that he made a comment

using profanity referring to management.

And, again, you testified that you

spoke with Resident Agent Castro about Special

Agent Tyson's demeanor and behavior.  Did you

have any concerns about Special Agent Tyson, as

he was departing?

A.    Yeah, I was concerned that he was

acting unprofessional and he was embarrassing

himself and our department.  That was my

concern.

Michael Alimenti
June 06, 2023

Q.      Okay.  I want to focus now on Grievance Exhibit No. 9.  If you could please look at that and let me know when --

A.      Exhibit 9.  Okay.

Q.      Could you please describe what is Grievance Exhibit 9?

A.      It's a Memorandum of Interview that the agents wrote after they interviewed me on May 29, 2019.

Q.      Who are the agents on record who interviewed you on May 29, 2019?

A.      Special Agent Brian Palmero and Special Agent Natasha Diamond.

Q.      Did you know Special Agent Brian Palmero prior to your May 29, 2019 interview?

A.      I don't think so.

Q.      Did you know Natasha Diamond prior to your May 29, 2019 interview?

A.      Yes, I did.

Q.      And describe for me your -- how you knew Special Agent Natasha Diamond prior to your May 29, 2019 --

A.      We came onto the Diplomatic Security Service around the same time.  I was

Michael Alimenti
June 06, 2023

Basic Special Agent Class 111 and she was Basic Special Agent Class 110, so some of our training overlapped.

I think I might have done some TDY, temporary duty assignments, with her while she was on the secretary's detail and I was assigned to Protective Intelligence Investigations.

Q.    Okay.  Grievance Exhibit 9, did you write up this Memorandum of Interview?

A.    No, I didn't.

Q.    Did you provide statements that ultimately are included in this Memorandum of Interview?

A.    Yes.

Q.    If you could just explain to me, how did you come to participate in an interview with Special Agent Brian Palmero and Natasha Diamond on May 29, 2019?

A.    Our Office of Special Investigations was conducting an investigation into, I believe, the comments he made to Special Agent Wallace about his rater and reviewer, so they decided to open up an investigation.

So they came up to Philadelphia

Michael Alimenti
June 06, 2023

from Washington, D.C., to conduct interviews and gather statements.

Q.    Is it accurate to say that you were not a witness to the allegations that Mr. Tyson made a comment to or in the presence of Special Agent Wallace on May 15, 2019?

A.    That's correct.

Q.    Is that accurate?

A.    Yes, that's correct.

Q.    What is your understanding as to how Special Agent Brian Palmero and Natasha Diamond came to interview you when you were not a witness to the Terrence Wallace discussion or allegations?

A.    I mean, I had spent the two days with Jabari, the day before and the day of, working the case.  Most of the comments he made before that he made to me.  And I was the one that called the RAC -- the resident agent in charge -- and let him know he was not being professional, and I thought it was best if he was taken out of the Marshals' place.

So I had information relative to the investigation.

Michael Alimenti
June 06, 2023

Q.      Was the May 29, 2019 interview with Special Agent Brian Palmero and Natasha Diamond a voluntary interview?

A.      Yes.

Q.      And, as you stand here today, was your testimony or statement to Special Agent Brian Palmero and Natasha Diamond truthful and accurate, to the best of your knowledge?

A.      Yes, they were.

Q.      Because it was a voluntary interview, do you have any recollection if you were sworn under oath prior to giving any statements?

A.      No, I wasn't.

Q.      As a law enforcement officer, are you required to provide truthful statements whenever you're interviewed or provide a statement?

A.      Yes, I am.

Q.      Could you look at page 1, paragraph four, of Grievance Exhibit 9.

A.      Okay.

Q.      It states, "Alimenti told the SAs that leading up to the execution of the

Michael Alimenti
June 06, 2023

warrants, it became clear that Tyson-Phipps was not ready for the operation."

A.    Yes.

Q.    "Alimenti stated that the operation plan that Tyson-Phipps submitted was over 40 pages long and contained limited practical specificity for the operation.  Alimenti felt that Tyson-Phipps was missing a lot of moving parts and specific details.  Alimenti felt that Tyson-Phipps was not given a lot of guidance on how to execute the plan, but indicated that Tyson-Phipps expressed a desire to succeed in the enforcement operation."

Do you see that?

A.    Yes.

Q.    Does that accurately capture your statement to Special Agent Brian Palmero and Natasha Diamond on May 29, 2019?

A.    Yes.

Q.    What did you mean when it says it became clear Special Agent Tyson was not ready for the operation?

A.    He had no experience meeting with AUSAs.  He had no -- the operation plan that he

had, it contained -- it read like a protection document, an advanced document that would make for a protection operation instead of an arrest operation.

He didn't have all of the relevant information that he needed, as far as addresses, the little details of how to identify the subject.  He didn't have exhibits prepared to show the subject.  He had not been in contact with local law enforcement.  He had not sought out the Marshals Service to try to figure out logistics to get people in and out.

So it was just a lot of things, off the top of my head.  There are arrest plans that we have in our field office that you're supposed to use for arrest, and he didn't have it filled out.  It covers a lot of all those things.

He didn't know how many agents he needed; he didn't know what weapons we were going to be using; he didn't know -- he didn't have good directions to the trauma centers; he didn't have contact lists.

I mean, just all the minute planning documents and details were not there.

Michael Alimenti
June 06, 2023

Q.    The operation plan you indicated that Special Agent Tyson-Phipps submitted was over 40 pages long?

A.    Approximately.

Q.    Who did Special Agent Tyson submit this operation plan to?

A.    I don't know.  He had it with him. Mind you, a lot of those pages were photos and maps of stuff, as well.  But, I don't know, he had it with him when he came down to Philadelphia.

Q.    Was Special Agent Tyson the author of this operation plan?

A.    I don't know.

Q.    Was this operation plan ultimately approved by management?

A.    I don't know.

Q.    Generally speaking, an operation -- is an operation conducted without an operation plan being approved by management?

A.    No, it's not.  But I don't know if the specific one he had with him was actually the one that was approved.  It wasn't in the format that we usually use.

Michael Alimenti
June 06, 2023

Q.      It's your testimony that you're not aware of whether or not Mr. Tyson was the author of this operation plan, with respect to the May 15, 2019 operation?

A.      No.  I mean, no, I don't.  I don't know if he -- if he did the entire thing, if he put pieces of it together, or if he got it from someone else, I don't know.

Q.      You previously testified that there was a list, basically, of information details that was missing from the operation plan.  Correct?

A.      Well, the operation format, the form that we use for planning, I don't recall seeing it.

Q.      Again, I believe I already asked you this but just to clarify:  Do you know whether Special Agent Tyson was the author of the operation plan with respect to the May 15, 2019 operation?

        MR. TODMAN:  Objection.  Asked and answered.

        You can go ahead and answer it.

A.      The one that he showed up with, I

Michael Alimenti
June 06, 2023

mean, I can assume it but I don't know it.  I don't know if -- like I said, if he put all 30 to 40 pages of that together himself or if other people helped him or where he got it from.

But I can tell you that what he had was not the boilerplate form that we use as an approved operation plan to execute an arrest.  I think I ended up having to help him rewrite the operations plan in order to make it compliant.

Q.    Again, you previously testified that the May 15, 2019 operation was successful by your standard?

A.    Yeah.

Q.    Why did you believe that Special Agent Tyson was not given guidance on how to execute a plan?

A.    Because he wouldn't have shown up with what he called his operations, his arrest plan.  He would've shown up with the approved document with the relevant information already filled in.  I wouldn't have to do it for him.

Q.    Okay.  I want to focus now on page 2, paragraph one.  Can you take a moment and read paragraph one on page 2, and let me know

Michael Alimenti
June 06, 2023

when you're done.

A.      Are we talking about the three lines at the top or the first full paragraph?

Q.      The first full paragraph.

(Brief pause in proceedings)

A.      Okay.

Q.      It states, "Alimenti stated that he agreed that Tyson-Phipps was getting more scrutiny, but that he needed the extra supervision."

A.      Yes.

Q.      What is your understanding of that?

A.      He didn't know what he was doing. He didn't know how to swear out the warrant.  He didn't know how to make the arrest plan.  He didn't know how to coordinate with local law enforcement.  He didn't know to establish radio protocols, communication plans.

None of that occurred to him, so we had to walk him through everything.

