# Exhibit I

Terrance Wallace
June 01, 2023

FOREIGN SERVICE GRIEVANCE BOARD
FSGB 2022-041 TYSON-PHIPPS
TELECONFERENCE DEPOSITION OF:
TERRANCE WALLACE
APPEARING REMOTELY FROM
SANTO DOMINGO, DOMINICAN REPUBLIC
June 1, 2023        9:04 a.m.
MYREL J. WILLIAMS
COURT REPORTER

Terrance Wallace
June 01, 2023

APPEARANCES:


Representing the Grievant:

BY:  LAURIS NGAI OTIENO, ESQ.

Avery Dooley & Noone, LLP

3 Brighton Street

Belmont, MA  02478

(617) 489-5300

notieno@averydooley.com


Representing the Agency:

BY:  STANLEY TODMAN, ESQ.

U.S. Department of State

2201 C Street NW

Washington, DC, 20520

(202) 647-4000

todmanst@departmentofstate.gov


Also Present:  Jason Tyson-Phipps

Terrance Wallace
June 01, 2023

I N D E X


WITNESS:                           TERRANCE WALLACE




EXAMINATION BY:                                    PAGE:

Mr. Otieno                                          4

Mr. Todman                                          58


                           EXHIBITS


   (Exhibits premarked and retained by Mr. Otieno.)


   No.       Description

   1         Proposed Five-Day Suspension

   2         Written Reply

   8         Wallace MOI-5-29-19

   22        Updated 12 FAM 092 Dept Firearm Policy

Terrance Wallace
June 01, 2023

P R O C E E D I N G S

REPORTED REMOTELY FROM SPRINGFIELD, MASSACHUSETTS

June 1, 2023, 9:04 A.M.


TERRANCE WALLACE,

having first been satisfactorily identified, and

duly sworn by this notary public, was examined and

testified as follows:


DIRECT EXAMINATION

BY MR. OTIENO:

Q.    My name is Attorney Ngai Otieno.  I
represent Special Agent Jason Tyson-Phipps
relative to his grievance to the Grievance Board
regarding a four-day suspension.  I've been asked
to take your deposition today with respect to that
action.  You are represented by Agency Counsel,
Mr. Stanley Todman.

Have you ever been deposed before?

A.    Not in a setting like this.  I have
testified in court but not during, like, a
deposition like this.

Q.    Okay.  Let me give you a few limited
instructions so that we can make this process as
smooth as possible.

Terrance Wallace
June 01, 2023

Before I begin, I do hear some background noise.  I don't know where that is coming from.

First, this is a telephonic deposition.  There is a court reporter that is taking down what we're saying.  She will produce a transcript.  I ask that you allow me to finish my questions before you answer.  It makes it easier for the court reporter to take down what we're saying as opposed to the two of us talking at the same time and talking over each other.

You are represented by Attorney Todman from the Agency.  From time to time, he may object to a question I ask.  If that's the case, I would ask for you to wait for us to resolve the objection and then Attorney Todman will instruct you on how to proceed.

If you need to take a break for any reason, just let me know and I'll try to accommodate you.  If you don't understand a question, please let me know.  Otherwise, I have no way of knowing.

Do you understand those instructions?

A.    I understand the instructions.

Q.    Lastly, when you're answering, please

refrain from gesturing as a means of answering. This is a telephonic deposition, and I will not be able to see you.  So please answer yes or no or however appropriate and speak loudly and clearly so everyone can hear you.

MR. OTIENO:  Attorney Todman, can we, again, stipulate that except to the form of question all objections are reserved until time of hearing?

MR. TODMAN:  That is fine.

BY MR. OTIENO:

Q.    Okay.  Please state your full name and spell your last name?

A.    Terrance Frederick Wallace.  My last name is spelled W-A-L-L-A-C-E.

Q.    And how old are you, Mr. Wallace?

A.    46.

Q.    Where are you currently employed?

A.    I am the Assistant Regional Security Officer for Investigations at U.S Embassy Santo Domingo in the Dominican Republic.

Q.    How long have you held this position?

A.    I've been here for approximately 23 months.

Q.    Can you take me through your career

Terrance Wallace
June 01, 2023

with the Department of State beginning with your first position held until the most recent?

A.    Yes.  I joined the Department of State in March of 2011.  My first assignment was to the Washington Field Office in Washington, D.C. I was there for three years.  From 2014 to 2015, I served at the U.S. Embassy Baghdad in Iraq.  2015 to 2018, I served in the Criminal Fraud Investigations Unit at our headquarters in Rosslyn, Virginia.  From 2018 to 2020, I was at the Philadelphia Resident Office as a special agent.

I then went on to my assignment training for this assignment where I was doing language training and updating my regional security officer training and stuff like that from '20 to '21.  Then I reported here in July of 2021. I started working as the ARSO-I at U.S. Embassy Santa Domingo.

Q.    Again, your current position, can you describe for me what your general day-to-day responsibilities include without touching on anything that deals with classified information or law enforcement sensitive information?

MR. TODMAN:  Hold on, Mr. Wallace.

Don't reveal any substance of any communications that you had with me or any other attorneys within the department.

THE WITNESS:  Okay.  I understand. My day-to-day responsibility is I'm a special agent that sits in the councilor section where VISAs are issued.  My primary responsibilities are to investigate passport fraud, VISA fraud, and alien smuggling that have connections to the U.S. and the U.S. Embassy.

BY MR. OTIENO:

Q.    With respect to today's deposition, I want to focus on how you prepared for today and what documents you reviewed and who you spoke with, with the exception of any communications, discussions with Agency counsel, or any Agency attorney.

Can you describe for me how you prepared for today's deposition, if at all?

A.    Yes.  I spoke with Mr. Todman on the 22nd.  And in preparation for this deposition, I reviewed the e-mail I sent on Wednesday, May 15th, 2019, and then I reviewed the memorandum of interview where Special Agent Brian Palmero and

Special Agent Natasha Diamond interviewed me at the Philadelphia Resident Office.

Q.    Did you review the Agency's 12-FAM-092 Department Firearm Policy?

A.    That was one of the exhibits that was sent my way.  I haven't reviewed it, but I can do that right now if you want.

Q.    No, that's okay.  Did you review a proposal for five-day suspension issued to Mr. Jason Tyson-Phipps?

A.    It was also one of the exhibits sent my way.  I didn't review it.

Q.    Okay.  Did you speak with anyone from human resources or any other non attorney at Department of State regarding today's deposition?

A.    I told my supervisor that I would be unavailable from 9:00 to 11:00 because of the deposition, but I didn't get into the substance for what the deposition was about, just that I wouldn't be reachable during this time.

Q.    Okay.  And just for the record, who is your supervisor, your current assigned supervisor?

A.    My current supervisor is Nicolas Derion, D-E-R-I-O-N.

Terrance Wallace
June 01, 2023

Q.    Do you know Mr. Special Agent Jason Tyson-Phipps?

A.    I met him.

Q.    And when did you first meet Special Agent Tyson?

A.    On May 19th -- excuse me -- May 15th, 2019, is when I first met him.

Q.    Other than meeting Special Agent Phipps on May 19th -- excuse me -- May 15th, 2019, did you ever work with him after that date?

A.    No, I did not work with him after that date, but I believe a year before, we were both assigned to the same chutes assignment at the U.N. General Assembly in New York, but we did not work with each other there.  We were on different chutes.

Q.    When you say "chutes," what do you mean by that?

A.    Chutes, spelled, C-H-U-T-E-S, is where the motorcade enter the secure area for the general assembly.

Q.    Okay.  So you guys were working the same chutes, but you didn't technically work together; is that correct?

A.    Correct.  We were on this -- we were

ultimately assigned to the team that worked the

chutes, but there's five or six different chutes

entrances and exits that the teams are broken up

to manage.  So we were not assigned to the same

physical chute.

Q.    Okay.  So other than your initial

interaction with Mr. Tyson on or about May 15,

2019, is it safe to say that you had no prior

interaction with Mr. Tyson?

A.    Correct.

Q.    Is it correct to say that you never

supervised Special Agent Tyson?

A.    No, I never supervised him.

Q.    Okay.  Have you ever been named in

any complaint in which Mr. Tyson filed?

A.    Not that I'm aware of.

Q.    Can you -- are you familiar at all

with Mr. Tyson's grievance to the Grievance Board

other than, you know, obviously, being notified

for a deposition?

A.    No.

Q.    I understand that you were

interviewed in relation to an investigation of

Mr. Tyson-Phipps.  Other than participating in an

interview or providing information that was

Terrance Wallace
June 01, 2023

memorialized in a memorandum of interview, did you assist in any fact finding relative to Mr. Tyson's five-day suspension?

A.    No.

Q.    And how did you become involved in an interview with respect to Mr. Tyson's case?

A.    I reported to my supervisor that I was concerned with some of the statements that Mr. Tyson-Phipps was making when I picked him up from the courthouse in Camden, New Jersey, and brought him back to our Philadelphia Resident Office.

Q.    Okay.  We'll get into that more later.  I want to shift focus now to -- could you please look at what's been marked Exhibit 22, Grievant Exhibit 22?

A.    Yes.  I have that up now and 12-FAM-092, Department State Deadly Force and Firearms Policy.

Q.    Yes.  Can you take a moment to review that and let me know when you're done?

A.    Yes, sir.

I have reviewed 12-FAM-092.

Q.    Are you familiar with this policy being an employee with the Department of State for

Terrance Wallace
June 01, 2023

years?

A.    Yes.

Q.    And is this a policy you have reviewed in the past?

A.    Yes.  It has been modified a couple of times over the years, but, yes, I have reviewed the Department of State Deadly Force and Firearms Policy previously.

Q.    Can you describe for me some of the training you've received concerning the Department of State Firearms Policy?

A.    I'm sorry.  I don't understand the question.  Can you rephrase?

Q.    Sure.  You are a law enforcement official with the Department of State; correct?

A.    Yes, sir.

Q.    And are you required to possess and essentially utilize a firearm as part of your duties?

A.    Yes.

Q.    Are you required to undergo training annually with respect to firearms use?

A.    We're required to go -- every four months we are required to go -- when we're domestic, we're required to go to the range to

qualify on the firearms -- on our firearms.  When we're overseas, we're required to do familiarization fires at least once a year on those firearms.

Q.    Okay.  And with respect to your training concerning firearms, have you received any training that addressed the issue as to whether agents are allowed to carry personal weapons on their person while on duty?

A.    Carrying personal weapons on duty is, to my knowledge, against policy.

Q.    And if you could, a little clearer, explain why it's your understanding to carry a personal firearm on duty is a violation of Agency policy?

A.    Because it's -- when you're on duty -- I'd have to find that specific policy, but to my understanding, it is a requirement to carry your service-issued weapon, either the Glock 19 or the Glock 26 during the course of official duties.

Q.    With respect to secondary firearms, what, if any, is your understanding as to the policy allowing agents to carry secondary firearms on their person while on duty?

A.    We used to have a policy where you

Terrance Wallace
June 01, 2023

were allowed to register a personally-owned weapon that would be your secondary, but after they started issuing us two weapons, the two pistols, the Glock 19 and Glock 26, we were encouraged to carry one of those two weapons.

But in reviewing this policy, I would say the off-duty carrying of the service weapon or on-duty carrying is permissible -- you have to -- well, according to this, no secondary handgun is authorized unless there is written documentation with DSS, Diplomatic Security Service, fully identifying the weapon and the date which such carry is authorized.

From my understanding, you'd have to go through, I guess, the qualification process and register that personally-owned weapon in order to carry it off duty.

Q.    I understand that you're reading the policy as we speak here today, but prior to reviewing this 12-FAM-092, did you have any knowledge prior to today's deposition as to whether or not agents were allowed to carry secondary weapons on their person while on duty?

A.    Like I said, it's changed over the years.  I mean, from my understanding it's not

just a policy but also the Law Enforcement Officer's Safety Act.  If a law enforcement officer chooses to carry a personally-owned weapon, it opens them up to greater liability, which is why if I carry a weapon off duty, I just carry my DSS issued firearms, one of them.

Q.     You said off duty?

A.     Yeah.

Q.     Okay.  Again, just to be clear, with respect to on-duty assignments, did you receive any specific training that prohibited agents from carrying a secondary personally-owned firearm?

A.     We were told when we were at the range by FTU, Firearms Training Unit instructors, that you're supposed to carry your issued firearm. And then in the briefings prior to starting details, traditionally, the agent in charge of the detail would remind everybody that you are to carry your issued firearm.

