# Exhibit N



United States Department of State

*Washington, D.C.   20520*

<u>SENSITIVE BUT UNCLASSIFIED</u>                    April 15, 2019

**INFORMATION MEMO FOR TJ Shelton – DS/EX/HRM**

FROM:        DS/FLD/NYFO – Peter Carlson

SUBJECT:    (SBU) Administrative Promotion Denial for SA Jason-Jabari Tyson-Phipps

**BLUF:**       (SBU) The Rating and Reviewing Officers for SA Jason-Jabari Tyson-Phipps do
                  not recommend him for Administrative Promotion.  The reason for this
                  determination is his performance has been unsatisfactory.  Moreover, he has been
                  advised of the areas of performance which are deficient, but failed to improve.

**(SBU)** SA Jason-Jabari Tyson-Phipps has been given a reasonable opportunity to demonstrate
satisfactory performance.  Not only has he failed to improve, he continues to repeat the same
poor judgment and poor interpersonal skills.  This recommendation to Human Resources (HR) to
withhold his administrative promotion is not made flippantly, nor is it made based purely on the
employee's mistakes.  As seasoned managers, both the Rater and Reviewer expect that agents
will make mistakes.  I speak from experience when I say that I have often learned more from my
mistakes than my successes.  What troubles me the most is that SA Tyson-Phipps not only
refuses to take responsibility for his actions but is adamant that he had not made any mistakes at
all (often blaming someone else for his "incidents" or short-comings).

Among the incidents was an email SA Tyson-Phipps sent to an investigator working at US
Attorney's Office for the Southern District of New York.  In the email, SA Tyson-Phipps
criticized New York Field Office management for their recommendations on how to proceed
with a passport fraud investigation assigned to him.  SA Tyson-Phipps was then counseled by his
rater and reviewer to show better judgment when communicating with personnel outside of our
office.  Because of the email he sent, SA Tyson-Phipps was given a DS-1974 Professional
Development Form identifying areas for improvement, specifically in this case focusing on how
his actions, deeds and words are perceived by others and sharpening his interpersonal skills.  The
DS-1974 is attached which includes SA Tyson-Phipps response.  I would have wanted SA
Tyson-Phipps to learn that even though his intentions were good, the way that he executed them
was not appropriate.  There is a saying, "good initiative, bad judgment;" I would have hoped that
SA Tyson-Phipps would have looked at this as an opportunity to improve his judgment while
maintaining his good initiative.

A second incident occurred about two months later when SA Tyson-Phipps was working in
Philadelphia on a protective detail for the US Ambassador to the United Nations.  During the
protective detail another agent observed SA Tyson-Phipps was carrying a secondary weapon in a
holster on his ankle.  This weapon was SA Tyson-Phipps' personal weapon; it was not issued or
approved by the Diplomatic Security Service.  This is a violation of 12 FAH-9 H-022 (7) which

prohibits, "Carrying or using any firearm, ammunition, or related equipment not specifically issued or approved by the Department of State."   SA Tyson-Phipps was then counseled by his rater and reviewer to show better judgment and better understanding of very elementary Diplomatic Security Service regulations.  He was given a DS-1974 Professional Development Form, specifically asking him to "… focus on his judgment and interpersonal skills as we go into the United Nations General Assembly (UNGA) 73."  In response to receiving the DS-1974 SA Tyson-Phipps stated no supervisor actually saw him carrying this weapon, the agent who did see it only saw it briefly and then only a small bit of it which stuck out from underneath his pants, it was not loaded, he had no place to store it safely, he wore it for officer safety, he was licensed to carry it in Pennsylvania, other regulations contradicted the provision cited, he did not wear it as part of his law enforcement and protection responsibilities and he did not display the weapon. He wrote, the "reading of this section of the FAH would infringe my second amendment rights as well as the license I have to carry the weapon as well as be nonsensical because it would suggest that a person could never carry their own weapon whenever they had their duty weapon." The DS-1974 is attached, however, his confusing and verbose argument is not the only cause for concern.  I find this so concerning, not only of his reluctance to take responsibility for violating rules and regulations, but also that it could have been avoided.  When both his DS colleagues who he was on post with informed him that he was not authorized to carry his personal firearm, he could have just asked what their suggestions were for safeguarding his personal weapon. Instead, he became combative and argumentative with them stating that it was his right to carry it (at no time did he make any of the arguments he made in his 1974 rebuttal).  Again, this was a lost opportunity for him to have learned from a mistake.  This was brought to the attention of our management team by SA Tyson-Phipps' colleagues not to "get him in trouble" but out of real concern that SA Tyson-Phipps could potentially find himself in a situation where the ramifications of his actions could be devastating.

A third incident occurred two months later during the United Nations General Assembly.  SA Tyson-Phipps was assigned to work the "chutes."  The chutes are a series of police controlled roads to allow protective details to drive to the United Nations building as quickly as possible. The Diplomatic Security agents who work the chutes assist our protective details who are moving by vehicle or on foot to get through the many layers of security and get to the appropriate location to enter the United Nations. One of the key rules is to not allow any movement of people or vehicles approximately 15 minutes before, then during and then 15 minutes after a Presidential move.

