UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JABARI-JASON TYSON-PHIPPS,                          :

                                                    :        OPINION & ORDER
                             Plaintiff,                      23 Civ. 2316 (LAK) (GWG)
                                                    :

        -against-                                   :

                                                    :
SECRETARY MARCO RUBIO,
*U.S. Department of State,*                         :

                             Defendant.[1]          :
-------------------------------------------------------------X
**GABRIEL W. GORENSTEIN, United States Magistrate Judge:**

        Jabari-Jason Tyson-Phipps brought this case against the United States Secretary of State

alleging violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title

VII"), the Whistleblower Protection Enhancement Act of 2012 ("WPA"), 5 U.S.C. § 2302(b)(8)-

(9), and the First, Second, and Fifth Amendments, among other state and federal laws.  See

Verified Complaint, filed March 18, 2023 (Docket # 1) ("Compl.").  His complaint was

dismissed for failure to state a claim and Tyson-Phipps now moves for leave to file an amended

complaint.[2]  In a proposed amended complaint, Tyson-Phipps alleges violations of Title VII.

See PAC ¶¶ 141-156.  For the reasons that follow, the motion for leave to amend is granted in

part.

---

        [1]  Secretary of State Marco Rubio is substituted as defendant for Antony Blinken by
operation of Fed. R. Civ. P. 25(d).

        [2]  Plaintiff's Motion for Leave to File an Amended Complaint Pursuant to the October 8,
2024, Order, filed November 7, 2024 (Docket # 37) ("Mot."); First Amended Verified
Complaint, filed November 7, 2024, annexed to Mot. (Docket # 37-2) ("PAC"); Letter from
Secretary Antony Blinken, filed November 19, 2024 (Docket # 38) ("Opp."); Letter from Tyson-
Phipps, filed November 20, 2024 (Docket # 39).

I.  BACKGROUND

   A.  Procedural Background

   As it relates to the claims in this case, the proposed amended complaint alleges that,

"[b]efore filing this action, [plaintiff] submitted a charge of discrimination with the Equal

Employment Opportunity Commission (EEOC), alleging Title VII violations," and that the

EEOC "issued a Notice of Right to Sue" on December 19, 2022.  PAC ¶¶ 12, 14.  Plaintiff

annexed to his original complaint a decision of the EEOC, dated December 19, 2022, denying a

motion to reconsider a prior decision in Case No. DOS-0385-19 (the prior decision is not

annexed to the complaint).  See Decision on Request for Reconsideration, dated December 19,

2022, annexed to Compl. (Docket # 1-3) (the "EEOC decision numbered DOS-0385-19").[3]

   On March 18, 2023, plaintiff filed the instant action.  See Compl.  On June 12, 2023,

plaintiff moved for a preliminary injunction, see Letter, filed June 12, 2023 (Docket # 9), which

was denied on June 29, 2023, see Order, filed June 29, 2023 (Docket # 12).  On July 17, 2023,

the Government filed a motion to dismiss the complaint or, in the alternative, for summary

judgment.  See Notice of Motion, filed July 17, 2023 (Docket # 13).  On December 20, 2023,

plaintiff filed a motion for a preliminary injunction, sanctions, and leave to amend.  See Motion

for an Injunction, Sanctions, to Amend, and or in Opposition to Dismissal, filed December 20,

2023 (Docket # 25).  On September 10, 2024, the undersigned issued a Report and

Recommendation recommending that the Government's motion to dismiss be granted and that

plaintiff's motion for a preliminary injunction and other relief be denied.  See Tyson-Phipps v.

---

   [3]  Because this document is referenced in the proposed amended complaint, PAC ¶ 14,
the Court takes judicial notice of the decision.  See Innes v. Cnty. of Warren, 2023 WL 3601237,
at *2 (N.D.N.Y. May 23, 2023) ("The Letter of Determination and Right to Sue letters [from the
EEOC] are . . . public records that are subject to judicial notice.").

Blinken, 2024 WL 4128445, at *1 (S.D.N.Y. Sept. 10, 2024).  After the plaintiff filed objections, the district judge adopted the substance of the undersigned's Report and Recommendation.  See Tyson-Phipps v. Blinken, 2024 WL 4444281 (S.D.N.Y. Oct. 8, 2024).  In that decision, the district judge gave plaintiff permission to "move for leave to file an amended complaint with respect only to his Title VII claims."  Id. at *2.

B.  Allegations in the Proposed Amended Complaint

Because the resolution of Tyson-Phipps' motion turns on whether his proposed amended complaint states a claim for relief, we "accept[ ] all factual allegations" in his proposed amended complaint "as true and draw[ ] all reasonable inferences in favor of the [plaintiff]."  Empire Merchants, LLC v. Reliable Churchill LLLP, 902 F.3d 132, 139 (2d Cir. 2018) (citation and internal quotation marks omitted).

Plaintiff is an employee of the United States Department of State.  PAC ¶ 6.  His 55-page proposed amended complaint outlines various actions by Department of State personnel that plaintiff asserts show that he has been the victim of employment discrimination, retaliation, and a hostile work environment.  Because plaintiff has made substantial revisions to the original complaint, we recount the allegations in the proposed amended complaint in some detail.  Nonetheless, we note that the proposed amended complaint constitutes a lengthy and often repetitive recounting of numerous incidents over the course of plaintiff's employment that are of indeterminate significance in relation to the claims in this case.  Thus, we do not recount all allegations in full and omit allegations that have no potential relevance to his claims.

1.  <u>Events Leading Up to Plaintiff's EEOC Charge</u>

Plaintiff has been employed by the Department of State as a United States Diplomatic Security Special Agent since September 18, 2016.  PAC ¶¶ 6, 7, 17.  Part of plaintiff's training was done at the Federal Law Enforcement Training Center ("FLETC") where, "[d]ue to [his] legal background and experience teaching law at East Stroudsburg University of Pennsylvania's business school, [he] was asked to teach the first Constitutional law class at FLETC until a staff legal instructor was assigned."  <u>Id.</u> ¶¶ 20, 30.  "This led to public mockery and harassment, including being called an 'Ivy League egghead' unfit to be an agent, which management ignored or even encouraged."  <u>Id.</u> ¶ 30.

"The training cadre engaged in harassment, subjecting [plaintiff] to racialized tests and disparate treatment."  <u>Id.</u> ¶ 31.  "In one instance, [plaintiff] was singled out as the only Black American and forced to drive around an unfamiliar area until lost, then had [his] maps and GPS confiscated."  <u>Id.</u>  Then, he "was ordered to drive to the nearest hospital, and upon reaching Howard University Hospital — a historically black institution — [he] was threatened with failure and termination for not choosing George Washington University Hospital, a predominantly white institution."  <u>Id.</u>  Upon protesting, the "instructor disparaged Howard, saying, 'You only go to Howard if you want to die,' referring to it as a 'Black hospital.'"  <u>Id.</u>

In April 2017, the plaintiff "was singled out . . . as the only Black agent in [his] class, to drive a white Confederate reenactor to the Belle Grove Plantation in Virginia . . . while being mocked and laughed at."  <u>Id.</u> ¶ 32.  During this episode, plaintiff "was called racial slurs like 'boy' and barred from using the restroom in the 'big house.'"  <u>Id.</u>

Plaintiff "reported these incidents to training coordinator Jeffrey Kraus, his supervisor Mark Typinski, and senior officials, including then-director Bill Miller, around April 13, 2017."