Q.      I'll restate my question:  What did you mean you agreed that Tyson-Phipps was getting more scrutiny?

A.      I agreed -- he said they were on

Michael Alimenti
June 06, 2023

him.  So I was agreeing with him.  Yeah, they were on him.  Meaning, the supervisors up in NYFO.  I don't even think at this point it was Jagels.  I think it was another supervisor.

But he was saying that they were on him to do things, they wanted to make this arrest.  And, as I recall, the U.S. Attorney in Camden was not happy that this case had gone on so long, that the arrests weren't made, that the case wasn't brought to conclusion.

So it was again giving a bad perception of the Diplomatic Security Service, so they wanted it done and they wanted it done right.  But he definitely needed a lot more hand-holding than a general, run-of-the-mill agent did.

Q.    If you look at page 2, paragraph two.

A.    Yeah.

Q.    Could you read that entire paragraph and let me know when you're done.

(Brief pause in proceedings)

A.    Okay.

Q.    Are the statements contained on

page 2, paragraph two, of Grievance Exhibit 9,

is that an accurate depiction of the statements

you provided to Special Agent Palmero and

Diamond?

A.    Yes.

Q.    In the middle of the paragraph it

states, "During the course of this conversation,

Alimenti stated that Tyson-Phipps was

continually speaking about his supervisors, Eric

Jagels and Peter Carlson, in a negative way, but

that he never made any threatening comments."

Do you see that?

A.    Yes.

Q.    Is that accurate?

A.    Yes.

Q.    If you can look now on page 2,

paragraph three of Grievance Exhibit 9, if you

could read that whole paragraph and let me know

when you're done.

A.    You mean the final paragraph?

Q.    Correct.

(Brief pause in proceedings)

A.    Okay.

Q.    Again, I'm referring to the third

Michael Alimenti
June 06, 2023

paragraph, starting with, "On 5/15/2019, the morning of the arrest . . ."

A.      Wait a minute.  Okay.

Q.      Take a minute and read that, please, let me know when you're done.

(Brief pause in proceedings)

A.      Okay.

Q.      (No verbal response)

A.      Hello?

Q.      Yep.  It states, ". . . that Tyson-Phipps had done a good job in the interview with the subject."

A.      Yes.

Q.      Do you agree with that statement?

A.      Yes.

Q.      So, again, you've already testified that the operation on May 15, 2019, was a successful operation and you listed the basis for that conclusion or opinion.

In this May 29, 2019 interview with Special Agent Brian Palmero and Natasha Diamond, you stated that Tyson-Phipps had done a good job in the interview with the subject, correct?

A.      Yes.  But, again, it was a lot of

Michael Alimenti
June 06, 2023

hand-holding in order to ensure that everything

went well to get to that point.

Q.     But, again, you stated that

Tyson-Phipps had done a good job in the

interview with the subject?

A.     Yes.

Q.     Okay.  On page 2 of the last

paragraph, the last sentence states, "Alimenti

also stated that he thought Tyson-Phipps should

quit DS."

Do you see that?

A.     Yes.

Q.     Is that an accurate statement that

you made to Special Agent Brian Palmero and

Natasha Diamond?

A.     Yes.

Q.     What did you mean when you said you

thought Tyson-Phipps should quit DS?

A.     I mean, over the course of the two

days that I worked with him, I saw repeated

instances of questionable decision-making

abilities and unprofessional demeanor.

And I didn't think that those -- in

a job like this, that I've been doing for almost

25 years, you need a strong decision-making ability and the ability to make those decisions based on sound facts and circumstances, not under preconceived notions and fitting narratives into -- fitting circumstances into your narrative.

That's what I witnessed of him over the last couple of days.

Q.    Did you convey to Special Agent Tyson that he should quit DS?

A.    No, of course not.

Q.    Did you convey to anyone in management at the Department that Tyson-Phipps should quit DS?

A.    Nope, just this interview.

Q.    So this is your opinion based on your two-day interaction with Special Agent Tyson-Phipps; is that correct?

A.    That's correct.  Well, and the interactions I had with him on the detail with Nikki Haley.

Q.    In total, how many days of interactions, on duty, did you have with Special Agent Tyson-Phipps, in total?

A.    With the two different operations, maybe, five.

Q.    Other than the five days of interactions with Special Agent Tyson-Phipps over the course of however many months or years, that was the extent of your interaction with Special Agent Tyson?

A.    Yes.

Q.    Do you normally render opinions as to whether or not agents should quit Department of State depending on your interactions with them, or is this the first time you rendered an opinion about a State Department employee?

A.    This is probably the first time I was ever asked.

MR. OTIENO:  All right.  I think we can take a ten-minute break.  I want to look at my notes and see if I have any other questions for Mr. Alimenti.

Does that work for everybody?

MR. TODMAN:  That works for me.

MR. OTIENO:  Mr. Alimenti, does that work?

THE WITNESS:  Yep, that's fine.

Michael Alimenti
June 06, 2023

(A break was taken at 10:23 a.m.)

(Back on the record at 10:34 a.m.)

MR OTIENO:  Mr. Alimenti, I do not have any further questions for you at this time. I will turn things over to Attorney Todman, if he has any questions for you.

MR. TODMAN:  Yeah, I do not have any questions.

MR. OTIENO:  Okay.  Mr. Alimenti, thank you for your time today.  I think we can conclude this deposition and we can go off the record.

THE COURT REPORTER:  Before we go off the record, I want to confirm that because this was a telephonic deposition and I cannot see the witness or his identification, both attorneys were okay with me swearing in the witness and taking the deposition?

MR. TODMAN:  Yes.

MR. OTIENO:  Yes.

(Whereupon the telephonic deposition concluded at 10:34 a.m.)

Michael Alimenti
June 06, 2023

COMMONWEALTH OF MASSACHUSETTS    )
                                 )    ss
HAMPDEN COUNTY                   )


        I, Marcy J. Rogala-Looney, Court Reporter

in and for the County of Hampden, Commonwealth

of Massachusetts, do hereby certify that the

foregoing is true and accurate, to the best of

my knowledge and ability.

_____
Marcy J. Rogala-Looney
Court Reporter


My Commission Expires:
April 19, 2030

**Exhibits**

EX 0001 Micha
el Alimenti 0
60623
  3:10 15:7
  21:23 22:2,
  9,10 43:14
EX 0002 Micha
el Alimenti 0
60623
  3:11 15:8
EX 0009 Micha
el Alimenti 0
60623
  3:12 15:9,20
  54:2,4,6
  55:8 57:21
  65:1,17
EX 0022 Micha
el Alimenti 0
60623
  3:13 15:10
  16:12,13,17,
  21,24

**0**

092
  17:10,14,17
  18:7 20:17

**1**

1
  15:7 21:23
  22:2,10
  43:14 49:11
  57:20
10:23
  70:1
10:34
  70:2,23
110
  55:2

**111**
  55:1
**12**
  17:10,13,17
  18:7 20:17
**15**
  22:11,21
  23:4,13
  24:20 25:6
  28:11 29:3,
  12 30:4,9,23
  31:3 38:6
  40:22 42:5,
  23 43:5,15
  44:10 52:16
  56:6 61:4,19
  62:11 66:17

**2**

2
  15:8,13 16:7
  22:9 43:14
  49:13 62:23,
  24 64:17
  65:1,16 67:7
2010
  7:8
2018
  21:2
2019
  14:24 16:5
  21:2 22:12,
  21 23:4,13
  24:20 25:6
  28:11 29:3,
  12 30:4,9,23
  31:3 38:7
  39:23 40:22
  42:5,23
  43:5,15
  44:10 52:16
  54:9,11,15,
  18,22 55:18
  56:6 57:1
  58:18 61:4,
  20 62:11
  66:17,20

**2020**
  15:14 16:7
**2021**
  7:24
**22**
  15:10 16:12,
  13,17,21,24
**25**
  68:1
**29**
  14:23 16:5
  54:9,11,15,
  18,22 55:18
  57:1 58:18
  66:20