Q.     Okay.  I understand.  You've made that point clear and answered that several times. Again, I'm not debating or discussing whether or not agents are required to have their official designated agency weapon on their person while on duty, but a secondary personal weapon, have you

Terrance Wallace
June 01, 2023

received any training that specifically places agents on notice that they're prohibited from carrying a personally-owned secondary firearm?

MR. TODMAN:  Objection.  Asked and answered.  You can go ahead and answer the question.

THE WITNESS:  No, I don't believe I received any specific training that says -- that said that at the time.

BY MR. OTIENO:

Q.   Okay.  If you could, please take a look at what's been marked as Exhibit 1.

A.   Yes.  I'm bringing that up now.  I see Exhibit 1.

Q.   If you could take a moment and look at what's labeled as Charge 4, Workplace Violence, in Exhibit 1 and let me know when you're finished.

A.   I finished reviewing Charge 4, Workplace Violence.

Q.   Having read Charge 4, do you have any knowledge as to whether Special Agent Tyson was charged with engaging in workplace violence by allegedly making a comment of a threatening nature on or about May 15th, 2019?

A.   I was one of the individuals riding

in the car with him that day.  I am the individual that reported him to my supervisor after he made that comment.  I took the comment, along with other comments he made, as being threatening and felt it needed to be reported through the chain of command.

Q.    Okay.  I'm going to focus now on that May 15th, 2019, date.  Can you walk me through, if you recall, to the best of your ability, what your assignment was that day?

A.    I was going through the course of my normal day.  I was investigating my cases.  I was basically doing my work.  I don't remember the exact time, but toward the end of the day, my supervisor at the time, Robert Castro, he was the Resident Agent in Charge of the Philadelphia Resident Office, he asked me if I could drive over to the courthouse in Camden, New Jersey, and pick up Mr. Tyson-Phipps and bring him back to the Philadelphia Resident Office so that Mr. Tyson-Phipps could retrieve his belongings and his government vehicle.

Q.    Okay.  What was your official position with the agency on May 15th, 2019?  What was your classification or your rank rather?

A.    I was a special agent for the Diplomatic Security Service.  I did not hold -- by rank, do you mean like my pay grade?

Q.    Yes.

A.    I believe I was a FS3 at the time, just a regular special agent but not a supervisory special agent.

Q.    Are there designations in terms of senior special agent versus junior special agent?

A.    No.

Q.    Okay.  Again, you already testified that, on or about May 15th, 2019, was the first time you met Special Agent Tyson and that you never supervised him in any capacity; correct?

A.    Correct.

Q.    Did you participate on May 15th in a multiagency operation?

A.    No.

Q.    Okay.  So on this day, on May 15th 2019, your supervisor is Resident Agent in Charge Robert Castro; is that correct?

A.    Yes.

Q.    He assigned you to pick up Special Agent Tyson; is that correct?

A.    Yes, to pick him up from the

courthouse and bring him back to the resident office, yes.

Q.   Did you have any knowledge when you were assigned this task what Mr. Tyson was doing on that date, on May 15th, 2019?

A.   Yes, I knew he was in town and working with other agents in the field office to execute an arrest warrant.

Q.   And how did you learn that information?

A.   Because it's a small office and people know what other people are doing.

Q.   Okay.  And when you arrived to pick up Special Agent Tyson, were you in a government-owned vehicle?

A.   Yes, I was in my government-owned vehicle that was assigned to me while I was at the Philadelphia Resident Office.

Q.   Okay.  I just want to back up real quick.  I know you indicated that you were a special agent, you were not in a supervisory capacity on May 15th, 2019.  Was your position as a special agent designated as a 3A?

A.   I'm not familiar with 3A, sir.

Q.   Okay.  You said your grade there was

Terrance Wallace
June 01, 2023

what again?

A.    At the time, my pay grade was an FS3.

Q.    Okay.  And is an FS3 categorized as a supervisory position?

A.    No.  FS2 is supervisory, where you would become a supervisory special agent.

Q.    Okay.  So you're confident that an FS3 is not designated as a supervisory position?

A.    Yes.

Q.    Okay.  So when you arrived, do you recall the general time period in which you picked up Special Agent Tyson on May 15th, 2019?

A.    I know it was in the afternoon on May 15th, 2019.  It was towards the end of the day.  Let me look back in my e-mail, and I'll probably be able to give a more exact answer.  So, yes, on May 15th around 2:30 p.m., Amanda Rivera and I drove over to the U.S. District Courthouse in Camden, New Jersey.

Q.    Who is Amanda Rivera?

A.    Amanda Rivera, at the time, was our Pathway intern assigned in the Philadelphia office.  She has since become a special agent with the Diplomatic Security Service.

Q.    So at the time in which the two of

you went to pick up Mr. Tyson-Phipps, she was in a training position or role?

A.    She was an intern.

Q.    Okay.

A.    An intern.

Q.    Had you worked with Ms. Rivera at any point prior to May 15th, 2019?

A.    Yes.  She was assigned as an intern to the Philadelphia Resident Office.  So I've worked with her regularly while she was interning there.

Q.    Okay.  And were you considered, you know, a field trainee or trainer, rather, of Amanda?

A.    No, because at the time, Amanda wasn't an agent; she was just an intern.  So we did invite her along to see and learn and do things.  We talked to her about processes and, you know, how DS does this or what DS life is like overseas, but I was not her field training officer and she was not my trainee.

Q.    Okay.  So when you arrived to pick up Mr. Tyson, where was Amanda sitting in the vehicle?

A.    Amanda was sitting in the right front

passenger seat.

Q.    Okay.  It was your plan to pick up Special Agent Tyson, and he would sit in the backseat; is that fair?

A.    Yes.

Q.    Okay.  And when you arrived to pick up Special Agent Tyson, describe for me what happened?

A.    Well, he got in the car.  He was outside the courthouse when I pulled up.  He got in the car.  I asked him how is it going.  Then he proceeded to speak.

Q.    Was Special Agent Tyson armed when he arrived for you to pick him up?

A.    No.  At that point in time, his service weapon was back at the Philadelphia Resident Office.

Q.    And how did you know that?

A.    Because RAC Castro told me that that was one of the things Mr. Tyson-Phipps needed to pick up.

Q.    What kind of relationship did you have with Resident Agent in Charge Castro during the time period of May 2019?

A.    I would say it was a very positive

Terrance Wallace
June 01, 2023

relationship.  I liked RAC Castro.  I thought he was a great supervisor.  I think we had a very balanced, professional relationship.

Q.    Did you have open lines of communication with Mr. Castro in terms of if you felt he needed to know anything work-related, you would feel comfortable speaking and discussing anything?

A.    Absolutely.  I felt I could go to him as my supervisor and discuss anything.

Q.    Okay.  When you picked up Special Agent Tyson on May 15th, 2019, you indicated that he sat in the back seat and you asked him how things were going.  Did you ever congratulate or commend Special Agent Tyson on his work with respect to his multiagency operation?

A.    Not that I remember.

Q.    Did you, in any way, ask Special Agent Tyson about his role in the multiagency arrest warrant operation?

A.    Not that I remember.

Q.    In the proposal, in Exhibit 1, Charge 4, it states that on May 15th, 2019, while riding in a vehicle with two other individuals, you, Special Agent Tyson, said something along the

Terrance Wallace
June 01, 2023

lines of, if murder was legal, NYFO ASAC PC would be dead.  Do you recall -- what do you know about this incident?

A.    As I mentioned, I was the one driving the vehicle at the time.  Amanda Rivera was the other individual in the car.  After I asked Mr. Tyson-Phipps how it was going that day, he proceeded to talk.  That was one of the comments he made while we were driving back to the Philadelphia Resident Office.  So I have firsthand knowledge of him saying that.

Q.    Okay.  Other than the comment, the alleged comment, that if murder was legal, NYFO ASAC PC would be dead, do you recall anything else about the nature of your conversation with Special Agent Tyson?

A.    Yes, he had also made reference to an unfortunate incident that had recently occurred when a DS agent had committed suicide.  He had made reference to an incident that occurred at an HSI, Homeland Security Investigations office, where a subordinate shot a supervisor.  He had talked about how he felt people were out to get him.  It was during the course of all of this where he made the comment, if murder was legal,

Carlson would be dead.

Q.    Regarding -- go ahead.

A.    No.  That's all.

Q.    With respect to what you just said concerning Mr. Tyson complaining about how he was treated, did Mr. Tyson ever disclose to you or make any comments concerning any allegations of being discriminated or harassed?

A.    He said that management was difficult at NYFO.  Let me look at my e-mail to refresh my memory.  He talked about how NYFO leadership was trying to ruin his career and reputation.  He mentioned the EER process and the lack of integrity of NYFO leadership.

Q.    Mr. Wallace, I will focus on that issue.  You said that Special Agent Tyson discussed issues concerning, you said, an EER?

A.    Yes, sorry, Employee Evaluation Report, EER.  It's our annual evaluation.

Q.    What specifically do you recall Special Agent Tyson discussing or disclosing or communicating to you about his EER review?

A.    He -- it was something about his suicide box.  And that's an unfortunate expression we use for an area where you are allowed to write

a rebuttal to whatever your rater and reviewer put in your employee evaluation. I believe he had put something in there about his rater and reviewer that was -- that they read and he was not happy that they read it.

Q. When you say "they," who are you referring to?

A. His rater and reviewer at the New York Field Office.

Q. Do you know who that individual or those individuals are?

A. I honestly don't know who his rater or his reviewer were for his EER that year.

Q. Did Special Agent Tyson disclose any allegations of harassment or retaliation by management to you during this May 15th, 2019, conversation?

A. Not that -- other than him being mad about them seeing his suicide box -- by them, again, I mean his rater and reviewer -- not that I recall.

Q. Did Special Agent Tyson express any frustrations he was having regarding his work for the Department of State during this conversation, other than EER?

A.    Well, as I mentioned earlier, he mentioned that NYFO leadership was trying to ruin his career and his reputation, but I don't remember the specifics other than, like I said, I just noted that in my e-mail that I sent from May 15th.

Q.    So, again, after you picked up Special Agent Tyson on May 15th, 2019, and you initiated a conversation with Special Agent Tyson, you testified that he was expressing concerns or issues that he felt he was experiencing from management.

How would you describe his overall demeanor as a result of what he was discussing with you on May 15th, 2019?

A.    I would say he was very much stressed out and frantic.

Q.    How did you respond to Special Agent Tyson's disclosures regarding his concerns or frustrations with management and what he was alleging to you?

A.    I really didn't have an opportunity to respond until we got back to the Philadelphia Resident Office.  Amanda Rivera, at the time, got out of the car and walked away.  I encouraged

Mr. Tyson-Phipps to take care of himself and get some, basically, help with mental -- his mental health.

Q.     And what did you mean by that?

A.     To get therapy, counseling, something.  He seemed, as I mentioned, extraordinarily stressed out and frantic.  I wanted to make sure he received proper counseling.

Q.     Given those statements, did you have concerns about -- you know, you described Mr. Tyson's demeanor as being stressed out and frantic.  Did you have any concerns, based on what you were being told by Special Agent Tyson, about how management was treating him at that time?

A.     My primary concern at that time was the threatening statements about hurting another employee.

Q.     Okay.  I'll shift -- we'll discuss the actual comment shortly.  So is it your position, that other than encouraging Special Agent Tyson to get some help or therapy, you didn't have or share any concern regarding the liturgy of the allegations he was making against management?

A.     No, I did not share -- I did not

Terrance Wallace

June 01, 2023

express any concerns to him when we returned to the Philadelphia Resident Office.

Q.     How long of a car ride is it, if you were just to give an estimate, from the location that you picked up Mr. Tyson to the location that you dropped off Mr. Tyson on May 15th, 2019?

A.     Approximately 15 minutes.

Q.     Is it accurate to say that the alleged comments Special Agent Tyson made concerning ASAC Carlson was made at the end of the conversation?

A.     It was towards -- I remember distinctly he said it while we were actually crossing over the Ben Franklin Bridge, so it was probably halfway between the courthouse and the Philadelphia Resident Office.

Q.     And you have an independent memory of specifically of hearing Special Agent Tyson say what with respect to a threatening comment?  I want to hear it from you.

A.     If murder was legal, Carlson would be dead.

Q.     Was Special Agent Carlson or ASAC Carlson in the vehicle at the time that Special Agent Tyson made this comment?

Terrance Wallace
June 01, 2023

A.    No, he was not.

Q.    And did you consider this alleged comment as a joke or a hyperbolic comment in any respect?

A.    No.

Q.    And why not?

A.    The totality of the conversation that he was -- it really wasn't a conversation, but the totality of everything that he was saying, talking about the incident that happened with TK, talking about the incident that happened at the HSI Field Office, then saying that if murder was legal, Carlson would be dead.  As I said earlier, it's the stressed out and frantic behavior.  I was extremely concerned for him.