On September 25 at 5:40pm there was a Presidential freeze on.  However, SA Tyson-Phipps accompanied a woman who he said stated she was a "Minister" to 45th street, which is not an appropriate intersection to cross over to the United Nations. When he attempted to escort the woman, who was not a Diplomatic Security Service protectee, across the street the Secret Service stopped him telling him this was not an appropriate area to cross and in any case there was a Presidential freeze on.  All three of these factors, escorting a non-protectee, crossing at a blocked intersection and moving anyone during a Presidential freeze are all elementary prohibitions for a special agent working at the United Nations General Assembly and were briefed at the mandatory pre-UNGA briefing for all DS Agents. These elementary prohibitions were also briefed at a separate walkthrough and briefing specifically for DS agents working the chutes.  For this action SA Tyson-Phipp's rater wrote him a DS-1974 Professional Development

SENSITIVE BUT UNCLASSIFIED

Form admonishing him on his lack of good judgment and interpersonal skills. SA Tyson-Phipps response is in the attached DS-1974.

The management team takes no pleasure in opposing the administrative promotion of SA Tyson-Phipps. I feel comfortable stating that the DS ethos is to take raw talent, train them and then let them go out to do the jobs for which they were trained. Along the way, there will be mistakes and an opportunity for learning. This learning will be done from peers, supervisors and often subordinates (I learn something from my employees almost daily). SA Tyson-Phipps has rejected all of these opportunities to learn. During his time at NYFO, a vast number of agents (other supervisors and peers) have tried to help him or offer him advice on his conduct; he has appeared to reject each attempt at that help (one example is the incident with him carrying his personal firearm on duty). I feel as if everyone wanted SA Tyson-Phipps to succeed except himself.

In determining tenure and promotion we turn to our core precepts. SA Tyson-Phipps has failed to show that he can perform many of these basic competencies. As an example, under "Decision Making and Judgment" he has not displayed good judgment nor is he able to discern what is practical, ethical and allowable in official duties. I feel the incident in escorting an unknown person, across the street in the middle of a presidential freeze shows extremely poor judgment. Another competency is that the employee "...Accepts supervision, provides appropriate feedback and collaborates effectively..." He has provided feedback although usually inappropriate and he has not accepted supervision. His insistence he did nothing wrong when carrying an unauthorized firearm is a striking example of this problem. I feel it clearly illustrates his reluctance to be supervised at all. As to Written Communication, he does not "write succinctly..." nor "convey analysis clearly and highlight essential points." His responses in the attached DS-1974s provide evidence of this deficiency. He does not demonstrate Workplace Perceptiveness, as he does not "Demonstrate the sensitivity, inside and outside the office, to status, protocol relationships and chain of command..." For instance, he has no problem going to supervisors other than his own or their supervisors and having overly familiar conversations, or seeking an answer to a question he has "at that moment" because he wants it answered right away.

Attachment(s):

1. DS-1974 Professional Development Form dated June 11, 2018
2. DS-1974 Professional Development Form dated August 15, 2018
3. DS-1974 Professional Development Form dated October 12, 2018

SENSITIVE BUT UNCLASSIFIED

U. S. Department of State

# PROFESSIONAL DEVELOPMENT FORM
## For All Foreign Service Employees

| **Name of Employee** *(Last, First, MI.)* | **Post or Office/Position Title** |
|---|---|
| TYSON-PHIPPS, JABARI-JASON | 172684 - DS/FLD/NYFO<br>SPECIAL AGENT |

**Name of Rating Official**

JAGELS, ERIC M

| **Date** *(mm-dd-yyyy)* | **Period Covered** |
|---|---|
| 06-11-2018 | **From** *(mm-dd-yyyy)* 01-23-2018    **To** *(mm-dd-yyyy)* 04-15-2019 |

This form is a mandatory part of the performance management process. Use it to record interim discussions of the rated employee's performance. At least one interim discussion session must be documented. Each discussion should identify areas of strength in the employee's performance and opportunities for improved effectiveness; review goals achieved and update work responsibilities; and provide a mechanism for the rating official and rated employee to have a compatible view of the outcomes of their discussion. Notations should highlight major points.

A copy of the completed form must be provided to the employee. The rater should keep the original for his or her own records. Use a separate form for each discussion.

**A. Discussion of Overall Performance:** The rater should briefly characterize the employee's overall performance and cite supporting examples.   The following items should be components in each discussion:

1. In considering performance to date, assess the performance areas where the employee was strongest:

SA Tyson-Phipps has been working tirelessly on closing cases and criminal investigations.

2. Describe the performance areas on which the employee should focus over the coming months, including any areas of specific weakness or deficiency:

SA Tyson-Phipps should focus on how his actions, deeds and words are perceived by others.