Id. ¶ 33.  "Miller and others requested that [plaintiff] refrain from filing a formal complaint, promising to address the issues."  Id.

At some point after his training, plaintiff was assigned to work at the New York Field Office ("NYFO").  Id. ¶¶ 27, 34.  However, "the discriminatory treatment continued due to the Department's unofficial 'hallway reputation' evaluation system," which "punishes agents who challenge authority."  Id. ¶ 34.  There, plaintiff "was treated differently than other agents without explanation [and] was denied a take-home vehicle and travel orders, as well as the relocation funds required by Department policy and federal regulations."  Id. ¶ 35.  This differential treatment was referred to as "'JJ Rules," "rules imposed solely on [Jabari-Jason Tyson-Phipps]."  Id. ¶ 36.  Plaintiff alleges that "further mistreatment" occurred "after reporting discrimination, bullying, and harassment."  Id. ¶ 34.  He does not specify, however, to whom he made such a report.

Plaintiff was "wrongfully accused of being late" during an assignment in Hamburg.  Id. ¶ 37.

On July 20, 2017, plaintiff complained about racial discrimination and continued harassment to Assistant Special Agent in Charge ("ASAC") Joseph Ugarte who "threatened [plaintiff's] career if [he] continued to complain.  Id. ¶¶ 38, 39.  After plaintiff informed Ugarte that he would be "administratively promoted to FS4," "Ugarte responded, 'We'll see about that,' implying he would block [plaintiff's] promotion — a threat he acted upon."  Id. ¶ 39.  This action "is the basis of this complaint."  Id.

Plaintiff "documented [his] conversation with Ugarte and reported it to [his] supervisor, Eric Jagels, on July 24, 2017."  Id. ¶ 40.  The resulting meeting "start[ed] the chain of events that led to [plaintiff's] EEOC complaint and this lawsuit."  Id.

On March 17, 2018, plaintiff sent "Tanya Sears, [plaintiff's] second-line supervisor and acting Special Agent in Charge" and the "office [Equal Employment Opportunity ("EEO")] coordinator" "an email describing the harassment, bullying, and discrimination [plaintiff] had experienced and was still facing." Id. ¶ 41. "Instead of keeping [this] email confidential . . . per Department regulations, Sears shared it with other NYFO managers, including ASAC Peter Carlson, Elizabeth McAleer, Jagels, and ultimately Ugarte." Id. ¶ 43.

"[B]etween March 26 and March 29, 2018, Carlson and Jagels confronted [plaintiff] in an interrogation room . . . threatening 'consequences' if [plaintiff] didn't drop [his] complaints." Id. ¶ 44.

Subsequently, in an April 27, 2018, email chain in which Ugarte, Carlson, and John R. Cory, "Senior Special Assistant to the Director and the Principal Deputy Secretary of State ('PDAS') for Diplomatic Security," discussed potential disciplinary actions to take against plaintiff, "Cory suggested . . . a performance improvement plan . . . , letters of admonishment, or blocking [plaintiff's] tenure by adding negative remarks" to plaintiff's performance evaluation ("EER"). Id. ¶¶ 45-46. In the same email chain, Ugarte claimed plaintiff had a "'medical condition' and disclosed . . . that [plaintiff] had raised concerns of disparate treatment." Id. ¶ 48. Ugarte also "continued pushing for [plaintiff's] removal" by requiring him to undergo a fitness-for-duty psychological evaluation ("FFDE"). Id. By "this point, no accusations of wrongdoing had been made against" plaintiff, he had not "committed any misconduct," and he had not been given notice of performance deficiencies. Id. ¶¶ 47, 52.

After "Ugarte was unable to place [plaintiff] on an FFDE, he . . . conspired with Cory and the NYFO team to give [plaintiff] an unsatisfactory rating in [his] 2018 EER. This became

Allegation 1 in EEO complaint DOS-0069-19." Id. ¶ 51.[4]

In response to Jagels, Carlson, and Ugarte's attempt to give plaintiff "the unsatisfactory rating in 2018," plaintiff "filed a formal complaint with [his] Career Development Officer Kerry Osterhout on May 3, 2018" and "formally requested reassignment . . . to escape the harassment." Id. ¶ 55.  Osterhout "then informed NYFO management of [plaintiff's] complaint against them." Id.

On the same day, during a conversation between Carlson and plaintiff about the 2018 EER, Carlson "made racially disparaging comments about [plaintiff's] family, specifically [plaintiff's] uncle whom [he] refer[s] to as [his] father because he raised [plaintiff]." Id. ¶ 111. Carlson "stated that [plaintiff was] raised by [his uncle] because [he] had no real father because of [his] race and that [plaintiff] did not really care about [his father]." Id.

Previously, plaintiff had left his "father's deathbed to attend training, with the assurance that [he] would be allowed to return if his condition worsened.  This promise was immediately broken, with threats made to jeopardize [plaintiff's] career if [he] attempted to leave training." Id. ¶ 114.  After plaintiff's father passed away, he "was denied permission to return home and was instead subjected to a mock kidnapping, SERE training, and practices that constitute torture . . . all within days of [plaintiff's father's] death." Id.  When plaintiff took the day to attend his "father's funeral," he was penalized, "while other agents in [his] class received a paid 'free day.'" Id. ¶ 115.  Plaintiff alleges that this "disparate treatment was clearly retaliatory, intended to pressure and torment [plaintiff] into quitting." Id.

---

[4]  It is unclear how or if "EEO complaint DOS-0069-19" — which is referred to several times over the course of the proposed amended complaint, see, e.g., PAC ¶¶ 51, 54, 56, 59, 62, 127(e) — relates to "DOS-0385-19," which is the number of the decision that generated the "right-to-sue" letter that underlies the complaint in this case and is the decision that plaintiff suggests forms the basis of this action.  See Mot. at 2, 3.

Plaintiff "reported the harassment to [the Office of Civil Rights] on May 11, 2018." Id. ¶ 56. "NYFO management responded by removing [plaintiff's] substantive cases, blocking new assignments and training opportunities, and denying temporary duty assignments. These acts form Allegations 2, 3, 4, and 5 in DOS-0069-19." Id.