**3**

3
  43:14
30
  62:2

**4**

40
  58:5 60:3
  62:3
46
  6:16

**5**

5/15/2019
  66:1

**9**

9
  15:9,20
  54:2,4,6
  55:8 57:21
  65:1,17

**A**

A-L-I-M-E-N-
T-I
  6:13
a.m.
  70:1,2,23
abilities
  67:22
ability
  68:2
able
  27:3
absolutely
  21:21
academy
  19:18
accepted
  48:12
access
  26:19
accommodate
  5:16
accurate
  29:23 33:13
  34:10 36:22
  37:23 40:10
  56:3,8 57:8
  65:2,14
  67:13
accurately
  58:16
across
  30:17
acting
  53:22
action
  4:9 22:6
actions
  21:17 28:14
  29:18
addition
  18:15
additional
  7:13 20:10

addresses
59:6
administrativ
e
45:3,12,22
advanced
20:11 59:2
advise
9:6
Affairs
17:1
afterwards
36:16
agencies
22:24 24:8
36:6 47:20
48:8
agency
4:10 5:9
9:13 18:21
24:13 34:22
36:10 41:19
48:6,13,15
Agency's
9:12 15:2,13
agent
4:6 10:19
11:1,21,24
12:18,21
13:14,18
14:2,6,17
15:15 18:14
22:20 23:5,
20,22 24:1
25:3 26:4
28:9 29:1,7,
11,16,21
30:3 31:5,18
32:9 33:9,21
34:12 35:10
36:3,18
37:1,4,9,13
38:5 39:16
40:5,21,23
41:2,18,24
42:4,22 43:4
44:6 46:6
48:17,19

49:9,16
50:3,14
51:1,18,20,
22,24 52:3,
9,13 53:5,8,
17,18,19
54:12,13,14,
21 55:1,2,
17,22 56:6,
11,19 57:2,6
58:17,21
60:2,5,12
61:18 62:15
64:16 65:3
66:21 67:14
68:9,17,24
69:4,7
agents
11:12 17:5
24:11,17,19,
22,24 25:1
27:1,2,9
43:16 44:18
48:8 54:8,10
59:18 69:10
agitated
53:13
ago
14:21 24:22
28:18 50:22
agree
66:14
agreed
63:8,22,24
agreeing
64:1
ahead
14:12 42:1
61:23
air
48:6
Alimenti
4:1,4 6:12,
15 9:8 16:4,
10 24:18
39:23 40:20
57:23 58:4,
7,9 63:7

65:8 67:8
69:19,22
70:3,9
allegation
40:24 41:11,
18 44:17
allegations
22:7 56:4,14
alleged
41:7 44:21
45:14 53:14
allegedly
41:1
allow
4:22,23
allowed
18:2,23
41:23 42:2
alongside
11:24
Amanda
10:23
ambassador
9:6
American
25:10,11,12
annual
20:4
answer
4:22,24 5:24
14:12 61:23
answered
14:11 61:22
answering
5:22
anyone
9:24 68:12
AOR
12:6 23:7
appeared
40:23
applied
25:16
apprehend
25:20
apprehension
26:5 28:10

approach
45:13
appropriate
6:1
approved
18:3,4
60:16,20,23
62:7,19
Approximately
60:4
area
12:5,8 23:7
37:6 45:16
46:3 49:1
50:4
arm
8:10
armed
32:7,9
armored
9:4
arms
47:6
around
7:11 11:11
21:2 35:16
36:1 43:20
45:4 47:6
54:24
arraign
49:4
arraigned
33:1 34:14
50:15 51:3,
10,17
arraignment
34:10 49:17,
20 50:18
51:12
arrest
23:10 25:21
26:8,11,14,
24 27:3,4,7
37:18 38:13,
15,21 59:3,
14,16 62:7,
18 63:15

Michael Alimenti
June 06, 2023

64:7 66:2
**arrested**
28:3
**arresting**
34:22
**arrests**
64:9
**arriving**
32:12
**ASAC**
40:12
**asked**
4:8 14:11
43:21 45:15,
23 50:4
51:24 61:16,
21 69:15
**assessment**
29:18
**assigned**
7:22 11:4,7,
8 12:3,23
23:24 55:6
**assignments**
55:5
**assist**
15:12 16:6
23:9 25:2
27:3
**Assistant**
40:5
**assisting**
15:21
**assume**
32:10 62:1
**assuming**
14:9
**attention**
46:4
**attorney**
4:5 5:8,11
6:4 9:13
64:7 70:5
**Attorney's**
30:19
**attorneys**
70:17

**August**
7:24
**AUSAS**
58:24
**author**
60:12 61:2,
18
**authorized**
18:14 21:4
**aware**
14:3,14 61:2

───────────

**B**

───────────

**back**
27:14 29:24
30:17,24
32:3 38:4,
14,24 39:10
41:12 45:17
48:18 49:10,
11,22 50:7,
10 51:5,14
53:3,4 70:2
**backpack**
52:18
**backseat**
31:21,22
**bad**
39:8 64:11
**based**
17:8 18:18
40:23 43:8
68:3,16
**basic**
20:9 55:1
**basically**
8:11 10:13
12:7 18:23
34:9 35:15,
23 41:20
46:1 61:10
**basis**
66:18
**beginning**
7:3

**begins**
22:11
**behavior**
48:21 53:18
**behind**
28:21
**believe**
51:4 55:21
61:16 62:14
**believed**
41:3
**best**
5:16 13:24
26:14 28:8
50:24 51:7
56:21 57:8
**bidding**
10:14
**bit**
28:13 41:10
49:12
**board**
4:7 14:18
**bodyguards**
9:3
**boilerplate**
62:6
**box**
34:1
**Boy**
45:19
**break**
5:14 69:17
70:1
**Brian**
54:12,14
55:17 56:11
57:2,7 58:17
66:21 67:14
**brief**
16:18 22:17
63:5 64:22
65:22 66:6
**briefing**
13:8 38:13
**briefly**
7:1 24:3

37:14
**bring**
48:6
**brought**
33:19 49:10
50:20 64:10
**bullpen**
35:15 36:4,
17,24 37:5,
9,14 38:7
40:22 44:14
**bunch**
25:1 45:1
**Bureau**
6:19 8:9
34:24 36:8

───────────

**C**

───────────

**call**
10:13 35:14
37:5,10,22
38:3 39:12,
13 45:7
46:13,17
48:5
**called**
38:20 48:19
49:23 56:19
62:18
**calm**
41:10 42:21
**calmed**
49:12
**Camden**
30:18 31:10,
14 32:7,13
35:2,11
36:9,18
38:8,24
44:12 48:17
49:17 51:22
52:5,10,15,
22 53:6 64:8
**Cameroon**
6:21 7:24
8:6

**capacity**
  12:1 28:16
**capture**
  58:16
**car**
  31:12
**career**
  7:2 20:15
  21:10 47:16
**careers**
  20:9
**Carlson**
  39:22 40:12,
  24 41:4
  65:10
**carried**
  20:22,23
**carry**
  8:21 18:2,
  14,24 21:4,6
**carrying**
  17:18,23
  18:22 20:19
  21:13 39:6
**case**
  5:10 13:15
  23:6 34:16
  43:10 52:18
  56:17 64:8,
  10
**Castro**
  10:3,9,11
  23:23,24
  40:1,15,16
  48:20 49:23
  51:20,24
  53:17
**cell**
  34:16 35:2,
  8,10
**center**
  19:20
**centered**
  11:11
**centers**
  59:21

**chain**
  40:11
**chairs**
  36:1
**changed**
  39:9 41:7,13
**changing**
  41:15
**characterize**
  27:23 41:18
**characterized**
  29:13
**charge**
  23:22 40:6
  43:14 48:20
  51:20 56:20
**Chevy**
  31:4
**children**
  26:21
**circumstances**
  68:3,5
**citizen**
  25:10,11,13
**City**
  36:9
**claim**
  46:5
**claiming**
  39:17
**clarify**
  61:17
**Class**
  55:1,2
**classified**
  8:4
**clear**
  12:9 14:22
  58:1,21
**colleague**
  43:19
**collect**
  52:13
**combination**
  34:6
**come**

  9:2 18:16
  23:6 25:2
  27:1 46:3
  52:1 55:16
**command**
  11:9 12:24
**commend**
  30:2
**comment**
  44:7,22 46:6
  53:14 56:5
**comments**
  45:2,9,14
  50:3 55:21
  56:17 65:11
**common**
  47:24 48:11,
  12
**communication**
  9:15 63:18
**communication
s**
  9:12
**complain**
  48:1,2,3
**complaining**
  46:10
**complaint**
  14:1,5,7
**completed**
  30:9
**completely**
  38:19
**completing**
  40:16
**compliant**
  62:9
**concern**
  53:24
**concerned**
  53:21
**concerns**
  53:7,9,10,19
**conclude**
  70:11
**concluded**
  70:22