Q.    You said the comment about TK.  Could you please describe for me what that means or the nature of that discussion?

A.    TK was a special agent with us who had recently committed suicide.

Q.    And what, if any, discussion was had on May 15th, 2019, between you and Special Agent Tyson regarding -- is it T as in Tom and K as in kite?

A.    Yes, T as in Tom, K as in kite.

Terrance Wallace
June 01, 2023

He had mentioned that the same stuff he was dealing with with NYFO management where they were trying to ruin his reputation and his career, TK also dealt with.  Mr. Tyson-Phipps said he had the e-mails to prove it at that time, and he had also made a comment about how he wasn't going to kill himself; he would just quit.

Q.    You also referenced something about an incident at HSI.  Can you explain to me what incident you're referring to?

A.    Yes.  It was a couple years prior. There was a shooting at a Homeland Security Investigations office, I believe, in California where a supervisor was counseling a subordinate and the subordinate shot him, shot the supervisor.

Q.    And this incident was raised during your conversation with Special Agent Tyson on May 15th, 2019?

A.    Yes.

Q.    What specifically or how is this incident raised during the conversation?

A.    He had mentioned that he wasn't going -- Tyson -- Mr. Tyson-Phipps had mentioned that he wasn't going to kill or hurt himself or go crazy like that ICE guy.

Terrance Wallace
June 01, 2023

Q.    So after you heard Special Agent
Tyson explain he was not going to go crazy like
the ICE guy, did that provide to you any
assurances about the alleged threatening comment
that was made?

A.    No.

Q.    Why not?

A.    Because he still made the threatening
comment.

Q.    Again, you interpreted the comment as
threatening; correct?

A.    Yes, I interpreted his comment of if
murder was legal, Carlson would be dead as
threatening.

Q.    After you heard the comment, did you
confront Special Agent Tyson about your position
on this comment?

A.    No.

Q.    Why not?

A.    Because I don't have to.

Q.    What do you mean by that, you don't
have to?

A.    Why would I have to confront him
about threatening to kill somebody?

Q.    I'm just asking you whether or not

you did?

A.    I said no.

Q.    After Special Agent Tyson allegedly made this comment in question, did you raise any concerns with anyone in management about the comment?

A.    Yes.  I immediately reported the comment to Resident Agent in Charge Rob Castro.

Q.    Okay.  Before we focus on your conversation with Resident Agent in Charge or RAC Castro, did Special Agent Tyson in the conversation with you on May 15th, 2019, ever raise any concerns or issues alleging that ASAC Carlson had with other agents?

A.    The only time that I recall he specifically mentioned ASAC Carlson was when he made the statement if murder was legal, Carlson would be dead.

Q.    You don't recall whether Special Agent Tyson raised concerns between ASAC Carlson and other State Department employees?

A.    Not that I recall.

Q.    So I'm going to shift focus now to your conversations with RAC Castro on May 15th, 2019.  You indicated that after you dropped off

Terrance Wallace
June 01, 2023

Special Agent Tyson, you spoke with Resident Agent in Charge Castro.  How soon after Mr. Tyson departed your car did you contact RAC Castro?

A.    I went back up to the office with Mr. Tyson-Phipps.  I made sure he retrieved his belongings and his car keys.  As soon as he departed the office, I went into Mr. Castro's office and told him about what happened and that I would be sending him an e-mail.

Q.    When you walked with Special Agent Tyson into the office, you said you helped him retrieve his things.  What things are you referring to?

A.    I didn't help him.  I made sure he got his things.  The things he had left at the office was his firearm, his car keys.  I don't remember what else, to be honest with you.

Q.    When you were walking into the office with Special Agent Tyson, you understood that he would be retrieving his firearm; correct?

A.    Yes.

Q.    And, again, did you have any concerns that Special Agent Tyson was retrieving his firearm after making the alleged comment in question?

A.    Yes, I did, which is why I immediately reported the comment to the resident agent in charge.

Q.    Again, you testified that you were concerned about the nature of the conversation or the nature of the alleged comment by Special Agent Tyson.  You determined it as a threat, but at the same time, you walked into the office with him knowing he was going to retrieve his firearm?

A.    Yes.

Q.    Okay.  So after Special Agent Tyson retrieved his things, which includes his firearm, you said you went into RAC Castro's office; is that correct?

A.    Yes.

Q.    Describe for me your conversation with RAC Castro on May 15th, 2019, after Special Agent Tyson retrieved his personal affects, including his personal firearms?

A.    I informed Mr. Castro that during the car ride from the courthouse to the resident office that Mr. Tyson-Phipps had made some concerning comments.  That I would be sending an e-mail to him regarding those comments.  And that he should probably speak with Amanda Rivera, the

intern, as she was a witness to this as well.

Q.    Prior to speaking with RAC Castro, did you speak with Amanda Rivera regarding the alleged comments Mr. Tyson made?

A.    No.  I specifically asked Mr. Castro to speak with Amanda Rivera outside of me being there so that he could get her honest answers on what happened.

Q.    You just explained that you informed RAC Castro that you were sending an e-mail detailing the nature of the conversation, but did you specifically verbally inform RAC Castro, when you met with him on May 15th, 2019, of the comment in question regarding Special Agent Tyson to him alleging that if murder was legal, ASAC Carlson would be dead?

A.    Yes.

Q.    What was RAC Castro's response to your disclosure to him regarding this alleged threat or threatening comment?

A.    He asked me to write up an e-mail and to send it to him and that he would get it to the New York Field Office leadership team as quickly as possible.

Q.    And then after this conversation with

RAC Castro, what did you proceed to do?

A. I then went back to my desk and I drafted my e-mail.

Q. Is your desk in the same office as RAC Castro?

A. I have -- yeah, in the grand scheme of things. Mr. Castro had a separate office, a private office as the resident agent. I was in a cubicle in the bull pen style office.

Q. Do you have any knowledge as to whether or not RAC Castro met with Special Agent Tyson on May 15th, 2019, after you reported the alleged threatening comment in question?

A. I don't know.

Q. And approximately what time did you send an e-mail to RAC Castro concerning your conversation with Special Agent Tyson on May 15th, 2019?

A. The time stamp on my sent e-mail is 3:42 p.m.

Q. All right. I will shift focus now to what's been marked as Grievant Exhibit 8. If you could, Mr. Wallace, take a moment to look at that document and let me know when you're finished.

A. I am finished.

Terrance Wallace
June 01, 2023

Q.      Just to be clear, what is the document marked as Grievant Exhibit 8?

A.      This is the Memorandum of Interview from when Special Agent Brian Palmero and Special Agent Natasha Diamond interviewed me regarding the incident on May 15th.

Q.      Okay.  What's the date of the interview?

A.      The date of the interview is May 29th, 2019.

Q.      Did you provide statements to Agents Brian Palmero and Natasha Diamond under oath on May 29th, 2019?

A.      In the same fashion as what we did here today where you raise your right hand and you swear to tell the whole truth and nothing but the truth?

Q.      Yes.

A.      No, I wasn't administered an oath that day.

Q.      Were you required to write out statements and sign it under the penalties of perjury?

A.      Not that I recall, no.

Q.      Can you describe the interview as

Terrance Wallace
June 01, 2023

more informal, you answering the agent's questions without being subject to being sworn under oath; is that correct?

A.      Yes, that would be correct.

Q.      Was the interview voluntary?

A.      It was voluntary.

Q.      Did you approach Special Agent Brian Palmero and Natasha Diamond as a means to initiate this interview, or was this interview initiated by Special Agent Palmero and Special Agent Diamond?

A.      It was initiated by them.

Q.      Okay.  This was approximately 13 days after the May 15th, 2019, incident with Special Agent Tyson?

A.      Yes, approximately 13 days, 14 days, from the 15th to the 29th.

Q.      In your experience, whenever you are interviewed by agents within the Department of State as a law enforcement officer, are you required at all times to provide a truthful statement?

A.      Yes.  That's covered in the employee -- Warning and Assurance to Employees for a voluntary statement.  It's covered in there that you should answer all questions truthfully and

Terrance Wallace
June 01, 2023

honestly.

Q.    Is it your position that your responses to Brian Palmero and Natasha Diamond on May 29th, 2019, were truthful and accurate, to the best of your knowledge?

A.    Yes.

Q.    Looking at page 2, paragraph 1, of Grievant Exhibit 8.

A.    I'm ready, sir.

Q.    Page 2, paragraph 1, states -- again, this Memorandum of Interview is basically a summary produced by Special Agent Brian Palmero and/or Natasha Diamond regarding your statement. So you did not draft this memorandum of interview; is that correct?

A.    Correct.

Q.    On page 2, paragraph 1, it states, "Wallace told Special Agents that he felt that Tyson-Phipps was insinuating to take other individuals out before committing suicide."  Do you see that?

A.    I do see that, sir.

Q.    Is that an accurate account of what you disclosed to Special Agents Palmero and Diamond?

Terrance Wallace
June 01, 2023

A.    Yes.

Q.    Could you explain to me at what point Special Agent Tyson insinuated that he would take other individuals out before committing suicide?

A.    When he said that if murder was legal, Carlson would be dead.

Q.    That's what you felt Mr. Tyson was insinuating when he made that comment, that alleged comment?

A.    Over the course of the whole conversation of him saying he wasn't going to hurt himself, that if murder were legal, Carlson would be dead, yes, I was generally concerned that Mr. Tyson-Phipps was going to hurt other people. Concerned enough to report it to my supervisor.

Q.    Did Special Agent Tyson confirm to you that he had no intentions of harming himself?

A.    He did -- he did say, during the car ride, that he wasn't going to go out like TK, rather.

Q.    What did you interpret that to mean?

A.    That he wasn't going to commit suicide.

Q.    Okay.  Did Special Agent Tyson ever say to you during that May 15th, 2019,

conversation that he intended to hurt others or other agency employees?

A.    How I interpreted his comment of if murder were legal, Carlson would be dead was exactly that.

Q.    Okay.  Excluding that comment in question, did Special Agent Tyson ever say to you that he intended to hurt others during that May 15th, 2019, conversation?

A.    He did not specifically mention anyone else that he was going to hurt.

Q.    I know you indicated that when you arrived at the office to drop off Special Agent Tyson on May 15th, 2019, Amanda Rivera exited the vehicle.  You indicated that Ms. Rivera was uncomfortable after Special Agent Tyson made the comment in question.  How did you reach that conclusion?

A.    Her body language.

Q.    Did she ever expressly tell you that she was uncomfortable with respect to Mr. Tyson's comment?

A.    Not that I recall.

Q.    Did she tell you anything directly regarding Special Agent Tyson's conduct during the

May 15th, 2019, ride?

A.      Not that I recall.

Q.      Page 2, paragraph 2, if you could take a look at that and read that whole paragraph for a moment and let me know when you're done?

A.      I am done.

Q.      On page 2, paragraph 2, of Exhibit 8, they quote you saying you need to take care of yourself and seek mental health.  Wallace stated that Tyson-Phipps disregarded the comment made by Wallace.  Is that accurate, based on what you stated to Special Agents Palmero and Diamond?

A.      That is accurate, as I recall it.

Q.      How did you determine that Special Agent Tyson-Phipps disregarded your comment to take care of yourself?

A.      He just walked away from me in the garage.

Q.      You interpreted that as disregarding your suggestion to take care of himself?

A.      Yes.

Q.      On page 2, paragraph 4 -- take a moment and read that, page 2, paragraph 4 under Exhibit 8.  Take a moment to read that paragraph that contains three sentences.  Let me know when

you're done.

A.    Just to confirm, it's the one that says SAs ask Wallace and Tyson-Phipps, is that the paragraph?

Q.    I'm sorry.  Can you repeat that?

A.    Is it the paragraph that begins with SA Wallace asked if Tyson-Phipps seemed like a competent agent?

Q.    That is correct.

A.    Okay.

Q.    The report states you said no in response to the question whether or not you believed Tyson-Phipps seemed like a competent agent.  Is that accurate?

A.    Correct.

Q.    How did you form that opinion that Special Agent Tyson did not seem like a confident agent?

A.    From the car ride.  That was really my only interaction with Mr. Tyson-Phipps.

Q.    So based on your conversation with Tyson-Phipps on May 15th, 2019, your first interaction with Special Agent Tyson-Phipps, you formed the opinion that the nature of his conversation, the comments he allegedly made, you

formed the opinion that he was incompetent as a result of that?