3. Discuss the employee's demonstrated potential to take on greater responsibilities and which core competencies need the most additional development to succeed in higher level positions:

SA Tyson-Phipps needs to work on his Interpersonal Skills.

4. Identify any needed changes to the employee's core work responsibilities or specific objectives:

N/A

DS-1974
05-2015

Page 1 of 4

**B. General Discussion:** Describe the employee's progress in meeting the core work responsibilities and achieving the goals and specific objectives established for the rating period. Cite specific policy and programmatic outcomes and their impact on the Department's mission.

You will not communicate with anyone from the Assistant U.S. Attorney's (AUSA) office without informing and getting clearance from your supervisor or your Assistant Special Agent in Charge (ASAC).

/s/ ERIC JAGELS                                                                08-13-2018
           Rating Official                                                   Date *(mm-dd-yyyy)*

**C. Optional Employee Comments:** The employee is encouraged but is not required to comment. The employee's signature acknowledges receipt of this form, not agreement with the conclusions recorded by the rating official.

This Professional Development Form directly stems from an email correspondence between the AUSA's office and I on 8 June 2018. I would like to put what happened in its full context including the actual email which is reproduced below. It is my contention that nothing I said is inaccurate and that it is all backed up directly by the documented case record and evidence. I do understand that it can be interpreted in a way that might not cast NYFO and DS in the best light and should not have been written as it was. The email I sent was in response to an email from a person from the AUSA's office offering to answer questions. In response to the email correspondence with this person which I did not start, I took him up on the offer and asked him to help me understand what his office is looking during case presentations so I could better give them what they are seeking. As an example, I cited to the circumstances in a case which multiple AUSAs declined prosecution, the FPM said there was no fraud, and which I believed there to be no fraud. I did not give any PII or details of the case only the generic set of facts. Specifically I said "For example I have a case where there was an allegation of two-parent consent fraud because the non-custodial parent, who agreed the child should get a passport so they child could, in fact, come to visit him, signed a power of attorney to his child so he could sign on the father's behalf because the father was not in the country. " After this, I stated my opinion of how such a case should be handled, a finding of no fraud and my rationale. I then stated that "management" felt different and had me present the case which I did as instructed. What I did not say was the passport application was done 28 June 2017 almost a year prior, I had been assigned to the case 9 August 2018 and that I had presented the case to be closed 29 December 2017 with a finding of no fraud but was instructed by the two NYFO ASACs, "NYFO Management," to present the case against the mother who by no evidence even knew the father did not sign. I further did not say that two AUSAs including the chief intake AUSA for the Eastern District of New York actually laughed about the case and declined when I did present

*(continued on page 3)*

                Rated Employee                                                   Date *(mm-dd-yyyy)*

**C. Continued**

it on 2 January 2018 which was embarrassing to me. I did not say that on that same day I informed ASAC Ugarte the case was declined and rather than allowing the case to be closed he first instructed me to jurisdiction shop the case to operation Checkmate and when I told him it was not eligible he told me to take it to RAC Michael Davies in Pennsylvania which to me seemed to be wrong in that we were shopping cases where there was no crime to find a friendly jurisdiction to force a non-criminal into the legal system to improve stats. I further did not say that after expressing my opinion that this was not a crime and being threaten to do what I was told by management I did in fact do what I was told and complied. The result was that the US Attorney's office in the EDPA also declined the case and that I was told they were also confused why anyone would present this case. I did not put in the email that the fraud prevention manager from the passport office said this was not fraud. In fact, my email in no way states the result of the presentation of the facts only generic facts of a case that I had. What should be noted is regardless of the if there is a cognizable criminal offense against any of the adults in the actual case, the minor child is a US citizen and entitled to a passport which she has been denied for more than a year. It was not until August of 2018 when what was going on in this case became more public that there was finally some movement to get the child the passport after the family missed several trips and called me nearly daily. The minor child, her parents, and two passport agencies called and reached out to me continuously to try to resolve this situation which was put in limbo because of this ASAC. The Applicant lost money on several trips as well as family time together. The minor child called me the week this happened and stated her father had taken ill in the Dominican Republic and she needs her passport to go see him. It was because of calls like that the case was was on my mind when I replied to the email. Throughout all of that, even though the FPM, AUSAs and I the case agent all agreed no action was taken by NYFO management to ensure that a minor US citizen who is entitled to a passport received for which she paid. The fact is I was attempting to do my job the right and legal way and this reprimand is being demanded by the same "NYFO Management" responsible for creating the problem because I dared almost shed light on what they were doing. The reproduced email below will show that I NEVER refer to any of these things and none of it would be documented but for this write up because now I am forced for explain and defend my behavior. It is not noted that it comes after and EEO complaint. The "embarrassing" thing would only be embarrassing to someone who knows the details I did not state and who is looking at the situation with those details. "NYFO Management" during their counseling session stated that I did not or should have followed the SOP but the fact is I did. In my orientation binder which they demanded I bring, they pulled out a page that refers to the "Prosecution Guildlines-January 2016" During this sit down ASAC Ugarte specifically put these in my face and said this is what I should be following but the fact is I did and it was them who were not. Specifically they state:"DSS Agents of New York Field Office will seek prosecution of passport and visa fraud suspects, when investigation reveals probable cause in affiliation with the following:Suspect(s): who:•Investigation reveals probable cause of passport fraud, while revealing that the:•Suspect has prior felony convictions,•Suspect has prior crimes of violence with handguns,•Ongoing criminal nexus to mail fraud, social security fraud, financial and/or other "white collar" crimes.•Immigration offender, moral turpitude crimes and re-entry after deportations.•Suspect(s) passport or visa fraud activity involves nexus to transportation and possible endangerment of children.•Suspect(s) passport or visa fraud activity involves nexus to smuggling of humans for purposes of indentured servitude or sexual slavery.•Passport fraud investigation reveals "identity theft" from death identity or stolen identity of a living U.S. citizen.•Passport fraud investigation reveals lower level rung to false "breeder" document vendors.•Preponderance of false documents investigation "public integrity" abuse in state, federal or local government agencies.•Passport and visa fraud offenses as a conveyance to terrorism activity (funding, conspiracy, surveillance, or endangering the lives of U.S. citizens).•Passport and visa offenses that involve the International Parental Child Abduction (IPCA) cases.This case did not meet one of these circumstances and I as the investigating agent, the FPM who referred the case and ultimately the AUSA all agreed there was no probable cause. The argument given to me was that it is not for me and I assume any of these people to decide it is for "NYFO Management." So Yet again I am being reprimanded for following the policy and ultimately I am sure will be further punished for putting this in writing which I don't feel is fair and which violates the whistleblower laws and protections. Further, I think it is important to put the conclusion of this matter into context. This case was referred by the Philadelphia FPM, Ray DeVoe. After I spoke with DeVoe and sent him the power of attorney he stated that had he known that the case would have never been referred. He conferred with NY FPM Luis Linares who also agreed the case should not have ever been referred. Ultimately, "NYFO Management" had me refer a case to 3 jurisdictions, and had 3 AUSAs decline a case which I did not want to refer and which the referring person stated they would not have referred had they had