Subsequently, "four baseless DS-1974 letters of admonishment [were] added to [plaintiff's] personnel file as Cory, Ugarte, Carlson, and Jagels stated in an email they conspired to do." Id. ¶ 57. "One write-up involved [plaintiff] carrying a licensed personal firearm in an open-carry state, within a private hotel that did not prohibit firearms, and not in a government facility. At the time, no policy or regulation prohibited this." Id. Subsequently, the Department of State created a regulation prohibiting such practice and "has continued to seek to suspend [plaintiff] and enforce the ex post facto rule against [plaintiff] only, while white agents who continue the same behavior face no consequences." Id. ¶ 59. "This is Allegation 6 in DOS-0069-19." Id.

Sometime before June 11, 2018, Ugarte, Jagels, and Carlson "accused [plaintiff] of racial bias in declining seeking the prosecution in a case alleging [plaintiff] acted out of racial solidarity with the Black Dominican woman" — racial characteristics shared by plaintiff. Id. ¶¶ 64, 65. Ugarte, Jagels, and Carlson "ordered [plaintiff] to alter" the immigration "A-file" of the woman "to say she had committed fraud which would impact her green card status." Id. ¶ 64. "Ugarte, Carlson, and Jagels stated their reason for pressing for the charges and marking the mother's A-file was to 'ruin her green card status.'" Id. Plaintiff refused to participate and reported this misconduct to "an investigator in the SDNY," who "subsequently reported to NYFO that [plaintiff] had made these claims about them." Id. ¶¶ 63, 65. "In response Jagels, Carlson, Ugarte, and Elizabeth McAleer, the other ASAC, screamed and cursed at [plaintiff] in

Carlson's office.  They threatened [plaintiff], warning [plaintiff] never to file a complaint against them again, and [plaintiff] was later punished with two DS-1974 letters of admonishment." Id. ¶ 65.  In the first letter of admonishment, "dated June 11, 2018, they explicitly stated that the reason for the admonishment was [plaintiff's] report to the SDNY."  Id.  When plaintiff "pointed out that this was whistleblower retaliation, [plaintiff] received a second letter of admonishment . . . on August 13, 2018.  This second letter was identical to the first, except they removed the part stating it was for reporting them to the SDNY."  Id.

On an unclear date, but sometime before October 23, 2018, see id. ¶¶ 62, 71, Carlson and Jagels "accused [plaintiff] of breaching security protocols creating different stories of [plaintiff] cutting through and jumping over metal fences" during plaintiff's service as the escort of the Indian High Minister to the UN.  Id. ¶ 69.  Plaintiff alleges that Carlson and Jagels "refused to acknowledge who she was and instead made racially charged statements about her, specifically describing her as a . . . 'f-cking terrorist.'"  Id.  Plaintiff was "issued a DS-1974 for" this incident and was "brought . . . up on charges."  Id. ¶¶ 69, 70.

Subsequently, Ugarte "urged the Office of Special Investigations ('OSI') to press charges against" plaintiff for the incident related to plaintiff's carrying of his personal weapon, "as noted in [an allegation] in DOS-0069-19."  Id. ¶ 62.  During his OSI interview on October 23, 2018, Ugarte "accused [plaintiff] of mental health issues."  Id.  Furthermore, Ugarte pursued "an unsatisfactory rating and a second FFDE attempt after [plaintiff's] complaint.  He stated his reason for doing so was the gun incident and [plaintiff] reporting his misconduct in attempting to force [plaintiff] to alter a report of investigation to say that a woman who was Black and Dominican like [plaintiff] had committed fraud."  Id.  During the interview, Ugarte also "refer[red] to the incident" relating to the Indian High Minister to the UN.  Id. ¶ 71.

On an unclear date, "Ugarte acknowledged that he intended to use an FFDE to remove [plaintiff] due to [his] whistleblower report, which [he] had raised with the SDNY." Id. ¶ 66. Because the date is not specified, it is not clear whether this statement was followed by an FFDE.

Sometime in late 2018 or early 2019, plaintiff's "friend and unit mate . . . committed suicide." Id. ¶ 122. Previously, in May 2018, plaintiff had reported that this individual was being harassed. Id. Following the death, "Carlson, Jagels, and Ugarte summoned [plaintiff] to the office, where they cursed, screamed, and threatened [him], warning [him] to keep silence." Id.

Plaintiff alleges that "[m]anagement continued to sabotage [his] work, including pulling [plaintiff] from an operation," and giving him "minimal, if any, security details or temporary duty assignments." Id. ¶¶ 72, 122. One exception was plaintiff's assignment "to Secretary Pompeo's security detail in Oman" in January 2019, preventing plaintiff from attending the funeral of his friend that had committed suicide. Id. ¶ 122. "En route to Oman, [plaintiff's] bags were lost, forcing [him] to purchase clothes locally," whereupon plaintiff "chose traditional Omani attire to blend in." Id. ¶ 123. Upon plaintiff's "return to New York, [plaintiff] was accused of 'embarrassing' the United States for wearing what they deemed 'not normal clothes,' specifically clothing associated with Middle Eastern and African cultures." Id. Plaintiff was subsequently investigated for this episode. Id. Additionally, photos of plaintiff "wearing these clothes, taken without [his] permission and shared within the agency with individuals who were not on the trip, represent another instance of racial discrimination." Id. ¶ 124.

"In early 2019 mediation, Jagels and Executive Director Steven Dietz acknowledged [the] falsity" of unspecified allegations against plaintiff and "offered to amend [plaintiff's] 2018 EER if [he] withdrew DOS-0069-19 during a mediated settlement conference." Id. ¶ 54.

Plaintiff refused. Id. Jagels, Carlson, and Ugarte subsequently "repeated their attempt to give [plaintiff] an unsatisfactory EER in 2019. . . initiating the root of this case." Id. Eventually, Carlson and Jagels . . . downgraded the EER to 'unsatisfactory.'" Id. ¶ 76.

### 2. The EEOC Decision

As plaintiff states in his memorandum of law, the proposed amended complaint includes "only actions . . . for which [plaintiff] exhausted [his] administrative remedies and was issued a right-to-sue notice" — apparently referring to EEOC decision numbered DOS-0385-19. See Mot. at 3. That decision lists following events,

1. On May 6, 2019, Complainant received an unfair performance evaluation;
2. On May 13, 2019, Complainant was denied the opportunity to participate in a sustainment skills class;
3. On May 16, 2019, Complainant's law enforcement credentials, badge, and weapon were taken from him;
4. On May 30, 2019, Complainant was placed on administrative leave;
5. On May 30, 2019, Complainant was instructed to submit to a Fitness for Duty evaluation;
6. At the end of calendar year 2019, Complainant lost 118.5 hours of annual leave, and his request to have it restored was denied; and
7. As recently as May 3, 2019, Complainant was subjected to a hostile work environment, disparaging comments, derogatory remarks, inflammatory remarks, false accusations, heightened scrutiny of his work, and changes to his duty station.