**conclusion**
  64:10 66:19
**conduct**
  21:20 56:1
**conducted**
  9:20 15:17
  60:19
**conducting**
  29:17 55:20
**conference**
  35:24
**confession**
  28:5 29:2,7,
  22 30:10,12
**confirm**
  70:14
**congratulate**
  30:2
**connection**
  46:9
**considered**
  12:17,18
**consistent**
  13:15
**consists**
  20:6
**contact**
  59:9,22
**contacted**
  10:5,17
**contained**
  58:6 59:1
  64:24
**content**
  17:12
**contingent**
  11:12
**continual**
  20:14
**continually**
  65:9
**continuous**
  19:17
**contraband**
  35:7
**control**

Michael Alimenti
June 06, 2023

33:2

**conversation**
46:24 47:1,3
65:7

**conversations**
9:11 10:18,
22 40:21

**convey**
68:9,12

**cool**
49:1

**coordinate**
63:16

**Copy**
16:15

**corner**
35:24

**correct**
14:24 16:14
22:13 24:5,6
34:11 37:2,3
40:9,13
50:17 56:7,9
61:12 65:21
66:23 68:18,
19

**correctly**
50:19

**correspondenc
e**
9:15

**counsel**
4:11 9:13,
16,21

**countless**
47:18

**country**
9:6

**couple**
68:8

**course**
20:10,11
65:7 67:19
68:11 69:5

**court**
4:18 5:2
15:22 16:3

28:23 30:21
31:10,13
32:13,16
70:13

**courthouse**
33:9,23
35:3,11
36:18 38:8,
24 43:15,20
44:12,14
48:17 49:11,
17 50:14
51:2,22
52:3,5,10,
15,22 53:6

**courtroom**
50:12 51:6,
16

**covers**
59:17

**criminal**
8:17 9:1

**current**
7:4

**custody**
26:1 27:13
28:6,21
34:23

---

**D**

---

**D.C.**
56:1

**date**
11:18

**day**
27:8 37:17
38:21,23
56:16

**day-to-day**
8:5

**days**
13:12 38:10
56:15 67:20
68:8,22 69:3

**deadly**
17:2

**dealing**
38:15

**decided**
55:23

**decision**
48:16

**decision-
making**
67:21 68:1

**decisions**
68:2

**deemed**
8:4

**defendant**
49:13

**Defense**
8:9

**definitely**
28:15 64:14

**demeanor**
48:21 53:13,
18 67:22

**depart**
37:5 49:16

**departed**
37:14 50:14
51:11 52:10
53:5

**departing**
52:15,22
53:20

**department**
6:19,23 7:2,
7 8:6,8,10
10:1 17:7,17
19:3,6,10,
15,23 20:16
21:11 23:2
24:4,14,17
25:20 42:14
43:18 44:22
45:10,12
46:7,19
47:16,19
48:2,7 53:23
68:13 69:10,
13

**Department's**
17:2 22:5

**depending**
6:1 69:11

**depiction**
65:2

**deposed**
4:12

**deposition**
4:9,18 5:23
9:9,17,23
10:10,12,20,
23 17:9
70:11,15,18,
22

**describe**
13:4 19:13
54:5,20

**described**
44:15 47:15
51:18 53:13

**describing**
40:20

**designated**
23:21

**desire**
58:12

**desk**
35:19 47:13

**desks**
35:17

**detail**
11:7,13
12:3,14,21
13:6,11,18
39:7 55:6
68:20

**details**
58:9 59:7,24
61:10

**Diamond**
54:13,17,21
55:18 56:12
57:2,7 58:18
65:4 66:21
67:15

different
12:4 20:22
69:1
dignitaries
8:13,15
Diplomatic
6:19 19:24
22:23 25:18
54:23 64:12
directed
23:6
directions
59:21
director
37:22 38:4
disciplinary
22:5
disclose
38:6 41:3
42:5,22 43:5
disclosing
8:2
disclosures
46:9
discriminated
42:6
discrimination
14:7 42:9
discuss
10:7
discussion
56:13
discussions
10:11
disparaging
45:9
distracted
48:24
District
30:20 31:9,
10,13 32:12,
13,16 35:2
38:8
DNA
30:14

document
22:4 59:2
62:20
documents
9:21 59:24
doing
23:17 35:6
42:3,21
48:10 63:13
67:24
domestic
8:20
door
27:11
DOS
44:3,7
doubt
38:3
draft
39:10
draw
46:3
drive
48:16 51:23
driver
11:9 12:16
driving
31:16
drop
34:19
dropped
33:4
drug
8:19
DS
18:4 24:11,
24 43:18
44:3,7
67:10,18
68:10,14
DSS
18:3,13
DSS-APPROVED
18:17
duties
8:5

duty
17:20,24
18:2,13,24
20:20 21:4,
5,7,9,14
55:5 68:23

—————————

E

—————————

e-mail
39:1
e-mails
37:20
early
27:4
earshot
43:16 44:18
easier
5:1
EEO
43:10
EEOC
14:6
EER
38:16 39:8,9
41:5,8,11,15
effect
41:22 45:20
effects
52:14
egregious
45:8
eighty
19:19
either
21:6 32:21
else's
33:3
eluding
42:18 43:9
embarrassing
43:19 48:21
53:22
Embassies
8:24
embassy

6:21 7:14,16
employed
6:17,18
employee
38:11 40:18
69:13
employees
45:18
employment
27:5
ended
62:8
enforcement
7:7 8:3,7,10
17:18 19:4,
7,10,15,20
20:16 23:1
24:13 45:5,
12 47:17,19,
21,24 57:15
58:13 59:10
63:17
ensure
4:15 67:1
entering
33:23
entire
61:6 64:20
Eric
39:21 40:11
65:9
essentially
41:22 43:3
46:22
establish
63:17
established
17:13
evaluation
38:11 39:21
evaluations
40:17
events
30:8
everybody
69:20

Michael Alimenti
June 06, 2023

everyone's
  35:20
exactly
  15:4 28:18
EXAMINATION
  4:3
exception
  9:14 18:20
exchanging
  37:19
excludeing
  20:17
excluding
  15:18
excuse
  30:23
execute
  58:11 62:7,
  16
execution
  57:24
Exhibit
  15:7,8,9,10,
  20 16:12,13,
  17,21,24
  21:23 22:2,9
  43:14 54:2,
  4,6 55:8
  57:21 65:1,
  17
exhibits
  59:8
expected
  39:11
experience
  23:17 47:17
  58:23
experts
  9:5
explain
  26:3 55:15
expressed
  58:12
extensive
  20:15 21:10
  47:15

extent
  69:6
extra
  63:9

_____

**F**

_____

face
  35:20
facilities
  7:11
facility
  33:3,18
factfinding
  15:13,21
  16:6
facts
  68:3
fair
  11:23 17:9
  29:10
fall
  8:13
FAM
  15:11 16:15
  17:10,13,17
  18:7 20:17
familiar
  12:8 14:16
  16:20,23
  17:6,12
  19:21 22:4
far
  29:17 31:7
  38:10 43:9
  59:6
farm
  27:6,8
federal
  19:20 24:8,
  16 30:21
  36:10
feel
  15:11
fell
  23:7

felt
  42:6,23
  43:8,11
  58:7,9
field
  13:19 25:1
  27:2,15,21
  28:19,22
  29:11,24
  40:5 42:14
  46:14 49:7
  59:15
fifteen
  50:10
figure
  59:11
figured
  49:5,8
filed
  14:1,5 42:17
files
  52:18
filled
  59:16 62:21
filling
  40:17
final
  65:20
fine
  6:8 69:24
fingerprintin
g
  30:15
finish
  4:22,24
firearm
  18:22 21:13
  33:22 39:6
  41:15
firearms
  17:3,19,24
  18:12,20
  19:9 20:9,
  13,19 33:12
  52:9
fired
  45:19

first
  4:17 7:3
  8:12 11:5,6
  13:20 14:20
  46:12 63:3,4
  69:12,14
first-line
  39:24 40:15
fitting
  68:4,5
five
  20:24 31:15
  36:21 45:1
  47:12 69:2,3
five-day
  15:3,8,14
  16:8
focus
  9:8 20:1
  30:7 39:20
  54:1 62:22
focused
  42:21
focusing
  21:8
follow
  28:19
follow-on
  20:8
follow-up
  5:1
followed
  26:22 28:21
followings
  7:20
foot
  47:12
force
  17:2
foreign
  8:15 17:1
form
  6:5 61:14
  62:6
format
  60:24 61:13