A.     Not that he was incompetent, that he was not a competent agent.

Q.     In that same paragraph on page 2, paragraph 4, it states, Wallace stated, no, that, according to Special Agent Michael Alimenti, who was working with Special Agent Tyson-Phipps, Tyson-Phipps was not prepared for the operation and was not knowledgeable of the process for search and arrest warrant execution.  Do you see that?

A.     I do see that, sir.

Q.     Is that an accurate statement regarding what you stated to Special Agents Palmero and Diamond?

A.     Yes.  In the days after the incident, Mike Alimenti, another special agent in the office with me, had shared his thoughts on if Mr. Tyson-Phipps was prepared that day.

Q.     And with your conversation with Special Agent Michael Alimenti, did that factor into your assessment as to whether or not Special Agents Tyson-Phipps was a competent agent?

A.     I would have to say it did.  Yes,

Terrance Wallace
June 01, 2023

sir.

Q.    Again, to be clear, you indicated that your brief interaction with Special Agent Tyson-Phipps on May 15th, 2019, regarding his alleged comment is what the basis was for your opinion that Special Agent Tyson-Phipps was not a competent agent; right?

A.    Correct.

Q.    But then you indicated that your conversations with Special Agent Michael Alimenti, who is alleged to have worked with Special Agent Tyson-Phipps, that Special Agent Tyson-Phipps was not prepared for the operation.  Are you referring to the operation of May 15th, 2019?

A.    Yes, sir.

Q.    So, again, just to be clear, how did you reach the conclusion that Special Agent Tyson-Phipps did not seem like a competent agent?

A.    I would say it was primarily based on my interaction with Mr. Tyson-Phipps during the car ride.  Then obviously in the -- after that day when I was speaking with Special Agent Michael Alimenti, that also contributed to my opinion.

Q.    Okay.  But you had never worked with Special Agent Tyson-Phipps or observed him in the

field at any point prior to May 15th, 2019;
correct?

A.    Other than that time mentioned earlier where we were both assigned to the chutes detail, but we did not work in the same physical chute.  So we worked together on that UN General Assembly, as previously mentioned, but not ever again and until that interaction with him on May 15th.

Q.    Regarding the operation, the May 15th, 2019, multiagency operation that Special Agent Tyson-Phipps participated in, do you have any knowledge as to who was the case agent for that operation?

A.    Not that I recall.

Q.    Do you have any knowledge as to whether the operation itself was considered successful in terms of executing the search warrant and arresting the alleged individual or individuals comprised as part of the operation?

A.    I know that an arrest was made.  I couldn't tell you who was arrested or what the results of the search warrant was.  I don't know any of the results or whether it was an overall successful operation.

Q.    Okay.  Did Special Agent Tyson-Phipps ever explain to you the outcome of the May 15th, 2019, operation during the car ride on May 15th, 2019?

A.    No.

Q.    He didn't touch on -- Special Agent Tyson didn't explain or touch on any of the underlying facts of the May 15th, 2019, operation to you?

A.    Not that I recall.

Q.    At any point either prior to, during, or after May 15th, 2019, did Special Agent Tyson ever disclose to you that he was being subjected to discrimination based on race, national origin or --

A.    No, not that I recall.

Q.    Did Special Agent Tyson ever disclose to you that he was subjected to retaliation based on whistleblower disclosures?

A.    Not that I recall.

Q.    Did Special Agent Tyson ever disclose to you that he was subjected to harassment or hostile work environment by members of management at Department of State?

A.    Well, he talked to me about the issue

with the EER and how he felt NYFO leadership was trying to ruin his career and reputation, but, no, not that I recall.

Q.     Special Agent Peter Carlson -- were you ever in Assistant Special Agent in Charge Peter Carlson's supervising reporting chain?

A.     No.  At the time I was assigned to the Philadelphia resident office.  My reporting chain of command was Robert Castro and then ASAC Joseph Ugarte.

Q.     During the May 19th time period, what is your understanding of who Special Agent Tyson-Phipp's first line supervisor was?

A.     I don't know who his first line supervisor was at that time.

Q.     Do you have any knowledge as to whether Special Agent Tyson-Phipps reported to ASAC Peter Carlson?

A.     I believe he was -- as far as the EER goes, I believe Carlson was his reviewer for the second line supervisor.

Q.     Okay.  So that was your understanding that ASAC Peter Carlson was a second line supervisor of Special Agent Tyson?

A.     Yes, that was one of the issues that

he was talking about, the suicide box and how it became -- how his rater and reviewer were able to review it and he was upset about it.  I believe Carlson was his reviewer, his second line supervisor at the time.

Q.    Again, the term, the phrase suicide box, was that a term created by Special Agent Tyson-Phipps?

A.    No.  It's a term that is largely used throughout the Department of State.

Q.    Did Special Agent Tyson ever disclose to you allegations of members of management violating any laws, rules, or policies?

A.    Can you please repeat that, sir?  The laws of what?

Q.    Sure.  Did Special Agent Tyson-Phipps ever make any disclosures to you alleging that he believed that members of management were violating any laws, rules, or agency policies?

A.    Not that I recall.

Q.    With respect to Special Agent Tyson's allegations concerning his EER rating, did he ever allege that management was violating agency policy with respect to that issue?

A.    I think that was at the heart of the

matter with the suicide box, if I remember the conversation correctly. That they were able to see his suicide box, and as a result of seeing what he wrote in the suicide box, they changed his EER. That was one of his concerns.

Q. Okay. Just to be clear, after Special Agent Tyson made these disclosures to you on May 15th, 2019, regarding the EER rating and the suicide box, did you ever report to management any of the concerns raised by Special Agent Tyson?

A. I believe I put it in my e-mail to RAC Castro about the concerns Mr. Tyson-Phipps expressed about the NYFO leadership, him talking about his EER and lack of integrity of NYFO leadership. I also talked about it with Special Agent Palmero and Special Agent Diamond when they came and interviewed me.

Q. After you sent the May 15th e-mail to RAC Robert Castro detailing your conversation with Special Agent Tyson-Phipps, did Resident Agent in Charge Castro ever report or explain to you what action, if any, he intended to take as a result of the May 15th, 2019, e-mail?

A. He told me he was going to forward it to the NYFO leadership, which would be the

assistant special agents in charge and the special agent in charge.

Q. Did RAC Castro ever express to you concerns he had regarding Special Agent Tyson's concerns made to you regarding EER rating and concerns with management?

A. Just so I understand the question, are you asking if Mr. Castro spoke to me about being concerned about the NYFO management and the comments about Mr. Tyson-Phipps' EER?

Q. Yes.

A. Not that I recall.

Q. Other than RAC Castro, did you disclose to any other management officials regarding concerns that Special Agent Tyson-Phipps raised to you regarding his EER rating?

A. I spoke with Mark Danzig, who is the peer support group person, because of my concerns for Mr. Tyson-Phipps and requested Mark Danzig reach out to Mr. Tyson-Phipps to talk to him about some mental health resources that the Department has available for employees.

Q. Is Mr. Danzig considered a management official, do you know?

A. Yes.

Q. Do you have any knowledge as whether or not Mr. Danzig reached out and contacted Mr. Tyson-Phipps?

A. I do not.

MR. OTIENO: If we could take a ten-minute break. I want to review my notes and see if I have any other questions for Mr. Wallace.

MR. TODMAN: That works for me.

(Thereupon, a recess is taken.)

BY MR. OTIENO:

Q. Mr. Wallace, did you have any conversations with Special Agent Michael Alimenti on May 15th, 2019, regarding Special Agent Tyson?

A. Not that I recall. Mr. Alimenti was out working with Mr. Tyson-Phipps that day, so I do not recall having a conversation with him that day.

Q. Did you ever inform or notify Resident Agent in Charge Castro that Special Agent Tyson-Phipps had access to his weapons after making the alleged comment in question?

A. Yeah.

Q. And what specifically do you recall you informed or stated to RAC Castro?

A.    I let him know that Mr. Tyson-Phipps had returned to the office, recovered his belongings, and had departed the office to head back to the courthouse.

Q.    What was Resident Agent in Charge Castro's response to your notice?

A.    I believe he just said okay.

Q.    Did you express any concern to Resident Agent in Charge Castro regarding the fact that Special Agent Tyson-Phipps was about to have access to his firearm?

A.    Not that I recall.

Q.    Did Resident Agent in Charge Castro ever express any concern to you about Special Agent Tyson-Phipps having access to his firearm?

A.    No, he did not.

Q.    What is your understanding as to how Special Agent Tyson-Phipps was going to travel from the Philadelphia office, back to the courthouse?

A.    My understanding was that he was going to drive his government-owned vehicle, which was parked in the vicinity of the Philadelphia Resident Office back to the courthouse in Camden, New Jersey.

Q.     What was your understanding as to why Special Agent Tyson-Phipps was going to be traveling from the Philadelphia office back to the Camden courthouse on May 15th, 2019?

A.     The person that they had arrested that day was still in the courthouse, I believe. Either had not been seen by the judge or the initial appearance or something to that effect, but he was going back to the courthouse to continue with the operation.

Q.     Okay.  Again, just to be clear, was it your understanding of the May 15th, 2019, multiagency operation, was it an arrest warrant or search warrant operation?

A.     I don't know what the totality of the operation was.  I just know that they arrested someone, and that's why Mr. Tyson-Phipps was at the courthouse that day.

Q.     Okay.  Do you have any knowledge as to whether Resident Agent in Charge Castro ever sent another agent to replace Special Agent Tyson-Phipps, who was leaving the Philadelphia Resident Office to go to the Camden office -- excuse me -- the Camden Courthouse?

A.     Mr. Alimenti was still at the

courthouse when I picked up Mr. Tyson-Phipps from the courthouse.

Q.    Okay.  Do you have any knowledge as to whether Resident Agent in Charge Castro ever sent another agent to replace Mr. Tyson-Phipps on May 15th, 2019, after making the alleged threatening comment?

A.    No, I do not.

Q.    And do you have any knowledge as to whether or not Special Agent Michael Alimenti stayed at the Camden Courthouse on May 15th, 2019, when Special Agent Tyson-Phipps was returning to the Camden Courthouse?

A.    I believe he did, but I can't say with 100 percent certainty, but I believe he was still there when Mr. Tyson-Phipps returned.

Q.    Do you have any knowledge about the relationship between Special Agent Tyson-Phipps and Special Agent Michael Alimenti during the time period of May 2019?

A.    No.

Q.    On May 15th, 2019, you indicated that you -- your office was located at the Philadelphia office; is that correct?

A.    Yes, sir.

Q.   Did Special Agent Michael Alimenti ever return to the Philadelphia office on May 15th, 2019, while you were there?

A.   No.

Q.   Mr. Wallace, I think that's all the questions I have for you now.

MR. OTIENO:  Attorney Todman, any questions at this time?

MR. TODMAN:  I do have a couple of questions.  I'll go ahead and proceed.

CROSS-EXAMINATION

BY MR. TODMAN:

Q.   Agent Wallace, thank you for participating in the deposition today.  I do have a couple of questions in quantifying something you referred to previously throughout the deposition as the suicide box.  Do you know specifically what that section of the EER was specifically referred to?

A.   I don't know the section number, but on the EER, it's the final box where the employee can provide a narrative that is essentially a rebuttal to the rater and reviewer's comments.

As I mentioned, it's an unfortunate

Terrance Wallace
June 01, 2023

nickname, slang term that the Department of State at large uses for that section.  They say you actually put any information in there, you are committing career suicide.

Q.    Okay.  Would that box be tabled the optional statement by rated employee?

A.    Yes, that is what that box is tabled.

MR. TODMAN:  Okay.  I have no further questions.

MR. OTIENO:  I have no questions.  I think we can end the deposition.  Mr. Wallace, thanks for the opportunity and taking the time to speak with us.

THE COURT REPORTER:  Same orders as yesterday?  You'd both like copies?

MR. OTIENO:  Yes.

MR. TODMAN:  Yes, and we will read and sign as well.

(Thereupon, the deposition was concluded at 10:42 a.m.)

Terrance Wallace
June 01, 2023

I, MYREL J. WILLIAMS, a Notary Public in and for the Commonwealth of Massachusetts, do hereby certify that Terrance Wallace, the witness whose testimony is hereinbefore set forth, was duly sworn by me, pursuant to Mass. R. Civ. P. 27, 29, 30, 30A and 31, and that such testimony is a true and accurate record of my stenotype notes taken in the foregoing matter, to the best of my knowledge, skill and ability.