**C. Continued**

d the facts. The Applicant as of August 13, 2018 is still waiting to get her passport which the FPMs agreed to work with her to get so I am actually being written up here for doing the right thing which they are trying to spin as being wrong when they ae the ones who had me shop a case that was not cognizable under the law. As a result of me speaking out about these circumstances of this case which I feel are not right, fair, or proper procedure in the treatment of a minor US citizen I have been punished multiple times including having opportunities taken from me, being reprimanded including this, a poor EER for the rating period, and suffering different treatment in the office. I understand completely that sending an email to an AUSA that can be perceived as critical of NYFO management is not right but a fair reading of the email will show that was not my intent and if anything my email speaking out about I perceived to be a wrong being committed that is still being committed a clear violation of the whistleblower laws. That is the context of why I am receiving this Professional Development Form. Below is the verbatim copy and paste of the email I wrote which gives rise to this write up. _____From the AUSA's office Hey guys. My apologies, but I do not think I will be able to make it Wednesday. Please feel free to give me a shout if any questions come up. Thanks [AUSA investigator] My response:Hi [AUSA investigator]:I'm not sure if we have met or if you can help me with this but it's something I that I've been trying to figure out and work on since I joined DS. My ask upfront is if you had a bit of time to discuss what you all are looking for and/or do you have a copy of the prosecutorial guidelines you could share.A bit of background I am a lawyer as well and I take a little backlash for it around the office even though I think it is helpful in understand some of the more nuance legal aspects of our case work which many people do not seem to understand. For example I have a case where there was an allegation of two parent consent fraud because the non-custodial parent, who agreed the child should get a passport so they child could in fact come visit him, signed a power of attorney to his child so he could sign on the father's behalf because the father was not in the country. My gut said no fraud, especially after the non-custodial parent appeared and replaced the form with one he signed in front of me and provided a sworn statement to me. Management said its fraud and to take it to you all because it should be prosecuted. I still see no way that is meets any fraud statute when there is clearly no scienter and at best it is administratively not allowed by a rule you would have to dig deep for and which is still questionable. These are the kinds of back and forward discussions that happen and why I get the backlash because my response is often I am admitted in NY, the SDNY, and EDNY and I would not take that case. It is my humble opinion that pressing things like this makes us look bad and wastes time. This is where my question comes from; I am hoping I can get a better understanding of what you all need and/or are looking for so I can be able to package my things better and or know what to spend more time on. For example in another case, it came to us as passport fraud but I have enough evidence to add on bank fraud, wire fraud, mail fraud charges as well. Would that be better to lead with those or does it not matter which charge and it is dependent on the Subject or some other factors. Thanks in advance,J



U. S. Department of State

## PROFESSIONAL DEVELOPMENT FORM
### For All Foreign Service Employees

| Name of Employee *(Last, First, MI.)* | Post or Office/Position Title |
|---|---|
| TYSON-PHIPPS, JABARI-JASON | 172684 - DS/FLD/NYFO<br>SPECIAL AGENT |