EEOC decision numbered DOS-0385-19 at 2. It is difficult to tell from the complaint which allegations pertain to which of the above enumerated events. As best as can be discerned, they are as follows:

(1) "In May 2019, Ugarte, Carlson, and Jagels again tried to issue an unsatisfactory rating." PAC ¶ 73. "They were ordered to change it back to satisfactory," and consequently, they "signed the corrected 2019 EER." Id. "Despite knowing the rating had been corrected, Carlson lied to the Director General, claiming [plaintiff] received an unsatisfactory rating in his April 15, 2019, memo to halt [plaintiff's] promotion as Ugarte had threatened in July 2017."

Id. ¶ 74.  In that memo, Carlson referenced the report Tyson-Phipps had made to the SDNY and the "ex post facto rule in the gun incident."  Id.  Plaintiff alleges that in this memo, Carlson also "acknowledge[s] . . . that the primary reason for the unsatisfactory rating and blocking [of plaintiff's] administrative promotion was [his] refusal to racially discriminate against a Black Dominican woman and reporting the incident" and referenced the incident regarding the Indian minister.  Id. ¶¶ 70, 82.

After plaintiff "receiv[ed] the notice of [his] administrative promotion being denied, [plaintiff] immediately documented the discrepancies," and reported them to "Director General Carol Perez, who issued the letter" (not elsewhere described) and "PDAS Kenneth H. Merten, who committed to taking action around May 5, 2019."  Id. ¶¶ 75-76.

On the Monday following the date at which plaintiff reported the issues with the EER to Perez and Merten, plaintiff "received an email from HR Officer TJ Sheldon stating that they had recalled the [2019] EER that Carlson, Jagels, and [plaintiff] had negotiated and signed.  Carlson and Jagels reneged on the agreement and downgraded the EER to 'unsatisfactory.'"  Id. ¶ 76. Sheldon ordered plaintiff "to sign the amended EER with the unsatisfactory rating under threat of termination, sparking the dispute over the 2019 EER—Accepted Allegation ('AA') 1 in DOS-0385-19 and the basis of this case."  Id.

Plaintiff was subsequently threatened with "termination unless [he] signed the altered EER."  Id. ¶ 87.

(2) Due "to the 2019 EER dispute, [plaintiff] was also barred from sustainment skills classes (AA 2)."  Id. ¶ 78.

(3), (4) and (5) Upon the issuance of the 2019 EER, several "punitive actions" were taken against plaintiff, "including confiscating [his] law enforcement credentials, badge, and weapon

(AA 3), placing [him] on administrative leave from May 2019 to January 2020 (AA 4), and subjecting [him] to a meritless FFDE in May 2019, which Ugarte had previously attempted twice to use to have [plaintiff] removed (AA 5)." Id. ¶ 77.  In January 2020, plaintiff was reinstated to his position.  Id. ¶ 97.

At another point in the proposed amended complaint, plaintiff alleges that "[t]hey falsely accused" plaintiff of "threatening suicide and homicide" and that it was these allegations that resulted in the FFDE.  Id. ¶ 95.  It is unclear which individuals made these false accusations and how this claim connects with his other allegations.

(6) "Due to the involuntary administrative leave, [plaintiff] lost 118.5 hours of annual leave . . . (Allegation 6)."  Id. ¶ 96.

(7) We have already recounted allegations regarding a hostile work environment and related claims.  As to the duty station allegation, the complaint alleges that plaintiff had "an unauthorized change in [his] duty station in May 2019."  Id. ¶ 106.  Plaintiff alleges that "[t]he change in [his] duty station involved [plaintiff's] unlawful placement on indefinite leave, later shifted to administrative suspension."  Id. ¶ 107.  He was assigned "to work from a windowless room under armed guard of 2 agents . . . which is unlawful imprisonment."  Id.

### 3. Other Events

Additionally, the proposed amended complaint makes allegations regarding events that are either undated or occurred after the events giving rise to the instant claims, and whose relevance to the exhausted claims is unclear.  In any case, we recount some of them below.

Plaintiff alleges that "[t]he conflict over the [2019] EER occurred during a high-threat, multi-agency enforcement operation, where [plaintiff] led over 20 agents in the arrest of a convicted trafficker."  Id. ¶ 83.  "Carlson, Ugarte, Jagels, and Sheldon attempted to use

[plaintiff's] distraction during this high-threat operation to pressure [plaintiff] into signing the altered EER." Id. "The day before the operation," plaintiff had "disclosed [his] concerns about racial discrimination to [Resident Agent in Charge Robert] Castro during preparations for the operation, seeking guidance." Id. ¶ 87.

At one point, plaintiff "informed senior agents Michael Alimenti and Terrance Wallace," that Sheldon threatened him with "termination unless [plaintiff] signed the altered EER by the end of the day." Id. ¶ 87. Alimenti and Wallace "relayed [plaintiff's] comments to . . . Castro." Id. Plaintiff alleges that during this conversation with Alimenti and Wallace, Alimenti suggested plaintiff "should quit DS." Id. ¶ 109.

At another point, "Wallace reported" — plaintiff does not allege to whom — that during a car ride that occurred while the trafficker was being processed at a courthouse, plaintiff "'ranted' about Carlson, Jagels, and Ugarte, complaining about the EER, their lack of integrity, and quoting a metaphor to express the point." Id. ¶ 88. Wallace's report was used "as a basis for disciplinary action and attempts to have [plaintiff] prosecuted." Id. Plaintiff alleges that his side of the story was vindicated "four years later" during Wallace's sworn deposition. Id. ¶ 89.

Plaintiff also alleges that "approximately five months after a unit mate had committed suicide following harassment that [plaintiff] had reported to OCR" — presumably referring to the suicide of plaintiff's "friend and unit mate" in late 2018 or early 2019, id. ¶ 122 — "[t]hey" — plaintiff does not say who "[t]hey" are — "falsely accused [plaintiff] of threatening to harm" himself. Id. ¶ 90. Plaintiff alleges that "[m]aking false allegations . . . is a Departmental pattern." Id. ¶ 92.

Plaintiff also mentions "requested FOIA documents" that "were incomplete" when "finally produced." Id. ¶ 93. It is unclear what this allegation refers to, but it appears connected

with Wallace's report.  See id.  At another point in the complaint, plaintiff refers "FOIA requests [that] were submitted in 2021," id. ¶ 102, but it is unclear whether these allegations refer to the same FOIA requests.

Plaintiff references an undated email sent by Wallace which "quotes [plaintiff] saying that [plaintiff has] emails implicating Carlson, Jagels, and Ugarte in harassment [plaintiff] believed contributed to a colleague's suicide.  That report was sent to the same management officials [plaintiff] was reporting on.  The next day, [plaintiff] lost access to those emails, which they refused to restore until after dismissing [plaintiff's] case for lack of evidence."  Id. ¶ 94.  It is not clear which "case" or "report" plaintiff is referring to — nor is it clear how this event connects to plaintiff's other claims.