Michael Alimenti
June 06, 2023

**formulate**
26:24
**forth**
17:13 39:1
**forward**
5:13
**found**
43:19
**four**
24:21 36:13
50:22 57:21
**four-day**
4:8
**fourteenth**
6:24 19:5
**fraud**
8:18
**front**
31:21 48:8
49:14 50:20
**full**
6:11 63:3,4

**G**

**garage**
32:19
**gather**
56:2
**gathered**
52:21
**gauging**
49:2
**gave**
52:24 53:2,3
**gear**
33:8
**geared**
46:18
**general**
27:17 37:23
38:4 64:15
**Generally**
60:18
**gestures**
5:22

**getting**
18:10 45:17
63:8,23
**gist**
41:16
**give**
4:14 13:9
39:8 49:1
**given**
33:24 58:10
62:15
**giving**
34:6 57:12
64:11
**Global**
37:16
**GLOCK**
21:2
**goal**
25:7
**goes**
4:16 44:1
**going**
5:13 10:6
18:1 26:13,
22 38:9,14,
20,24 42:15,
19 45:17
50:1 51:5,6
59:20
**good**
4:4 59:21
66:11,22
67:4
**grievance**
4:7 14:7,17
16:12,21,24
21:23 22:2,9
54:2,6 55:8
57:21 65:1,
17
**grievances**
48:7
**guards**
9:3
**guess**
19:19

**guidance**
58:10 62:15
**guide**
23:18
**guidelines**
17:13
**guy**
36:15 50:5
51:9
**guys**
39:2,15 50:6

**H**

**Haley**
68:21
**Haley's**
11:7
**half**
7:17 19:22
**hand**
26:12
**hand-holding**
64:15 67:1
**handed**
50:5
**handgun**
18:15,16
**handguns**
18:4,5,17
**handling**
20:1
**hang**
21:24 39:5
**happy**
64:8
**harassed**
42:24
**harassment**
43:2
**hats**
8:11
**head**
11:19 59:14
**hear**
15:22 16:3

44:6 47:9
49:3
**heard**
46:5
**hearing**
6:7
**held**
7:3 12:21
**Hello**
66:9
**help**
23:1,18
24:15 28:22
62:8
**helped**
62:4
**highly**
20:1
**hired**
20:21
**Hold**
14:10
**holding**
33:9 34:15
35:2,7,10
**hospital**
34:18
**hour**
14:21 49:4
**hours**
19:19 20:3
27:5 36:21
45:1
**house**
26:13,21
27:10
**HR**
37:16 38:3
**HSI**
24:19,22
25:3
**human**
10:1
**hurt**
28:7
**hurting**
53:10

---

### I

**Ideally**
26:16
**identification**
70:16
**identified**
9:22 21:19
23:11
**identify**
59:7
**identity**
25:10,13,14
**immediately**
30:8
**incident**
10:4,6 28:4
44:11
**include**
9:1
**included**
14:23 30:14
55:12
**indicated**
5:7 13:2
34:8 58:11
60:1
**individual**
25:19,21,24
26:6 35:16
**information**
8:3 18:10
56:23 59:6
61:10 62:20
**initial**
7:8 13:8
**initially**
20:21
**inquiring**
9:10
**inside**
33:8,16,20
34:2
**instances**
67:21

**instruct**
5:13
**instructions**
4:15
**instructor**
20:10
**Intelligence**
55:7
**Intelligent**
7:9
**intended**
27:4
**interacted**
47:18
**interaction**
13:7 68:17
69:6
**interactions**
11:3 13:3,17
68:20,23
69:4,11
**interview**
9:19 15:16,
19 16:5
38:12 54:7,
15,18 55:9,
13,16 56:12
57:1,3,11
66:12,20,23
67:5 68:15
**interviewed**
28:5 29:4
54:8,11
57:17
**interviews**
56:1
**investigates**
7:10
**investigation**
12:6 16:6
23:2 24:16
55:20,23
56:24
**investigation
s**
7:9 8:18,19,
20,22 9:2,20

55:7,20
**involved**
20:12
**irate**
48:23 51:19
**issue**
11:17 20:19
21:12 38:16
41:6
**issued**
18:5 21:16
**issues**
9:7 26:18
38:11,14
39:17,18
**items**
52:21

---

### J

**J.J.**
51:10,14
**Jabari**
26:7 31:1
32:24 33:4
38:10 56:16
**Jagels**
39:22 40:12,
24 41:4 64:4
65:10
**Jason**
4:6
**Jersey**
23:8 27:21
30:17,23,24
31:10,14
32:6,13
**Jersey's**
30:20
**job**
26:24 66:11,
22 67:4,24
**Joe**
40:4,19
**judge**
26:10 35:8
49:3,14

50:21
**justify**
41:15

---

### K

**keep**
42:20,21
**key**
34:1
**keys**
53:2,3
**kids**
27:10
**kind**
23:15 31:2
**knew**
54:21
**knives**
33:16
**knocked**
27:11
**know**
5:15,18 11:1
13:2 14:21
20:24 22:15
24:3 25:4
37:20,23
40:7,14
41:23 42:13,
18 45:22
46:1 47:15
48:1,2 50:2
52:20 54:3,
14,17 56:20
59:18,19,20
60:7,9,14,
17,21 61:6,
8,17 62:1,2,
24 63:13,14,
15,16,17
64:21 65:18
66:5
**knowing**
5:19
**knowledge**
13:24 17:16

Michael Alimenti
June 06, 2023

22:19 24:7,
19 25:23
28:8 37:12
52:8 57:8

**L**

**language**
7:13,21
43:18 48:12,
13
**large**
46:19
**lasted**
13:11
**lastly**
5:21 43:4
**law**
7:6 8:3,6,9
17:18 19:4,
7,9,14,20
20:16 22:24
24:12 45:5,
12 47:16,18,
21,24 57:15
59:10 63:16
**lawsuit**
14:8
**leadership**
20:11
**leading**
39:12 57:24
**leave**
34:20 49:21
51:14 53:1
**left**
36:15 46:3
51:16 52:18
**legal**
42:19 43:9
**liable**
33:1
**liaison**
12:7 23:14,
20 24:1
**licensed**
17:19,23

20:19
**limited**
4:15 11:3,24
13:3,17 58:6
**limo**
11:9
**limousine**
12:16
**line**
30:8
**lines**
10:15 43:10
63:3
**list**
18:3,17
20:22,23
61:10
**listed**
14:9 15:7
66:18
**lists**
59:22
**litigation**
42:12
**little**
28:13 34:1
41:10 49:12
59:7
**living**
25:14
**local**
22:24 24:14
59:10 63:16
**located**
18:7 30:19,
21 31:19
32:1
**location**
27:17
**lock**
34:2
**locked**
34:3
**locker**
32:22 34:1
**lockers**
33:18

**logistics**
59:12
**long**
6:22 31:12
36:17 58:6
60:3 64:9
**look**
16:11,16
21:22 22:8
43:13 54:3
57:20 64:17
65:16 69:17
**looking**
36:20
**lot**
23:17 32:17
35:22 42:11
47:7 58:8,10
59:13,17
60:8 64:14
66:24
**loud**
45:8 47:8
**loudly**
43:17 44:2

**M**

**made**
14:14 22:7
38:2 44:22
50:3 53:14
55:21 56:5,
17,18 64:9
65:11 67:14
**main**
8:11
**maintain**
33:2
**make**
38:20 44:7
46:6 59:2
62:9 63:15
64:6 68:2
**makes**
5:1

**making**
42:11 45:1,9
**management**
37:16 39:17
42:7,24 43:6
46:10 53:15
60:16,20
68:13
**manipulation**
20:2
**manner**
4:23 48:10
**Manual**
17:1
**maps**
60:9
**Marines**
9:3
**marked**
15:19 16:11,
21,24 21:23
**Marshal**
45:22
**Marshal's**
43:16 44:18
**Marshals**
32:20 33:5,
10 44:20
45:4 59:11
**Marshals'**
33:18 34:21
56:22
**material**
14:19
**materials**
14:23
**matter**
9:5
**Mauritania**
7:14,15
**mean**
12:2 13:6
14:9 28:12
29:14 36:21
38:9 41:6,20
44:24 47:4
48:5 51:13