I further certify that I am not a relative or employee of counsel/attorney for any of the parties, nor a relative or employee of such parties, nor am I financially interested in the outcome of the action.

WITNESS MY HAND this 8th day of June 2023.

Myrel J. Williams          My Commission expires:
Notary Public              July 13, 2023

Today's date:      June 8, 2023

To:                Lauris Ngai Otieno, Esq.

To:                Stanley Todman, Esq.

From:              Myrel J. Williams

Deposition of:    Terrance Wallace

Taken:             June 1, 2023

Action:            FSGB 2022-041 TYSON-PHIPPS

     Enclosed is a copy of the deposition of

TERRANCE WALLACE, pursuant to the Rules of Civil

Procedure, Mr. Wallace has thirty days to sign the

deposition from today's date.

   Please have Mr. Wallace sign the enclosed

signature page.  If there are any errors, please

have him mark the page, line, and error on the

enclosed correction sheet.  He should not mark the

transcript itself.  This addendum should be

forwarded to all interested parties.

   Thank you for your cooperation in this matter.

FOREIGN SERVICE GRIEVANCE BOARD


FSGB 2022-041 TYSON-PHIPPS


*****************************************


     I, TERRANCE WALLACE, do hereby certify, under
the pains and penalties of perjury, that the
foregoing testimony is true and accurate, to the
best of my knowledge and belief.

     WITNESS MY HAND, this    day of     2023.


                    _____
                    TERRANCE WALLACE


mjw

CORRECTION SHEET


DEPONENT: TERRANCE WALLACE

CASE:  FSGB 2022-041 TYSON-PHIPPS

DATE TAKEN: June 1, 2023

*************************************************

PAGE /LINE /CHANGE OR CORRECTION AND REASON

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

_____/_____/_____

Terrance Wallace
June 01, 2023

## 1

**1**
4:3 17:12,
14,17 24:22
41:7,10,17
**100**
57:15
**10:42**
59:20
**11:00**
9:17
**12-FAM-092**
9:4 12:18,23
15:20
**13**
40:12,15
**14**
40:15
**15**
11:7 30:7
**15th**
8:23 10:6,9
17:24 18:8,
24 19:12,16,
19 20:5,22
21:12,14,17
22:7 24:12,
23 27:16
28:6,8,15
30:6 31:22
32:18 34:12,
24 36:17
37:13 38:12,
17 39:6
40:13,16
42:25 43:9,
14 44:1
45:22 47:4,
14 48:1,9,11
49:2,3,8,12
52:8,18,23
54:14 56:4,
12 57:6,11,
22 58:3

**19**
14:19 15:4
**19th**
10:6,9 50:11

## 2

**2**
41:7,10,17
44:3,7,22,23
46:5
**20**
7:17
**2011**
7:4
**2014**
7:6
**2015**
7:6,7
**2018**
7:8,10
**2019**
8:24 10:7,9
11:8 17:24
18:8,24
19:12,20
20:5,22
21:12,14
22:7 23:24
24:12,23
27:16 28:8,
15 30:6
31:22 32:18
34:12,25
36:17 37:13
38:12,18
39:10,13
40:13 41:4
42:25 43:9,
14 44:1
45:22 47:4,
14 48:1,11
49:3,4,8,12
52:8,23
54:14 56:4,
12 57:6,11,
20,22 58:3

**2020**
7:10
**2021**
7:17
**2023**
4:3
**21**
7:17
**22**
12:15,16
**22nd**
8:22
**23**
6:23
**26**
14:20 15:4
**29th**
39:10,13
40:16 41:4
**2:30**
21:17

## 3

**3:42**
38:20
**3A**
20:23,24

## 4

**4**
17:16,18,20
24:23 44:22,
23 46:6
**46**
6:17

## 8

**8**
38:22 39:2
41:8 44:7,24

## 9

**9:00**
9:17
**9:04**
4:3

## A

**a.m.**
4:3 59:20
**ability**
18:9
**able**
6:3 21:16
51:2 52:2
**Absolutely**
24:9
**access**
54:21 55:11,
15
**accommodate**
5:20
**account**
41:23
**accurate**
30:8 41:4,23
44:11,13
45:14 46:14
**Act**
16:2
**action**
4:17 52:22
**actual**
29:19
**addressed**
14:7
**administered**
39:19
**affects**
36:18
**afternoon**
21:13
**agency**
4:17 5:13

Terrance Wallace
June 01, 2023

8:17 14:14
16:24 18:24
43:2 51:19,
23
**Agency's**
9:3
**agent**
4:13 7:12
8:6,25 9:1
10:1,5,8
11:12 16:17
17:21 18:16
19:1,6,7,9,
13,20,24
20:14,21,23
21:6,12,23
22:16 23:3,
7,13,23
24:12,15,19,
25 25:16,19
26:16,21
27:14,22
28:8,9,18
29:13,21
30:9,18,23,
25 31:19,22
32:17 33:1,
16 34:3,8,
10,11,20
35:1,10,19,
23 36:3,6,
11,18 37:14
38:8,11,17
39:4,5 40:7,
10,14 41:12
42:3,16,24
43:7,13,16,
25 44:15
45:8,14,17,
18,23 46:4,
7,8,18,22,24
47:3,6,7,10,
11,12,17,18,
22,25 48:12,
13 49:1,6,
12,17,21
50:4,5,12,
17,24 51:7,

11,16,21
52:7,10,16,
20 53:2,4,15
54:13,14,20
55:5,9,10,
13,15,18
56:2,20,21
57:4,5,10,
12,18,19
58:1,14
**agent's**
40:1
**agents**
14:8,23
15:22 16:11,
23 17:2 20:7
34:14 39:11
40:18 41:18,
24 44:12
46:15,24
53:1
**ahead**
17:5 26:2
58:10
**alien**
8:9
**Alimenti**
46:7,18,22
47:10,23
54:13,15
56:25 57:10,
19 58:1
**allegations**
26:7 27:15
29:23 51:12,
22
**allege**
51:23
**alleged**
25:13 30:9
31:2 33:4
35:24 36:6
37:4,19
38:13 42:9
47:5,11
48:19 54:22
57:6

**allegedly**
17:23 34:3
45:25
**alleging**
28:21 34:13
37:15 51:17
**allow**
5:7
**allowed**
14:8 15:1,22
26:25
**allowing**
14:23
**Amanda**
21:17,20,21
22:14,15,23,
25 25:5
28:24 36:25
37:3,6 43:14
**and/or**
41:13
**annual**
26:19
**annually**
13:22
**answer**
5:8 6:3 17:5
21:16 40:25
**answered**
16:21 17:5
**answering**
5:25 6:1
40:1
**answers**
37:7
**anyone**
9:13 34:5
43:11
**appearance**
56:8
**approach**
40:7
**appropriate**
6:4
**approximately**
6:23 30:7
38:15 40:12,

15
**area**
10:20 26:25
**armed**
23:13
**around**
21:17
**arrest**
20:8 24:20
46:11 48:21
56:13
**arrested**
48:22 56:5,
16
**arresting**
48:19
**arrived**
20:13 21:10
22:22 23:6,
14 43:13
**ARSO-I**
7:18
**ASAC**
25:1,14
30:10,23
34:13,16,20
37:15 50:9,
18,23
**asked**
4:15 17:4
18:17 23:11
24:13 25:6
37:5,21 45:7
**asking**
33:25 53:8
**assembly**
10:14,21
48:7
**assessment**
46:23
**assigned**
9:22 10:13
11:1,4 19:23
20:4,17
21:22 22:8
48:4 50:7

Terrance Wallace
June 01, 2023

assignment
 7:4,13,14
 10:13 18:10
assignments
 16:10
assist
 12:2
assistant
 6:19 50:5
 53:1
Assurance
 40:23
assurances
 33:4
attorney
 4:12 5:12,16
 6:6 8:18
 9:14 58:7
attorneys
 8:3
authorized
 15:10,13
available
 53:22
aware
 11:16

―――――――――

   B

back
 12:11 18:19
 20:1,19
 21:15 23:16
 24:13 25:9
 28:23 35:4
 38:2 55:4,
 19,24 56:3,9
background
 5:2
backseat
 23:4
Baghdad
 7:7
balanced
 24:3
based
 29:12 44:11

45:21 47:19
 49:14,18
basically
 18:13 29:2
 41:11
basis
 47:5
begin
 5:1
beginning
 7:1
begins
 45:6
behavior
 31:14
believe
 10:12 17:7
 19:5 27:2
 32:13 50:19,
 20 51:3
 52:11 55:7
 56:6 57:14,
 15
believed
 45:13 51:18
belongings
 18:21 35:6
 55:3
Ben
 30:14
best
 18:9 41:5
Board
 4:14 11:18
body
 43:19
box
 26:24 27:19
 51:1,7 52:1,
 3,4,9 58:18,
 22 59:5,7
break
 5:18 54:6
Brian
 8:25 39:4,12
 40:7 41:3,12

Bridge
 30:14
brief
 47:3
briefings
 16:16
bring
 18:19 20:1
bringing
 17:13
broken
 11:3
brought
 12:11
bull
 38:9

―――――――――

   C

C-H-U-T-E-S
 10:19
California
 32:13
Camden
 12:10 18:18
 21:19 55:24
 56:4,23,24
 57:11,13
capacity
 19:14 20:22
car
 18:1 23:9,11
 25:6 28:25
 30:3 35:3,6,
 16 36:21
 42:18 45:19
 47:21 49:3
care
 29:1 44:8,
 16,20
career
 6:25 26:12
 28:3 32:4
 50:2 59:4
Carlson
 26:1 30:10,
 21,23,24

31:13 33:13
 34:14,16,17,
 20 37:15
 42:6,12 43:4
 50:4,18,20,
 23 51:4
Carlson's
 50:6
carry
 14:8,13,18,
 23 15:5,13,
 17,22 16:3,
 5,6,15,19
carrying
 14:10 15:7,8
 16:12 17:3
case
 5:14 12:6
 48:13
cases
 18:12
Castro
 18:15 19:21
 23:19,23
 24:1,5 34:8,
 11,24 35:2,3
 36:17,20
 37:2,5,10,12
 38:1,5,7,11,
 16 50:9
 52:12,19,21
 53:3,8,13
 54:20,25
 55:9,13
 56:20 57:4
Castro's
 35:7 36:13
 37:18 55:6
categorized
 21:3
certainty
 57:15
chain
 18:5 50:6,9
changed
 15:24 52:4

Terrance Wallace
June 01, 2023

charge
  16:17 17:16,
  18,20 18:16
  19:20 23:23
  24:22 34:8,
  10 35:2 36:3
  50:5 52:21
  53:1,2 54:20
  55:5,9,13
  56:20 57:4
charged
  17:22
chooses
  16:3
chute
  11:5 48:6
chutes
  10:13,16,17,
  19,23 11:2
  48:4
classificatio
n
  18:25
classified
  7:23
clear
  16:9,21 39:1
  47:2,16 52:6
  56:11
clearer
  14:12
clearly
  6:4
comfortable
  24:7
command
  18:6 50:9
commend
  24:15
comment
  17:23 18:3
  25:12,13,25
  29:19 30:19,
  25 31:3,16
  32:6 33:4,9,
  10,12,15,17
  34:4,6,8

35:24 36:2,6
37:13,20
38:13 42:8,9
43:3,6,17,22
44:10,15
47:5 54:22
57:7
comments
  18:4 25:8
  26:7 30:9
  36:23,24
  37:4 45:25
  53:10 58:24
commit
  42:22
committed
  25:19 31:20
committing
  41:20 42:4
  59:4
communicating
  26:22
communication
  24:5
communication
s
  8:2,16
competent
  45:8,13
  46:4,24
  47:7,18
complaining
  26:5
complaint
  11:15
comprised
  48:20
concern
  29:15,22
  55:8,14
concerned
  12:8 31:15
  36:5 42:13,
  15 53:9
concerns
  28:10,19
  29:10,12

30:1 34:5,
13,20 35:22
52:5,10,12
53:4,5,6,15,
18
concluded
  59:20
conclusion
  43:18 47:17
conduct
  43:25
confident
  21:7 45:17
confirm
  42:16 45:2
confront
  33:16,23
congratulate
  24:14
connections
  8:10
consider
  31:2
considered
  22:12 48:17
  53:23
contact
  35:3
contacted
  54:2
contains
  44:25
continue
  56:10
contributed
  47:23
conversation
  25:15 27:17,
  24 28:9
  30:11 31:7,8
  32:17,21
  34:10,12
  36:5,16
  37:11,25
  38:17 42:11
  43:1,9
  45:21,25