**Name of Rating Official**

JAGELS, ERIC M

| Date *(mm-dd-yyyy)* | Period Covered |
|---|---|
| 08-15-2018 | **From** *(mm-dd-yyyy)* 04-16-2018   **To** *(mm-dd-yyyy)* 04-15-2019 |

This form is a mandatory part of the performance management process. Use it to record interim discussions of the rated employee's performance. At least one interim discussion session must be documented. Each discussion should identify areas of strength in the employee's performance and opportunities for improved effectiveness; review goals achieved and update work responsibilities; and provide a mechanism for the rating official and rated employee to have a compatible view of the outcomes of their discussion. Notations should highlight major points.

A copy of the completed form must be provided to the employee. The rater should keep the original for his or her own records. Use a separate form for each discussion.

**A. Discussion of Overall Performance:** The rater should briefly characterize the employee's overall performance and cite supporting examples.   The following items should be components in each discussion:

1. In considering performance to date, assess the performance areas where the employee was strongest:

Jabari has shown improvement in his criminal investigations and conduct in the office.  He has seemed to "hit his stride" and doing well closing cases, developing surveillance plans and focusing on the administrative process of closing cases.

2. Describe the performance areas on which the employee should focus over the coming months, including any areas of specific weakness or deficiency:

I want Jabari to focus on his judgment and interpersonal skills as we go into the United Nations General Assembly (UNGA) 73.

3. Discuss the employee's demonstrated potential to take on greater responsibilities and which core competencies need the most additional development to succeed in higher level positions:

Jabari is showing that he is able to take on greater responsibility with the caveat that he incorporates good decisions and sound judgement.  He has the work ethic and intelligence, I want him to focus on the intangibles of interpersonal and judgement. I want Jabari to focus his "Leadership Skills", specifically the element of "Decision Making and Judgement".

4. Identify any needed changes to the employee's core work responsibilities or specific objectives:

N/A

DS-1974
05-2015

Page 1 of 4

**B. General Discussion:** Describe the employee's progress in meeting the core work responsibilities and achieving the goals and specific objectives established for the rating period. Cite specific policy and programmatic outcomes and their impact on the Department's mission.

The reason I want Jabari to focus on Interpersonal Skills and Leadership is because of the following incident. While standing post in Philadelphia in support of the U.S. Ambassador to the United Nations (USUN), Jabari was wearing his personally owned firearm on his ankle. He was wearing his authorized/issued firearm, however, he also had his personal pistol. Jabari claims he is licensed to carry his personal pistol in the state of Pennsylvania, however, him carrying it on duty is in violation of the following DS policy (12 FAH-9 H-022 #7):

12 FAH-9 H-022  ACTIVITIES SPECIFICALLY PROHIBITED (U)
(CT:SPE-2;  12-29-2011)
(SBU)  The following activities are specifically prohibited for DSS special agents while armed:
(1)  (SBU)  Careless or irresponsible behavior;
(2)  (SBU)  Careless or unnecessary display of a firearm in public;
(3)  (SBU)  Dry-firing or practicing quick draws other than during training or qualification practice;
(4)  (SBU)  Threatening a person, or making an unwarranted allusion to being armed, in any situation not directly related to an official purpose;
(5)  (SBU)  Consumption of any alcoholic beverage while armed, or six hours prior to being armed, or at any time prior to being armed sufficient to impair an agent's judgment or ability to perform his or her duties;
(6)  (SBU)  Use of medications or drugs that may impair judgment or ability while on duty (see 12 FAH-9 H-030);
(7)  (SBU)  Carrying or using any firearm, ammunition, or related equipment not specifically issued or approved by the Department of State, FPRB; or
(8)  (SBU)  Carrying or using a modified firearm not previously approved by the DS armorer.

(continued on page 3)

/s/ ERIC JAGELS                                              08-22-2018
              Rating Official                          Date *(mm-dd-yyyy)*

**C. Optional Employee Comments:** The employee is encouraged but is not required to comment. The employee's signature acknowledges receipt of this form, not agreement with the conclusions recorded by the rating official.