At a time that appears to be after the incidents at issue, plaintiff alleges that when he was on a security detail for U.N. Ambassador Kelly Craft, he had a conversation with her regarding "racial discrimination and harassment [plaintiff suffered in [his] time with the Agency" after he "diverted [their] route to avoid Black Lives Matter protesters [sic]."  Id. ¶ 99.[5]  Mark Romanowski, the "agent in charge," then questioned plaintiff about his conversation with Ambassador Craft, an incident that "followed another racial encounter where [plaintiff] was questioned for being in her neighborhood."  Id. ¶¶ 99, 100.  Romanowski was subsequently asked to write a report on "everything [plaintiff] said and what [the agent in charge] observed about" plaintiff.  Id. ¶ 101.

"[I]n July 2020, they cut off [plaintiff's] access to the email account and have since denied [plaintiff] access, even after a motion to compel discovery."  Id. ¶ 103.  Plaintiff has been

---

[5]  The incident involving Kelly Craft appears to be after 2019 because it is alleged that it took place "during COVID."  PAC ¶ 23.

forced to use his "personal Gmail account for official government business" because he was denied access to the system used by other employees.  Id. ¶ 104.  This incident postdates the events giving rise to the instant claims.

Plaintiff also alleges additional undated incidents.  For instance, plaintiff alleges that "Jagels publicly berated and humiliated [plaintiff] in the office," including by calling him "'stupid' in front of colleagues."  Id. ¶ 110.  At another point, plaintiff alleges that Romanowski falsely accused plaintiff of travelling to Israel on a diplomatic passport, id. ¶¶ 116-18, and of threatening to commit suicide, id. ¶ 120.

## II.  LEGAL STANDARD

### A.  Law Governing Motions to Amend

Fed. R. Civ. P. 15(a)(2) provides that leave to amend a pleading should be "freely give[n] . . . when justice so requires."  A court must have "good reason" to deny leave to amend. See Acito v. IMCERA Grp., Inc., 47 F.3d 47, 55 (2d Cir. 1995).  Leave to amend may be denied in situations of "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, [or] undue prejudice to the opposing party."  Foman v. Davis, 371 U.S. 178, 182 (1962).  An amendment may also be denied if it is futile.  See id.  Here, defendants argue only that the proposed amendment is "futile."  See Opp. at 1.

When a party argues that an amendment to a pleading would be futile, the court must determine whether "a proposed claim could . . . withstand a motion to dismiss pursuant to" Fed. R. Civ. P. 12(b)(6).  Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals, 282 F.3d 83, 88 (2d Cir. 2002) (citing Ricciuti v. N.Y.C. Transit Auth., 941 F.2d 119, 123 (2d Cir. 1991)); accord Orient Plus Int'l Ltd. v. Baosheng Media Grp. Holdings Ltd., 2024 WL 4635483, at *5

(S.D.N.Y. Oct. 31, 2024). Under that rule, a party may move to dismiss the opposing party's pleading on the ground that it "fail[s] to state a claim upon which relief can be granted." Fed. R. Civ. P. 12(b)(6). In deciding such a motion, a court must accept as true all of the allegations contained in the complaint. See Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). But that principle does not apply to legal conclusions. See Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) ("[A party's] obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal quotation marks, citation, and alteration omitted)). In other words, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and thus a court's first task is to disregard any conclusory statements in the pleading. Iqbal, 556 U.S. at 678-79 (citation omitted).

Next, a court must determine if the complaint contains "sufficient factual matter" which, if accepted as true, states a claim that is "plausible on its face." Id. at 678 (internal quotation marks and citation omitted); accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc., 507 F.3d 117, 121 (2d Cir. 2007) ("[A pleading] must allege facts that are not merely consistent with the conclusion that the [adverse party] violated the law, but which actively and plausibly suggest that conclusion." (citations omitted)).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. The plausibility standard is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (internal quotation marks and citations omitted). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," a complaint is insufficient under Fed. R.

Civ. P. 8(a) because it has merely "alleged" but not "'show[n]'—'that the pleader is entitled to relief.'" Id. at 679 (second alteration in original) (quoting Fed. R. Civ. P. 8(a)(2)).

B.  Pro Se Pleadings

Plaintiff is proceeding pro se.  Ordinarily, "[a] document filed pro se is to be liberally construed and a pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers."  Erickson v. Pardus, 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted); accord McPherson v. Coombe, 174 F.3d 276, 280 (2d Cir. 1999) (a pro se party's pleadings should be construed liberally and interpreted "to raise the strongest arguments that they suggest" (quoting Burgos v. Hopkins, 14 F.3d 787, 790 (2d Cir. 1994))).

However, where a party is a licensed attorney, the party does not receive any "special solicitude."  See Tracy v. Freshwater, 623 F.3d 90, 102-03 (2d Cir. 2010); Bank v. Alarm.com Holdings, Inc., 828 F. App'x 5, 7 (2d Cir. 2020) ("As an initial matter, although he is proceeding pro se, [plaintiff] is a licensed attorney and is not entitled to any special solicitude.").  Plaintiff concedes that he "graduated with a J.D. from Washington University School of Law," and has taught law at East Stroudsburg University of Pennsylvania's business school and FLETC.  PAC ¶¶ 19, 30.  As such, his pleadings will be held to the same standard as any other pleadings drafted by a lawyer, as has already been held in this case.  See Tyson-Phipps, 2024 WL 4444281, at *1 n.1.[6]

---

[6]  In fact, plaintiff recently appeared as the attorney for a corporate entity in a case filed in November 2022.  See The Celebrity Source LLC v. Johnson et al., 22 Civ. 9440 (S.D.N.Y.).

III.  <u>DISCUSSION</u>

Plaintiff's proposed amended complaint lists three causes of action, all arising under Title VII: discrimination, hostile work environment, and retaliation.  <u>See</u> PAC ¶¶ 141-56.  The Court had dismissed each of these causes of actions as they were pled in the original complaint. <u>Tyson-Phipps</u>, 2024 WL 4444281, at *2.  The Government argues that the proposed amended complaint "fails to correct the deficiencies that the Court previously identified in granting the Government's motion to dismiss the complaint."  Opp. at 1.  We address each cause of action next.

A.  <u>Title VII Discrimination</u>

To state a claim for discrimination under Title VII, "a plaintiff must plausibly allege that (1) the employer took adverse action against him and (2) his race, color, religion, sex, or national origin was a motivating factor in the employment decision."  <u>Vega v. Hempstead Union Free Sch. Dist.</u>, 801 F.3d 72, 86 (2d Cir. 2015); <u>accord</u> <u>Anderson v. City of N.Y.</u>, 2024 WL 183103, at *6 (S.D.N.Y. Jan. 17, 2024).  The plaintiff "may do so by alleging facts that directly show discrimination or facts that indirectly show discrimination by giving rise to a plausible inference of discrimination."  <u>Vega</u>, 801 F.3d at 87.  While "a Plaintiff need only give plausible support to a minimal inference of discriminatory motivation," a complaint "must still at a minimum assert nonconclusory factual matter sufficient to nudge its claims across the line from conceivable to plausible to proceed."  <u>O'Toole v. Cnty. of Orange</u>, 255 F. Supp. 3d 433, 437-38 (S.D.N.Y. 2017) (quotation marks and alteration marks omitted).