Michael Alimenti
June 06, 2023

53:9,12
56:15 58:20
59:23 61:5
62:1 63:22
65:20 67:17,
19

**Meaning**
64:2

**meet**
11:5

**meeting**
58:23

**memorable**
50:9

**memorandum**
9:18 14:24
54:7 55:9,12

**memory**
50:24

**mention**
43:7

**mentioned**
10:5 24:4
43:1

**messages**
37:20

**met**
11:6 32:20
33:8

**michael**
4:1 6:12

**middle**
35:17 65:6

**mind**
50:9 60:8

**minimal**
19:19

**ministers**
8:16

**minute**
59:23 66:3,4

**minutes**
31:15 50:10

**missing**
58:8 61:11

**MOI**
15:9

**moment**
16:16,17
19:18 22:14
62:23

**month**
20:12

**months**
69:5

**morning**
4:4 27:4
66:2

**motherfucking**
44:3

**moved**
51:15

**moving**
47:6 58:8

**multi-agency**
22:21

**multiagency**
22:22

**multiple**
44:9,24

**Muscat**
7:17,18

---

**N**

---

**name**
4:5 6:11

**named**
14:1,5

**narrative**
68:6

**narratives**
68:5

**Natasha**
54:13,17,21
55:17 56:11
57:2,7 58:18
66:21 67:15

**nature**
6:1

**need**
5:14,24 17:5
68:1

**needed**
48:24 59:6,
19 63:9
64:14

**negative**
65:10

**negatively**
43:17

**never**
14:5,14 42:8
43:1 65:11

**Ngai**
4:5

**night**
38:12,18,20

**Nikki**
11:7 68:21

**non-attorney**
10:2

**non-state**
45:11

**notes**
69:18

**noticed**
10:10

**notions**
68:4

**Nouakchott**
7:14

**number**
25:14 49:11,
13

**NYFO**
46:14 64:3

---

**O**

---

**oath**
57:12

**object**
5:9

**objection**
5:12 14:11
61:21

**objections**
6:6

**observe**
13:19

**observed**
29:11

**observing**
29:15

**obtained**
28:5

**occurred**
30:8 63:19

**off-duty**
18:11,19

**office**
7:9,19 9:19
23:15 25:2
27:2,15,21
28:20,22
30:1,19 34:1
40:5 42:14
43:21 46:14
48:18 49:7
51:23 52:6,
11,16 53:7
55:19 59:15

**officer**
7:16 19:4,7,
10,15 20:17
26:17 47:17
57:15

**offices**
35:16

**official**
8:7 12:14

**officials**
17:18 47:19,
21

**okay**
6:3,9,14
10:8 11:1
12:9 14:22
15:12,18
16:15,19,23
21:24 22:18
23:12,19
24:3 25:19
27:23 32:5
37:8 38:21

Michael Alimenti
June 06, 2023

41:17 42:4
52:2 54:1,4
55:8 57:22
62:22 63:6
64:23 65:23
66:3,7 67:7
70:9,17
**Oman**
7:17
**on-duty**
21:17
**Once**
26:11
**one**
11:13 13:21
18:14 21:16
22:11 28:23
32:18 35:24
36:10 41:12
45:18,21
48:4 52:24
56:18 60:22,
23 61:24
62:23,24
**ones**
18:5
**ongoing**
42:12
**open**
55:23
**open-air**
35:23
**operate**
17:6 23:9
**operation**
22:21 23:4,
10,13 24:5,9
25:7,8,20
27:18,24
28:11,14
29:3,12,13
30:5,9,23
58:2,4,7,13,
22,24 59:3,4
60:1,6,13,
15,18,19
61:3,4,11,
13,19,20

62:7,11
66:17,18
**operations**
8:12 24:20
62:9,18 69:1
**opinion**
47:20 66:19
68:16 69:13
**opinions**
69:9
**order**
17:6 62:9
67:1
**organizations**
48:9
**OSI**
15:17
**Otieno**
4:3,5 6:4,9,
10 15:24
16:2 69:16,
22 70:3,9,20
**outside**
26:17,18
48:13,14
**overlapped**
55:3
**overseas**
7:11 8:22,23
9:1
**owned**
17:19 18:19
21:13

---

**P**

**page**
22:9 43:14
57:20 62:22,
24 64:17
65:1,16 67:7
**pages**
58:6 60:3,8
62:3
**Palmero**
54:12,15
55:17 56:11

57:2,7 58:17
65:3 66:21
67:14
**paragraph**
18:12 22:9,
15 43:14
57:20 62:23,
24 63:3,4
64:17,21
65:1,6,17,
18,20 66:1
67:8
**paraphrasing**
46:21
**park**
33:6
**parked**
33:7
**parking**
35:5
**part**
25:19 29:12
46:8
**participate**
28:9 55:16
**participated**
22:20 24:8,
19 28:15
**participating**
15:19 16:4
23:13 30:4
**parts**
58:9
**passenger's**
32:3
**passport**
25:17
**pause**
16:18 22:17
63:5 64:22
65:22 66:6
**people**
36:14,15,16
45:4,5 46:2,
3,14 47:9
59:12 62:4

**percent**
51:8
**perception**
64:12
**performance**
40:17
**performing**
21:17
**perimeter**
35:17
**period**
11:14
**permitted**
21:15
**person**
8:19 26:15
27:12 28:20
39:6 45:21
49:3 53:1
**personal**
11:17 17:24
18:24 20:19
39:6 52:14
**personally**
17:19 18:19
21:13
**personnel**
7:10 45:13
**pervasive**
46:18
**Pete**
39:22
**Peter**
65:10
**Philadelphia**
7:19 11:4,8,
11 12:1,5,
14,22 13:14,
19 27:16,22
30:18,24
31:13 32:6
48:18 49:7
51:23 52:6,
11,16 53:6
55:24 60:11
**Phipps**
11:5

Michael Alimenti
June 06, 2023

phone
  10:13 37:5,
  10 38:2
  39:12,13
  45:7 46:13,
  17
photographing
  30:15
photos
  60:8
physically
  29:6,20
  51:2,16
pick
  43:22 51:21
  52:1
picked
  45:16 49:6,9
picking
  43:2
pieces
  61:7
PII
  15:17
place
  26:14 27:5,
  19,20 35:23
  44:11 56:22
plan
  26:24 38:15
  51:13 58:5,
  11,24 60:1,
  6,13,15,20
  61:3,11,19
  62:7,9,16,19
  63:15
planning
  27:3 59:24
  61:14
plans
  59:14 63:18
played
  26:5
please
  5:18 6:10
  16:11 21:22
  22:8 54:2,5

66:5
point
  18:9 25:16
  35:1 37:4,8
  64:3 67:2
police
  24:14 36:9
policies
  34:22
policy
  17:2 21:2
  41:5,19
port
  33:6
position
  7:3,4 12:15,
  18
positions
  8:21 12:4
possible
  4:16 51:11
post
  11:9 12:24
  34:1
practical
  58:6
pre-approved
  18:21
preconceived
  68:4
preparation
  9:9
prepared
  9:16 59:8
presence
  56:5
present
  29:6 34:13
  44:21 51:2
presented
  26:9
pretty
  13:15 32:10
  37:21 38:1,
  17 39:2,11,
  13 48:23
  49:24 50:23

previously
  44:15 61:9
  62:10
primarily
  8:20 21:8
primary
  21:7 25:7
prior
  17:9 26:9
  49:21 51:12
  54:15,17,21
  57:12
prisoner
  32:1,14 33:2
  34:8,13 36:5
Prisons
  34:24 36:8
privacy
  35:23 48:14
private
  7:5,6 47:1,3
privately-
owned
  18:22
probably
  10:16 33:19
  36:22 47:18
  69:14
proceed
  5:13
proceedings
  16:18 22:17
  63:5 64:22
  65:22 66:6
process
  4:16 32:14
  42:19
processed
  30:14 32:15
  36:5
processing
  27:16 28:22
produce
  4:19
profane
  43:18

profanity
  44:8,23 46:8
  47:22 53:15
profanity-
laced
  48:10
professional
  56:21
programs
  8:24
prohibited
  18:20 21:19
prohibition
  17:23
prohibits
  17:17
promotions
  10:14
proposed
  15:3,8,14
  16:8 22:5
protection
  8:13,21
  13:20 59:1,3
protective
  7:9 8:12
  12:2 55:7
protocols
  63:18
provide
  55:11 57:16,
  17
provided
  14:20 19:8
  20:18 21:11,
  18 33:18
  65:3
pull
  32:19
put
  27:14 33:15
  34:2,15 35:7
  61:7 62:2