46:21 52:2,
19 54:17
conversations
  34:24 47:10
  54:13
copies
  59:15
correct
  10:24,25
  11:10,11
  13:15 19:14,
  15,21,24
  33:11 35:20
  36:14 40:3,4
  41:15,16
  45:9,15 47:8
  48:2 57:24
correctly
  52:2
councilor
  8:6
counsel
  4:17 8:17
counseling
  29:5,8 32:14
couple
  13:5 32:11
  58:9,16
course
  14:20 18:11
  25:24 42:10
court
  4:21 5:5,9
  59:14
courthouse
  12:10 18:18
  20:1 21:18
  23:10 30:15
  36:21 55:4,
  20,24 56:4,
  6,9,18,24
  57:1,2,11,13
covered
  40:22,24
crazy
  32:25 33:2

Terrance Wallace
June 01, 2023

created
  51:7
Criminal
  7:8
CROSS-
EXAMINATION
  58:12
crossing
  30:14
cubicle
  38:9
current
  7:20 9:22,24

D

D-E-R-I-O-N
  9:25
D.C.
  7:5
Danzig
  53:17,19,23
  54:2
date
  10:10,12
  15:12 18:8
  20:5 39:7,9
day
  18:1,10,12,
  14 19:19
  21:15 25:7
  39:20 46:20
  47:21 54:16,
  18 56:6,18
day-to-day
  7:21 8:5
days
  40:12,15
  46:17
dead
  25:2,14 26:1
  30:22 31:13
  33:13 34:18
  37:16 42:6,
  13 43:4
Deadly
  12:18 13:7

dealing
  32:2
deals
  7:23
dealt
  32:4
debating
  16:22
demeanor
  28:14 29:11
departed
  35:3,7 55:3
department
  7:1,3 8:3
  9:4,15
  12:18,25
  13:7,10,15
  27:24 34:21
  40:18 49:24
  51:10 53:21
  59:1
deposed
  4:19
deposition
  4:16,22 5:5
  6:2 8:13,20,
  22 9:15,18,
  19 11:20
  15:21 58:15,
  17 59:11,19
Derion
  9:25
describe
  7:21 8:19
  13:9 23:7
  28:13 31:17
  36:16 39:25
described
  29:10
designated
  16:24 20:23
  21:8
designations
  19:8
desk
  38:2,4

detail
  16:18 48:5
detailing
  37:11 52:19
details
  16:17
determine
  44:14
determined
  36:7
Diamond
  9:1 39:5,12
  40:8,10
  41:3,13,25
  44:12 46:16
  52:16
different
  10:15 11:2
difficult
  26:9
Diplomatic
  15:11 19:2
  21:24
DIRECT
  4:10
directly
  43:24
disclose
  26:6 27:14
  49:13,17,21
  51:11 53:14
disclosed
  41:24
disclosing
  26:21
disclosure
  37:19
disclosures
  28:19 49:19
  51:17 52:7
discriminated
  26:8
discriminatio
n
  49:14
discuss
  24:10 29:18

discussed
  26:17
discussing
  16:22 24:7
  26:21 28:14
discussion
  31:18,21
discussions
  8:17
disregarded
  44:10,15
disregarding
  44:19
distinctly
  30:13
District
  21:18
document
  38:24 39:2
documentation
  15:10
documents
  8:15
doing
  7:14 18:13
  20:4,12
domestic
  13:25
Domingo
  6:21 7:19
Dominican
  6:21
draft
  41:14
drafted
  38:3
drive
  18:17 55:22
driving
  25:4,9
drop
  43:13
dropped
  30:6 34:25
drove
  21:18

Terrance Wallace
June 01, 2023

DS
  22:19 25:19
DSS
  15:11 16:6
duly
  4:7
duties
  13:19 14:20
duty
  14:9,10,14,
  17,24 15:17,
  23 16:5,7,25

_____

**E**
_____

e-mail
  8:23 21:15
  26:10 28:5
  35:9 36:24
  37:10,21
  38:3,16,19
  52:11,18,23
e-mails
  32:5
earlier
  28:1 31:13
  48:4
easier
  5:8
EER
  26:13,17,19,
  22 27:13,25
  50:1,19
  51:22 52:5,
  8,14 53:5,
  10,16 58:19,
  22
effect
  56:8
either
  14:19 49:11
  56:7
Embassy
  6:20 7:7,18
  8:11
employed
  6:18

employee
  12:25 26:18
  27:2 29:17
  40:23 58:22
  59:6
employees
  34:21 40:23
  43:2 53:22
encouraged
  15:4 28:25
encouraging
  29:20
end
  18:14 21:14
  30:10 59:11
enforcement
  7:24 13:14
  16:1,2 40:19
engaging
  17:22
enter
  10:20
entrances
  11:3
environment
  49:23
essentially
  13:18 58:23
estimate
  30:4
evaluation
  26:18,19
  27:2
everybody
  16:18
everyone
  6:5
exact
  18:14 21:16
exactly
  43:5
EXAMINATION
  4:10
examined
  4:7
exception
  8:16

Excluding
  43:6
excuse
  10:6,9 56:24
execute
  20:8
executing
  48:18
execution
  46:11
Exhibit
  12:15,16
  17:12,14,17
  24:22 38:22
  39:2 41:8
  44:7,24
exhibits
  9:5,11
exited
  43:14
exits
  11:3
experience
  40:17
experiencing
  28:11
explain
  14:13 32:9
  33:2 42:2
  49:2,7 52:21
explained
  37:9
express
  27:22 30:1
  53:3 55:8,14
expressed
  52:13
expressing
  28:10
expression
  26:24
expressly
  43:20
extraordinari
ly
  29:7

extremely
  31:15

_____

**F**
_____

fact
  12:2 55:9
factor
  46:22
facts
  49:8
fair
  23:4
familiar
  11:17 12:24
  20:24
familiarizati
on
  14:3
far
  50:19
fashion
  39:14
feel
  24:7
felt
  18:5 24:6,9
  25:23 28:11
  41:18 42:7
  50:1
field
  7:5 20:7
  22:13,20
  27:9 31:11
  37:23 48:1
filed
  11:15
final
  58:22
find
  14:17
finding
  12:2
fine
  6:10
finish
  5:7

Terrance Wallace
June 01, 2023

finished
  17:17,18
  38:24,25
firearm
  9:4 13:18
  14:14 16:12,
  15,19 17:3
  35:16,20,24
  36:9,12
  55:11,15
firearms
  12:19 13:7,
  11,22 14:1,
  4,6,21,23
  16:6,14
  36:19
fires
  14:3
first
  4:6 5:4 7:2,
  4 10:4,7
  19:12 45:22
  50:13,14
firsthand
  25:10
five
  11:2
five-day
  9:9 12:3
focus
  8:14 12:14
  18:7 26:15
  34:9,23
  38:21
follows
  4:8
Force
  12:18 13:7
form
  6:7 45:16
formed
  45:24 46:1
forward
  52:24
four
  13:23

four-day
  4:15
Franklin
  30:14
frantic
  28:17 29:7,
  12 31:14
fraud
  7:8 8:9
Frederick
  6:14
front
  22:25
frustrations
  27:23 28:20
FS2
  21:5
FS3
  19:5 21:2,3,
  8
FTU
  16:14
full
  6:12
fully
  15:11

─────────────

          G
─────────────

garage
  44:18
general
  7:21 10:14,
  21 21:11
  48:6
generally
  42:13
gesturing
  6:1
give
  4:23 21:16
  30:4
Given
  29:9
Glock
  14:19,20

  15:4
goes
  50:20
going
  18:7,11
  23:11 24:14
  25:7 32:7,
  23,24 33:2
  34:23 36:9
  42:11,14,19,
  22 43:11
  52:24 55:18,
  22 56:2,9
government
  18:22
government-
owned
  20:15,16
  55:22
grade
  19:3 20:25
  21:2
grand
  38:6
great
  24:2
greater
  16:4
grievance
  4:14 11:18
Grievant
  12:16 38:22
  39:2 41:8
group
  53:18
guess
  15:15
guy
  32:25 33:3
guys
  10:22

─────────────

          H
─────────────

halfway
  30:15

hand
  39:15
handgun
  15:9
happened
  23:8 31:10,
  11 35:8 37:8
happy
  27:4
harassed
  26:8
harassment
  27:15 49:22
harming
  42:17
head
  55:3
headquarters
  7:9
health
  29:3 44:9
  53:21
hear
  5:1 6:5
  30:20
heard
  33:1,15
hearing
  6:9 30:18
heart
  51:25
held
  6:22 7:2
help
  29:2,21
  35:14
helped
  35:11
hold
  7:25 19:2
Homeland
  25:21 32:12
honest
  35:17 37:7
honestly
  27:12 41:1

Terrance Wallace
June 01, 2023

**hostile**
  49:23
**HSI**
  25:21 31:11
  32:9
**human**
  9:14
**hurt**
  32:24 42:11,
  14 43:1,8,11
**hurting**
  29:16
**hyperbolic**
  31:3

---

**I**

**ICE**
  32:25 33:3
**identified**
  4:6
**identifying**
  15:12
**immediately**
  34:7 36:2
**incident**
  25:3,18,20
  31:10,11
  32:9,10,16,
  21 39:6
  40:13 46:17
**include**
  7:22
**includes**
  36:12
**including**
  36:19
**incompetent**
  46:1,3
**independent**
  30:17
**indicated**
  20:20 24:12
  34:25 43:12,
  15 47:2,9
  57:22

**individual**
  18:1 25:6
  27:10 48:19
**individuals**
  17:25 24:24
  27:11 41:20
  42:4 48:20
**inform**
  37:12 54:19
**informal**
  40:1
**information**
  7:23,24
  11:25 20:10
  59:3
**informed**
  36:20 37:9
  54:25
**initial**
  11:6 56:8
**initiate**
  40:8
**initiated**
  28:9 40:9,11
**insinuated**
  42:3
**insinuating**
  41:19 42:8
**instruct**
  5:16
**instructions**
  4:24 5:23,24
**instructors**
  16:14
**integrity**
  26:14 52:14
**intended**
  43:1,8 52:22
**intentions**
  42:17
**interaction**
  11:7,9
  45:20,23
  47:3,20 48:8
**intern**
  21:22 22:3,
  5,8,16 37:1

**interning**
  22:10
**interpret**
  42:21
**interpreted**
  33:10,12
  43:3 44:19
**interview**
  8:25 11:25
  12:1,6 39:3,
  8,9,25 40:5,
  9 41:11,14
**interviewed**
  9:1 11:23
  39:5 40:18
  52:17
**investigate**
  8:8
**investigating**
  18:12
**investigation**
  11:23
**Investigation**
**s**
  6:20 7:9
  25:21 32:13
**invite**
  22:17
**involved**
  12:5
**Iraq**
  7:7
**issue**
  14:7 26:16
  49:25 51:24
**issued**
  8:7 9:9
  16:6,15,19
**issues**
  26:17 28:11
  34:13 50:25
**issuing**
  15:3

---

**J**

**Jason**
  4:13 9:10
  10:1
**Jersey**
  12:10 18:18
  21:19 55:25
**joined**
  7:3
**joke**
  31:3
**Joseph**
  50:10
**judge**
  56:7
**July**
  7:17
**June**
  4:3
**junior**
  19:9

---

**K**

**keys**
  35:6,16
**kill**
  32:7,24
  33:24
**kind**
  23:22
**kite**
  31:24,25
**knew**
  20:6
**know**
  5:2,19,21
  10:1 11:19
  12:21 17:17
  20:12,20
  21:13 22:13,
  19 23:18
  24:6 25:2
  27:10,12
  29:10 38:14,