In reference to this, again I feel I am being unfairly targeted and singled out with clear intent to tarnish my record as a pretext to whatever action is going to be taken against me next. This write up comes as a result of me having my personal weapon on my person instead of leaving it in an unsecure hotel room. What is not noted it that the weapon was unloaded and concealed on my ankle. SSA Jagels did not nor did any supervisor see the weapon. Instead this was reported to him by a non-supervisor who scrutinizing me noticed it because was wearing ankle socks and he saw the black from the leather of the holster and confronted me. I pulled my pants down the less that an inch they would have fell had I not been seated with my leg crossed to re-conceal the holster but that apparently was not enough for this not to be reported back. For this, I was yet again confronted and guilty of things that were later provable untrue. The individual only saw the weapon in the ankle holster because it had slipped below my pant line while I was in the down room with my leg crossed. The weapon was not visible at any other time and it was not seen by any one at any other time. It should be further noted that SA Ari Kaufman who is also under Jagels supervision and who is left as our acting supervisor was the person who encouraged me and told me I could wear whatever I want as a federal agent as long as I carried my duty weapon. He does/did as well and Jagels was well aware of this because he had/has seen it. It should be noted that was a loaded weapon.Additionally SSA Grady and other senior agents stated for officer safety he would encourage carrying a firearm at all times and I do not generally carry my duty weapon off duty. I have been told the story of LEOs who were killed because they were confronted off duty without their firearm. I have been involved in high profile arrests and the sentiment against law enforcement would make it prudent to carry.Rather than carry my larger duty weapon, I carry the smaller "pocket" firearm which is earlier concealed. The weapon is the same caliber which is authorized by DS. Being in an unfamiliar city which can be dangerous I thought it prudent to have my personal off duty weapon being that I have a

(continued on page 4)

/s/ JABARI-JASON TYSON-PHIPPS                               10-11-2018
              Rated Employee                          Date *(mm-dd-yyyy)*

**B. Continued**

To me and others this did not show sound judgement. I think if Jabari had stronger interpersonal skills, he could have diffused the situation. It is my understanding that Jabari was arguing the legality of his personally owned pistol. I feel strongly if Jabari had said "you're right, the reason I have it on is because I didn't want to leave it in the safe, I'll take it off and just put it in my bag and keep in in the command post" it would have ended the conversation and this would have never made it to this level. The agent who reported the incident was more concerned about Jabari finding himself in a situation where he could use his personal pistol in an official capacity and not be covered by the State Department and Diplomatic Security.

Jabari will have an easier time in the Department if he realizes that not everything is up for debate and not everyone is interested in debating.

DS-1974                                                                                          Page 3 of 4

**C. Continued**

license to carry it in the state we were in but I did not want to leave it unsecured. Contrary to SSA Jagels statement I do not "allegedly" have a license to carry that weapon aside from my creds and leosa, I in fact have a private license to carry in Pennsylvania where this occurred. In fact contrary to SSA Jagel's assertion, he has not only seen but he has held that license as I showed it to him had handed it to him to examine when this was first brought to my attention by him.SSA Jagels cited to a part of the FAH which is not easily accessible to make the point that "unauthorized firearms are prohibited" however he cherry picks from that section. 12 FAH-9 H-011 entitled "PURPOSE" gives how the section he cuts and pastes is to be applied and when it does apply. He selectively leaves that portion out and I believe it is important to include it in it's entirely if we are going to include part of it. It states:"This Handbook provides procedures and guidelines for the acquisition, handling, and protection of firearms used in connection with DS law enforcement and protection responsibilities in the United States and abroad. It contains the weapons qualification requirements and standards of conduct for persons authorized to carry firearms. In addition, this Handbook describes firearm discharge procedures and circumstances that may suspend or terminate carry authority."I would like to emphasize the portion that states the section provides procedures and guidelines for "firearms used in connection with DS law enforcement and protection responsibilities in the United States and abroad." My personal firearm which was unloaded was not being used "in connection with DS law enforcement and protection responsibilities in the United States and abroad." It was being secured on my person rather than irresponsibly being left an insecure hotel room. I was carrying my duty firearm "in connection with DS law enforcement and protection responsibilities in the United States and abroad." This is contrary to the rumor I was confronted with and accused on and which was being repeated by people who were not there. There is no question by anyone who was there that I was carrying my duty firearm and I only carry my duty firearm in connection with my duties as is required. His reading of this section of the FAH would infringe my second amendment rights as well as the license I have to carry the weapon as well as be nonsensical because it would suggest that a person could never carry their own weapon whenever they had their duty weapon.Overall I am willing to take responsibility for having my personal weapon but to this day no one can suggest what I could have done better to secure it better in the situation. I was not displaying the weapon and the only reason any one knew I had it was again a spy network putting extra scrutiny on everything I do. If not that how does this information go all the way back for a non-supervisory agent to NYFO management to a write up before I can return to the office? It sounds silly to suggest people are out to get you until there are this many examples where there are constantly things like this after an EEO complaint. Again I am willing to take responsibility but I think it's also clear that the treatment I receive is unfair and has gotten worse since I complained about it formally which is not right.



U. S. Department of State

# PROFESSIONAL DEVELOPMENT FORM
## For All Foreign Service Employees

| Name of Employee *(Last, First, MI.)* | Post or Office/Position Title |
|---|---|
| TYSON-PHIPPS, JABARI-JASON | 172684 - DS/FLD/NYFO<br>SPECIAL AGENT |

**Name of Rating Official**
JAGELS, ERIC M

| Date *(mm-dd-yyyy)* | Period Covered |
|---|---|
| 10-12-2018 | From *(mm-dd-yyyy)*  04-16-2018    To *(mm-dd-yyyy)*  04-15-2019 |

This form is a mandatory part of the performance management process. Use it to record interim discussions of the rated employee's performance. At least one interim discussion session must be documented. Each discussion should identify areas of strength in the employee's performance and opportunities for improved effectiveness; review goals achieved and update work responsibilities; and provide a mechanism for the rating official and rated employee to have a compatible view of the outcomes of their discussion. Notations should highlight major points.