In ruling on the motion to dismiss the original complaint, the undersigned noted that "the complaint contains numerous allegations regarding unfair treatment, many of which constitute adverse actions."  <u>Tyson-Phipps</u>, 2024 WL 4128445, at *6.  Yet when considering the "factual

allegations that relate to any claim that a motive for these actions was plaintiff's race," the undersigned concluded that "plaintiff has not shown that his race or other protected characteristics were 'motivating factors' in the adverse employment actions." Id. Specifically, the undersigned concluded that no allegations shed "further light on the motive for the [adverse employment actions] forming the basis of this action." Id.

The district court adopted the undersigned's recommendation, concluding that "the first claim for relief is insufficient as a matter of law because it fails to allege facts that would permit a reasonable trier of fact to conclude that any adverse employment action was motivated by racial animus." Tyson-Phipps, 2024 WL 4444281, at *2. The district court concluded that "[w]ith one exception, the remarks plaintiff relies upon are not alleged to have been made by decision makers involved in the alleged adverse employment actions, and none allegedly was made in the course of a relevant decision making process." Id. at *1.

Like the events at issue in the original complaint, see Tyson-Phipps, 2024 WL 4128445, at *6, the events at issue in the proposed amended complaint include episodes of adverse treatment, many of which we assume constitute adverse employment actions within the meaning of Title VII. The only new incidents relate to racial comments made during the drive to Howard University Hospital, the Omani clothing incident, and the questioning about the Black Lives Matter protest. PAC ¶¶ 31, 122-24, 99.[7]

_____

[7] At one point in the proposed amended complaint, Plaintiff also asserts that "[t]he Department" has "continued to seek to suspend me and enforce" a rule regulating personal weapon possession of agents, "while white agents who continue the same behavior face no consequences." Id. ¶ 59. However, because plaintiff does not identify any individuals involved or specify the conduct at issue, this allegation offers only minimal support, if any, for an inference of discriminatory animus underlying the adverse actions at issue.

In examining these, we note that while "[a]llegations of discriminatory comments directed at the plaintiff's racial group are a recognized method of establishing discriminatory intent," Henry v. NYC Health & Hosp. Corp., 18 F. Supp. 3d 396, 408 (S.D.N.Y. 2014) (citing Chertkova v. Conn. Gen. Life Ins. Co., 92 F.3d 81, 91 (2d Cir.1996)), a plaintiff must still allege that these allegedly racially discriminatory comments are "causally connected to conduct rising to the level of an adverse employment action," id. at 409; see Luka v. Bard Coll., 263 F. Supp. 3d 478, 487 (S.D.N.Y. 2017) ("As a general matter, verbal comments may raise an inference of discrimination, but not where they lack a causal nexus to the termination decision." (citation marks and citation omitted)); cf Fried v. LVI Servs., Inc., 500 F. App'x 39, 41 (2d Cir. 2012) (finding that even though plaintiff showed discriminatory bias, plaintiff was also "required to adduce sufficient evidence to permit a reasonable jury to find that 'but for' defendants' age bias, he would not have been terminated").

We accept that the proposed amended complaint alleges facts showing scattered comments by various personnel that are racially-related. Nonetheless, as explained in the prior Report and Recommendation, the proposed amended complaint fails to show that plaintiff's race was a motivating factor in the 2019 adverse employment actions. Of the new allegations, only the comment regarding Howard University hospital could possibly be interpreted as showing anti-Black racial animus by anyone at the agency. But the comment was made by an "instructor" at training, not any decisionmaker involved in the adverse actions. PAC ¶ 31. As a result, there is no connection made between the decisionmakers in the 2019 adverse employment actions and the previous incidents that plaintiff contends show racial animus. The other two new incidents simply do not show racial animus in any clear form and no connection is made to any decisionmakers who were involved in the adverse actions at issue in this lawsuit.

Additionally, none of the alleged incidents, including those contained in the new allegations, appear to have occurred "in the context of any complained of decision-making process." Tyson-Phipps, 2024 WL 4128445, at *6.

Accordingly, the Title VII discrimination claim in plaintiff's proposed amended complaint would not withstand a motion to dismiss and thus plaintiff's motion to amend would be futile as to the Title VII discrimination claim.

B. Hostile Work Environment

To state a hostile work environment claim under Title VII, a plaintiff must plausibly allege: "[1] that the harassment was 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' and [2] that a specific basis exists for imputing the objectionable conduct to the employer." Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (alteration marks in original) (quoting Perry v. Ethan Allen, Inc., 115 F.3d 143, 149 (2d Cir. 1997)); accord Dimps v. N.Y. State Dep't of Corr. & Cmty. Supervision, 2024 WL 1443095, at *3 (S.D.N.Y. Apr. 3, 2024). In determining whether harassment is sufficiently severe, "[c]ourts look to the totality of the circumstances to determine whether a plaintiff has met this burden, including proof of the frequency of the discriminatory conduct; its severity; whether it was physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interfered with the plaintiff's work performance." Fox v. Costco Wholesale Corp., 918 F.3d 65, 74 (2d Cir. 2019) (internal alteration marks and quotation marks omitted); accord Stanley v. Phelon, 2024 WL 1453872, at *4 (2d Cir. Apr. 4, 2024) (summary order). "As a general rule, incidents must be more than 'episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.'" Alfano, 294 F.3d at 374 (quoting Perry, 115 F.3d at 149 (citation marks omitted)). "Isolated acts, unless very serious, do not meet

the threshold of severity or pervasiveness." Id. (citation omitted); accord Doyle v. Am. Glory
Rest. Corp., 2024 WL 1466161, at *5 (S.D.N.Y. Apr. 4, 2024).

In ruling on the motion to dismiss the original complaint, the undersigned, after
disregarding the conclusory allegations, concluded that "[t]he specific factual allegations . . . fail
to meet the 'the high bar to make out a hostile work environment claim under Title VII.'"
Tyson-Phipps, 2024 WL 4128445, at *7 (citing Maron v. Legal Aid Soc'y, 605 F. Supp. 3d 547,
561 (S.D.N.Y. 2022)). Specifically, the undersigned noted that the "comments already discussed
in connection with plaintiff's discrimination claim occurred over several years," and thereby
"cannot satisfy plaintiff's burden of showing 'that discriminatory incidents were sufficiently
continuous and concerted to have altered the conditions of the employee's working
environment.'" Id. (quoting Banks v. Gen. Motors, LLC, 81 F.4th 242, 267 (2d Cir. 2023)
(citation marks omitted)). Factual allegations recounting additional "incidents of conduct
inappropriate for the work-place" were dismissed because they did not show that "these other
incidents were related to plaintiff's race," id., as required by Title VII, see Vega, 801 F.3d at 86-
87 (to survive motion to dismiss, plaintiff must "plausibly allege facts that provide at least
minimal support for the proposition that the employer was motivated by discriminatory intent"
(citation and internal quotation marks omitted)); accord Perez v. N.Y. City Dep't of Educ., 2017
WL 4122702, at *8 (S.D.N.Y. Aug. 2, 2017), adopted 2017 WL 4129637 (S.D.N.Y. Sept. 15,
2017); see Harge v. City of New York, 2022 WL 17481819, at *2 (2d Cir. Dec. 7, 2022)
(summary order) (affirming district court's grant of summary judgment dismissing a hostile work
environment claim where "the record [did] not support the claim that [the] workplace
environment was a byproduct of racial animus"), and were not shown to be sufficiently

continuous as required to be deemed pervasive, see Alfano, 294 F.3d at 374. The proposed

amended complaint does not overcome these shortcomings.