Michael Alimenti
June 06, 2023

## Q

**qualifications**
 20:5,7
**question**
 4:22 5:1,10,
 17,20 6:2,6
 14:13 15:23
 63:21
**questionable**
 67:21
**questions**
 5:22 41:9
 69:18 70:4,
 6,8
**quieter**
 41:10
**quit**
 67:10,18
 68:10,14
 69:10
**quote**
 44:2

## R

**RAC**
 56:19
**radio**
 63:17
**rater**
 39:20 40:18
 55:22
**read**
 14:20 17:10
 18:9 22:14
 59:1 62:24
 64:20 65:18
 66:4
**reading**
 15:11 22:4
**ready**
 35:8 49:13
 58:2,21

**realized**
 26:22
**reason**
 4:21 5:15
**recall**
 11:15 12:20
 23:3 24:10,
 23,24 25:4,
 12,15 27:6
 28:12 30:6
 31:7,20,23,
 24 33:14,21
 34:5 36:8,
 11,20 37:21
 39:16 41:21
 44:20 50:19
 51:17 61:14
 64:7
**recipients**
 13:9
**recognized**
 10:16
**recollection**
 51:8 57:11
**record**
 16:3 54:10
 70:2,12,14
**reduced**
 21:3
**refer**
 44:7
**referred**
 15:20
**referring**
 44:2,22 46:7
 53:15 65:24
**refrain**
 5:21
**regarding**
 10:11,19,23
 13:18 41:5
**regulations**
 17:7
**relationship**
 13:4,10
**relative**
 4:6 16:7

 56:23
**relevant**
 59:5 62:20
**remain**
 34:13,19
 35:11
**remanded**
 28:6 34:23
**remember**
 24:24 45:21
 51:4,5,6
**removed**
 32:15 45:16
 48:24 52:21
**render**
 69:9
**rendered**
 69:12
**renewal**
 25:17
**repeat**
 15:24 17:4
**repeated**
 67:20
**Reply**
 15:9
**report**
 36:21 38:11
 40:19
**reporter**
 4:18 5:2
 15:22 16:3
 70:13
**represent**
 4:5
**representative**
 23:15
**represented**
 4:10 5:8
 24:13
**required**
 57:16
**reserved**
 6:6
**residence**
 26:17,18

 27:9,12,19,
 20
**resident**
 7:19 23:22
 48:19 51:20
 53:17 56:19
**resolve**
 5:12
**resources**
 10:1
**respect**
 4:9 12:21
 23:3 25:6
 27:18 28:10
 30:3 40:11
 45:14 61:3,
 19
**response**
 66:8
**responsibility**
 8:14 12:5
 23:7 34:9,18
**responsible**
 8:23 40:16
**restate**
 63:21
**retaliated**
 43:6
**return**
 37:9
**returned**
 7:18 50:16
**review**
 15:2
**reviewed**
 9:18,20
 14:23 15:5
**reviewer**
 39:20 40:19
 55:22
**rewrite**
 62:8
**ridden**
 49:8
**ride**
 31:12 52:5,

10

**right**
4:14 5:7
43:13 64:14
69:16

**river**
30:17

**Rivera**
10:23

**Rob**
10:3 23:22
48:20 49:23

**Robert**
10:9 23:24
40:1,14,16

**role**
12:11,17,20
15:18,20
23:12,21
26:4 29:2
30:4

**room**
33:9 35:16
50:20

**rules**
17:7 18:6

**run-of-the-mill**
64:15

---

**S**

**SA**
44:1

**safe**
32:23 34:4

**safety**
26:18

**sally**
33:6

**samples**
30:15

**SAS**
57:23

**sat**
36:14

**saying**
4:19 21:18
42:15 64:5

**says**
58:20

**scenario**
36:7 47:23

**scene**
23:1 24:14,
15

**scheduled**
51:21

**school**
27:11 48:5

**scores**
20:7

**screw**
39:3,4 42:3
46:19

**screwing**
41:1

**scrutiny**
63:9,23

**search**
26:8 35:6

**seat**
31:21

**second**
4:24 8:17
19:22 32:18

**second-line**
40:2

**secondary**
18:12,15,16,
19 21:7

**Secretary**
8:14

**secretary's**
55:6

**section**
18:11 45:18

**sectioned**
35:18

**sector**
7:6

**secure**
32:21,22

**secured**
29:8,22
30:10 33:7,
11,22 52:9

**securing**
8:24 29:2

**security**
6:20 7:16
8:9 9:5
19:24 22:23
25:18 54:24
64:12

**security-related**
9:7

**see**
5:23,24 22:3
26:13 35:19,
20 42:16
43:23 44:4
58:14 65:12
67:11 69:18
70:16

**seeing**
61:15

**senior**
12:18

**sensitive**
8:3

**sentence**
67:8

**September**
15:13 16:7

**served**
7:15

**service**
18:16 19:2
22:23 25:18
43:17 44:19
54:24 59:11
64:12

**serving**
6:20 12:13

**set**
26:12

**she'll**
4:19

**shortly**
49:15

**shoulders**
35:20

**show**
59:9

**showed**
61:24

**shown**
62:17,19

**sick**
34:17

**side**
32:3

**SIG**
20:23

**signed**
28:24

**sit**
33:10 47:7

**sitting**
35:19 36:2,
4,23,24
37:19 38:2,
22,23 45:6
47:4,12,13

**situated**
35:13

**small**
35:24

**smoothly**
4:16

**sought**
59:10

**sound**
68:3

**Southern**
23:8 30:20

**speak**
9:24 45:13

**speaking**
10:4,9 37:13
46:24 60:18
65:9

**special**
4:6 9:19
10:19 11:1,

20,24 12:18,
20 13:18
14:2,6,17
15:14 18:14
22:20 23:5,
20 24:1 26:4
28:9 29:1,7,
11,21 30:3
31:5,18 32:9
33:21 34:12
35:10 36:3,
18 37:1,4,8,
13 38:5
39:16 40:5,
21,23 41:2,
17,24 42:4,
22 43:4 44:6
46:6 48:17
49:16 50:14
51:1,18,22
52:3,9,13
53:5,7,17,19
54:12,13,14,
21 55:1,2,
17,19,21
56:5,11
57:2,6
58:17,21
60:2,5,12
61:18 62:14
65:3 66:21
67:14 68:9,
17,23 69:4,7

**specific**
19:24 20:18
21:12 58:9
60:22

**specifically**
29:14

**specificity**
58:7

**spell**
6:11

**spelled**
40:7

**spent**
56:15

**spoke**
43:17 53:17

**spoken**
51:19

**staff**
11:12 45:3,
22

**stand**
47:7 57:5

**standard**
62:12

**standing**
47:6

**Stanley**
4:11

**started**
7:7,23

**starting**
66:1

**starts**
19:18

**state**
6:10,19,23
7:2,6 8:6,8,
10,15 10:1
17:17 19:4,
6,11,16,23
20:16 21:11
23:2 24:4,17
44:1,23 46:7
47:16,20
69:11,13

**State's**
25:20

**stated**
58:4 63:7
65:8 66:22
67:3,9

**statement**
17:8 30:13
57:6,18
58:17 66:14
67:13

**statements**
55:11 56:2
57:13,16
64:24 65:2

**states**
18:12,13
43:15 44:17
57:23 63:7
65:7 66:10
67:8

**stationed**
8:5

**stay**
34:22 49:20
50:4 53:1

**stayed**
38:14 49:22
50:7 51:14,
15

**stipulate**
6:5

**stop**
20:14 43:21

**store**
33:17 34:5

**stored**
33:14,22

**strong**
68:1

**stuff**
10:14 33:16
34:2,5 41:14
42:16,17
45:23 50:1
53:3 60:9

**subject**
9:4 14:15
23:10 25:9
28:3 29:5
31:22 33:1,5
59:8,9
66:12,23
67:5

**submit**
60:5

**submitted**
58:5 60:2

**substance**
10:7

**succeed**
58:12

**successful**
27:24 29:13
62:11 66:18

**superficial**
41:8

**supervised**
11:20

**supervision**
63:10

**supervisor**
39:24 40:3,
15 48:1 64:4

**supervisors**
38:18 39:3
46:13 48:15
64:2 65:9

**supervisory**
40:11

**supervisory-
subordinate**
12:10

**supposed**
49:3 59:15

**sure**
7:5 8:8 13:1
15:24 21:24
28:18 32:10
38:20 50:23
51:9

**surprise**
24:23 25:5

**surveillance**
26:12,20

**suspension**
4:8 15:3,8,
14 16:8

**swear**
63:14

**swearing**
70:17

**switched**
21:1

**swore**
26:7

**sworn**
4:1 45:3
57:12

Michael Alimenti
June 06, 2023

**T**

**table**
35:24 37:1,
19 45:6
47:5,11
**tactical**
20:11
**Tahoe**
31:4
**take**
4:8 5:14 7:1
8:4 16:16
22:14 30:11
32:13,20
33:5 34:17
37:5 47:14
62:23 66:4
69:17
**taken**
22:6 25:9,
13,24 28:20
30:12 35:2,9
56:22 70:1
**takes**
20:3
**taking**
4:18 30:14
37:9 70:18
**Talent**
37:16
**talk**
48:5
**talking**
5:3 10:15
11:14 37:15
39:2 43:21
48:14 53:11
63:2
**target**
28:10 29:2,
22 30:22
31:3,6,9,24
32:6 35:1,9
49:18,21
50:15 51:3,