24 43:12
44:5,25
48:21,23
50:14 53:24
55:1 56:15,
16 58:18,21

**knowing**
5:22 36:9

**knowledge**
14:11 15:21
17:21 20:3
25:11 38:10
41:5 48:13,
16 50:16
54:1 56:19
57:3,9,17

**knowledgeable**
46:10

---

**L**

---

**labeled**
17:16

**lack**
26:13 52:14

**language**
7:15 43:19

**large**
59:2

**largely**
51:9

**Lastly**
5:25

**law**
7:24 13:14
16:1,2 40:19

**laws**
51:13,15,19

**leadership**
26:11,14
28:2 37:23
50:1 52:13,
15,25

**learn**
20:9 22:17

**leaving**
56:22

**left**
35:15

**legal**
25:1,13,25
30:21 31:12
33:13 34:17
37:15 42:6,
12 43:4

**liability**
16:4

**life**
22:19

**limited**
4:23

**line**
50:13,14,21,
23 51:4

**lines**
24:4 25:1

**little**
14:12

**liturgy**
29:23

**located**
57:23

**location**
30:4,5

**long**
6:22 30:3

**look**
12:15 17:12,
15 21:15
26:10 38:23
44:4

**Looking**
41:7

**loudly**
6:4

---

**M**

---

**mad**
27:18

**made**
16:20 18:2,4
25:9,17,20,
25 30:9,10,

25 32:6
33:5,8 34:4,
17 35:5,14
36:22 37:4
42:8 43:16
44:10 45:25
48:21 52:7
53:5

**make**
4:24 26:7
29:8 51:17

**makes**
5:8

**making**
12:9 17:23
29:23 35:24
54:22 57:6

**manage**
11:4

**management**
26:9 27:16
28:12,20
29:14,24
32:2 34:5
49:23 51:12,
18,23 52:9
53:6,9,14,23

**March**
7:4

**Mark**
53:17,19

**marked**
12:15 17:12
38:22 39:2

**MASSACHUSETTS**
4:2

**matter**
52:1

**mean**
10:18 15:25
19:3 27:20
29:4 33:21
42:21

**means**
6:1 31:17
40:8

**meet**
10:4

**meeting**
10:8

**members**
49:23 51:12,
18

**memorandum**
8:24 12:1
39:3 41:11,
14

**memorialized**
12:1

**memory**
26:11 30:17

**mental**
29:2 44:9
53:21

**mention**
43:10

**mentioned**
25:4 26:13
28:1,2 29:6
32:1,22,23
34:16 48:3,7
58:25

**met**
10:3,7 19:13
37:13 38:11

**Michael**
46:7,22
47:10,22
54:13 57:10,
19 58:1

**Mike**
46:18

**minutes**
30:7

**modified**
13:5

**moment**
12:20 17:15
38:23 44:5,
23,24

**months**
6:24 13:24

motorcade
  10:20
multiagency
  19:17 24:16,
  19 48:11
  56:13
murder
  25:1,13,25
  30:21 31:12
  33:13 34:17
  37:15 42:5,
  12 43:4

**N**

name
  4:12 6:12,
  13,15
named
  11:14
narrative
  58:23
Natasha
  9:1 39:5,12
  40:8 41:3,13
national
  49:14
nature
  17:23 25:15
  31:18 36:5,6
  37:11 45:24
need
  5:18 44:8
needed
  18:5 23:20
  24:6
never
  11:11,13
  19:14 47:24
Ngai
  4:12
nickname
  59:1
Nicolas
  9:24
noise
  5:2

normal
  18:12
notary
  4:7
noted
  28:5
notes
  54:6
notice
  17:2 55:6
notified
  11:19
notify
  54:19
number
  58:21
NYFO
  25:1,13
  26:10,11,14
  28:2 32:2
  50:1 52:13,
  14,25 53:9

**O**

oath
  39:12,19
  40:2
object
  5:14
objection
  5:16 17:4
objections
  6:8
observed
  47:25
obviously
  11:19 47:21
occurred
  25:18,20
off-duty
  15:7
office
  7:5,11 9:2
  12:12 18:17,
  20 20:2,7,
  11,18 21:23

22:9 23:17
25:10,21
27:9 28:24
30:2,16
31:12 32:13
35:4,7,8,11,
16,18 36:8,
13,22 37:23
38:4,7,8,9
43:13 46:18
50:8 55:2,3,
19,24 56:3,
23 57:23,24
58:2
officer
  6:20 7:16
  16:3 22:20
  40:19
Officer's
  16:2
official
  13:15 14:20
  16:23 18:23
  53:24
officials
  53:14
okay
  4:23 6:12
  8:4 9:8,13,
  21 10:22
  11:6,14
  12:13 14:5
  16:9,20
  17:11 18:7,
  23 19:11,19
  20:13,19,25
  21:3,7,10
  22:4,12,22
  23:2,6 24:11
  25:12 29:18
  34:9 36:11
  39:7 40:12
  42:24 43:6
  45:10 47:24
  49:1 50:22
  52:6 55:7
  56:11,19
  57:3 59:5,8

on-duty
  15:8 16:10
once
  14:3
one
  9:5,11 15:5
  16:6 17:25
  23:20 25:4,8
  45:2 50:25
  52:5
open
  24:4
opens
  16:4
operation
  19:17 24:16,
  20 46:9
  47:13,14
  48:10,11,14,
  17,20,25
  49:3,8
  56:10,13,14,
  16
opinion
  45:16,24
  46:1 47:6,23
opportunity
  28:22 59:12
opposed
  5:10
optional
  59:6
order
  15:16
orders
  59:14
origin
  49:14
Otieno
  4:11,12 6:6,
  11 8:12
  17:10 54:5,
  11 58:7
  59:10,16
outcome
  49:2

Terrance Wallace
June 01, 2023

outside
  23:10 37:6
overseas
  14:2 22:20

_____

**P**
_____

p.m.
  21:17 38:20
page
  41:7,10,17
  44:3,7,22,23
  46:5
Palmero
  8:25 39:4,12
  40:8,10
  41:3,12,24
  44:12 46:16
  52:16
paragraph
  41:7,10,17
  44:3,4,7,22,
  23,24 45:4,6
  46:5,6
parked
  55:23
part
  13:18 48:20
participate
  19:16
participated
  48:12
participating
  11:24 58:15
passenger
  23:1
passport
  8:8
past
  13:4
Pathway
  21:22
pay
  19:3 21:2
PC
  25:1,14

peer
  53:18
pen
  38:9
penalties
  39:22
people
  20:12 25:23
  42:14
percent
  57:15
period
  21:11 23:24
  50:11 57:20
perjury
  39:23
permissible
  15:8
person
  14:9,24
  15:23 16:24
  53:18 56:5
personal
  14:8,10,14
  16:25 36:18,
  19
personally-
owned
  15:1,16
  16:3,12 17:3
Peter
  50:4,6,18,23
Philadelphia
  7:11 9:2
  12:11 18:16,
  20 20:18
  21:22 22:9
  23:16 25:10
  28:23 30:2,
  16 50:8
  55:19,23
  56:3,22
  57:23 58:2
Phipps
  10:9
phrase
  51:6

physical
  11:5 48:5
pick
  18:18 19:23,
  25 20:13
  22:1,22
  23:2,6,14,21
picked
  12:9 21:11
  24:11 28:7
  30:5 57:1
pistols
  15:3
places
  17:1
plan
  23:2
please
  5:21,25 6:3,
  12 12:15
  17:11 31:17
  51:14
point
  16:21 22:7
  23:15 42:2
  48:1 49:11
policies
  51:13,19
policy
  9:4 12:19,24
  13:3,8,11
  14:11,15,17,
  23,25 15:6,
  19 16:1
  51:23
position
  6:22 7:2,20
  18:24 20:22
  21:4,8 22:2
  29:20 33:16
  41:2
positive
  23:25
possess
  13:17
possible
  4:25 37:24

preparation
  8:22
prepared
  8:14,20
  46:9,20
  47:13
previously
  13:8 48:7
  58:17
primarily
  47:19
primary
  8:7 29:15
prior
  11:8 15:19,
  21 16:16
  22:7 32:11
  37:2 48:1
  49:11
private
  38:8
probably
  21:16 30:15
  36:25
proceed
  5:17 38:1
  58:10
proceeded
  23:12 25:8
process
  4:24 15:15
  26:13 46:10
processes
  22:18
produce
  5:6
produced
  41:12
professional
  24:3
prohibited
  16:11 17:2
proper
  29:8
proposal
  9:9 24:22

prove
  32:5
provide
  33:3 39:11
  40:20 58:23
providing
  11:25
public
  4:7
pulled
  23:10
put
  27:1,2 52:11
  59:3

**Q**

qualification
  15:15
qualify
  14:1
quantifying
  58:16
question
  5:14,21 6:8
  13:13 17:6
  34:4 35:25
  37:14 38:13
  43:7,17
  45:12 53:7
  54:22
questions
  5:8 40:1,25
  54:7 58:6,8,
  10,16 59:9,
  10
quick
  20:20
quickly
  37:23
quit
  32:7
quote
  44:8

**R**

RAC
  23:19 24:1
  34:10,24
  35:3 36:13,
  17 37:2,10,
  12,18 38:1,
  5,11,16
  52:12,19
  53:3,13
  54:25
race
  49:14
raise
  34:4,13
  39:15
raised
  32:16,21
  34:20 52:10
  53:16
range
  13:25 16:14
rank
  18:25 19:3
rated
  59:6
rater
  27:1,3,8,12,
  20 51:2
  58:24
rating
  51:22 52:8
  53:5,16
reach
  43:17 47:17
  53:20
reachable
  9:20
reached
  54:2
read
  17:20 27:4,5
  44:4,23,24
  59:17

reading
  15:18
ready
  41:9
real
  20:19
reason
  5:19
rebuttal
  27:1 58:24
recall
  18:9 21:11
  25:2,14
  26:20 27:21
  34:15,19,22
  39:24 43:23
  44:2,13
  48:15 49:10,
  16,20 50:3
  51:20 53:12
  54:15,17,24
  55:12
receive
  16:10
received
  13:10 14:6
  17:1,8 29:8
recent
  7:2
recently
  25:18 31:20
recess
  54:10
record
  9:21
recovered
  55:2
reference
  25:17,20
referenced
  32:8
referred
  58:17,19
referring
  27:7 32:10
  35:13 47:13

refrain
  6:1
refresh
  26:10
regarding
  4:15 9:15
  26:2 27:23
  28:19 29:22
  31:23 36:24
  37:3,14,19
  39:5 41:13
  43:25 46:15
  47:4 48:10
  52:8 53:4,5,
  15,16 54:14
  55:9
regional
  6:19 7:15
register
  15:1,16
regular
  19:6
regularly
  22:10
relation
  11:23
relationship
  23:22 24:1,3
  57:18
relative
  4:14 12:2
remember
  18:13 24:17,
  21 28:4
  30:12 35:17
  52:1
remind
  16:18
REMOTELY
  4:2
repeat
  45:5 51:14
rephrase
  13:13
replace
  56:21 57:5

Terrance Wallace
June 01, 2023

report
  26:19 42:15
  45:11 52:9,
  21
reported
  4:2 7:17
  12:7 18:2,5
  34:7 36:2
  38:12 50:17
reporter
  5:5,9 59:14
reporting
  50:6,8
represent
  4:13
represented
  4:17 5:12
Republic
  6:21
reputation
  26:12 28:3
  32:3 50:2
requested
  53:19
required
  13:17,21,23,
  24,25 14:2
  16:23 39:21
  40:20
requirement
  14:18
reserved
  6:8
resident
  7:11 9:2
  12:11 18:16,
  17,20 19:20
  20:1,18 22:9
  23:17,23
  25:10 28:24
  30:2,16
  34:8,10 35:1
  36:2,21 38:8
  50:8 52:20
  54:20 55:5,
  9,13,24
  56:20,23

57:4
resolve
  5:15
resources
  9:14 53:21
respect
  4:16 8:13
  12:6 13:22
  14:5,21
  16:10 24:16
  26:4 30:19
  31:4 43:21
  51:21,24
respond
  28:18,23
response
  37:18 45:12
  55:6
responses
  41:3
responsibilit
ies
  7:22 8:8
responsibilit
y
  8:5
result
  28:14 46:2
  52:3,22
results
  48:23,24
retaliation
  27:15 49:18
retrieve
  18:21 35:12
  36:9
retrieved
  35:5 36:12,
  18
retrieving
  35:20,23
return
  58:2
returned
  30:1 55:2
  57:16

returning
  57:12
reveal
  8:1
review
  9:3,8,12
  12:20 26:22
  51:3 54:6
reviewed
  8:15,23,24
  9:6 12:23
  13:4,6
reviewer
  27:1,3,8,13,
  20 50:20
  51:2,4
reviewer's
  58:24
reviewing
  15:6,20
  17:18
ride
  30:3 36:21
  42:19 44:1
  45:19 47:21
  49:3
riding
  17:25 24:23
right
  9:7 22:25
  38:21 39:15
  47:7
Rivera
  21:17,20,21
  22:6 25:5
  28:24 36:25
  37:3,6
  43:14,15
Rob
  34:8
Robert
  18:15 19:21
  50:9 52:19
role
  22:2 24:19
Rosslyn
  7:10

ruin
  26:12 28:2
  32:3 50:2
rules
  51:13,19

——————————

S

——————————

SA
  45:7
safe
  11:8
Safety
  16:2
Santa
  7:19
Santo
  6:20
SAS
  45:3
sat
  24:13
satisfactoril
y
  4:6
saying
  5:6,10 25:11
  31:9,12
  42:11 44:8
says
  17:8 45:3
scheme
  38:6
search
  46:11 48:18,
  23 56:14
seat
  23:1 24:13
second
  50:21,23
  51:4
secondary
  14:21,23
  15:2,9,23
  16:12,25
  17:3