A copy of the completed form must be provided to the employee. The rater should keep the original for his or her own records. Use a separate form for each discussion.

**A. Discussion of Overall Performance:** The rater should briefly characterize the employee's overall performance and cite supporting examples.  The following items should be components in each discussion:

1. In considering performance to date, assess the performance areas where the employee was strongest:

Jabari has shown improvement in his criminal investigations.  He is talented at using technology as well maximizing the use of the internet in his criminal investigations.

2. Describe the performance areas on which the employee should focus over the coming months, including any areas of specific weakness or deficiency:

Jabari should focus on his judgment and interpersonal skills.

3. Discuss the employee's demonstrated potential to take on greater responsibilities and which core competencies need the most additional development to succeed in higher level positions:

I am hesitant to increase to SA Tyson-Phipps' responsibility.

4. Identify any needed changes to the employee's core work responsibilities or specific objectives:

N/A

DS-1974
05-2015

Page 1 of 5

**B. General Discussion:** Describe the employee's progress in meeting the core work responsibilities and achieving the goals and specific objectives established for the rating period. Cite specific policy and programmatic outcomes and their impact on the Department's mission.

You're having difficulties making progress and meeting your continuing responsibilities and core work responsibilities in the realm of protective operations.

As an example, at the United Nations General Assembly held during the week of September 24 to September 28, 2018, you were assigned to work the "chutes." The chutes are a series of police controlled roads to allow protective details to drive to the United Nations building as quickly as possible. The Diplomatic Security agents who work the chutes assist our protective details who are moving by vehicle or on foot get through the many layers of security and get to the appropriate location to enter the United Nations. One of the key rules is to not allow any movement of people or vehicles approximately 15 minutes before, then during and then 15 minutes after a Presidential move. On September 25 at 5:40PM there was a Presidential freeze on. However, you accompanied a woman who said she was a "Minister" to 45th street, which is not an appropriate intersection to cross over to the United Nations. This is after you were briefed in detail by SA Brenden Hobson (the Diplomatic Security agent in charge of chutes and your Point of Contact during UNGA 73) that you are there to aid and facilitate only people who are under the protection of Diplomatic Security. Additionally, you were briefed multiple times in our all hands brief that the only place to cross 1st Avenue is at 46th Street. You attempted to walk a non-Diplomatic Security protectee across 1st Avenue in a place where you were told not to cross multiple times and you did it in the middle of a POTUS freeze. This is a serious violation of our security protocol. You were only stopped because a US Secret Service agent told you this was not an appropriate place to cross the street and in any case there was a Presidential freeze in place. You did then stopped and go back to the sidewalk.

You were then verbally counseled by SA Brenden Hobson for assisting the woman to cross over to the United Nations at an inappropriate time (there was a Presidential freeze on) and place (an intersection at which no

(continued on page 3)

/s/ ERIC JAGELS                                                          10-12-2018
_____                              _____
Rating Official                                                          Date *(mm-dd-yyyy)*

**C. Optional Employee Comments:** The employee is encouraged but is not required to comment. The employee's signature acknowledges receipt of this form, not agreement with the conclusions recorded by the rating official.

Yet again I feel this is another retaliatory action being taken against me that is filled with blatant and clear untruths that are proven by indisputable evidence. In this case, first I was accused of walking around a security gate and taking someone into the street. When it became apparent that is a blatant lie now the story is that I somehow opened a security gate that several NYPD and USSS personal were standing at which yet again is easily proven to be a blatant lie because it happened literally in front of the USUN building where there are several cameras. I have requested several times the cameras be reviewed because its clear either I'm lying and I should not be trusted nor should I have this job or whoever is telling this story is and they lack integrity. I am more than willing to make that wager because I know the truth but for some reason they are not willing to make the same wager. I think that says a lot about who is telling the truth in this situation.Again this has become indicative of these things. There is a complete lack of transparency and integrity. An accusation is make against me, I am guilty, and then when the facts don't support that accusation then the accusation is changed or I am told the facts don't matter. It has gotten to the point where it is clear they will say whatever they want on these things and it will be used a pretext to get rid of me or say I am not fit for positions. Yet somehow in all of this there is actual evidence of who is telling the truth which they are in control of which they will not let me see nor will they make reference to.There are three undeniable truths in this story which if taken together support everything I am saying barring things a fact free world. 1. I did walk with this woman. 2. I walked past several senior DS agents who if they knew I was doing something so out of the ordinary chose not to stop me. 3. I came to a fence line that was manned by the USSS and the gate was opened and I was let through and they did not stop me. So in this case I am being told I am wrong for stopping an altercation and then doing as I was told, asking my superiors what to do, and then doing EXACTLY what I was told to do all of which is on camera.This all starts to feel like gaslighting when

(continued on page 4)

/s/ JABARI-JASON TYSON-PHIPPS                                 10-12-2018
_____                              _____
Rated Employee                                                          Date *(mm-dd-yyyy)*

**B. Continued**

crossing was allowed) and for leaving your post to work with someone not being protected by a Diplomatic Security detail.