First, like the original complaint, many of the allegations purporting to establish a hostile

work environment are conclusory, which we disregard. For instance, paragraph 130(e) of the

proposed amended complaint alleges that

> Defendant subjected [plaintiff] to a hostile work environment, characterized by
> the following conduct: i. Heightened scrutiny . . . ii. Interference with a . . . arrest.
> . . . iii. Numerous violations of the Whistleblower Protection Act ("WPA") and
> the Follow the Rules Act ("FRA") . . . viii. Bullying and harassment, including
> insensitive and racist remarks and name-calling . . . ix. Threats regarding [his]
> career.

PAC ¶ 130(e).

Turning to the factual allegations that have more specificity, they fail to meet "the high

bar to make out a hostile work environment claim under Title VII." Maron, 605 F. Supp. at 561.

The factual allegations that recount behavior directed towards plaintiff's race, described in

section III.A. above, occurred over the course of several years, and thus are insufficiently

"continuous and concerted to have altered the conditions of the employee's working

environment." Banks, 81 F.4th at 267; see De Figueroa v. New York, 403 F. Supp. 3d 133, 160-

61 (E.D.N.Y. 2019) ("Isolated incidents or 'episodic' stray remarks are not 'sufficiently

continuous and concerted in order to be deemed pervasive.'" (quoting Terry v. Ashcroft, 336

F.3d 128, 148 (2d Cir. 2003)). Like the original complaint, the proposed amended complaint

also points to other incidents of conduct inappropriate for the work-place. See, e.g., PAC ¶ 114

(mentioning "torture," a "mock kidnapping," and "war crimes"); id. ¶ 130(e)(xiv) (mentioning

the confiscation of a "badge plaque" which plaintiff paid for). However, the proposed amended

complaint fails to provide facts that show that these incidents were related to plaintiff's race.

See Vega, 801 F.3d at 86-87 (to survive motion to dismiss, plaintiff must "plausibly allege facts

that provide at least minimal support for the proposition that the employer was motivated by discriminatory intent" (citation and internal quotation marks omitted)); <u>Harge</u>, 2022 WL 17481819, at *2 (affirming district court's grant of summary judgment dismissing a hostile work environment claim where "the record [did] not support the claim that [the] workplace environment was a byproduct of racial animus"). The three new comments described in the proposed amended complaint are not of a character that they could be found to have altered the conditions of plaintiff's working environment.

Accordingly, the Title VII hostile discrimination in plaintiff's proposed amended complaint would not withstand a motion to dismiss and thus plaintiff's motion to amend would be futile as to the Title VII discrimination claim.

C. <u>Retaliation</u>

To state a claim of retaliation at the motion to dismiss stage, a plaintiff must allege that: "(1) defendants discriminated — or took an adverse employment action — against him, (2) because he has opposed any unlawful employment practice." <u>Duplan v. City of New York</u>, 888 F.3d 612, 625 (2d Cir. 2018) (internal quotation marks omitted) (quoting <u>Vega</u>, 801 F.3d at 90); <u>accord</u> <u>Rowe v. Brookdale U. Hosp.</u>, 2024 WL 3443460, at *6 (E.D.N.Y. July 17, 2024).

In ruling on the motion to dismiss the original complaint, the undersigned concluded that "the complaint never clearly identifies what protected activity resulted in what allegedly retaliatory action. It thus never makes clear whether retaliation for that protected activity was a 'but for' cause of the alleged retaliatory action." <u>Tyson-Phipps</u>, 2024 WL 4128445, at *9. The Court "agree[d]." <u>Tyson-Phipps</u>, 2024 WL 4444281, at *2.

The proposed amended complaint contains a lengthy section (about 9 pages) devoted to describing various purportedly protected activities and explaining the alleged connection

between those activities and adverse employment actions.  <u>See</u> PAC ¶¶128-40.  In response, the Government essentially devotes only two sentences to arguing that the relevant legal test has not been met — and does so without referencing any of the allegations in this section of the complaint.  <u>See</u> Opp. at 3.[8]  The Government's lack of argument on this point undermines their argument that the motion to amend the retaliation claim is futile.  In any case, our own analysis suggests that plaintiff has stated a claim for retaliation as to at least some activities.

1.  <u>Protected Activities</u>

Protected activities under Title VII consist of (1) opposition to "any practice made . . . unlawful" by Title VII and (2) "ma[king] a charge, testif[ying], assist[ing], or participat[ing] in any manner in an investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a); <u>accord</u> <u>Littlejohn v. City of New York</u>, 795 F.3d 297, 316 (2d Cir. 2015).  Further, as the Supreme Court has explained "[w]hen an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's <u>opposition</u> to the activity."  <u>Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.</u>, 555 U.S. 271, 276 (2009) (internal citation and citation marks omitted).

Plaintiff makes many unclear allegations relating to his protected activities, lumping together complaints that may relate to race discrimination with those that appear to relate to other matters such as whistleblowing.  <u>See</u>, <u>e.g.</u>, PAC ¶ 127 (recounting "numerous instances where [plaintiff] engaged in protected activity").  Nonetheless, there are allegations that show protected activity under Title VII and the employer's knowledge of such activity.  For example, the

---

[8]  Inexplicably, the Government's opposition to the motion to amend was in the form of a letter rather than the memorandum of law required by Local Civil Rule 7.1(a)(4).

proposed amended complaint alleges that in July 2017, plaintiff "complained to . . . ASAC . . . Joseph Ugarte" that McAleer and others "had discriminated against [plaintiff] due to [his] race." Id. ¶ 38.  He reported the same conversation to his supervisor, Eric Jagels.  Id. ¶ 40.  Plaintiff also reported "harassment, bullying, and discrimination" and Ugarte's "threat to 'ruin [plaintiff's] career'" to the EEO coordinator, who shared plaintiff's complaints with ASAC Peter Carlson and Ugarte, among others.  Id. ¶¶ 41-43.

## 2.   Adverse Employment Actions

"An adverse employment action is 'a materially adverse <u>change</u> in the terms and conditions of employment.'"  Mathirampuzha v. Potter, 548 F.3d 70, 78 (2d Cir. 2008) (citing Sanders v. N.Y. City Hum. Res. Admin., 361 F.3d 749, 755 (2d Cir. 2004)).