12
**target's**
27:18,20
30:10,12
**targeting**
43:8,12
**tasked**
23:9
**TDY**
11:19 13:14
25:1 55:4
**team**
9:6
**technically**
7:21
**telephonic**
4:17 5:23
70:15,22
**tell**
9:16 15:4
20:2 62:5
**telling**
37:22
**temporary**
55:5
**ten**
31:15 50:10
**ten-minute**
69:17
**terms**
26:5 39:17
**Terrence**
10:19 56:13
**testified**
53:16 61:9
62:10 66:16
**testimony**
50:13 57:6
61:1
**text**
37:20
**thank**
15:6 70:10
**thing**
10:6,17
33:24 48:4
61:6

**things**
9:5 59:13,17
64:6 70:5
**think**
10:5 11:6,8
12:23 13:11
27:8 29:21
31:8 32:18
33:15 34:3
36:1,10,21
38:19,23
39:21 43:7,
11 49:2,23
51:24 52:17
54:16 55:4
62:8 64:3,4
67:23 69:16
70:10
**third**
7:20 65:24
**thought**
56:21 67:9,
18
**thousand**
51:8
**threatening**
65:11
**threats**
7:10 42:12
**three**
7:20 8:11
20:5 31:6
63:2 65:17
**time**
5:4,9,15 6:7
11:14 13:16
14:20 30:7
36:13 39:20
49:1,5,8
50:2,8,10
54:24 69:12,
14 70:4,10
**times**
20:5 44:9
**today**
4:9 15:11
57:5 70:10

**today's**
9:9,17
10:11,19,23
17:9
**Todman**
4:11 5:8,11
6:4,8 14:10
61:21 69:21
70:5,7,19
**told**
48:20 57:23
**top**
11:19 35:19
59:14 63:3
**total**
19:2 68:22,
24
**trafficking**
8:19
**training**
7:8,13,21
19:8,14,17,
20,23,24
20:6,10,12,
13,18 21:12,
19 55:2
**trainings**
20:8
**transcript**
4:20
**transport**
30:16 31:3
32:1 33:12
52:4
**transported**
27:15 28:4
30:22 52:4
**transporting**
31:9 32:5
**trauma**
59:21
**treated**
46:11
**treating**
46:15
**true**
45:23

**truthful**
 57:7,16
**try**
 4:23 5:15
 42:3 59:11
**trying**
 23:18 26:23
 39:3,4,5,7
 41:9,13,21
 42:20 45:24
 46:15,19
**turn**
 70:5
**twenty**
 35:15,16
**twenty-third**
 19:6
**two**
 5:2 7:15,17
 13:11 18:12
 21:3 22:9
 29:22 36:13
 38:10 43:14
 45:18 56:15
 64:18 65:1
 67:19 69:1
**two-day**
 68:17
**type**
 12:10 19:14
 27:6
**Tyson**
 11:21,24
 12:21 13:3,
 5,18 14:2,6
 15:3,15
 22:6,20 23:5
 24:1 26:5
 28:9 29:1,7,
 11,21 30:3
 31:6 32:9
 33:22 34:13
 35:10 36:4,
 19 37:1,5,9,
 13 38:5
 40:22,23
 41:2,18,24
 42:4,22 43:5

 44:1,6,21
 46:6,24
 48:17 49:16
 50:14 51:1,
 18,22 52:3,
 9,13 53:5,8,
 19 56:4
 58:21 60:5,
 12 61:2,18
 62:15 68:10
 69:7
**Tyson's**
 14:17 45:14
 53:18
**Tyson-phipps**
 4:6 11:2
 31:19 39:16
 58:1,5,8,10,
 12 60:2
 63:8,22 65:8
 66:11,22
 67:4,9,18
 68:13,18,24
 69:4
**Tyson-phipps'**
 16:7 23:20

―――――――――

**U**

―――――――――

**U-G-A-R-T-E**
 40:8
**U.S.**
 6:18,21 8:24
 25:17 30:19
 31:9,13
 32:12 33:10,
 18 43:16
 44:18,20
 45:3 64:7
**Ugarte**
 40:4,7,19
**ultimately**
 25:24 50:16
 55:12 60:15
**unacceptable**
 48:22

**uncommon**
 47:21
**undergo**
 19:14
**underground**
 32:19
**understand**
 5:5,17,20
 10:8
**understanding**
 14:4 17:22
 18:6,18 19:1
 22:1 56:10
 63:12
**understood**
 5:19
**uniform**
 36:11
**United**
 18:13
**unprofessiona
l**
 53:22 67:22
**upset**
 37:21 38:1,
 6,17 39:2,11
 40:23 49:24
 53:14

―――――――――

**V**

―――――――――

**vehicle**
 27:14 28:21
 31:2,16
 32:2,4,15,23
 33:6,7,12,16
 34:4 35:5
 45:17 49:6,
 10 50:3
 52:4,15,19,
 22
**vehicles**
 9:4
**venue**
 48:22
**verbal**
 66:8

**Vineland**
 27:21
**violated**
 41:4
**violation**
 41:19
**visa/passport**
 8:18
**visit**
 11:11,16
**visiting**
 8:15 45:5
**vocal**
 39:13,14
**volume**
 47:9
**voluntary**
 57:3,10

―――――――――

**W**

―――――――――

**wait**
 5:11 66:3
**waited**
 27:10
**waiting**
 36:5 37:6
 38:7
**walk**
 50:11 52:2,
 23 63:20
**walked**
 50:6
**walking**
 23:16
**Wallace**
 10:19 50:4
 52:1 55:22
 56:6,13
**want**
 9:8 25:11
 30:7 54:1
 62:22 69:17
 70:14
**wanted**
 26:16 64:6,
 13

Michael Alimenti
June 06, 2023

warning
  9:10
warrant
  26:8,9,11
  63:14
warrants
  28:24 58:1
Washington
  56:1
waving
  47:6
way
  5:18 41:12,
  15 46:8,10
  47:2 65:10
weapon
  11:17,18
  18:16,24
  20:22
weapons
  18:2,3,19
  19:21 20:1,
  23 21:1,3,16
  26:19 32:21
  33:8 35:6
  59:19
wear
  8:11
went
  7:8,12,16
  26:23 27:7,
  10 38:2
  50:23 53:2
  67:2
whatnot
  30:15
whispering
  47:5
withdrawn
  28:13 38:19
witness
  56:4,13
  69:24 70:16,
  18
witnessed
  68:7

wives
  48:3
word
  42:8 43:1
work
  13:4,15
  26:23 30:3
  38:14 52:14
  69:20,23
worked
  6:22 11:23
  46:22 51:19
  67:20
working
  56:17
works
  69:21
world
  7:11
would've
  40:4 49:13
  62:19
write
  55:9
written
  15:8 41:12
wrote
  54:8

—————————

          Y
—————————

Yaoundé
  6:20 7:23
yeah
  16:15 24:21
  35:4 39:19
  43:7 45:15
  46:2 51:6,7
  52:17 53:21
  62:13 64:1,
  19 70:7
year
  6:24 7:20
  11:15 20:6
years
  7:15,17,20
  19:2 24:22

25:15 50:22
68:1 69:5
York
  11:10,12
  27:2 40:5
  46:14