Terrance Wallace
June 01, 2023

| | | | |
|---|---|---|---|
| **section** | **shared** | 13,23 20:14, | 12 43:10 |
| 8:7 58:19,21 | 46:19 | 21,23 21:6, | 54:24 58:18, |
| 59:2 | **shift** | 12,23 23:3, | 19 |
| **secure** | 12:14 29:18 | 7,13 24:11, | **specifics** |
| 10:20 | 34:23 38:21 | 15,18,25 | 28:4 |
| **security** | **shooting** | 25:15 26:16, | **spell** |
| 6:19 7:16 | 32:12 | 21 27:14,22 | 6:13 |
| 15:11 19:2 | **shortly** | 28:8,9,18 | **spelled** |
| 21:24 25:21 | 29:19 | 29:13,20 | 6:15 10:19 |
| 32:12 | **shot** | 30:9,18,23, | **spoke** |
| **see** | 25:22 32:15 | 24 31:19,22 | 8:15,21 35:1 |
| 6:3 17:14 | **sign** | 32:17 33:1, | 53:8,17 |
| 22:17 41:21, | 39:22 59:18 | 16 34:3,11, | **SPRINGFIELD** |
| 22 46:11,13 | **sir** | 19 35:1,10, | 4:2 |
| 52:3 54:7 | 12:22 13:16 | 19,23 36:6, | **stamp** |
| **seeing** | 20:24 41:9, | 11,17 37:14 | 38:19 |
| 27:19 52:3 | 22 46:13 | 38:11,17 | **Stanley** |
| **seek** | 47:1,15 | 39:4 40:7, | 4:18 |
| 44:9 | 51:14 57:25 | 10,13 41:12, | **started** |
| **send** | **sit** | 18,24 42:3, | 7:18 15:3 |
| 37:22 38:16 | 23:3 | 16,24 43:7, | **starting** |
| **sending** | **sits** | 13,16,25 | 16:16 |
| 35:9 36:23 | 8:6 | 44:12,14 | **state** |
| 37:10 | **sitting** | 45:17,23 | 6:12 7:1,4 |
| **senior** | 22:23,25 | 46:7,8,15, | 9:15 12:18, |
| 19:9 | **slang** | 18,22,23 | 25 13:7,11, |
| **sensitive** | 59:1 | 47:3,6,10, | 15 27:24 |
| 7:24 | **small** | 11,12,17,22, | 34:21 40:19 |
| **sentences** | 20:11 | 25 48:11 | 49:24 51:10 |
| 44:25 | **smooth** | 49:1,6,12, | 59:1 |
| **separate** | 4:25 | 17,21 50:4, | **stated** |
| 38:7 | **smuggling** | 5,12,17,24 | 44:9,12 |
| **served** | 8:9 | 51:7,11,16, | 46:6,15 |
| 7:7,8 | **speak** | 21 52:7,10, | 54:25 |
| **service** | 6:4 9:13 | 15,16,20 | **statement** |
| 15:7,11 19:2 | 15:19 23:12 | 53:1,4,15 | 34:17 40:21, |
| 21:24 23:16 | 36:25 37:3,6 | 54:13,14,20 | 24 41:13 |
| **service-** | 59:13 | 55:10,14,18 | 46:14 59:6 |
| **issued** | **speaking** | 56:2,21 | **statements** |
| 14:19 | 24:7 37:2 | 57:10,12,18, | 12:8 29:9,16 |
| **setting** | 47:22 | 19 58:1 | 39:11,22 |
| 4:20 | **special** | **specific** | **states** |
| **several** | 4:13 7:11 | 14:17 16:11 | 24:23 41:10, |
| 16:21 | 8:6,25 9:1 | 17:8 | 17 45:11 |
| **share** | 10:1,4,8 | **specifically** | 46:6 |
| 29:22,25 | 11:12 17:21 | 17:1 26:20 | **stayed** |
| | 19:1,6,7,9, | 30:18 32:20 | 57:11 |
| | | 34:16 37:5, | |

stipulate
 6:7
stressed
 28:16 29:7,
 11 31:14
stuff
 7:16 32:1
style
 38:9
subject
 40:2
subjected
 49:13,18,22
subordinate
 25:22 32:14,
 15
substance
 8:1 9:18
successful
 48:18,25
suggestion
 44:20
suicide
 25:19 26:24
 27:19 31:20
 41:20 42:4,
 23 51:1,6
 52:1,3,4,9
 58:18 59:4
summary
 41:12
supervised
 11:12,13
 19:14
supervising
 50:6
supervisor
 9:16,22,23,
 24 12:7
 18:2,15
 19:20 24:2,
 10 25:22
 32:14,15
 42:15 50:13,
 15,21,24
 51:5

supervisory
 19:6 20:21
 21:4,5,6,8
support
 53:18
supposed
 16:15
sure
 13:14 29:8
 35:5,14
 51:16
suspension
 4:15 9:9
 12:3
swear
 39:16
sworn
 4:7 40:2

———————————

T

———————————

tabled
 59:5,7
take
 4:16 5:9,18
 6:25 12:20
 17:11,15
 29:1 38:23
 41:19 42:3
 44:4,8,16,
 20,22,24
 52:22 54:5
taken
 54:10
taking
 5:6 59:13
talk
 25:8 53:20
talked
 22:18 25:23
 26:11 49:25
 52:15
talking
 5:10,11
 31:9,10 51:1
 52:13

task
 20:4
team
 11:1 37:23
teams
 11:3
technically
 10:23
telephonic
 5:4 6:2
tell
 39:16 43:20,
 24 48:22
ten-minute
 54:6
term
 51:6,7,9
 59:1
terms
 19:8 24:5
 48:18
Terrance
 4:5 6:14
testified
 4:8,21 19:11
 28:10 36:4
thank
 58:14
thanks
 59:12
therapy
 29:5,21
things
 22:18 23:20
 24:14 35:12,
 15 36:12
 38:7
think
 24:2 51:25
 58:5 59:11
thought
 24:1
thoughts
 46:19
threat
 36:7 37:20

threatening
 17:23 18:4
 29:16 30:19
 33:4,8,11,
 14,24 37:20
 38:13 57:7
three
 7:6 44:25
time
 5:11,13 6:9
 9:20 17:9
 18:14,15
 19:5,13
 21:2,11,21,
 25 22:15
 23:15,24
 25:5 28:24
 29:14,15
 30:24 32:5
 34:15 36:8
 38:15,19
 48:3 50:7,
 11,15 51:5
 57:19 58:8
 59:13
times
 13:6 16:21
 40:20
TK
 31:10,16,19
 32:4 42:19
today
 4:16 8:14
 15:19 39:15
 58:15
today's
 8:13,20 9:15
 15:21
Todman
 4:18 5:13,16
 6:6,10 7:25
 8:21 17:4
 54:9 58:7,9,
 13 59:8,17
told
 9:16 16:13
 23:19 29:13
 35:8 41:18

Terrance Wallace
June 01, 2023

52:24
**Tom**
  31:23,25
**totality**
  31:7,9 56:15
**touch**
  49:6,7
**touching**
  7:22
**town**
  20:6
**traditionally**
  16:17
**trainee**
  22:13,21
**trainer**
  22:13
**training**
  7:14,15,16
  13:10,21
  14:6,7
  16:11,14
  17:1,8 22:2,
  20
**transcript**
  5:7
**travel**
  55:18
**traveling**
  56:3
**treated**
  26:6
**treating**
  29:14
**truth**
  39:16,17
**truthful**
  40:20 41:4
**truthfully**
  40:25
**try**
  5:19
**trying**
  26:12 28:2
  32:3 50:2
**two**
  5:10 15:3,5

21:25 24:24
**Tyson**
  10:5 11:7,9,
  12,15 17:21
  19:13,24
  20:4,14
  21:12 22:23
  23:3,7,13
  24:12,15,19,
  25 25:16
  26:5,6,16,21
  27:14,22
  28:8,9
  29:13,21
  30:5,6,9,18,
  25 31:23
  32:17,23
  33:2,16
  34:3,11,20
  35:1,2,11,
  19,23 36:7,
  11,18 37:4,
  14 38:12,17
  40:14 42:3,
  7,16,24
  43:7,14,16
  45:17 49:7,
  12,17,21
  50:24 51:11
  52:7,10
  54:14
**Tyson's**
  11:18 12:2,6
  28:19 29:11
  43:21,25
  51:21 53:4
**Tyson-phipp's**
  50:13
**Tyson-phipps**
  4:13 9:10
  10:2 11:24
  12:9 18:19,
  21 22:1
  23:20 25:7
  29:1 32:4,23
  35:5 36:22
  41:19 42:14
  44:10,15

45:3,7,13,
  20,22,23
  46:8,9,20,24
  47:4,6,12,
  18,20,25
  48:12 49:1
  50:17 51:8,
  16 52:12,20
  53:15,19,20
  54:3,16,21
  55:1,10,15,
  18 56:2,17,
  22 57:1,5,
  12,16,18
**Tyson-phipps'**
  53:10

————————————

**U**

————————————

**U.N.**
  10:14
**U.s**
  6:20
**U.S.**
  7:7,18 8:10
  21:18
**Ugarte**
  50:10
**ultimately**
  11:1
**UN**
  48:6
**unavailable**
  9:17
**uncomfortable**
  43:16,21
**undergo**
  13:21
**underlying**
  49:8
**understand**
  5:20,23,24
  8:4 11:22
  13:12 15:18
  16:20 53:7
**understanding**
  14:13,18,22

15:14,25
  50:12,22
  55:17,21
  56:1,12
**understood**
  35:19
**unfortunate**
  25:18 26:24
  58:25
**Unit**
  7:9 16:14
**updating**
  7:15
**upset**
  51:3
**utilize**
  13:18

————————————

**V**

————————————

**vehicle**
  18:22 20:15,
  17 22:24
  24:24 25:5
  30:24 43:15
  55:22
**verbally**
  37:12
**versus**
  19:9
**vicinity**
  55:23
**violating**
  51:13,18,23
**violation**
  14:14
**violence**
  17:16,19,22
**Virginia**
  7:10
**VISA**
  8:9
**VISAS**
  8:7
**voluntary**
  40:5,6,24

Terrance Wallace
June 01, 2023

---

**W**

---

**W-A-L-L-A-C-E**
  6:15
**wait**
  5:15
**walk**
  18:8
**walked**
  28:25 35:10
  36:8 44:17
**walking**
  35:18
**Wallace**
  4:5 6:14,16
  7:25 26:15
  38:23 41:18
  44:9,11
  45:3,7 46:6
  54:8,12
  58:5,14
  59:12
**want**
  8:14 9:7
  12:14 20:19
  30:20 54:6
**wanted**
  29:8
**Warning**
  40:23
**warrant**
  20:8 24:20
  46:11 48:19,
  23 56:13,14
**Washington**
  7:5
**way**
  5:22 9:6,12
  24:18
**weapon**
  14:19 15:1,
  7,12,16
  16:4,5,24,25
  23:16
**weapons**
  14:9,10

15:3,5,23
54:21
**Wednesday**
  8:23
**went**
  7:13 22:1
  35:4,7 36:13
  38:2
**whistleblower**
  49:19
**witness**
  8:4 17:7
  37:1
**work**
  10:10,11,15,
  23 18:13
  24:15 27:23
  48:5 49:23
**work-related**
  24:6
**worked**
  11:1 22:6,10
  47:11,24
  48:6
**working**
  7:18 10:22
  20:7 46:8
  54:16
**workplace**
  17:16,19,22
**works**
  54:9
**write**
  26:25 37:21
  39:21
**written**
  15:10
**wrote**
  52:4

---

**Y**

---

**yeah**
  16:8 38:6
  54:23
**year**
  10:12 14:3

27:13
**years**
  7:6 13:1,6
  15:25 32:11
**yesterday**
  59:15
**York**
  10:14 27:9
  37:23

---