**C. Continued**

because everyone tries to convince you of something but anyone who looks at it from an objective standpoint can see is not true. If there was a presidential freeze why were people still arriving at the USUN. That is never answered because it is a fact incongruous with their story so it is ignored. If it was a Presidential freeze who allowed me to open the gate being that there were people at the gate and even then who allowed to go from the south side to the north side of the block. Why was I not directed to stay? If they thought it was a DS detail why were there no other agents? No advance no AIC only me not in a suit. Did no one find that out of place? These are just examples of simple questions that poke holes in the story they want to tell again as a pretext. When I point out that the facts they are saying are not compatible then meeting are shut down and they don't want to hear it so basically like always this is a hangman's jury and judge. They have made their decision, they want to come to the conclusion they have regardless of the facts and they will lie obfuscate, and/or manipulate facts to make sure that I am wrong. When asked what else I could have done the initial answer was allow the fight to happen. Clearly that did not sound good and so now the answer is I should/could have talked to Hobson. When I pointed out that he was not there then again that was changed to I should have called him on the radio. This all again is the type of Monday morning QBing that I and no one else is subject to. I was accused of taking this person into a secure zone which again was a lie provably. So that too was changed but the stuff that was derive was not. Throughout all these instances when I point out the falsity of all the claims they always come back to I'm missing the big picture by pointing out everything in that picture and what it is made of is untrue.I know this comes off combative and angry but my true feeling is frustrated which is why I am going to leave it as it. I am being made to do my job with one hand behind my back. I am under constant unwarranted scrutiny. I am given formal write ups for things that others are not even spoke to about and there is a clear disparate treatment.My version of what happened as I wrote it the day after is below. Again there are cameras and if there was actual interest in facts or the truth there would be a review of the cameras as I requested but as can be seen they are refusing to do that only pass this judgment and punishment.I should be pointed out that it is claimed that I was stopped and told to go back to the sidewalk in this write up. That is not true. In fact I was allowed to cross just not in the direction I was initially told to cross. I had done what was done several times prior by the senior agent and what I was instructed to do and yet here we are. This is what is frustrating. Just to be clear this did not occur when there was no movement at all. When this occurred we were still dropping motorcades and delegates to USUN as I think can be inferred by the fact that I had her wait for the people to clear before I let her walk even to the corner. Official UNCLASSIFIEDFrom: Tyson-Phipps, Jabari-Jason Sent: Wednesday, September 26, 2018 9:56 AMTo: Jagels, Eric M <jagelsem@state.gov>Cc: Carlson, Peter M <CarlsonPM@state.gov>Subject: Incident 25 September 2018 first and 45. While standing post at check point F I observed what seemed to be another heated argument between a Uniform Secret Service officer, one many that had happened, and two women regarding direction of travel. I approached the situation in an attempt to calm it down. One woman stated to me that the other was a minister and needed to give a speak at a meeting at the UN. She was sent to 42 and 2 and turned away and then to 43 then 46 and now 44. I explained that due to a hold there was no movement allowed at those check points but she may be able to make the left down first between 44 and 45 as we had told everyone all day. They later came back and said there were told they were not allowed to travel in that direction the one woman stated that she did not need to go but asked if they minster could go. She showed me credentials identifying her as a minister from India I believe her name was Getty and paperwork indicating she was scheduled to attend and event. I told her to hold and I would check as Adams had done previously. I informed the senior agent at the checkpoint SA Adams and walked to the front of the USUN to inform the senior agents there of what was going on and ask for guidance. I informed them that she claimed she is a minister who had to give a speak but could not get through anywhere. I was told she can get through "her and only her" and I was told to walk her across. This was loud enough to be in ear shout of the NYPD officer line behind whom I had left the lady. The officers hearing that turned and let her pass. I walked up to meet her and told her to hold until the front of the USUN was clear of arriving guests. I then walked her to the south west corner at 45 and first with the intent of walking her just across the street to south west side corner on 46 and first as I was told. It was clear the woman had no other agents or detail with her because 1 she was told her and only her and I had her stop before the door to the USUN and there was no other agents or people. The USSS people, officers and people manning the fence line on the north east corner of 45 and first told me to take her directly across to the northeast side through a whole that was opened in the gate having heard I assume the conversation rather than the south west side corner where normal pedestrian traffic was going before as I intended. I complied but was stopped by uniform secret service and to take her the way I intended. I complied. I took the woman to the public line and informed the officers there of the situation as I

**C. Continued**

I understood it and ask then to make sure when the freeze which had now started was over she would be allowed to cross first. I waited until POTUS' motorcade passed 10+ minutes later in the rain then walked back to my post and informed Adams.