> To be materially adverse, a change in working conditions must be more disruptive than a mere inconvenience or an alteration of job responsibilities.  Examples of such a change include termination of employment, a demotion evidenced by a decrease in wage or salary, a less distinguished title, a material loss of benefits, significantly diminished material responsibilities, or other indices unique to a particular situation.

Id. (citing Sanders, 361 F.3d at 755).  However, the Second Circuit has also "made clear that adverse employment actions are not limited to 'pecuniary emoluments.'"  Treglia v. Town of Manlius, 313 F.3d 713, 720 (2d Cir. 2002) (citing Preda v. Nissho Iwai Am. Corp., 128 F.3d 789, 791 (2d Cir. 1997)).  Thus, in some circumstances "actions such as negative employment evaluation letters may also be considered adverse."  Id. (citation omitted).  Whether a negative performance evaluation constitutes an adverse employment action "is typically a fact question for the jury."  Heaphy v. Webster Cent. Sch. Dist., 761 F. Supp. 2d 89, 92 (W.D.N.Y. 2011) (citing Sanders, 361 F.3d at 756), aff'd, 452 F. App'x 73 (2d Cir. 2012); see Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 71 (2006) (leaving for the jury the question of whether

unwanted reassignment of employee's duties following complaint of discrimination was adverse employment action for purposes of retaliation claim).

Here, plaintiff has alleged several events that, giving the proposed amended complaint the benefit of every reasonable inference, amount to adverse employment actions. Most obviously, he received an unfair performance rating that resulted in his being placed on administrative leave, resulting his loss of 118.5 hours of annual leave and the FFDE. See PAC ¶¶ 76-77, 96; see Treglia, 313 F.3d at 720 ("negative employment evaluation letters" may be "considered adverse"); Whaley v. City Univ. of N.Y., 555 F. Supp. 2d 381, 402 (S.D.N.Y. 2008) ("A negative evaluation, accompanied by negative consequences, such as demotion, diminution of wages, or other tangible loss, may constitute an adverse employment action."). Plaintiff has also alleged that he was denied an "administrative promotion," see PAC ¶ 75, though it is not clear whether it was merely "delayed," id. ¶ 125, without other consequences. In any case, the Government makes no argument whatsoever that these do not qualify as adverse employment actions.

### 3. Causation

"[A] plaintiff must plausibly plead a connection between the act and his engagement in protected activity. See 42 U.S.C. § 2000e–3(a)." Vega, 801 F.3d at 90. Proof of a causal connection can either be "established 'directly through evidence of retaliatory animus directed against a plaintiff,' or 'indirectly by showing that the protected activity was followed closely by discriminatory treatment.'" Terry, 336 F.3d at 152 (citing Richardson v. N.Y. State Dep't of Corr. Serv., 180 F.3d 426, 444 (2d Cir. 1999)).

As the Second Circuit has explained,

A retaliatory purpose can be shown indirectly by timing: protected activity followed closely in time by adverse employment action. See Cifra v. Gen. Elec.

28

Co., 252 F.3d 205, 217 (2d Cir. 2001) ("The causal connection needed for proof of a retaliation claim can be established indirectly by showing that the protected activity was closely followed in time by the adverse action." (internal quotation marks omitted)); accord Gorzynski v. JetBlue Airways Corp., 596 F.3d 93, 110 (2d Cir. 2010) ("Though this Court has not drawn a bright line defining, for the purposes of a prima facie case, the outer limits beyond which a temporal relationship is too attenuated to establish causation, we have previously held that five months is not too long to find the causal relationship.").

Unlike Title VII discrimination claims, however, for an adverse retaliatory action to be "because" a plaintiff made a charge, the plaintiff must plausibly allege that the retaliation was a "but-for" cause of the employer's adverse action. See Univ. of Tex. Sw. Med. Ctr. v. Nassar, [570 U.S. 338, 360-61] (2013). It is not enough that retaliation was a "substantial" or "motivating" factor in the employer's decision. See id. "'[B]ut-for' causation does not[, however,] require proof that retaliation was the only cause of the employer's action, but only that the adverse action would not have occurred in the absence of the retaliatory motive." Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 846 (2d Cir. 2013). Further, "the but-for causation standard does not alter the plaintiff's ability to demonstrate causation . . . through temporal proximity." Id. at 845.

Vega, 801 F.3d at 90-91 (second and third alteration in original). Here, plaintiff has alleged a plausible causal connection between protected activities and at least one adverse employment action.

After plaintiff complained to Ugarte, the ASAC, about racial discrimination in July 2017, Ugarte responded by "threaten[ing] [plaintiff's] career if [he] continued to complain." PAC ¶ 39. At another point, plaintiff was confronted by Carlson and Jagels in an interrogation room and "threaten[ed with] 'consequences' if [plaintiff] didn't drop [his] complaints" — apparently referring to complaints of racial discrimination. Id. ¶ 44. Carlson and Jagels had been told of plaintiff's complaints of discrimination by Sears. See id. ¶ 43. Immediately before the adverse employment actions at issue in this lawsuit, Jagels and Dietz "offered to amend [plaintiff's] 2018 EER if [he] withdrew DOS-0069-19 during a mediated settlement conference." Id. ¶ 54. After plaintiff refused, Jagels, Carlson, and Ugarte subsequently "repeated their attempt to give [plaintiff] an unsatisfactory EER in 2019. . . initiating the root of this case." Id. Plaintiff

ultimately received the unsatisfactory rating.  Id. ¶ 76.  That rating resulted in plaintiff being placed on administrative leave and the loss of 118.5 hours of annual leave and the FFDE.  See id. ¶¶ 76-77, 96.  In light of the threats made by Jagels specifically directed at plaintiff's complaints of discrimination, it is plausible that Jagels acted with a retaliatory motive when he downgraded the EER to "unsatisfactory."  See Terry, 336 F.3d at 152 (allowing for proof of a causal connection through evidence of retaliatory animus).

Accordingly, plaintiff's claim of retaliation under Title VII would survive a motion to dismiss and thus may form the basis of an amended complaint.

## IV.  CONCLUSION

For the foregoing reasons, plaintiff's motion to amend (Docket # 37) is granted but only to the extent of permitting a claim of retaliation under Title VII.  Thus, the proposed amended complaint shall be filed without the inclusion of what is now labeled the "First Cause of Action" and the "Second Cause of Action."  See PAC ¶¶ 141-51.  The amended complaint shall be filed on or before May 1, 2025.[9]

SO ORDERED

Dated: April 24, 2025
       New York, New York

GABRIEL W. GORENSTEIN
United States Magistrate Judge

---

[9] This Opinion and Order shall not be interpreted as constraining the defendant's ability to move to dismiss on any ground not specifically addressed herein, including but not limited to whether the complaint complies with Fed. R. Civ. P. 8(a)(2)'s requirement of a "short and plain statement of the claim."